SOPHIA STEWART
P.O. BOX 31725
Las Vegas, NV 89173
702-501-5900

*IN PROPRIA PERSONA*

```
┌─────────────────────────────────────┐
│ ___FILED        ___RECEIVED          │
│ ___ENTERED      ___SERVED ON         │
│        COUNSEL/PARTIES OF RECORD     │
│  ┌───────────────────────────┐       │
│  │                           │       │
│  │       DEC 1 1 2018        │       │
│  │                           │       │
│  └───────────────────────────┘       │
│     CLERK US DISTRICT COURT          │
│       DISTRICT OF NEVADA             │
│ BY:_____DEPUTY   │
└─────────────────────────────────────┘
```

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### 2:18-cv-02351-JAD-GWF

SOPHIA STEWART,
      Plaintiff,
            v.
JAMES CAMERON, an individual;
LIGHTSTORM ENTERTAINMENT, a
Corporation; SKYDANCE MEDIA, a
Corporation; GALE ANNE HURD, an
individual ; PARAMOUNT PICTURES, a
Corporation; WARNER BROS, a
Corporation; TWENTIETH CENTURY
FOX PRODUCTION , a Corporation ;
DAVID ELLISON, an individual,
TENCENT PICTURES, a Corporation;
ANDY WACHOWSKI, an individual;
LARRY WACHOWSKI an individual;

**COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF FOR:**
(1) **FELONY COPYRIGHT
INFRINGEMENT-17 U.S.C.
506(e)**
(2) **ANTI-COUNTERFEITING
CONSUMER PROTECTION
ACT OF 1996 -FRAUDULENT
OATHS OF OWNERSHIP OF
CHARACTERS SARAH
CONNER AND TERMINATORS**
(3) **CIVIL RICO**
(4) **UNFAIR COMPETION**
(5) **ACCOUNTING**
(6) **MONEY LAUNDERING ACT OF
1986**
(7) **MONOPOLY**
(8) **CONCEALMENT OF CO-
AUTHORS ON COPYRIGHT
REGISTRATION**
   (9) **The intellectual Property
protection and Courts Amendments Act
of 2004**
   (10) **GENDER DISCRIMINATION
42 U.S.C 1981, 42 U.S.C. 1982**
   (11) **Declaratory Judgment that Pau
584-564 and PA 241-495 are invalid due
to a Fraudulent Registration and
contracts without true owner void
against public policy**

**JURY TRIAL DEMANDED**

<table>
<tr><td></td><td></td></tr>
<tr><td></td><td></td></tr>
</table>

**PRELIMNARY STATEMENT**

This is a RICO, Civil Rights, and Declaratory Judgment complaint for damages and equitable relief brought forth on behalf of the Plaintiff Sophia Stewart " Sole Legal Copyright Owner " Terminator " and " Matrix " Movie Franchises ( adjudicated facts in the Utah Federal Courts in Utah 9/25/2014 case #: 2:07-cv-00552-DB-EJF ) against Defendants James Cameron, Gale Anne Hurd, Paramount Pictures, Skydance Media, Twentieth Century Fox Production, Warner Bros., Lightstorm Entertainment, David Ellison, Tencent Pictures, Andy Wachowski, Larry Wachowski, and John Does 1 through X11 pursuant to 17 U.S.C. 106, 17 U.S.C. §201, Criminal Copyright Infringement 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e), 18 U.S.C. 1962 (b), and 28 U.S.C. 2201-2202 essentially alleging that defendants established a "pattern of racketeering" through a fraudulent scheme of "sham and shell" companies that were conceived to avoid individual tax liability, and were so inadequately funded without "legitimate ownership" to "Terminator" or " Matrix " asset copyrights for the purpose to defraud and "money launder" proceeds from individuals, financial institutions, and creditors by utilizing the investors to illegally transfer said assets and deceive the consuming public into believing that certain Defendants created the story concepts and characters in the "Terminator" and " Matrix " films. The Plaintiff asserts and alleges the Defendants James Cameron and Gale Anne Hurd through a premeditated "pattern of brazen theft," "counterfeiting," and deceit upon the U.S. Copyright Office, the Defendant Cameron publically admitted to Tracy Torme, Reporter of Starlog magazine for the December 1984 edition (#89), and Thomas McKelvey Cleaver that he

had willfully "ripped off" Harlan Ellison stories entitled "Soldier" which aired first on September 19, 1964, and "Demon with a Glass Hand" which aired on October 17, 1964 and were released as Outer Limits segments, thus making the "Terminator" copyright PAu 584-564 "inoperative/invalid," including but not limited to any and all derivative and/or counterfeiting "Terminator" works. Shortly thereafter, producer Gale Anne Hurd contacted Starlog with a demand to see the interview.  Gale Anne Hurd then modified Starlog's article on The Terminator. She omitted a quote from Cameron in the article that read, "'Oh, I took a couple of Outer Limits segments.'" The Plaintiff asserts facts and alleges, Harlan Ellison did not send James Cameron, Gale Anne Hurd, Hemdale Films or Pacific Western Productions his work to establish "access." On information and belief James Cameron, Gale Anne Hurd, Hemdale Films and Pacific Western Productions did not register with the Writers Guild of America, or U.S. Copyright Office the "Terminator" script bearing the stolen work therein from Harlan Ellison and Sophia Stewart, because their work was already registered with the Register of Copyrights. On information and belief Defendants Gale Anne Hurd, Hemdale Film, and James Cameron pilfered Ellison and Stewart's work, and placed their work in plain sight in the actual "Terminator" movies, of which, proves "substantial similarity," and infringements of "protective expression."   The Plaintiff asserts and alleges that Defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, and Hemdale Films breached the settlement agreement between Harlan Ellison in 1984; whereby, Ellison name appears in the credits of the "Terminator" products/films as a "substantial contributing co-author;" however, to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright registration reflecting "indictable acts" as required by law pursuant to 18 U.S.C. 4, and  17 U.S.C. 106, 17 U.S.C. §201, Felony Copyright Infringement 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e). The first item produced by Pacific Western Productions not only willfully infringed Harlan Ellison and Sophia Stewart's copyrights, but the defendant's registration to the United States Copyright Office for the film wrongfully failed to disclose the fact that both Ellison and Stewart are co-authors.  On information and belief, Defendants James

Cameron, Gale Anne Hurd, and Hemdale Films knew or should have known without Harlan Ellison and Sophia Stewart's name on line 6 of the "Terminator" copyright PAu 584-564 that they could not sell an "inoperative copyright" and attempt to walk away while simultaneously failing to ameliorate the problem of the copyright not bearing Ellison and Stewart's names as co-authors, of which, is an issue that the Defendants designed to vicariously explode a "money launder scheme" for proceeds from future creditors, institutional investors, and deceive the consuming public by counterfeiting derivative works such as "Terminator 2": Judgment day, "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," " Terminator: Genisys",  and now "Terminator 6" and the "Sarah Conner Chronicles" in violation of Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Money Laundering Act of 1986, Unfair Business Practices Act, Unfair Competition, Monopoly, Civil RICO, Accounting, (15 U.S.C. §1, 17 U.S.C. §106 Article 1, Section 8, Clause 7 of the U.S. Constitution,  17 U.S.C. §201, 17 U.S.C. §408d, 17 U.S.C. §501, 17 U.S.C. §506, 17 U.S.C. §506(e), 18 U.S.C. §1001, 18 U.S.C. §1001(a)(1), 18 U.S.C. §1341, 18 U.S.C. §1641, 18 U.S.C. §1967, 18 U.S.C. §2319), *Buchwald v. Paramount Pictures*, 1990 WL 357611 (Cal. Superior); (*Dezendorf vs. Twentieth Century Fox, SD.Cal., 1940, 32 F.Supp. 359, Aff'd 9Cir,.118F.2d 561; Lockheed Information Management Systems Co. v. Maximus, Inc., 259 Va. 92 (2000); Bridgeport Music Inc. v. Bad Boy 507 F.3d 470 (6th Cir. 2007),* and The Intellectual Property Protection and Courts Amendments Act of 2004, Pinkerton v. United States, 328 U.S. 640 (1946), commonly known as the Pinkerton doctrine. (Exhibits T145, Terminator 1 minute 45 seconds "Theft"), (the UCC Liens 22173560002 filed against James Cameron and Gale Anne Hurd), (Exh 1, Sophia Stewart's, The Third Eye Copyright, TXU 117-610 dated 1981), (Exhs. 2-96 Utah Federal Courts ), Sophia Stewart's The Third Eye Movie Treatment),

## INTRODUCTION

1.     In fact, the placement of the sequence in a post nuclear war between man verses machines came directly from the story concept written by Plaintiff Sophia Stewart, an American film student at USC film school. In addition, the concept of a machine coming forth out of a burning meteorite "naked and without shame," was stolen from Sophia Stewart by defendant Gale Anne Hurd, and James Cameron in concert with certain John Does I through XII affiliated with Twentieth Century Fox, Paramount,  and New World Productions, Inc. between and including May 1, 1981 and May 12, 1981 while Sophia Stewart's screen treatment entitled the "Third Eye" was in the possession of Susan Merzbach, then the Creative Director of Twentieth Century Fox, for review.  Merzbach spoke to Sophia Stewart by telephone between May 1, 1981 and May 12, 1981 and expressed her view that the movie treatment was good.

2.     Kay Harrison, the administrative assistant to Merzbach for Twentieth Century Fox, sent the document back to Sophia Stewart in a letter dated June 1, 1981, but it failed to provide reasonable security for Stewart's story while it was in the possession of Twentieth Century Fox.  On information and belief, the Plaintiff asserts and alleges the Defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, and Hemdale Film's infringer liability arises out of misappropriation of her federally protected intangible property entitled "The Third Eye" registered with the U.S. Copyright Office dated May 1, 1981(83'84').  As a proximate result of being the legal and beneficial copyright claimant, Stewart advances RICO and Criminal copyright infringement claims against Defendants Twentieth Century Fox Film Corp., Warner Bros. Entertainment Inc., James Cameron, Gale Anne Hurd, Andy and Larry Wachowski, David Ellison, Skydance Media, Paramount Pictures, Tencent Pictures. The Plaintiff asserts facts and alleges the "Terminator" and "Matrix" series infringed on her copyrights.  The Plaintiff asserts and alleges the Anti-Counterfeiting Consumer Protection Act of 1996 includes copyright counterfeiting as predicate offense under RICO against the Defendants. Similarly, the Plaintiff asserts and alleges the Copyright Felony Act of 1992 expanded 18 USC §2319 embrace and protect all copyrighted works

stolen by the Defendants. The Plaintiff asserts and alleges Congress amended the Money Laundering Control Act of 1986 to identify "criminal copyright infringement" as "specified unlawful activity" of which is perpetrated against Stewart by the Defendants. Section §2319(a) specifically proscribes criminal copyright infringement activity contravening 17 USC §506(a), and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law."

3.     Gale Anne Hurd, while a public relations specialist and production assistant for Roger Corman of New World Productions, Inc. and later a co-producer, quickly went to attorney James Miller for the purpose of filing Articles of Incorporation for Pacific Western Productions, Inc. in Los Angeles County on May 12, 1981. Amazingly, this is the same day that the script admits that a "Terminator" came to destroy the fictional character that might conceive the child that would lead the revolution against the rebellion by the machines. The script admission for May 12, 1981 states that Gale Anne Hurd started the destruction of Plaintiff Stewart's rights.

4.     By James Cameron's confession to Tracy Torme and Thomas Cleaver, it could not be denied that Gale Anne Hurd had willfully used parts of "Soldier" and "Demon with a Glass Hand" in the shot sequence that occurred within the first 9 minutes of "Terminator 1". It also could not be denied that the written screenplay sought to use the "cat" that was discussed in the last 5 minutes of soldier in the written screenplay to create the same phenomenon of communication in PAu 584-564.  These acts are evidence of the careful study and use of three copyrighted stories by Gale Anne Hurd, James Cameron, and Pacific Western Productions Inc. to make false copyright applications that were designed to suppress the names of the true authors – Sophia Stewart and Harlan Ellison.  The teleplay and the final film reveals that Gale Anne Hurd and James Cameron were not really authors, rather, they were copying the protected work product of other people and then gave false oaths to the United States Copyright Office in violation of 17 U.S.C. 506 (e) of which voids all contractual agreements that were based upon these illegal acts.

5.     Gale Anne Hurd was then an employee of New World Productions, Inc. in May of 1981 and she was transitioning to working as a co-producer on "Smokey Bites the Dust" on the creative end of the company for her boss, Roger Corman.  That film was released in April of 1981.  Corman was the president of New World Pictures, Inc. in May of 1981 and he was also a former story analyst of Twentieth Century Fox.  Corman, based upon his relationships with Fox, sometimes received scripts and screen treatments from Twentieth Century Fox that the studio decided not to buy. [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 196]

6.     Between May 1, 1981 and May 12, 1981, Gale Anne Hurd did not receive a story idea from James Cameron or learn of a "dream" from him.  Instead, through a John Doe affiliated with Twentieth Century Fox and a John Doe of New World Pictures, Inc., Gale Anne Hurd got a copy of the "Third Eye" book and script with the same name by Plaintiff Stewart and started Pacific Western Productions, Inc. on May 12, 1981 in California through a Los Angeles attorney named James Miller under C1043898:

> "The "liability" ("emphasis added") of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California Law." (Exh. 14.4, Freudian Slip - Smoking Gun, Articles of Incorporation, dated May 12, 1981); (Exhs. 13, 14, 14.1, 14.2, 14.3, 14.4 James R. Miller, Esq. Embezzlement Construct Trust, Articles of Incorporation)

7.     The admission by conduct that Hurd, James Cameron, and Pacific Western Productions obtained a copy of Plaintiff's "Third Eye" came when the film was released on October 26, 1984 and the first minute and 45 seconds read exactly on Plaintiff's copyrighted May 1, 1981 movie treatment under TXu 117-610, the same one that was given to Susan Merzbach in early May 1, 1981. The Defendants Cameron and Hurd's use of that subject matter in the film was not a part of the screenplay filed with the Writer's Guild of America and the Copyright Office is evidence of consciousness of guilt of misappropriation of the story, access, substantial similarity, protective expression, and unauthorized use. (Exhibits T145, Terminator 1 minute 45 seconds

"Theft") entered in as evidence to the Utah Federal Courts on September 25, 2014 Rulings by Federal Judges Dee Benson and Evelyn J. Furse. Exhibit Doc 282 & 283

8.    The admission by conduct was assisted by the skillful effort to omit that language from the written screenplay submitted to the United States on February 3, 1984 by Hemdale Film Corporation, Pacific Western Productions, Inc., James Cameron, and Gale Anne Hurd under PAu 584-564.  The admission by conduct was assisted again by the skillful omission of that discussion in the written screenplay submitted solely in the name of James Cameron to the Writer's Guild in July 1982 that hid any contention of authorship in Gale Anne Hurd that may have suggested to Sophia Stewart that her book and script had been misappropriated while in the hands Twentieth Century Fox through Susan Merzbach.     (Exhs. 11, 12, "Terminator" Fraudulent Copyright, Pau 584-564), (Exhs. Doc 282 , James Cameron's handwritten notes "Terminator" 2) (Exh. 1-96, Letter of Access by Kay Harrison reference Susan Merzbach), (Exhs. 1-96, Letter of Access Lora Lee Story Editor)

9.    However, the skillful manipulation was uncovered when it became necessary to release the film with an introduction that made sense as to why there was a post nuclear war fight going on between man and machines.  It was at that time that Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation admitted that its movie also "ripped off" the May 1, 1981 movie treatment formerly submitted to Twentieth Century Fox for review by Sophia Stewart when the first minute and 45 seconds of the film did not match the written screen play that was copyrighted under PAu 584-564; rather, it reads exactly on the May 1, 1981 movie treatment of Sophia Stewart registered as TXu 117-610 as confirmed in the film registration by Gale Anne Hurd and Pacific Western Productions, Inc. with James Cameron and Hemdale Film Corporation under PA 241-495 in the United States Copyright office.

10.   This activity required careful planning including the use of film school archives to study the teleplay and plot lines, which conduct cannot be denied by a person who was weak in training in shot selection for dramatic effect.   James Cameron had just been chastised by the producer of "Piranha II: The Spawning" by Ovidio Assonitis for poor shot selection.

11.   Cameron admitted this use and his confession is by conduct in that the shots and characters used in the first 5 minutes were patterned after those used by Harlan Ellison in the "Soldier," which conduct was done apparently due to the inexperience of Cameron in choosing shots to establish the setting for a new story.   By this admission by shot selection and content, Cameron admitted by conduct that he and Gale Hurd worked together to pilfer the work product of others to design the "Terminator".   Cameron admitted that he used the "Soldier" and "Demon with a Glass Hand" for two reasons. One reason was because he got advice from an industry insider that if he wanted it to be believed that he did not steal from Plaintiff Stewart, he should borrow from a true professional from something that is vintage.   They were advised to settle quickly so that it would appear that it was unlikely that the first victim was the source.   The second advice that he got was to get the money from the film first and then he could use his earnings to fight off any contentions by the primary copyright victim.

12.   The scheme was put into play and Thomas M. Cleaver of Starlog Magazine and Tracy Torme heard his admission to willful copyright infringement, but they also heard him admit to giving aid and support to two false copyright registrations in violation of 17 U.S.C. 506 (e) with Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation.   The laws of the United States are paramount, not the private rules of the Writers Guild of American.   Their scheme was to violate federal law with false registrations and then be the first to file a story with the Writers Guild of America in July of 1982. Every screenplay made since July of 1982 by Cameron does not include any

written language concerning the first minute and 45 seconds including the one filed with the Register of Copyrights in February of 1984.

13.     At the same time that the script was received, a series of events went into play that caused the "Terminator" to constantly remain outside of a major studio where the misconduct would have been more obvious.  The employer of Cameron and Hurd, Roger Corman of New World Pictures, Inc., received an immediate offer to sell the stock of New World Pictures, an independent film company, from three attorneys, Harry Sloan, Larry Kippur, and Larry Thompson.  By February of 1983 when the offer was made by Hemdale Film Corporation to finance the movie with Orion Pictures, Inc. serving as the distributor, Corman received $16.5 million for his stock, but he got to keep his movie portfolio and therefore he did not have to disclose any development work that had been done on new projects.  Between February of 1983 and February of 1984, Gale Anne Hurd sought to develop a relationship with James Cameron that was intimate to assure his loyalty to her. They were married so each could not testify against the other.

14.     The confession that Hurd, Cameron, and Pacific Western Productions, Inc. used illegal registrations as a modus operandi to take parts of stories of a third person without their consent of the owner is confirmed against Harlan Ellison.   These willful false registrations were criminal acts that support the classification of these acts as racketeering under the RICO statute.

15.     Hemdale Film Corporation, Tencent Pictures, Skydance Media, Paramount Pictures, Warner Bros, Twentieth Centruy Fox, Lightstorm Entertainment, David Ellision, Larry Wachowski, Andy Wachowski and Orion Pictures, Inc. took these illegal acts and classified it as business conduct for which they could own by acts of rebellion against the Copyright Act.  Yet, unlike a movie, no agreement is lawful that is based upon a criminal act.  An arrangement to trade in illegal copyright registrations that omit the names of co-authors as a matter of design that is supported by false oaths of

ownership of the illegal registrations is a "pattern of racketeering" that cannot be willfully endorsed by Courts of the United States when this misconduct is disclosed in accordance with 18 U.S.C. 2. 3.4.

16.     The willful concealment of these illegal registrations by industry personnel that set up this operation to defy the duty to disclose the true authors is evidence of a strategy to do business by intentionally defying the public policy of the United States and then using false testimony in courts and false oaths in bankruptcy proceedings to contend ownership of that which was never legally purchased.  [See 18 U.S.C. 152 (2) and 18 U.S.C. 1621 (a)]

17.     As such, there is evidence that Gale Anne Hurd willfully used three distinct elements from three different copyrighted works willfully in the release of the October 26, 1984 film called the "Terminator" through Pacific Western Productions, Inc., Hemdale Film Corporation, and Orion Pictures, Inc., which conduct was an aspect of the modus operandi of the producer and director to do business by illegal activity in violation of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 152 (2), and 18 U.S.C. 157 (2).

18.     Once the creative participants decide to do business by illegal acts that suppress the names of the true authors, every agreement becomes evidence of a material breach of public policy that no court can knowingly endorse.  It is not viable or feasible that persons can choose to commit crimes to do business and then claim that they made agreements that are enforceable.  A plan by Gale Anne Hurd, James Cameron, and Pacific Western Productions to implement an illegal business operation that predictably included the use of bankruptcy procedures to "money launder" based upon false oaths in violation of 18 U.S.C. 152 (2) to legitimize illegal contracts, agreements by investors and bankruptcy registrations made so that sales could appear to be done with Court sanction and is an offense so offensive that the FBI had to be brought in the case in the year 2000

to make the statement to Warner Brothers that the introduction of the "Terminator" read on the "Third Eye." Thereafter, Warner Brothers "deleted" the introduction, and this indictable conduct based upon the illegal registrations associated with PAu 584-564 and PA 241-495 was designed to deceive and defraud Plaintiff Stewart, but later offered $5 Million for the copyrights as a settlement. In 2006, Arnold Schwarzenegger also wanted to buy the copyrights for the "Terminator".

19.   The FBI in 2000 through the agent John Barrio found that the original introduction of the "Matrix" used Stewart's previously submitted "Third Eye" submission in the making of the "Matrix." That film was released in 1999. In the same pattern, Plaintiff Stewart had submitted the May 1, 1981 "Third Eye" screen treatment and book to Twentieth Century Fox, through Producer David Madden, Valarie Redd (Paramount Pictures) and Susan Merzbach, the Vice President of Creative Affairs. When that information was disclosed, Andy and Larry Wachowski were about to do the same thing with the "Third Eye" that had been done by Gale Anne Hurd and James Cameron through Pacific Western Productions, Inc.. When Plaintiff Stewart exposed the pattern of activity to the FBI, and the FBI confirmed the wrongful use of plaintiff's copyright on the "Third Eye" under TXu 117-610, Warner Brothers, through the Wachowski Brothers, they re-edited the "Matrix" and removed the introduction. This information is described in the New York City FBI reports under 295E Theft Case number: 295-NY-U275271. (Exh. MA, Declaration of Andy Wachowski); (Exh. ML, Declaration of Larry Wachowski); (Exh. MJ, Declaration of John Schulman); (Exh. MT, Declaration of Teresa Wayne)

20.   However, after the FBI disclosed the infringement in the introduction of the "Matrix," Warner Brothers had that aspect of the film removed that looked just like the introduction of the "Terminator" and read on the "Third Eye" following the complaint of Sophia Stewart. However, when Victor Kubicek and Derek Anderson borrowed $30 million from Pacificor LLC to pretend to buy the rights of the "Terminator" franchise

based upon the same illegal copyright registrations through sham and shell companies T Asset Acquisitions LLC, a subsidiary of Halcyon Holding Group LLC, Warner Brothers then provided that entity $200 million when it knew from the FBI that the "Terminator" introduction read on the "Third Eye" without the consent of Plaintiff Stewart. (Exhs. 15, 16, 17, 18, Andy Wachowski and Larry Wachowski Fraudulent Copyright); (Exh. 20, "The Matrix" cover-page by Larry and Andy Wachowski dated August 23, 1994); (Exh. MJ, Declaration of John Schulman); (Exh. MT, Declaration of Teresa Wayne)

21.    In the background of this sorted situation, Twentieth Century Fox was reported to have offered $50 million for the rights during the Chapter 11 of Carolco Pictures, Inc. for what it refused to make an offer to Plaintiff Stewart at its inception between May 1, 1981 and June 1, 1981.

22.    Yet, it backed off of its offer when questions arose about its relationship to the story line and the history of the "Terminator" franchise.   The rights ended up in the hands of Victor Kubicek and Derek Anderson for far less. (Exh. MB, Declaration of Bruce Isaacs); (Exhs. 14.6, 14.7, 14.8, Bruce Isaac Declaration Power of Attorney); (Exhs. 130, 131, Bruce Isaac $7 million dollar settlement offer)

23.    Each of these separate and distinct acts constituted three distinct violations of 17 U.S.C. 506 (e) at the time that the copyright registration was submitted on February 3, 1984.  The racketeering enterprise willfully violated numerous federal laws in an effort to conceal this "pattern of racketeering" in violation of public policy, and therefore all contracts made regarding these matters should be declared void as against public policy. Each sale has been premised upon a false oath of intellectual property ownership in violation of 17 U.S.C. 506 (e) that was not openly disclosed to the court.

24.    Plaintiff Stewart maintains that her story was taken by illegal means, commercially exploited by sham and shell companies with illusory agreements without

her permission in violation of public policy, and then willfully concealed by industry insiders that learned about the malfeasance at its inception.   Susan Merzbach and Michael Medavoy were aware of the misconduct at its inception, but they concealed their knowledge of the unlawful copyright registrations from the United States in violation of 18 U.S.C. 2. 3. 4.

25.    Merzbach then knew that Hemdale Film Corporation, Pacific Western Productions, Inc., Gale Anne Hurd, and James Cameron had given materially false information to the copyright office regarding authorship in violation of 17 U.S.C. 201 and 17 U.S.C. 506 (e).  Merzbach had a duty from October 26, 1984 not to conceal her knowledge, but was put on a payroll not to report it.   Similarly, Kay Harrison of Twentieth Century Fox had the same duty. (Exh. 12.3, Letter of Access by Kay Harrison reference Susan Merzbach), (Exhs. 12.4, Letter of Access Lora Lee Story Editor)

26.    Harlan Ellison in an interview spoke up to protect the public policy of the nation when he disclosed that Pacific Western Productions, Hemdale Film Corporation, and Orion Pictures, Inc. that Hurd and Cameron had willfully given false statements of authorship to the Copyright Office regarding the "Terminator" in violation of 17 U.S.C. 506 (e).  Ellison proved that the concealment of true authors was the modus operandi of Gale Anne Hurd and James Cameron through Pacific Western Productions, Inc. on the "Terminator" as a modus operandi of their production technique. (Exhibits T145, Terminator 1 minute 45 seconds "Theft,")

27.    While Gale Anne Hurd was the primary known instigator of this malfeasance, she could not and did not act alone in getting access to the "Third Eye" or in making plans to get into a separate sham and shell corporation to theorize a means by which it could be commercially exploited.   [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 100, 114, and196]; [FBI report in case number 295-NY-U275271]

28.     By virtue of the organized "pattern of racketeering" acts that violated public policy and illegally concealed the authorship of Plaintiff Sophia Stewart, she now requests this court to address the question of the offenders of the public policy of the United States under the contentions that agreements could not be reached regarding the "Terminator" without her authorization or consent. Plaintiff Stewart maintains that all deals made without a recognition of her rights was done to willfully suppress her rights and restrain her in her trade and talents,  and to show that some industry leaders concealed the malfeasance by illegal means in violation of 18 U.S.C. 2. 3. 4 so that the perpetrators could benefit from their illegal malfeasance and to make certain that Plaintiff Stewart did not collect her just compensation as a gifted writer who in 1981 did not have membership in the Writers Guild of America.

29.     Plaintiff Stewart maintains that the willful understanding of the two offenses against Harlan Ellison was notice to every business entity from October of 1984 that it had a duty to determine who the real authors were before making responsible contracts with these admitted public policy violators.

30.     The organized efforts to conceal the stories "ripped off" from Harlan Ellison and Sophia Stewart cannot be claimed to be a basis for Hemdale Film Corporation to contend that it owned the rights to the "Terminator" or " Matrix "  by a criminal act in a "pattern of racketeering".  That same pattern cannot be said to be a lawful basis for shell and sham companies such as Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, and Pacificor LLC to maintain that they could be bona fide purchasers through false oaths of ownership when the seller did not have the lawful title to sell that part of the work product that is owned by Harlan Ellison and Sophia Stewart in light of 17 U.S.C. 201 and 17 U.S.C. 506 (e). [Jamescamerononline.com]

31.     Plaintiff has brought this action to stop the Defendants from "money laundering," making and selling more than 10 copies of counterfeit derivatives of her work across state lines, and continuing to abuse her rights by the use of "invalid/inoperative copyrights" obtained by concealing material contributions to authorship, false declarations of ownership to the "Terminator" and " Matrix " franchises by corporations that have made deals with knowledge of the malfeasance with companies and in the Bankruptcy Courts without disclosing that false oaths were made in violation of 18 U.S.C. 152 (2), and further decisions made in another United States Court achieved by false declarations of ownership in violation of 18 U.S.C. 1621 (a).  Plaintiff maintains that a legal outcome achieved by a criminal act is void as a matter of law.

32.     Plaintiff will show how the "Terminator" and " Matrix " being one Epic story was made, reproduced and more than 10 counterfeit derivatives of Stewart work was sold across state lines by illegal means such as mail and wire fraud in violation of the RICO Act and strategically done to use the Bankruptcy Courts as the vehicle for "money laundering;" in order to make it look like illegal transfers of criminal fruit could be done and made to seem legitimate.  It is a violation of the law of the United States to establish a business plan based upon illegal copyright registrations that were to be enforced through the use of false oaths through the United States Bankruptcy Courts of the United States.

33.     Plaintiff Stewart has brought this case because she has been restrained in her trade and talents because of gender and race in violation of her civil rights, as well as, her copyrights were taken illegally and she has been consistently been treated differently by Fox and Warner Bros. in "contract opportunities" with the same subject matter as an gifted writer and woman than White males and women who pretended to have ownership to her story entitled the "Third Eye."  Thus, in an effort to vindicate her rights and the superiority of the laws of the United States regarding story rights, Plaintiff decided to initiate this action.

34.   The on-going and continuous victim of the RICO crimes against the United States has been Plaintiff Sophia Stewart.  Each and every Chapter 11 reorganization was made to "money lauder" where each owner made a false oath of full ownership of the "Terminator" intellectual property rights in violation of 18 U.S.C. 152 (2) and is an aspect of the "pattern of racketeering," in contravention to the Counterfeiting Consumer Protection Act of 1996, and Anti-Counterfeiting Amendments Act of 2004.

35.   On informational facts and belief, Gale Anne Hurd started Pacific Western Production on May 12, 1981 while still employed under Roger Corman for "Smokey Bites the Dust." Another employee of New World Pictures, Inc., James Cameron, turned in a screenplay to the Writers Guild of America West in July 1982 while he was then employed by New World Pictures, Inc. entitled the "Terminator."  James Cameron was employed by New World Pictures, Inc. between January 1, 1981 and at least December 31, 1982 in that he worked on the October 1982 release called "Android" with Roger Corman, the executive producer. This confirms that three registrations were made illegally on the "Terminator" (PAu 584-564 and PA 241-495) by Gale Anne Hurd through Pacific Western Productions, Inc. Then, in February of 1983, when it was reported that Roger Corman of New World Pictures, Inc. sold the stock of the company without the films and stories in the amount of $16.5 million to three attorneys.  These admissions by James Cameron proved three acts in violation of 17 U.S.C. 506 (e) between and including February 3, 1984 and December 31, 1984. The clients of these entertainment attorneys and the subject of their representation are not known and cannot be legally ascertained.

36.   Soon thereafter, Hemdale Film Corporation agreed to finance the "Terminator" for $6.5 million with Gale Anne Hurd, an untested producer, and James Cameron, an untested Director, which conducts all together, was essentially unheard of in movie making even at that level of budget.  This was particularly difficult because Cameron

had been described as ineffective as a director by Ovidio Assonitis on "Piranha II: the Spawning" in Italy.

45.     The finished product revealed a work product that was much better than expected from a film making point of view because it appeared that an experienced filmmaker had participated in the design of the project between January of 1982 and July of 1982 when Cameron continued to be employed by New World Pictures.   By these facts, it is clear that executives in Twentieth Century Fox concealed their knowledge of the misappropriated "Third Eye" story by Sophia Stewart that was liked by film companies all over Hollywood in 1982 and 1983.   The film companies did not want to do the project with an untested producer and director.   These combinations of acts led to a story being made that was based upon the "Third Eye" that made $78 million on a $6.5 million investment.   After this success, Hemdale Film Corporation filed for bankruptcy in order to "money lauder" when lesser stories turned out to be commercial flops in violation of the Money Laundering Act of 1986.   Hemdale falsely represented to the Bankruptcy Court that it had the ownership rights to the "Terminator" intellectual property in violation of 18 U.S.C. 152 (2) when it was known around the industry that Gale Anne Hurd and James Cameron had falsified the copyright registrations and did not reveal all co-authors, including Harlan Ellison and Sophia Stewart.   In spite of the knowledge and access of Twentieth Century Fox, it did not reveal to law enforcement officials that the introduction of the "Terminator" came from Hurd's misappropriation of the "Third Eye" that Susan Merzbach read and liked.   Thus, the sale of the rights through that bankruptcy case was based upon crimes under 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2) that was made possible by the concealment by Twentieth Century Fox after Harlan Ellison proved the pattern of racketeering as to "Soldier" and "Demon with a Glass Hand" in 1984. The concealment of this malfeasance by Twentieth Century Fox, through Susan Merzbach, was an offense against the United States under 18 U.S.C. 2. 3. 4. (Exhs. 1-96, Terminator Fraudulent Copyright, Pau 584-564), (Exhs. 1-96, James Cameron's handwritten notes

Terminator 2), (Exh. 12.3, Letter of Access Susan Merzbach), (Exhs. 12.4, Letter of Access Lora Lee Story Editor);   (Exhs. 13, 14,   14.1, 14.3, 14.4, 14.5, Articles of Incorporation Pacific Western)

46.     The later sales were void as against public policy through other shell and sham companies such as Carolco Pictures Inc. that were undercapitalized and associated with "Terminator 2: Judgment Day" in violation of Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Money Laundering Act of 1986. Again, a false statement of authorship contributed to the intellectual property in violation of 17 U.S.C. 506 (e) that then led to a false oath of intellectual property ownership of the "Terminator" franchise to the Bankruptcy Court in the Central District of California in violation of 18 U.S.C. 152 (2).

47.     In 2004, Stewart initiated a court lawsuit before Judge Margret Morrow. Sophia Stewart filed a lawsuit pro-se having entered her "Certified Copyrights" into court record as evidence. Most notably, Stewart's copy written book the "Third Eye" was admitted as "Physical Evidence" of creative authenticity at the beginning of the TRIAL. ("Emphasis Added") "Stewart's manuscript of "The Third Eye" was registered with the United States Copyright Office on May 1, 1981, which was a 6 page movie treatment that came before Cameron's 1982 treatment. "Stewart's manuscript of "The Third Eye" was registered with the United States Copyright Office (TXu 117-610) on February 2, 1983.[1] Additional work was registered on February 6, 1984 (TXu-154-281) consisting of a narrative, preface, characters, special effects, Sarah Conner character, creation of the Terminators, introductions, the making of The Third Eye, 8 brief chapters, and illustrations.

48.     The Plaintiff asserts and alleges the pleadings and affidavits submitted to Federal Judge Morrow by Defendants James Cameron and Gale Hurd denied having access or making use of Stewart's treatment and book. (Exh. JC, Affidavit of James Cameron);(Exh. GH, Affidavit of Gale Anne Hurd) The Plaintiff asserts and alleges that

Defendants Bruce Isaac on behalf of Cameron and Hurd Defendants infiltrated the Plaintiff legal camp and entered in an incestuous agreement with Stewart's former lawyers to not disclose the first minute and 45 seconds of the Terminator to Judge Morrow, because it proved access, substantial similarity, protective expression, and unauthorized use. The Plaintiff asserts and alleges Defendant Bruce Isaac told Judge Morrow he was afraid of the "transmissions" that are "indictable acts" of his clients and the conduct of all the "counterfeiting" of the Sole Owner's copyrights constituted "indictable acts under **The Anti-Counterfeiting Consumer Protection Act of 1996**, Copyright Felony Act of 1992 expanded 18 USC §2319 to embrace and protect all copyrighted works. (***Smith v. Jackson***, *84 F.3d 1213 (9th Cir. 1996)*, ***Pinkerton v. United States***, *328 U.S. 640 (1946)*, ***Pinkerton Doctrine***, ***Money Laundering Control Act of 1986*** to identify criminal copyright infringement as "specified unlawful activity." Section §2319(a) specifically proscribes criminal copyright infringement activity contravening 17 USC §506(a) and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law."

49.     The Plaintiff asserts and alleges that the Defendants Cameron and Hurd did not disclose their unauthorized use of the first minute and 45 seconds from "The Third Eye" to Federal Judge Morrow of which was a strategy an act of deception on a federal official in violation of 18 U.S.C. 152 (2). Then, to make the matter worse, after the FBI had made their view known to Warner Brothers in a dispute regarding the "Matrix," James Cameron, Gale Anne Hurd, Andy Wachowski, and Larry Wachowski gave false affidavits to the United States District Court regarding authorship on April 29, 2005, which false affidavits were further acts in the pattern of racketeering in violation of 18 U.S.C. 1621 (a).  By these acts, Plaintiff Stewart has been and continues to be the repeated victim of a RICO enterprise that floats between sham and shell companies that do not own "Terminator" nor " Matrix " intellectual property rights and changes from independent corporation to independent corporation all of which carry and use the "same illegal DVDS and other merchandise for sale" and fraudulent Trademarks – the illegally

obtained intellectual property rights of the "Terminator" that were misappropriated from the "Third Eye" by a willful design. (Exhibits T145, Terminator 1 minute 45 seconds "Theft")

50.    The same pattern of "money laundering" and "counterfeiting" more than 10 copies of Stewart's work across state lines continued through Halcyon Holding Group LLC where "Terminator Salvation" was released in May of 2009, made $172 million over budget, and was in Chapter 11 reorganization by August 17, 2009 before Plaintiff Stewart could assert violations of 17 U.S.C. 506 (e), Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Money Laundering Act of 1986. Again, a false oath of full ownership was made and Halcyon auctioned rights that it did not fully own to Pacificor on or about February 8, 2010 for $29.5 million.  This pattern of racketeering activity continued with economic support of Warner Brothers of $200 million when it had learned from the FBI in 2000 that "Terminator 1" had an introduction that read on the introduction of the "Third Eye" dated May 1, 1981 that was registered as a copyright under TXu 117-610 before any "Terminator" movie was written or released.

51.    Everybody that has been affiliated in any way with this misappropriated intellectual property has had great success, except the gifted writer and female USC Film Student that created it – Sophia Stewart.

52.    As it was for Harlan Ellison who was victimized by the same RICO enterprise, plaintiff Sophia Stewart seeks damages, Oscars and a screen credit for her protected intellectual property that was willfully "ripped off" and used by the same pattern of racketeering  that was visited upon Harlan Ellison on the same production.

## JURISDICTION

53.    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §1331, 1332 (a) (2), 1367 (a), 1338, 1334, 1343 (a) (1) and (3) in reference to claims raised under 17

U.S.C. 501, 18 U.S.C. 1962, 42 U.S.C. 1981, 42 U.S.C. 1982, 42 U.S.C. 1983, 28 U.S.C. 2201 and 2202.

54.     Venue is proper under 28 U.S.C. §1391(b) (2), 28 U.S.C. 1400 (a), 28 U.S.C. 1408, 28 U.S.C. 1409 (a), 18 U.S.C. 1965 (a) in that the alleged acts and practices that involve acts of Civil Rights violations involving discrimination, Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1964 and 1965. violations, and void contracts under state law involve defendants that reside and do business in Los Angeles County of the State of California but cross state lines for business. Venue is proper in this district for any claims based upon void contracts against public policy in that those acts and occurrences depend from the dominant RICO allegations.   Crimes "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).   United States v. Tucker, 495 F. Supp. 607, 618 (E.D.N.Y. 1980) The matter in controversy exceeds, exclusive of interest and costs, the sum of $300,000,000 dollars, with jurisdiction founded on the existence of the state and federal question, civil rights violations, and amount in controversy.

**PARTIES**

55.     Plaintiff Sophia Stewart is a citizen and resident of Las Vegas, Nevada.

56.     Defendant James Cameron is a citizen and resident of the County of Los Angeles, California and is doing business in this state and in interstate commerce having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

57.     Defendant Gale Anne Hurd is a citizen and resident of the County of Los Angeles, California and is doing business in this state and in interstate commerce having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

58.     Defendant Twentieth Century Fox, Inc. had access and is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce in the motion picture business having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

59.     Defendant Larry Wachoski, Andy Wachoski d.b.a. as Eons, David Ellison d.b.a. as Skydance Media, are citizens and residents of the County of Los Angeles, California and is doing business in this state and in interstate commerce in the motion picture business are part of the R.I.C.O Enterprises. Tencent Pictures d.b.a. as Tencent Holdings Limited, a Chinese Corporation who will co-finance as a global partner with Skydance Media Terminator 6 Movie produced by James Cameron and David Ellision. Tencent will also handle distribution, marketing and merchandising of the film in China. Paramount Pictures and 20th Century Fox are also co-financing the film. The movie will be distributed domestically by Paramount Pictures and internationally (excluding China )by 20th century Fox ( adjudicated facts in Utah Federal Court Case both defendants had access and knowledge but continues felony acts ).

60.     Pacific Western Productions, Inc, is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, Pacific Western Productions has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

61.     Hemdale Film Corporation, is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, Pacific Western Productions has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

62.     Halcyon Holding Group, LLC is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office associated with the motion picture business. Furthermore, Halcyon Holding Group, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

63.     T Salvation Productions, LLC is a California Limited Liability Company doing business in the County of Los Angeles and in interstate commerce in the motion picture business. Furthermore, T Salvation Productions, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

64.     T Salvation Distributions, LLC is a California Limited Liability Company doing business in the County of Los Angeles and in interstate commerce in the motion picture business. Furthermore, T Salvation Distribution, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

65.     T Asset Acquisition Company, LLC is a Delaware Limited Liability Company doing business in the County of Los Angeles of the State of California and in interstate

commerce in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

66.     Dominion Group, LLC is a California Limited Liability Company that is doing business in the County of Los Angeles in the State of California and in interstate commerce through its primary members Derek Anderson and Victor Kubiceck in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

67.     Salvation Distribution, LLC is a California Limited Liability Company that is doing business in the County of Los Angeles in the State of California and in interstate commerce through its primary members Derek Anderson and Victor Kubiceck in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

68.     Victor Kubicek is a citizen and resident of the County of Los Angeles, California doing business in the movies through at least one under capitalized California Corporation that was found to have defrauded investors. Furthermore, Victor Kubicek has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

69.     Derek Anderson is a citizen and resident of the County of Los Angeles, California doing business in the movies through at least one under capitalized California Corporation that was found to have defrauded investors. Furthermore, Derek Anderson has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

70.    Defendant Warner Brothers Entertainment Inc. ("Warner Brothers"), upon informational facts and belief, was organized under the laws of the State of Delaware, maintaining its principal office and place of business within the City of Los Angeles, California and provided approximately $200 million to T Asset Acquisitions LLC for Victor Kubicek and Derek Anderson to promote the production of "Terminator Salvation" between 2007 and 2009 which permitted T Asset Acquisitions LLC and Warner Brothers to release the film on May 21, 2009. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

71.    Defendant Lightstorm Entertainment is a California Corporation doing business in the County of Los Angeles, California which was founded from the proceeds of fraudulently obtained copyright material entitled "The Third Eye" where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

72.    Valhalla Motion Pictures is a California Corporation doing business in the County of Los Angeles, California which was founded from the proceeds of fraudulently obtained copyright material entitled "The Third Eye" where the true co-authors of that material was not disclosed to the United States Copyright Office.

73.    Andrew George Vajna | Andrew Vajna | Andy Vajna | Andy Vajnac is an Executive for THE HALCYON COMPANY, and located at 9853 Lime Orchard Rd, Beverly Hills, CA 90210 and engages in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of Utah and Nevada.

74.  Mario F. Kassar, are Executive 10281 CHaring Cross, L.A., CA 90024 and engages in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of Utah and Nevada.

75.     Defendant s John Does I through XII are employed at all of the above Defendants companies existing and doing business under the laws of the State of California, and located at  and engaging in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of California.

**FIRST CAUSE OF ACTION**

**Anti-Counterfeiting Consumer Protection Act Of 1996,**

**Money Laundering Control Act of 1986,**

**Willful Concealment of Co-Author**

**From All Copyright Registrations**

**On "Terminator"  and " Matrix "Movie Copyrights**

**Should Render them**

**Void Against Public Policy**

76.     Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

77.     The Plaintiff states a claim against Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Warner Bros, David Ellison, Skydance Media, Tencent Pictures, Larry Wachoski, Andy wachoski, Paramount Pictures, Lightstorm Entertainment, and RICO Enterprises: Susan Merzbach, Pacific Western Productions, Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna,  Mario

F. Kassar and John Does I through XII for establishing a "pattern of racketeering" through a fraudulent scheme of "sham and shell" companies that were conceived to avoid individual tax liability, and were so inadequately funded without "legitimate ownership" to "Terminator" asset copyrights for the purpose to defraud and "money launder" proceeds from individuals, financial institutions, and creditors by utilizing the Bankruptcy Court to illegally transfer said assets and deceive the consuming public into believing that certain Defendants created the story concept in the "Terminator" film.

78.     The Plaintiff asserts and alleges said Defendants and RICO Enterprises James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Pacific Western Productions, Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna, Mario F. Kassar and John Does I through XII carried out "transmissions" and "sold" Stewart's work via "wire" and "mail fraud" of which are "indictable acts" for distributing and "counterfeiting" more than 10 copies of her federally protected copyright work worth more than $2,500 dollars, within a 180-day period, across the state lines of California for "commercial distribution" and in different formats including over a publicly-accessible computer network in violation, and movie theater screens, CDs' and DVD in violation of 17 U.S.C. § 506(a)(1), **The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Copyright Felony Act of 1992 expanded 18 USC §2319** to embrace and protect all copyrighted works. (Smith v. Jackson, 84 F.3d 1213 (9th Cir. 1996), Pinkerton v. United States, 328 U.S. 640 (1946), Pinkerton Doctrine, **Money Laundering Control Act of 1986** to identify criminal copyright infringement as "specified unlawful activity," pursuant to Section §2319(a) which specifically proscribes "criminal copyright infringement" activity contravening 17 USC §506(a) and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law, 18 U.S.C. § 1341 (1994) – Mail Fraud, 18 U.S.C. § 1343 (1994) – Wire Fraud, 18 U.S.C. § 1344 (1994) –

Bank fraud statute, 18 U.S.C. § 1030 (1994 & Supp. 1997) - Computer Fraud, 18 U.S.C. § 1031 (1994) - Major fraud, "Conspiracy to Defraud by Interference with Government Functions," prosecuted pursuant to 18 U.S.C. § 371 falls under guideline 2C1.7. See id. App. a, § 2C1.7, Tax evasion, 26 Ul.S.C. § 7201 (1994), 18 U.S.C. § 157 (1994), Marriage fraud, 8 U.S.C. § 1325(c) (1994 & Supp. 1997), 18 U.S.C. § 371 (1994), and Insurance Fraud.

79.   Plaintiff Stewart is a victim of this "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "**The Terminator**" in violation of The Anti-Counterfeiting Consumer Protection Act of 1996: USA  26 October 1984,  Australia  20 December 1984, South Korea  22 December 1984, UK  11 January 1985 Spain,  18 January 1985, Italy  25 January 1985, Sweden  8 February 1985, Philippines  9 February 1985 (Davao), Finland 15 February 1985,  Netherlands  21 February 1985,  Switzerland  27 February 1985, Switzerland  27 February 1985, West Germany  15 March 1985, Hong Kong  22 March 1985, Norway  28 March 1985, Colombia  10 April 1985, Argentina  18 April 1985, France  24 April 1985, Japan  4 May 1985, Uruguay  4 July 1985, Turkey  January 1988, Hungary  26 May 1988, Czechoslovakia  1 September 1990, Germany  29 August 1991,UK  16 March 2001. [http://www.imdb.com/title/tt0088247/releaseinfo]

80.   Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "**Terminator 2": Judgment Day**," in violation of The Anti-Counterfeiting Consumer Protection Act of 1996:  USA  1 July 1991 (Century City, California), Canada  3 July 1991, USA  3 July 1991, Hungary  4 July 1991, South Korea 6 July 1991, Brazil  August 1991, Hong Kong  1 August 1991 , Argentina  8 August 1991, Colombia  16 August 1991,  UK  16 August 1991, Japan  24 August 1991, Turkey September 1991, Philippines  3 September 1991 (Davao), Australia  5 September 1991, Uruguay  5 September 1991, Sweden  13 September 1991, Netherlands  27 September

1991, Finland  4 October 1991, France  16 October 1991 , Germany  24 October 1991, Austria  25 October 1991, Denmark  8 November 1991,  Spain  5 December 1991, Czechoslovakia  6 March 1992, Poland  5 May 1992, China  18 May 2000 (Beijing), Finland  1 August 2003, Finland  14 June 2006 (Midnight Sun Film Festival) (70mm version), Canada  7 February 2010 [http://www.imdb.com/title/tt0103064/releaseinfo].

81.    Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "**Terminator 3: Rise of the Machines,**" USA  30 June 2003 (Westwood, California) (premiere), Canada  2 July 2003, USA  2 July 2003, Puerto Rico  3 July 2003, Russia  3 July 2003, Colombia  4 July 2003, Kazakhstan  4 July 2003, Japan  5 July 2003 (premiere),  Argentina  8 July 2003, Philippines  9 July 2003,  Hong Kong  10 July 2003, Malaysia  10 July 2003  , Singapore  10 July 2003, Estonia  11 July 2003, Thailand  11 July 2003, Japan  12 July 2003,  Kuwait  15 July 2003, Bahrain  16 July 2003, Qatar  16 July 2003, Republic of Macedonia  16 July 2003, United Arab Emirates  16 July 2003,   Australia  17 July 2003, Netherlands  17 July 2003 (limited),  New Zealand  17 July 2003, Taiwan  17 July 2003,  Iceland  18 July 2003, Denmark  23 July 2003, Switzerland  23 July 2003 (French speaking region) Lebanon  24 July 2003, Netherlands  24 July 2003, Peru  24 July 2003,  Switzerland  24 July 2003, Bulgaria  25 July 2003, India  25 July 2003, Mexico  25 July 2003, Panama  25 July 2003, Portugal  25 July 2003, South Korea  25 July 2003,  Turkey  25 July 2003, Spain  30 July 2003, Sweden  30 July 2003, Germany  31 July 2003,  Israel  31 July 2003,  Slovenia  31 July 2003,  Austria  1 August 2003,  Brazil  1 August 2003, Finland  1 August 2003,  South Africa  1 August 2003, UK  1 August 2003,  Belgium  6 August 2003, France  6 August 2003,  Czech Republic  7 August 2003,   Slovakia  7 August 2003, Norway  8 August 2003 (premiere),  Poland  8 August 2003,  Oman  12 August 2003, Malta  13 August 2003,  Norway  15 August 2003, Jordan  20 August 2003, Hungary  21 August 2003, Greece  22 August 2003,     Lithuania  22 August 2003, Egypt  27 August 2003,

Venezuela  27 August 2003, Italy  19 September 2003, Switzerland  19 September 2003 (Italian). [http://www.imdb.com/title/tt0181852/releaseinfo]

82.    Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "Terminator 4: Salvation": USA  14 May 2009 (Hollywood, California) (premiere), Bahrain  21 May 2009, Canada  21 May 2009, Kuwait  21 May 2009, Lebanon  21 May 2009, USA  21 May 2009, South Korea  22 May 2009, Egypt  27 May 2009,  Indonesia  27 May 2009, Philippines  27 May 2009,  Taiwan  27 May 2009, Hong Kong  28 May 2009, Malaysia  28 May 2009, Singapore  28 May 2009,  Thailand 28 May 2009,   Netherlands  31 May 2009, Argentina  3 June 2009, Belgium  3 June 2009,  Finland  3 June 2009, France  3 June 2009,  Greece  3 June 2009 (Athens), Iceland  3 June 2009, Ireland  3 June 2009, Sweden  3 June 2009, Switzerland  3 June 2009, UK  3 June 2009, Australia  4 June 2009, Chile  4 June 2009, Croatia  4 June 2009, Czech Republic  4 June 2009,   Denmark  4 June 2009, Georgia  4 June 2009, Germany  4 June 2009, Greece  4 June 2009, Hungary  4 June 2009, Israel  4 June 2009, Kazakhstan  4 June 2009, New Zealand  4 June 2009, Panama  4 June 2009, Peru 4 June 2009, Portugal  4 June 2009,   Russia  4 June 2009, Slovakia  4 June 2009, Slovenia  4 June 2009, Switzerland  4 June 2009, Ukraine  4 June 2009, Austria  5 June 2009, Brazil  5 June 2009, Bulgaria  5 June 2009, Colombia  5 June 2009, Ecuador  5 June 2009, Estonia  5 June 2009, Italy  5 June 2009, Japan  5 June 2009, Latvia  5 June 2009, Lithuania  5 June 2009, Norway  5 June 2009, Poland  5 June 2009, Romania  5 June 2009,  South Africa  5 June 2009, Spain  5 June 2009,  Turkey  5 June 2009, Uruguay  5 June 2009, Venezuela  5 June 2009, China  9 June 2009, Japan  13 June 2009,  India  26  June  2009,  Mexico  31  July  2009. [http://www.imdb.com/title/tt0438488/releaseinfo]

83.    Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the

release dates of "Sarah Conner Chronicles": 31 episodes, January 13, 2008 – April 10, 2009.[http://www.imdb.com/title/tt0851851/];

[http://en.wikipedia.org/wiki/Terminator:_The_Sarah_Connor_Chronicles]

84.    At various times the Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Susan Merzbach, Pacific Western Productions,  Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions,  T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc.,  Andrew Vajna, Mario F. Kassar and John Does I through XII through the "racketeering enterprise" of "shell and sham" companies made false oaths of ownership in order to "money launder" within the California District Bankruptcy Court for the "The Terminator," "Terminator 2": Judgment day," "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," and "Terminator Genisys" , "Terminator 6", characters Sarah Conner, Terminators, the "Sarah Conner Chronicles" intellectual property copyrights in violation of **Money Laundering Control Act of 1986,** 17 U.S.C. 506 (e), 18 U.S.C. § 371 of which falls under guideline 2C1.7. See id. App. a, § 2C1.7.  Furthermore, the Defendants willfully violated numerous federal laws in an effort to conceal this "pattern of racketeering" in violation of public policy, and therefore all contracts made regarding these matters should be declared void as against public policy.  Each sale by the Defendants within the Bankruptcy has been premised upon a false oath of intellectual property ownership in violation of 17 U.S.C. 506 (e) that was not openly disclosed to the court.

85.    The Plaintiff asserts and alleges all of the above named Defendants amd RICO Enterprises  including Derek Anderson and Victor Kubicek knew or should have known that they did not legitimately own "The Terminator" intellectual property copyrights as a proximate result of  Harlan Ellison's name appearing in the "credits" of the "Terminator" products/films as a "substantial contributing co-author," and to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright

registration as required by law pursuant to 18 U.S.C. 4, and  17 U.S.C. 106, 17 U.S.C. §201, **Felony Copyright Infringement** 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e). The Plaintiff asserts and alleges the Defendants Anderson and Kubicek "aided and abetted" the commission of a Felony Copyright Infringement by "money laundering" and "Pump and Dump Fraud," and committed an affirmative act by selling the fraudulent procured copyrights via an auction on or about February 8, 2010 for $29.5 million to Pacificor intended to further the commission of indictable conduct. The Plaintiff asserts Defendant Pacificor's affiliative liability is deemed to have committed a substantive offense even though that entity was not present at the commission of Cameron and Hurd filing a fraudulent copyright with the U.S. Copyright Office for the Terminator (PAu 584-564 and PA 241-495) and did not physically consummate it. The Plaintiff asserts all of the above Defendants carry "contributory and vicarious infringer" liability, and it is reasonably foreseeable that the primary infringers Gale Anne Hurd and James Cameron did consummate a conspiratorial agreement with others whose active commission necessarily invokes the Pinkerton Doctrine.  In violation of Pinkerton, the Plaintiff asserts said Defendants affinitive acts were agreeing that violations of **The Anti-Counterfeiting Consumer Protection Act of 1996, and Money Laundering Control Act of 1986** would be committed; for complicity, the affinitive act can take various forms as long as it reliably evinces a desire to support the commission of indictable conduct."

86.    The Defendants "restrained" Stewart in her "trade and talents," and encroached upon her exclusive rights of ownership amounting to violations of Felony Copyright Infringement 17 USC §506, **The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Copyright Felony Act of 1992 expanded 18 USC §2319** for: (1) reproduction, (2) preparation and distribution of derivative works based upon the original copyrighted work through federal mail and /or wire at the Register of Copyrights, (3) public distribution, (4) public performance of said types of works, (5) public display of said types of works, and (6) performance of sound

recordings by means of digital audio transmission. (See 17 U.S.C. § 106(1)-(6); 17 U.S.C. § 101). The Plaintiff asserts and alleges the Defendants were given "Constructive Notice" to cease and desist from committing Felony Copyright Infringement either for (7) commercial advantage or private financial gain, (8) by reproducing, counterfeiting or distributing infringing copies of works with a total retail value of over $1,000 over a 180-day period, or (9) by distributing a "work being prepared for commercial distribution" by making it available on a publicly-accessible computer network, and movie theater screens, CDs' and DVD in violation of 17 U.S.C. § 506(a)(1), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319.

87. Defendants Gale Anne Hurd, James Cameron, and RICO Enterprises Pacific Western Productions, Inc., and Hemdale Film Corporation knew between May 1, 1981 and February 2, 1984 that Harlan Ellison was the copyright owner of the stories entitled the "Soldier" that was first aired on the Outer Limits on September 19, 1964 and "Demon with a Glass Hand" that was first aired on October 17, 1964 on The Outer Limits.

88. Nevertheless, Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation, now defunct, did not reveal their knowledge of the co-authorship of Harlan Ellison nor Sophia Stewart to the United States Copyright Office when the "Terminator" screenplay was submitted under numbers (PAu 584-564 and PA 241-495) on February 3, 1984 as it was their duty to do under 17 U.S.C. 506 (e).

89. Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation knew between May 1, 1981 and February 2, 1984 that Sophia Stewart was the copyright owner of the May 1, 1981 story entitled the "Third Eye" registered under TXu 117-610 regarding a post nuclear war battle between man and

machines associated with the end of time with subjects from outer space acting while "naked without shame." On May 1, 1981, Sophia Stewart completed the screen treatment entitled the "Third Eye" which concept was placed in 2019 after horrible nuclear wars and a spiritual evolution was underway due to conflicts between those who were spiritually based and those that were technologically based, and this conflict led to a war between highly sophisticated machines brought about by highly skilled weapon systems scientists and humans. The war involved the use of interplanetary space travel through an advanced machine that functioned from the planet commanded by Queen Johnny called Spacestar that functions totally through cybernetic ally made machines that functioned through highly sophisticated micro chips. Each is programmed to achieve a particular function connected to warfare. Some are programmed to kill. One planet that engages in warfare with the main character who has been touched by a spiritual happening is Ikahn, a warrior. It is through this conflict that he is forced to take up arms against those on earth that are in pursuit of a spiritual life when he is forced into conflict with the machines that operate without emotion or conscious. The engagement takes place and those with spirit prevail leaving those with the seed of life to go on unencumbered by the highly programmed machines that are almost able to reason so as to conflict with the leadership of man that is grounded in spiritual thought.

90.    In May of 1981, the Plaintiff asserts and alleges subject matter of fact above was in the hands of Susan Merzbach of Fox who spoke with Sophia Stewart about the content in May of 1981.

91.    The Plaintiff asserts and alleges Susan Merzbach had physical possession of the Third Eye in May of 1981 with the consent of Sophia Stewart, but Fox did not have ownership of the story. [A constructive trust is imposed when a defendant has possession of property that in good conscience belongs to another. Knieniem v. Group Health Plan Inc., 434 F.3d 1058, 1064 (8th Cir. 2006).]

92.    James Cameron confessed between October 1, 1984 and December 31, 1984 that he "ripped off a couple of Harlan Ellison stories" to Tracy Torme and Thomas M. Cleaver, a reporter of Starlog Magazine to make the "Terminator," which admission was admitted to permit the parties to confess to willfully concealing the authorship of someone that had a story that could help them cover-up the more significant crime for concealing the story taken from Plaintiff Sophia Stewart.

93.    When Gale Anne Hurd learned that James Cameron had confessed to the unlawful misconduct to reporters at Starlog magazine, she frantically called the magazine, requested to see Cameron's confession, and begged to "cover up" Cameron's truthful statement so that it was not published in the December 1984 edition of the magazine (#89) to officials of the United States and investors.

94.    On information and belief, Roger Corman, the president of New World Productions, Inc., Gale Anne Hurd's former employer at New World Pictures, Inc. and a former story analyst of Twentieth Century Fox, knew that Hurd had obtained possession of a copy of the "Third Eye" by Sophia Stewart from Twentieth Century Fox between and including May 1, 1981 and May 10, 1981. [Roger Corman, How I made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196]

95.    On information and belief, Roger Corman, the president of New World Productions, Inc., recommended and mentored Gale Anne Hurd to commence a separate company to develop what he thought was a commercially viable story into a separate company as soon as possible between May 1, 1981 and May 10, 1981.

96.    On information and belief, Gale Anne Hurd, with the assistance of John Does 1 and 2 from Twentieth Century Fox and assistance from John Does 7 and 8 from New World Productions, Inc., Gale Anne Hurd retained attorney James Miller to file articles of incorporation for Pacific Western Productions, Inc. on May 12, 1981 in the Office of

the Secretary of State of California under C1043898. (Exhs. 13, 14,  14.1, 14.3, 14.4, 14.5, Articles of Incorporation Pacific Western)

97.    On information and belief, the sole story concept that Gale Anne Hurd had between May 1, 1981 and May 10, 1981 involving a post nuclear war fight between man and machines from another planet in a darkened earth that used naked people without shame through a large mechanized spacecraft to engage the machines was written by Sophia Stewart on May 1, 1981 which was then submitted to Twentieth Century Fox to the Vice President of Creative Affairs for consideration.

98.    On information and belief, Gale Anne Hurd did a search of the Copyright Office before February 3, 1984, knew that Plaintiff Sophia Stewart had a Copyrights registration on the "Third Eye" under TXu 117-610, and knew that Hemdale Film Corporation and Pacific Western Productions, Inc. planned to use the "Third Eye" in the introduction of the "Terminator" Film thereafter in violation of 17 U.S.C. 506 (e), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319.

99.    With this knowledge, Susan Merzbach, Kay Harrison, Gale Anne Hurd, James Cameron, and Roger Corman, still chose to conceal the contribution of Plaintiff Stewart and Harlan Ellison in the registration of the "Terminator" as depicted in PA 241-495 after the movie was released on October 26, 1984. [17 U.S.C. 506 (e) and 18 U.S.C. 4]

100.   It was the modus operandi of Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation to conceal the names of important co-authors because Hurd had decided to take credit for the writing and directing of others to create a successful first solo film using the ability of James Cameron as the apparent creator, which assertion Hurd knew to be false.

101.   The choice by these defendants to conceal the names of Harlan Ellison and Plaintiff Sophia Stewart from the United States Copyright Office proved that Hurd did not have confidence in her creative ability, Cameron's creative ability, and Cameron's directing ability from July 1982 through October of 1984.

103.   Plaintiff Stewart therefore requests that the registrations by defendants concerning the "Terminator" described as PAu 584-564,  PA 241-495, TX 3-134-386, PA 1-210-058, and PA 1-628-221, all of which are derivative of Plaintiff Stewart's May 1, 1981 "Third Eye" previously registered under TXu 117-610 be declared void against public policy under 28 U.S.C. 2201 and 2202 to prevent these defendants from making the Government of the United States from continuing to be an unwitting agent to these deceptive and willful violations of 17 U.S.C. 506 (e), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319. The United States Customs Service may impose civil fines on any entities such as Warner Brothers and all other Defendants who directs, assists financially or otherwise aids or abets the importation of counterfeit goods. In this case where the court finds that the use of the counterfeit of goods is willful, as a proximate result of Harlan Ellison's name appearing in the credits of the "Terminator" products/films as a "substantial contributing co-author;" and to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright registration reflecting "indictable acts" as required by law a court can award up to $1,000,000 "per counterfeit per type of goods sold."


## SECOND CAUSE OF ACTION
### MONOPOLY AND RICO
### (18 U.S.C. 1961, 18 U.S.C. §1962 (b), and 18 U.S.C. 1962 (c))
### A PATTERN OF RACKETEERING

**IN THE MAKING OF THE "TERMINATOR"**

104.   Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

105.   The Plaintiff asserts and alleges the Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Susan Merzbach, Pacific Western Productions,  Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna,  Mario F. Kassar and John Does I through XII, have committed "Willful "**Infringements**" upon Stewart's copyright, thus constituting "**Felony Copyright Infringement**," of which, constitutes "**Racketeering Activity**" that either bullies, retaliates, infringes, steals, embezzles, or harms through an association by a pattern of unlawful actions.  The Plaintiff asserts and alleges the Defendants conduct was both the "but for" and proximate cause of concrete financial injury.

106.   Pacific Western Productions, Inc. was initiated by Gale Anne Hurd and certain unidentified Media Moguls with Media Companies to create a racketeering vehicle for the enterprise that was established to conceal the authorship of Plaintiff Sophia Stewart and Harlan Ellison and to move the intellectual property rights of this entity without obvious detection for this malfeasance with false copyright registrations and false bankruptcy representations of intellectual property ownership with respect to the "Soldier," "Demon with a Glass Hand," and the "Third Eye" through another trade name – "The Terminator."

107.   The pattern of racketeering activity by defendants Gale Anne Hurd, Pacific Western Productions, Inc., James Cameron, and Hemdale Film Corporation included

three acts of concealment regarding the authorship of Harlan Ellison and Plaintiff Stewart between and including May 1, 1981 and October 26, 1984 that violated 17 U.S.C. 506 (e) as to PA 241-495.

108. The first act designed to create the racketeering enterprise occurred when Gale Anne Hurd obtained Plaintiff Stewart's script by illegal means between May 1, 1981 and May 10, 1981 and used it to commence Pacific Western Productions, Inc. on May 12, 1981 while she was still an employee of New World Pictures, Inc. under Roger Corman's supervision.  [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196.

109. After October 26, 1984 through November 26, 1984, the defendants described herein willfully violated three copyrights -- "Soldier," "Demon with a Glass Hand," and the "Third Eye."

110. Between May 1, 1981 and February 10, 1984, the defendants described concealed the true co-authors of the "Terminator" from the copyright registrations dated February 3, 1984 identified as PAu-584-564 (screenplay) and February 22, 1985 identified as PA-241-495 (motion picture) in violation of 17 U.S.C. 506 (e) as to three separate prior valid copyright registrations concerning the "Soldier," "Demon with a Glass Hand," and the "Third Eye."

111. On information and belief, Susan Merzbach of Twentieth Century Fox, and Kay Harrison of Twentieth Century Fox, Roger Corman and John Does VII through XII  of New World Productions, Inc.,  were aware of the registration that related to PA 241-295 and did not disclose to United States Copyright Office or other U.S. government officials that Pacific Western Productions, Inc. had designed itself to commercialize the story concepts of Harlan Ellison and Plaintiff Stewart without first obtaining their

authorization in the "Terminator" film on October 26, 1984 in violation of  17 U.S.C. 506 (e), and 18 U.S.C. 4.

112.  Based upon the above-mentioned pattern of racketeering by defendants orchestrated by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc., false oaths were made to the United States Copyright Office of authorship by persons that willfully omitted the creators Harlan Ellison, and Plaintiff Stewart, in violation of 17 U.S.C. 506 (e) as to PA 241-495, TX 3-134-386, PA 1-210-058, and PA 1-628-221.

113.   James Cameron admitted that this conduct was the modus operandi of the listed producer, Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation when he said, "I ripped off a couple of Harlan Ellison stories" to help make the "Terminator" movie and those acts constituted predicate acts through the pattern of racketeering designed to usurp Plaintiff Stewart of her fair share of the remuneration from the "Terminator" film in violation of 17 U.S.C. 506 (a) (1) (A), 17 U.S.C. 506 (e), and 18 U.S.C. 1962 (c).

114.   As an aspect of the pattern of racketeering, Cameron admitted by that statement that the copyright registration dated February 3, 1984 under PAu 584-564 for the screenplay and the registration for the "Terminator" movie under PA 241-495 willfully violated 17 U.S.C. 506 (e) in that they deceptively concealed the co-authorship of Harlan Ellison and Plaintiff Stewart from the U.S. Copyright Office.

115.   The pattern of racketeering has existed from May 12, 1981 through February of 2010.

116.   The conduct described in paragraphs above by the defendants constitutes racketeering within the meaning of 18 U.S.C. 1961 and 18 U.S.C. 1962 (c).

117.   On information and belief, John Does 1 and 2 of Twentieth Century Fox transferred it to John Does 7 and 8 of New World Pictures, Inc. between May 1, 1981 and May 12, 1981 and then it came into the possession of Gale Anne Hurd without the knowledge or consent of Sophia Stewart, the author of the May 1, 1981 screen treatment entitled the "Third Eye." [Roger Corman, How I made a Hundred Movies in Hollywood and never Lost a Dime (Da Capa Press 1990), p. 196.]

118.   On information and belief, having discussed the value of the story concept in May of 1981 with Roger Corman, Gale Anne Hurd decided to make the movie using the skills of other people while she was in a position to ask Corman questions to help achieve the goal.

119.   On information and belief, Hurd and Cameron had the "Third Eye" before they were recommended to check old "Outer Limits" episodes from the film library at the USC film school.

120.   In May of 1981, Gale Anne Hurd was not aware that Roger Corman of New World Pictures, Inc. would entertain an offer from attorneys Harry Sloan, Lawrence Kippur, and Larry Thompson to sell his stock in New World Pictures in mid-1982.

121.   On information and belief, Gale Anne Hurd realized that Harry Sloan, Larry Kuppin, and Larry Thompson were entertainment lawyers that sought to make a deal with Corman almost at the same time that the "Terminator" was registered with the Writers Guild of America.

122.   On information and belief, Gale Anne Hurd and Roger Corman discussed the risk that would exist to the "Terminator" story if he sold his film library with the company, which discussion led Corman to decide not to sell his film library.

123.   On information and belief, Roger Corman agreed with Sloan, Thompson, and Kippur not to compete with New World Pictures, Inc. for a period of 1 year, further agreed to be a consultant for 2 years, refused to sell his film portfolio, and closed in February of 1983.

124.   On information and belief, the strategy by Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation to conceal their possession and willful unauthorized use of the "Third Eye" was  racketeering under 17 U.S.C. 506 and 18 U.S.C. 1962 (c).

125.   On information and belief, the effort to conceal the development of the "Third Eye" Story at New World Pictures was helped by Roger Corman's decision not to sell his film library with the stock, which permitted the sale to take place without the necessity of an accurate disclosure of the intellectual property that was then in progress.

126.   In July of 1982, James Cameron gave no credit to Gale Anne Hurd for writing any aspect of the "Terminator" that could have connected her to the misappropriation for Plaintiff Sophia Stewart.

127.   On information and belief, Roger Corman contributed to the modification of the May 1, 1981 "Third Eye" story possessed by Gale Anne Hurd either knowingly or unwittingly through budgetary controls, style of presentation, and screenplay dynamics from May 31, 1981 to May 31, 1982.

128.   On information and belief, Gale Anne Hurd and Pacific Western Productions, Inc. concealed the fact that they had willfully used the "Third Eye" in the first minute and 45 seconds of the "Terminator" film in violation of Plaintiff Stewart's exclusive rights described in 17 U.S.C. 201, 17 U.S.C. 106, and 17 U.S.C. 506 (a) (1) (A) in reference to her TXu 117-610 copyright on and after October 26, 1984.

129.   Gale Anne Hurd, as the primary managerial force of Pacific Western Productions, Inc. set out to terminate the property rights of Plaintiff Stewart, Harlan Ellison, and the marital relationship of James Cameron with Sharon Cameron, all with the objective of taking profits that should have been assigned to others without feeling, regret, or remorse through a pattern of racketeering within the meaning of 18 U.S.C. 1961 that violated 18 U.S.C. 1962 (c).

130.   Based upon the above-mentioned "pattern of racketeering" constituting "counterfeiting" by defendants and orchestrated by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc., false oaths were made regarding the ownership of the intellectual property of the "Terminator" movie to the United States Bankruptcy Court by Hemdale Film Corporation in or about 1992 in violation of 18 U.S.C. 152 (2) and/or 18 U.S.C. 157 (2) and Carolco Pictures, Inc. in 1997 in violation of 18 U.S.C. 152 (2) and/or 18 U.S.C. 157 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319,   Money Laundering Control Act of 1986.

131.   C2 Partners, Mario Kassar and Andrew Vajna, received false representations through Hurd that Hemdale Film Corporation had purchased 50 percent of the "Terminator" rights from Gale Anne Hurd through Pacific Western Productions, Inc. and that James Cameron had sold his percent of Pacific Western Productions to Gale Anne Hurd for $1.00 in exchange for the right to direct "Terminator 1," when in fact they could not together have 100 percent of a property that Hurd acquired by confessed illegal means from Plaintiff Stewart through a failed bailment by Twentieth Century Fox. [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 196]

132.   On information and belief, because Gale Anne Hurd "ripped off" the "Third Eye," started Pacific and Western Productions, Inc. on May 12, 1981 with it, got James Cameron to re-write it under supervision without the creator's consent, claimed that she had contributed something to the venture worth 50 percent of the intellectual property rights, and then illegally compensated Cameron under the minimum wage law, the deal between Pacific Western Productions, Inc and Hemdale Film Corporation was illegal and void.

133.   Gale Anne Hurd then appeared to sell 50 percent of the stock in Pacific Western Productions Inc. to Hemdale Film Corporation without revealing to the company that she had first illegally "ripped off" Plaintiff Stewart and then used that offense to submit a false registration of authorship to the United States Copyright Office as if she worked for hire, when in fact she was essentially taking credit for the work product of James Cameron, Plaintiff Sophia Stewart, and Harlan Ellison.

134.   As these events occurred in defiance of public law, Gale Anne Hurd illegally sold 50 percent of the "Terminator" rights to Mario Kassar and Andrew Vajna as C2 Partners for $8 million in or about 1997 through the bankruptcy court when she did not truly have 50 percent to sell in the bankruptcy case of Carolco Pictures, Inc. in violation of The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319, Money Laundering Control Act of 1986.

135.   Illusory contracts through "sham and shell" companies by Hurd, Cameron, and Pacific Western Productions, Inc. made in violation of the public laws of 17 U.S.C. 506 (e) should have been declared void for being against federal public policy.

136.   C2 Partners, Mario Kassar and Andrew G. Vajna, created illusory contracts through "sham and shell" companies that were under-capitalized and without legitimate

"Terminator" assets and pretended to sell what it did not buy from Hurd to Halcyon Holding Group LLC in 2007 for $25 million.

137.   On August 17, 2009, after Halcyon Holding Group LLC profited from the fictitious use of the "Terminator" rights, made poor business decisions which led it to file for Chapter 11 reorganization which followed the same "pattern of bankruptcy" filings based upon false oaths of ownership of the "Terminator" franchise rights in violation of 18 U.S.C. 152 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319,  Money Laundering Control Act of 1986 in the same manner as Hemdale Film Corporation and Carolco Pictures, Inc.

138.   Again, Halcyon Holding Group LLC made the deceptive representation to the Bankruptcy Court that it owned the rights that it could not legally acquire by the aforementioned indictable acts that violated 17 U.S.C. 506 (e), and therefore the assertions of ownership by Halcyon Holding Group LLC to the Bankruptcy Court violated 18 U.S.C. 152 (2) and 18 U.S.C. 157 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319,  Money Laundering Control Act of 1986.

152.   The same false oaths regarding authorship were used by Carolco Pictures, Inc. in its Chapter 11 bankruptcy case that commenced in 1995 in violation of 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 17 U.S.C. 506 (e) to a U.S. Bankruptcy Court in the Central District of California for the "Terminator" story that is estimated to be valued at $100,000,000 million dollars.

153.   By these false oaths Hemdale Film Corporation, Pacific Western Productions, Inc., Carolco Pictures, Inc., C2 Pictures, Orion Pictures, T Asset Acquisitions, LLC have achieved revenue in excess of $1.4 billion on the story treatment first written by Sophia

155.   The subject matter described in paragraph 154 is not in the introduction of the "Terminator" film as it is depicted in PA 241-495.

156.   The "Terminator" film released on October 26, 1984 is depicted in PA 241-495 ("Terminator" movie) reads on the May 1, 1981 treatment of the "Third Eye" written by Sofia Stewart as described here:

> One of the major research and weapon systems development organizations on Earth was headed by a philosopher-scientist, Ikahan.  His organization was instrumental in building the Spacestar, a huge vehicle . . . designed for inter-planetary warfare and space travel.  . . .  [I]t contained the most secret and highly advanced devices known at that time.  The [leaders] commanded Ikahan to use the Spacestar as a vehicle for war against any people who resisted their tyranny.  .  .  .  When all of the preparations were completed, the vessel left the orbiting dock where it had been constructed.  . . .  These orders clearly stated [that the] rebels on board the Spacestar [engage in interplanetary travel] and destroy . . . the consciousness of God from the population on Earth. . . .  The Spacestar fights many battles with Earth's fleet, pirates, and experiences space storms.  Many are wounded, and others die.  .  .  .  Eventually, they are forced to land on the planet Sorr, ruled by Queen Johnny, that is completely operated by Machines powered by energy from the "Black Moons".  The light from planet Sorr is such that it encompasses everything in darkness . . . As they stand in the open, the surrounding heavens blaze with fire, lightning, thunderous roars, and other phenomenon.  [The director] moves in for a medium close shot of Ikahn who is now standing . . . They are all naked and without shame.  Ikahn retired to his quarters for meditation, and received notification from the [leaders] to open his secret orders.  These orders clearly specified . . . that the parties [engage in an] expedition of destruction . . . on Earth [for

systematic termination of its future leaders].  [They] descend to Earth . . . [to engage].

157.  Based upon the false oath statements by Gale Anne Hurd, James Cameron, Lightstorm Entertainment, Skydance media, Paramounts pictures, Warner Bros., 20th Century Fox, David Ellison, Andy Wachowski, Larry wachowski Tencent Pictures, Pacific Western Productions, Inc., Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, Dominion Group LLC, Mario Kassar, Andrew Vajna, Derek Anderson, Victor Kubicek, and Pacificor LLC to the United States Copyright Office, numerous Bankruptcy Court proceedings, and the United States District Court for the Central District of California in CV 03-2873 by the defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation, all agreements and submissions should be declared void as against public policy under 17 U.S.C. 506 (e), and 18 U.S.C. 152 (2) from 1984 through and including February of 2018.

158.  The first minute and 45 seconds of "Terminator 1" willfully infringed Plaintiff Stewart's TXu 117-610 copyright from October 26, 1984 and every subsequent time that it was commercially produced through February 2018.

159.  The aforementioned bankruptcy cases from 1995 through August of 2009 have been used to create an air of propriety regarding the next transfer of the "Terminator" franchise, but each bankruptcy case including Hemdale Film Corporation in 1992, Carolco Pictures, Inc. in 1997, and T Asset Acquisitions in August of 2009 were based upon false oaths of sole ownership of the intellectual property rights of the "Terminator" that arose from PAu 584-564 and PA 241-495 through illegal representations of authorship to the U.S Copyright Office, all of which was known by Twentieth Century Fox, through its vice president of Creative Affairs, Susan Merzbach and Kay Harrison, from October 26, 1984 to the present.

160.   Based upon the allegations contained herein, the illusory agreements made by Gale Anne Hurd, Pacific Western Productions, Inc., Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, Dominion Group LLC, Mario Kassar, Andrew Vajna, Derek Anderson, Victor Kubicek, and Pacificor LLC are void to the extent that they purport to transfer intellectual property rights that were made by the illegal copyright registrations by Hurd, Cameron, Pacific Western Productions, Inc. and Hemdale Film Corporation against the copyright rights of Plaintiff Sophia Stewart and Harlan Ellison at their inception.

161.   The assertions of sole ownership to the "Terminator" and " Matrix " publishing, merchandising, and other exploitative rights asserted by the corporations described in paragraph 159 through 160 was a public offense under 18 U.S.C. 152 (2) and were acts in the pattern of racketeering within the meaning of 18 U.S.C. 1961 that violated 18 U.S.C. 1962 (c).

162.   Gale Anne Hurd and James Cameron made the "Terminator" and production decisions based upon the fraudulent conversion of intellectual property owned by Plaintiff Stewart and Harlan Ellison as a means of business planning.

163.   On information and belief, Gale Anne Hurd went to Starlog Magazine to omit Cameron's admissions that they had "ripped off" Harlan Ellison stories to assist in the directing and placing of the setting of the story described in the "Third Eye" by Harlan Ellison, which admissions Gale Anne Hurd sought to conceal by making threats to Starlog Magazine to remove those confessions recorded by Thomas M. Cleaver and confirmed by Tracey Torme.

164.   By virtue of Cameron's admission that he went to a film library and searched for the September 19, 1964 edition of the Outer Limits entitled "Soldier" and the October

17, 1964 edition of the Outer Limits entitled "Demon with a Glass Hand" to help him set up the teleplay for the willful unauthorized use of the story described in Plaintiff Stewart's "Third Eye" as confirmed by the FBI in case number 295-NY-U275271 is an admission by conduct that Cameron, Hurd, and Pacific Western Productions, Inc. established a RICO enterprise to function by unlawful means to commercially exploit Plaintiff's copyright described as TXu 117-610.

165.   Warner Brothers stood by two men, Victor Kubicek and Derek Anderson, known to undercapitalize business ventures in the entertainment industry who borrowed $30 million from Pacificor LLC to unlawfully acquire the illusory "Terminator" franchise from C2 Partners, Mario Kassar and Andrew Vajna. Then plan was for Halcyon Holding Group LLC to be operated by Victor Kubicek and Derek Anderson in concert with Moritz Borman. This outcome was achieved when Warner Brothers provided $200 million in financing to T Asset Acquisitions LLC, a subsidiary of Halcyon Holding Group LLC in or about 2007 to make "Terminator Salvation" that was released on May 21, 2009 even though Warner Brothers was aware of the fact that the intellectual property rights were illegally acquired from Plaintiff Sophia Stewart at least as early as October 26, 1984.

166.   Notwithstanding the knowledge held by Twentieth Century Fox through Susan Merzbach and Kay Harrison from May 1, 1981 and June 1, 1981 that the "Third Eye" belonged to Sophia Stewart, the original plan of reorganization under Chapter 11 for Carolco Pictures, Inc. in 1995 in the United States Bankruptcy Court for the Central District of California stated that Twentieth Century Fox would provide $50 million for the rights to the illusory "Terminator" franchise rights, which contention was evidence of complicity between Mario Kassar of Carolco Pictures, Inc. and high level executives of Twentieth Century Fox.

167.   Yet, in spite of these admissions by the Twentieth Century Fox and Warner Brothers that they recognized the highly valuable branch of the story line that led to $1.4 billion in revenue, no person affiliated with Twentieth Century Fox or Warner Brothers ever elected to recognize the tremendous value of Sophia Stewart's copyright on the subject matter of her May 1, 1981 screen treatment that was written and registered before anything was done by James Cameron, Gale Anne Hurd, and Pacific Western Productions Inc., which facts are subject to verification by Susan Merzbach of Twentieth Century Fox.

168.   Due to the collective "pattern of racketeering" through multiple "sham and shell" under-capitalized corporations described by Moritz Borman about Dominion Group, LLC, the parent company to Halcyon Holding Group LLC, the parent company to T Asset Acquisition Company LLC, all of which were essentially owned, controlled, and undercapitalized by Derek Anderson and Victor Kubicek as described in the Superior Court of the County of Los Angeles in case number SC102043, Plaintiff Sophia Stewart was again victimized of "counterfeiting" by the illusory transfers by entities that sought to sell what they did not own in that Gale Anne Hurd and James Cameron intentionally used Pacific Western Productions Inc. to violate 17 U.S.C. 506 (e) to get control over the "Third Eye" by illegal means from February 3, 1984 and then illegally transferred rights that they did not own by false pretenses including through false assertions of ownership in the U.S. Bankruptcy Court in the Central District of California.

169.   Because Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. did these acts of misconduct as described above in violation of 17 U.S.C. 506 (a)(1)(A) and 17 U.S.C. 506 (e) in 1984 on at least two occasions, and then deceived Hemdale Film Corporation to continue to make false oaths in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 157 to the U.S. Bankruptcy Court regarding its illusory ownership interest, then persuaded Mario Kassar and Andrew Vajna to transfer the illusory properties to Halcyon Holding Group LLC by the same false pretense that Hurd, James Cameron, and

Stewart without her remuneration or consent, which conduct were acts of racketeering.

http://en.wikipedia.org/wiki/The_Terminator;

http://en.wikipedia.org/wiki/Terminator_2:_Judgment_Day,

http://en.wikipedia.org/wiki/Terminator_3:_Rise_of_the_Machines,

http://en.wikipedia.org/wiki/Terminator_Salvation

154.   The screen play that was supposedly written for the U.S. Copyright Office by Cameron and Hurd for Pacific Western Productions, Inc. stated in pertinent part:

> Spray can hieroglyphics.  A Los Angeles public school in a blue-collar neighborhood. Angle between school buildings, where a trash dumpster Looms in a low angle. A cat crosses frame. Close on CAT, which freezes, alert, sensing something. Just beyond perception. [Harlan Ellison's "Soldier] A source less wind rises, and with it a keening WHINE. Papers blow across the pavement The cat YOWLS and hides under the dumpster. Windows rattle in their frames. The WHINE intensifies, accompanied now by a wash of Frigid purple light. A concussion like a thunderclap Right overhead blows in all the windows facing the yard. C.U. – CAT, its eyes are wide as the glare dies. 1A/FX  Angle – Dumpster – 1A/FX Electrical discharges are from the dumpster to a water Faucet and climb a drainpipe like a Jacob's ladder. 2 EXT. School yard – Night – Slow Pan as the sound of stray electrical crackling subsides. Frame comes to rest on the figure of a naked man kneeling, faced away, in the previously empty yard.  He stands slowly. This man is in his late thirties, tall and powerfully built moving with grace and precision. He is the "TERMINATOR".

Pacific Western Productions, Inc. could legally transfer illegal outcomes that defied 17 U.S.C. 506 (e) notwithstanding their admissions to Harlan Ellison, each and every transfer of the fictitious and illusory assertion of ownership were through similar acts of deception and fraud on investors including Pacificor LLC to obtain $30 million to acquire the "Terminator" franchise rights by Kubicek and Anderson were further acts of fraud in the RICO enterprise in the pattern of racketeering by mail and wire fraud in violation of 18 U.S.C. 1341 and 18 U.S.C. 1343 in and about 2007.

170.   The $30 million that was obtained by Victor Kubicek and Derek Anderson from Pacificor LLC to finance "Terminator Salvation" was achieved by false representations of ownership by Mario Kassar and Andrew Vajna through C2 Partners to Halcyon Holding Group LLC in violation of 18 U.S.C. 1341 and 18 U.S.C. 1343, which false representations through means of interstate commerce were the result of prior illegal copyright registrations by Hurd, Cameron, and Pacific Western Productions, Inc. that willfully violated 17 U.S.C. 506 (e) as to both PA 241-495 and PAu 584-564 in 1984 as was admitted by Cameron to Thomas M. Cleaver, Tracy Torme, Starlog Magazine, and Harlan Ellison.

171.   The RICO enterprise that first formed as Pacific Western Productions, Inc. was replaced by numerous undercapitalized corporations, all of which including Halcyon Holding Group LLC have used fictitious intellectual property rights that were owned in part by Plaintiff Sophia Stewart, and this pattern of racketeering has continued through repeated offenses of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 18 U.S.C. 1621 (a), all of which violated 18 U.S.C. 1962 (c) by the fictitious sale of the "Terminator" franchise rights through at least three acts of wire and mail fraud in interstate commerce between and including 2007 and February 8, 2018.

172.   By the aforementioned acts, Plaintiff Stewart was the subject of strategic and repeated under-capitalized corporate trickery through multiple violations of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 18 U.S.C. 1621 (a), all of which racketeering was designed to block Plaintiff Stewart as a women from receiving her fair share of the $1.4 billion in revenue that has been made on her May 1, 1981 screen treatment entitled the "Third Eye" that is protected by TXu 117-610.

173.   The corporate participants in this pattern of racketeering that were aware of the malfeasance of Hurd, Cameron, and Pacific Western Productions included Twentieth Century Fox, but it never reported its knowledge of the illegal copyright registrations through Susan Merzbach and Kay Harrison since October 26, 1984 in accordance with its duty to do so under 18 U.S.C. 4.

174.   Every entity that got close to the "Third Eye" had amazing outcomes:

a)   Roger Corman - $16.5 Million;

b)   Gale Anne Hurd – in excess of $8 million;

c)   Pacific Western Productions – (unknown);

d)   Hemdale Film Corporation - - $72 million;

e)   Carolco Pictures, Inc. -- $400 million;

f)   C2 Partners (Intermedia) - $233 million;

g)   Halcyon Holding Group LLC - $172 million;

h)   James Cameron – unknown; and

175.   James Cameron was employed by New World Pictures, Inc. between January 1, 1981 and at least December 31, 1982 in that he worked on the October 1982 release called "Android" with Roger Corman, the executive producer.

176.   At all times while James Cameron worked on the first draft of the "Terminator" that was filed with the Writer's Guild of America, he was the employee of New World Pictures, Inc. through July of 1982.

177.   The only entity therefore that should have been able to claim that James Cameron did an act as an employee for hire based upon that story was New World Pictures, Inc. since Cameron was its employee through the close of December of 1982.

178.   Yet, Cameron labeled the July 1982 First Draft of the "Terminator" that was registered with the Writers Guild of America as a writing done totally by him for Pacific Western Productions, Inc. without any credit to Roger Corman even though he was then admittedly employed by New World Pictures, Inc. and employed as design consultant on the "Android."

179.   On information and belief, James Cameron, by that indictable action, admitted part of the pattern of racketeering by the script language about the "cat" from "Soldier," but withheld and concealed that part of the misconduct that involved his abuse of the rights of Plaintiff Sophia Stewart that were identified in the first minute and 45 seconds of "Terminator 1" as depicted in the film filed under PA 241-495.

180.   Gale Anne Hurd and Pacific Western Productions, Inc. deceived numerous businesses and entities into investing into the "Terminator" franchise by falsifying the original copyright application regarding authorship with Hemdale Film Corporation.

181.   Defendant Hurd, Pacific Western Productions, Inc., and her fellow defendants in the motion picture industry RICO enterprise defiantly breached and rebelled against the following laws to carry out the on going pattern of racketeering: 17 U.S.C. 506 (a) (1) (A), 17 U.S.C. 506 (e), 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), 18 U.S.C. 1621 (a), and 18 U.S.C. 1962 (c).

182.   Gale Anne Hurd, by paying Cameron only $1.00 for a script that he claimed that he wrote for Pacific Western Productions after February of 1982 for 50 percent of the story rights that she claimed were then worth $1.00 to permit Cameron to Direct was a farce designed to subvert the minimum wage and scale for the writers in the Writers Guild of America.  [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196]

183.   At the same time that Gale Anne Hurd made this legally inoperative arrangement with Cameron, she involved herself in an intimate relationship with James Cameron to the detriment of his then existing marriage with Sharon Cameron in 1982, which conduct is an admission by conduct that she did not respect required boundaries of business and social society in order to gain an unfair advantage in the business value of the "Third Eye" that she knowingly used to create the "Terminator" through Pacific Western Productions Inc. to usurp the commercial advantage that should have been assigned to Plaintiff Stewart under the laws of the United States.

184.   On information and belief, James Cameron filed a false affidavit under oath on the Motion for Summary Judgment to the United States District Court for the Central District of North Carolina on or about April 29, 2005 and declared that he: (1) conceived the story idea alone in February of 1982; (2) pitched the idea to Hurd in March or April of 1982; (3) obtained Hurd's interest in producing the idea; (4) completed a treatment in July of 1982 and registered it with the Writers Guild of America; which assertions of authorship were false within the meaning of 18 U.S.C. 1621.

185.   These same statements were presented to a federal judge in the United States District Court for the Central District of California in case number CV 03-2873 MMM on or about April 29, 2005.

186.   By Cameron's admissions in the dispute against Hemdale Film Corporation and Orion Pictures Inc. for the "ripped off" work of Harlan Ellison reflects a modus operandi to pilfer the work product of other writers with copyrights and was "willfully" omitted from his April 29, 2005 Affidavit to the United States District Court of the Central District of California in violation of 18 U.S.C. 1621, which material omission illegally deceived the assigned United States District Court Judge and earlier deceived the United States Copyright Office on February 3, 1984 in violation of 17 U.S.C. 506 (e), which conduct was another "indictable act" in the pattern of racketeering by Hurd, Cameron, and Pacific Western Productions, Inc. within the meaning of 18 U.S.C. 1961, 18 U.S.C. 1621 (a), and 18 U.S.C. 1962 (c) that began in May of 1981.

187.   Cameron's affidavit to the United States District Court for the Central District of California in case number CV 03-2873 MMM dated April 29, 2005 was a materially false statement of authorship via an affidavit in violation of 18 U.S.C. 1621 (a) that was based upon a prior materially false copyright registration that did not disclose that Harlan Ellison and Sophia Stewart were co-authors of the "Terminator" in violation of 17 U.S.C. 506 (e); in order to cover up the complete strategy of making the "Terminator" film with the copyrighted work of others as the primary elements of its production.

188.   Before Starlog Magazine could publish the truthful statement made by James Cameron, Gale Anne Hurd sent a legal demand to the magazine to review the article before it was published; and by that action, she took steps to "conceal" Cameron's admission of the misconduct in accordance with the public policy of the United States described in 18 U.S.C. 4.

189.   Gale Anne Hurd, on information and belief, consulted Roger Corman regarding the "Third Eye" and was advised that the writer was not a member of the Writers Guild of America West and therefore New World Pictures, Inc., a signatory, would not consider her submission.

190.   On information and belief, Gale Anne Hurd then took the copy of the "Third Eye" while James Cameron was still in Italy working on "Piranha II: the Spawning" and then registered articles of incorporation for Pacific Western Productions, Inc. on May 12, 1981 under C1043898 through Carmelle M. Gray and M. Forg Eu of the Office of the Secretary of State through attorney James R. Miller, then of 2029 Century Park East, Suite 2500, Los Angeles, California.

191.   On information and belief, Cameron, by his admission, tried to stop the conspiracy to conceal the unlawful misconduct that he was engaged in with Gale Anne Hurd and Pacific Western Productions, Inc. in 1984 after he noticed that Hurd had duped him out of his interest in the work product for playing the role of the writer of the "Terminator."

192.   On information and belief, Cameron intentionally used aspects of "Soldier" and "Demon with a Glass Hand" in an effort to protect himself from being accused of a far greater wrong, an allegation of theft from an unknown student writer, then Plaintiff Sophia Stewart of the USC Film School.

193.   On information and belief, the best protection from an allegation from Plaintiff Stewart was to actively construct part of the teleplay from a well-respected writer, Harlan Ellison, who would elevate the perspective of a quality screenplay and provide the appearance of a defense of the real malfeasance, the willful unauthorized use of a story created by a student writer that did not then have the units to become a member of the Writers Guild of America West.

194.   On information and belief, this malfeasance was done on purpose to deter Plaintiff Sophia Stewart from believing that the malfeasance came from the "Third Eye," but from Harlan Ellison and the Outer Limits.

195.  On information and belief, while James Cameron was fully employed by Roger Corman of New World Pictures Inc. in early to mid-1982, he then submitted the first draft of the "Terminator" to the Writers Guild of America West surprisingly in the name of Pacific Western Productions, Inc.

196.  On information and belief, Roger Corman of New World Pictures Inc. mentored James Cameron regarding his efforts between February of 1982 and July of 1982.

197.  Between February of 1982 and July of 1982, Cameron went to the USC Film School and reviewed and copied Harlan Ellison's "Soldier" and "Demon with a Glass Hand" as to the teleplay in an effort to create an alibi as to how he did not use the "Third Eye" by intentionally using portions of Harlan Ellison's work product.

198.  The idea of using Harlan Ellison's 1964 episodes from the Outer Limits did not come first from Cameron or Hurd, it came from another New World Pictures, Inc. employee described here as John Doe number 7.

199.  Before "Terminator 1" was made, the following executives knew that the introduction that was filed with the Writers Guild of America and that disclosed in the copyright registration for the film was not used, including Susan Merzbach of Twentieth Century Fox, Gale Anne Hurd of Pacific Western Productions, Inc., Barry Plumley of Hemdale Film Corporation, Barbara Boyle, Senior Vice President of Orion Pictures, Inc., Mike Medavoy, Vice President of Productions, and John Daly, a co-founder of Hemdale Film Corporation.

200.  Derek Anderson, Victor Kubicek, Warner Brothers, Halcyon Holding Group LLC, T Asset Acquisitions LLC, T Salvation Productions, LLC, T Salvation Distribution LLC, T Salvation Distribution (BVI), LTD, Halcyon Company, Halcyon Consumer Products, LLC, and Dominion Group, LLC knew from the FBI, Harlan Ellison, Plaintiff Sophia

Stewart, and James Cameron that C2 Partners through Mario Kassar and Andrew G. Vajna could not lawfully sell 100 percent of the "Terminator" production, merchandising, interactive, software, and other exploitative media rights because of the prior and superior story rights of Plaintiff Stewart disclosed in TXu 117-610.

201.    According to Barbara Boyle, Vice President of Orion Pictures, Inc., John Daly, the co-founder of Hemdale Film Corporation, Susan Merzbach of Twentieth Century Fox, Mike Medavoy, vice president of productions of Orion Pictures, Inc., and Barry Plumley of Hemdale Film Corporation, the story depicted in the "Terminator" film that was based upon the "Third Eye" was commercially feasible in 1984.

202.    According to Moritz Borman, Derek Anderson, Victor Kubicek, Warner Brothers, Twentieth Century Fox, T-Salvation Productions, LLC, T Salvation Distribution LLC, T Asset Acquisition Company, LLC, T Salvation Distribution (BVI), LTD., Halcyon Holding Group LLC, and Dominion Group LLC, the story concept that formed the basis on "Terminator 1" was highly valuable and therefore they collectively made a significant effort to obtain the so-called "Terminator" franchise, but they ignored their responsibility to ascertain how it was that the FBI had informed Warner Brothers in 2000 that the so-called franchise was based upon the prior registration of the "Third Eye" by Sophia Stewart in 2000 before they  collectively invested about $200 million, mostly from Warner Brothers, in 2007 to bring forth "Terminator Salvation" in May of 2009. [New York City FBI -- 295-NY-U275271]

203.    After Plaintiff Stewart notified James Cameron and Gale Anne Hurd that they had violated her rights under 17 U.S.C. 201 through the deceptive assertion of full authorship to the "Terminator" franchise, they along with Bruce Isaac and David Boren took steps to wrongfully retaliate against her for reporting their misconduct to them as to the first minute and 45 seconds of the film, which the indictable conduct was illegal under 18 U.S.C. 1513 (e) (2), 18 U.S.C. 241, 18 U.S.C. 1621,  18 USC §242 – Deprivation of civil

rights under the color of law, 18 USC §1505 – Obstruction of proceedings before a judiciary, U.S. v. Cross, 128 F.3rd 145 (3rd Cir. 1997), and Dennis v. Sparks, 449 U.S. 24 (1980), and a further extortion act in accordance with the "pattern of racketeering" in or about 2007:

**BRUCE ISAAC:**
"I would like to set a judgment debtor examination regarding your financial condition so that we        can collect the $305,000 YOU OWN MY CLIENTS." (Exhs. 14.11, Bruce Isaac Extortion   Request…); (Exh. 21, 22 Bruce Isaac Extortion Liens for $305,235.62); (Exh. 22.11, Katherine        Chilton Extortion Letter dated July 25, 2007)

204.   In spite of the fact that there was a "genuine issue of material fact" as to James Cameron, Gale Anne Hurd, and Pacific Western Productions, Inc. "ripping off" the "Third Eye" through disclosed and undisclosed John Does 1 through 6 of Twentieth Century Fox and disclosed and undisclosed John Does 7 through 12 of New World Pictures, Inc. from Plaintiff Stewart using the same modus operandi as they had used against Harlan Ellison, Plaintiff Stewart was entitled to a decision that denied defendant's Motion for Summary Judgment in that the disputed facts of substantial similarity," and infringements of "protective expression were generally known through public reports in the media about the making of the "Terminator".

205.   The federal court did not permit Plaintiff Stewart to have a trial on the genuine disputed facts described hereinabove because defendants James Cameron and Gale Anne Hurd gave intentionally false statement about their creative authorship, but omitted how they willfully studied and copied "Soldier" and "Demon with a Glass Hand" in making he "Terminator" as they admitted it to Harlan Ellison, Tracy Torme, Thomas M. Cleaver, and Starlog Magazine in violation of 18 U.S.C. 1621.

206.   On information and belief, other industry executives that opined that the "Terminator" Story alone, which was based upon the "Third Eye" by Sophia Stewart, was commercially feasible were Barry Plumley, an executive of Hemdale Film Corporation, Mike Medavoy, an executive with Orion Pictures Inc., John Daley, a co-founder of Hemdale Film Corporation, Roger Corman, CEO of New World Pictures, Inc., and Susan Merzbach, the vice president of Creative Affairs of Twentieth Century Fox between and including May 1, 1981 and February 3, 1984.

207.   "The Terminator" story, based upon a number 1 box office rating three weeks in a row, produced $78 million in revenue world wide on a cost basis of $6.5 million, making "Terminator 1" the film that had the highest rate of return on investment of all of the film series.

208.   After Twentieth Century Fox did not make the required report of this malfeasance that its executive recognized in violation of 18 U.S.C. 4 in light of the obvious false copyright registration in violation of 17 U.S.C. 506 (e), Twentieth Century Fox participated in negotiations to buy the rights of what it knew were unlawful intellectual property rights during the Carolco Pictures, Inc. Chapter 11 for $50 million.

209.   After Harlan Ellison disclosed the modus operandi to Hemdale Film Corporation, all industry executives were aware that James Cameron, Gale Anne Hurd, and Pacific Western Productions, Inc. had used illegal means to craft and author the "Terminator" in 1985.

210.   The RICO enterprise offenses have included 17 U.S.C. 506 (e) (false registrations), 17 U.S.C. 506 (a) (1) (A) (willful infringement), 18 U.S.C. 152 (2) (false oaths to the Bankruptcy Court), 18 U.S.C. 1621 (a) (false affidavits to the U.S. District Court regarding sole authorship), 18 U.S.C. 1341 (mail fraud by false submissions to the U.S. Bankruptcy Court), 18 U.S.C. 1343 (false representations regarding ownership to

solit offers to buy intellectual property that the sellers did not wholly own in reference to the U.S. Bankruptcy Court), all of which offenses were used to deprive one true co-author of her screen credit and remuneration on $1.4 billion in sales in violation of 18 U.S.C. 1962 (c) and (d) and 18 U.S.C. 1964 (a) and (c), which damages to plaintiff when trebled are in excess of $30 million.

## THIRD CAUSE OF ACTION
## DEFENDANTS' EFFORTS TO MAKE
## CONTRACTS REGARDING COPYRIGHTED
## INFORMATION THAT THEY DID NOT
## OWN UNDER 17 U.S.C. 201 AND 106
## ARE VOID AND AGAINST PUBLIC POLICY
## UNDER 17 U.S.C. 506 (e)

211.   Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

212.   Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Hemdale Film Corporation, Cinema '84, Lightstorm Entertainment, Intermedia/IMF Production, C2 Pictures, Mostow/Lieberman Productions, Halcyon Holding Group, LLC, Halcyon Consumer Products, LLC, Dominion Group, LLC, T-Salvation Productions, LLC, T-Salvation Distribution, LLC, T Asset Acquisition Company, LLC, and T-Salvation Distribution (BVI), LTD. made agreements regarding the "Terminator" story without first getting authorization from co-author Plaintiff Stewart to use her copyrighted "Third Eye" story that had been incorporated into "The Terminator," "Terminator 2: Judgment Day," "Terminator 3: Rise of the Machines," "Terminator Salvation," and the "Sarah Conner Chronicles".

213.   The failure of the above defendants to get the authorization from Harlan Ellison to use "Soldier" (1964), and "Demon with a Glass Hand" (1964), and to use the first minute and 45 seconds of Sophia Stewart's the "Third Eye" (May 1, 1981) registered under [Txu117-610], is a confession by the defendants that they had a modus operandi to willfully conceal the names of the true authors and creative designers of the concept and thereby wrongfully and illegally took all credit in violation of 17 U.S.C. 506 (e) for authorship and profit to the derivates "The Terminator" [PAu 584-564 and PA 241-495] (October 26, 1984), "The Terminator 2: Judgment Day" [PA 527-728] (July 3, 1991), "Terminator 3: Rise of the Machines" [PA 1-210-058] (July 2, 2003), "Terminator Salvation" [PA 1-628-221] (May 21, 2009), and the "Sarah Conner Chronicles" (January 13, 2008 – April 10, 2009).

214.   Based upon Gale Anne Hurd's willful misconduct to combine to illegally conceal Harlan Ellison and Plaintiff Stewart's names as co-authors from the U.S. Copyright Office through Hemdale Film, and Pacific Western Productions, Inc., every business arrangement involving the rights of every "Terminator" movie were void at their inception against public policy because Harlan Ellison and Plaintiff Stewart, co-owners, were not consulted for authorization under 17 U.S.C. 106, which willful omission was an offense under 17 U.S.C. 506 (e).

215.   The public policy of the United States from October 26, 1984 through May 21, 2009 is that every co-author must be listed on the copyright registration that deals with their creative input under 17 U.S.C. 201, and the willful omission/concealment of that disclosure from the United States Copyright Office by Gale Anne Hurd through Pacific Western Productions, Inc. and the deception of all buyers, beginning with Hemdale Film Corporation through Pacificor LLC in February of 2010 by that offense under 17 U.S.C. 506 (e) has been  an intentional violation of federal public policy pursuant to 17 U.S.C. 106 for commercial purposes.

216. Plaintiff Stewart was a co-author/co-owner of the "Terminator" motion picture copyrights pursuant to 17 U.S.C. 201 as demonstrated in the first minute and 45 seconds of the film identified as PA 241-495 in the same way that Harlan Ellison was later determined to be a co-author after that same crime under 17 U.S.C. 506 (e) on the same movie by the same actors, Hurd, Cameron, and Pacific Western Productions, Inc The first minute and 45 seconds of "The Terminator" was based upon Plaintiff's May 1, 1981 "Third Eye" screen treatment as described in paragraphs 156 and 160 as registered under TXu 117-610.

217. Hemdale Film Corporation provided $6.5 million to do the "Terminator" near the same time that Roger Corman received $16.5 million from attorneys Sloan, Kippur, and Thompson for New World Pictures, Inc. minus the film library near February of 1983.

218. Upon information and belief, the investors in Hemdale Film Corporation had assistance in evaluating the "Terminator" screenplay from Roger Corman of New World Pictures, Inc., Mike Medavoy of Orion Pictures, Arthur Krim of Orion Pictures, and Eric Pleskow of Orion Pictures.

219. Every business deal that was made by the companies described in paragraphs above did not disclose the fact that Harlan Ellison and Plaintiff Stewart were co-authors of the base story depicted in PA 241-495 and every derivative work described as "Terminator 2: Judgment Day," "Terminator 3: Rise of the Machines," and "Terminator Salvation."

220. The defendants described in paragraph 165 were deceived by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. regarding authorship due to the false statements of authorship submitted to the United States Copyright Office by them regarding PA 241-495 and PAu 584-564, when, in fact, those submissions were

derivative works from Plaintiff's May 1, 1981 "Third Eye" under TXu 117-610 and Harlan Ellison's "Soldier" and "Demon with a Glass Hand."

221.  Each and every agreement reached by the defendants from February 3, 1984 to May 21, 2009 regarding the "Terminator" has been legally inoperative because Plaintiff Stewart was not included or compensated in accordance with 17 U.S.C. 106 and 201.

222.  Plaintiff Stewart requests that the Court declare each agreement void as against public policy based upon offenses in the registrations that violated 17 U.S.C. 506 (e) as to PAu 584-564 and PA 241-495 that became the basis of every other illegal "Terminator" registration under 28 U.S.C. 2201 and 2202, and that the defendants disgorge any and all profits that resulted from the illegal concealment of Plaintiff's contribution to authorship that was done by the same unlawful modus operandi that was used to conceal the rights of Harlan Ellison in the production of the first "Terminator" film.

223.  Plaintiff Stewart requests that a constructive trusts be imposed upon Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Halcyon Holding Group LLC, and T Asset Acquisitions LLC that failed to ascertain the validity of Plaintiff Stewart's public assertion of co-ownership, particularly after the FBI disclosed that its investigation confirmed Stewart's assertions to Warner Brothers before it provided $200 million in 2007 for the production of "Terminator Salvation" to Halcyon Holding Group LLC.

224.  Gale Anne Hurd, Pacific Western Productions, Inc., and Halcyon Holding Group LLC should be required to disgorge the reasonable value of Plaintiff Stewart's interest in the "Terminator" franchise for the recent $29.5 million paid by Pacificor LLC to Halcyon Holding Group LLC due to the illegal pattern of racketeering that has been used to deprive Stewart of her interest including but not limited to false oaths of ownership to

the U.S. Bankruptcy Court in the Halcyon Holding Corporation LLC case commenced on August 17, 2009 in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 1621 (a).

225.   James Cameron admitted by conduct in the movie and screenplay that Gale Anne Hurd "ripped off" Plaintiff's "The Third Eye" when he used the date May 12th to describe the day that the "Terminator" arrived in Los Angeles.

226.   Gale Anne Hurd started Pacific Western Productions, Inc. on May 12, 1981 through attorney James R. Miller in California under C1043898, just days after Twentieth Century Fox in Los Angeles had possession of the script and its former story analyst, Roger Corman of New World Pictures, Inc. had his employee start a new production company while still employed by him at New World Pictures, Inc.

227.   James Cameron, by those words in the dialogue, admitted that Gale Anne Hurd was the person that illegally terminated Plaintiff Stewart's rights in the "Third Eye" in the same way that she acted toward Harlan Ellison's story entitled "Soldier" in the fall of 1964 in violation of 17 U.S.C. 506 (e).

228.   By the concerted concealment of the evidence of the foundation work for each "Terminator" story by Gale Hurd, James Cameron, and Pacific Western Productions, Inc. beginning in May of 1981, these defendants deceived every subsequent purchaser into believing that they could buy intellectual property rights that were illegally acquired by them in violation of 17 U.S.C. 506 (e), but this law was established to protect rights accorded under Article 1, Section 8, and Clause 6 of the Constitution of the United States and cannot be contravened by a private agreement based upon an illegal act.

229.   On information and belief, Hemdale Film Corporation was defrauded by Pacific Western Productions, Inc. in that neither James Cameron nor Gale Anne Hurd authored the "Terminator"; rather, they misappropriated the May 1, 1981 screen treatment of the

"Third Eye" by Plaintiff Stewart to create a derivative work that was called the "Terminator" without disclosing their additional illegal use of the "Soldier" and "Demon with a Glass Hand" by Harlan Ellison in violation of 17 U.S.C. 506 (e) and 17 U.S.C. 201.

230.    On information and belief, Hemdale Film Corporation after the successful release of the "Terminator" that made more than $70 million in revenue world-wide, later filed for bankruptcy protection and alleged to the United States Bankruptcy Court falsely that it owned all rights to the "Terminator" story with Pacific Western Productions Inc. and its related merchandising, publishing, and other commercial rights, based upon the false registrations by Gale Anne Hurd, James Cameron, and Pacific Western Productions regarding the "Terminator" film under PA 241-495 and PAu 584-564 which statement was in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 157 (2).

231.    Carolco Pictures, Inc. paid $10 million to Hemdale Film Corporation for the rights to the "Terminator" franchise without first giving Plaintiff Stewart her credit and remuneration for the use of her May 1, 1981 screen treatment called the "Third Eye" registered as TXu 117-610 in "Terminator" as revealed in PA 241-495 and "Terminator 2: Judgment Day" that reads on PAu 1-513-625.

232.    Carolco Pictures, Inc. made "Terminator 2: Judgment Day" on a budget of $102 million and achieved gross sales of $519.8 million from a movie released on July 3, 1991 that is represented by registration PAu 1-513-625 that did not acknowledge the use of Plaintiff's "The Third Eye" screen treatment dated May 1, 1981 as it is described above and identified as TXu 117-610.

233.    Nevertheless, Carolco Pictures, Inc. had to file for bankruptcy protection on November 10, 1995 where a plan was proposed by Mario Kassar and Andrew G. Vajna to sell the stock to Twentieth Century Fox for $50 million, but this plan failed to

materialize apparently due to this history, which resulted in Mario Kassar and Andrew Vajna purchasing the right to the "Terminator" merchandising, publishing, and franchise rights without first resolving Plaintiff Sophia Stewart's interest in the amount of $15 million through a new entity called C2 Pictures that constitutes a partnership between Kassar and Vajna.

234.   Carolco Pictures made false oaths of ownership to the Bankruptcy Court. As a result, the purchase through the bankruptcy court was void as a matter of public policy under 17 U.S.C. 201 and 106 in light of 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2) due to the fact that Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. had willfully concealed the contribution of Plaintiff Stewart to PA 241-495 in violation of 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2).

235.   The purchase by C2 Pictures through Mario Kassar and Andrew G. Vajna for $15 million was void against public policy in 1997 because Twentieth Century Fox then knew that it had reviewed the "Third Eye" between and including May 1, 1981 and June 1, 1981 through a letter by Kay Harrison and that this story was clearly derived from that submission without the consent of Plaintiff Stewart. (Exh. 12.3, Letter of Access by Kay Harrison reference Susan Merzbach)

236.   C2 Pictures made "Terminator 3: Rise of the Machines" that was released on June 30, 2003 that was registered with the Copyright Office under PA 1-210-058 and they continued to conceal the fact that Plaintiff Stewart was a co-author on the underling copyright in violation 17 U.S.C. 506 (e) even though the film was made with a budget of $102 million and generated revenue of $519.8 million with the use of Plaintiff Stewart's story incorporated within the introduction of the film.

237.   In 2007, C2 Pictures with the assistance of businessman Moritz Borman sold the "Terminator" merchandising, publishing, and other exploitation rights that arose from

the original film copyright PAu 584-564 and PA 241-495 and related copyrights to Halcyon Holding Group, LLC for the sum of $25 million, but this deal was also void because Plaintiff Stewart's rights were not resolved and the agreement was based upon the public offense by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. in violation of 17 U.S.C. 506 (e) as to PA 241-495 and PAu 584-564.

238.   Halcyon Holding Group LLC then made "Terminator Salvation" that was released on May 21, 2009 on a budget of $200 million with a gross revenue of $372 million with a copyright registration of PA 1-628-221 registered to T Asset Acquisition Company LLC without disclosing the contribution of Plaintiff Stewart to the story through the "Third Eye" as disclosed in TXu 117-610 that predated all "Terminator" film registrations as of February 3, 1984.

239.   The copyright of "Terminator Salvation" was registered as PA 1-628-221 without any reference to the co-authorship of Plaintiff Stewart.

240.   Again, after another successful "Terminator" movie, Halcyon Holding Group, LLC continued its pattern of "money laundering" and "counterfeiting" by filing bankruptcy with the false claim that it was the true owner of the copyright rights in violation of 17 U.S.C. 506 (e) as of the August 2009 submission for protection under Chapter 11 of the Bankruptcy Code.

241.   Plaintiff Stewart is the only party in the history of "Terminator" bankruptcy filings to simultaneously enter the actual copyrights of the "Terminator" with Harlan Ellison and Sophia Stewart's names being absent thereon, and a copy of the "Terminator" movie bearing Harlan Ellison's name in the credits, thus Stewart requests that the Court follow the procedure to contact the executive branch of the government and "The Register of Copyrights" to investigate the circumstances to make sure that the government is not providing an "Unlawful Monopoly" under 15 U.S.C. 1 because the facts to support

exclusive use under 17 U.S.C. 106 are factually inaccurate. Since, it is obvious that the registration is based upon materially false facts that are called into question, the Court can request that the investigatory arm of the United States to confirm the facts to eliminate the possibility of an offense under 18 U.S.C. 1001 (a). If it is known to the Court that the Terminator copyrights PAu 584-564 and PA 241-495 are materially false/inoperative, it would be participating in a "Wrongful Restraint of Trade" ("Emphasis Added"), because the writers would not then be "Entitled to a Lawful Monopoly" of the subject matter under 17 U.S.C. 106 based upon Article 1, Section 8, Clause 7 of the Constitution."

242. The auction sale on or about February 8, 2010 by T Asset Acquisition LLC, the subsidiary to Halcyon Holding Group LLC to Pacificor LLC for $29.5 million with an additional $5 million was void in that it constitutes a violation of Money Laundering Act of 1986 against Pacificor creditors  and was also based upon offenses under 18 U.S.C. 152 (2) and 17 U.S.C. 506 (e) through a "pattern of racketeering" that violated 18 U.S.C. 1962 (c) and (d), and was therefore void against public policy.

243.  The consistent "pattern of racketeering" by poorly capitalized sham and shell companies without legitimate "Terminator" assets constitutes a "Ponzi Scheme," then converting the "Terminator" franchise copyrights it into millions of dollars, and repeatedly returning back to the bankruptcy court for a cheap sale is a pattern that is too consistent to be ignored as a modus operandi to thwart Plaintiff Stewart's ability to recover for the willful infringement of her copyright on May 21, 2009 as described above and then filing for bankruptcy on August 17, 2009 after having quickly made $172 million.

244.  The effort by Twentieth Century Fox to acquire the "Terminator" franchise by a purchase from Carolco Pictures, Inc. and C2 Partners, Mario Kassar and Adrew Vajna, for $50 million as a part of a plan of reorganization is further evidence that Twentieth

Century Fox knew that the story written by Plaintiff Stewart was valuable and commercially viable between May 1, 1981 and May 12, 1981.

245. The discussions that Twentieth Century Fox had in the Carolco Pictures, Inc. bankruptcy in 2007 to acquire the "Terminator" franchise is evidence that Plaintiff Stewart was truthful when she said that Susan Merzbach of Twentieth Century Fox advised her between May 1, 1981 and May 12, 1981 that the story was commercially useful.

246. On information and belief, the election of Twentieth Century Fox to conceal its knowledge that all of the persons involved in these transfers did so illegally is confirmed by the decision of Twentieth Century Fox not to buy it after it confirmed within the corporation that the title was bad because the sellers had not resolved the interest of Plaintiff Stewart.

247. Due to this pattern of malfeasance, all agreements discussed hereinabove were void against public policy for failing to identify the contribution of the first author, Plaintiff Sophia Stewart, in violation of 17 U.S.C. 506 (e) and 17 U.S.C. 506 (a) (1) (A) as of May 12, 1981 when Gale Anne Hurd "ripped off" Stewart and used it to start Pacific Western Productions, Inc. with a story that revealed the "naked" without shame interplanetary travel in a post nuclear setting between man and machines as it was clearly depicted in the "Third Eye."

248. The entity that first had a lawful right to review the May 1, 1981 "Third Eye" screen treatment by Plaintiff Stewart was Twentieth Century Fox between May 1, 1981 and May 31, 1981.

249.   On information and belief, John Does 1 through 6 of Twentieth Century Fox got together with John Does 7 through 12 of New World Pictures, Inc., one of whom was a former story analyst of Twentieth Century Fox  between May 1, 1981 and May 12, 1981 transferred the "Third Eye" to a representative of New World Pictures, Inc. who could develop the story through a writer that would first register the work with the Writer's Guild of America on the recommendation of a  manager of New World Pictures, then Roger Corman.

250.   Upon information and belief, Twentieth Century Fox had an internal policy not to act on submissions that were submitted by writers that were not members of the Writer's Guild of American, but that policy did not permit industry heads to aid and abet in a "rip off" of the subjects creative work product through illegal copyright submissions in violation of 17 U.S.C. 506 (e) and the willful infringement of the subject's story rights in violation of 17 U.S.C. 506 (a) (1) (A).

251.   Upon information and belief, the perpetuation of such a "pattern of racketeering" through the use of illegal copyright registrations in violation of 17 U.S.C. 506 (e), illegal statements of ownership to the bankruptcy courts in violation of 18 U.S.C. 152 (2), and illegal affidavits to the United States District Court for the Central District of California cannot be endorsed by the Courts after the FBI in the year 2000 found that the "Third Eye" was infringed in the "Terminator" in a New York City FBI report described as case number 295-NY-U275271.

252.   When false information was submitted to the United States District for the Central District of California in case number CV 03-2873 MMM through the false affidavits of April 29, 2005 by Cameron and Hurd, the Court was encouraged to make a decision on a Motion for Summary Judgment where the actual film at issue described in PA 241-495 was not even presented to the federal Judge or the expert witness as a matter of deception to compare the language in TXu 117-610, and that indictable act of deception

is further proof that the "pattern of racketeering" by the use of materially false statements was in violation of 18 U.S.C. 1621 in the federal court in Los Angeles.

253.   James Cameron, Gale Anne Hurd, Pacific Western Productions, Inc., Hemdale Film Corporation, and Orion Pictures, Inc.  already admitted in writing that they "ripped off" other stories in the making of the "Terminator" in or about December of 1984 to Harlan Ellison, Thomas M. Cleaver, Tracy Torme, and Starlog Magazine.

254.   Pacific Western Productions, Inc. was started by Gale Anne Hurd when James Cameron was not in the Country and when he was in the midst of working on "Piranha II: The Spawning" in Italy.

255.   On information and belief, Roger Corman of New World Pictures, Inc. was not looking for a buyer for New World Pictures, Inc, in May of 1981, but as soon as James Cameron finished the first draft of the script as his employee supposedly while working as a design consultant on "Android" for New World Pictures, Inc. between February of 1982 and June of 1982, three attorneys came to make an offer to buy the stock of New World Pictures, Inc.   [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 221]

256.   Thus, Gale Anne Hurd's position has been that she started Pacific Western Productions, Inc. without a story of her own and also without strategic and economic support from Roger Corman of New World Pictures, Inc.

257.   Still, Susan Merzbach and Kay Harrison of Twentieth Century Fox have affirmed that Twentieth Century Fox had a copy of Plaintiff Stewart's "Third Eye" between May 1, 1981 and May 12, 1981, and thereafter a story that resembled it was filed with the Writers Guild of America by another New World Pictures employee who was then working on the movie "Android" in July 1982.

258.   The language in the screenplay that infringed the copyrights of Harlan Ellison was in the July 1982 submission to the Writers Guild of America by James Cameron that was written while he was employed by New World Pictures, Inc. apparently on the film entitled "Android" as a design consultant.

259.   Plaintiff Stewart later submitted the "Third Eye" to the Wachowski Brothers before the "Matrix" was written near the late 1990s.

260.   The Federal Bureau of Investigation investigated her complaint in case number: 295-0-25/195-SU-0 that the introduction of the "Matrix" read on the "Third Eye," but when those facts were brought to the attention of Warner Brothers before the movie was released, some aspects of the infringing portions were removed immediately in 2000.

261.   The Federal Bureau of Investigation also opined in 2001 at the Salt Lake City Branch that the segments of the "Matrix" were the same as segments of the introduction to "The Terminator" that was released on October 26, 1984.

262.   In both instances, Plaintiff Stewart had submitted her screen treatment to a major studio before this malfeasance surfaced; however, no studio that used the "Third Eye" would accept this story when submitted by Sophia Stewart, an person of color, but each studio accepted the story under all kinds of adverse circumstances when it came from Gale Anne Hurd, James Cameron, Andy Wachowski, Larry Wachowski, Victor Kubicek, Derek Anderson, Mario Kassar, Andrew Vajna, and Moritz Borman, all of whom are White citizens with varying levels of experience in movie making.

263.   Gale Anne Hurd, from May 12, 1981 surrounded herself with the one young married writer, Cameron, who had a background that had an interest in a concept that at least had some involvement with robots in 1978 called "Xenogenesis."

264.  Gale Anne Hurd, started Pacific Western Productions, Inc. on May 12, 1981, created a romance with James Cameron while he was then married, promised to let him direct for co-writing the script, and violated the minimum wage law when she paid him $1 dollar for the "Terminator" script. At the same time Hurd accepted help from New World Pictures, Inc. by permitting it to pay Cameron while the first draft was worked on, covered up Cameron's admissions that he had used two copyrighted works from Harlan Ellison in writing the "Terminator", and threatened editors of Starlog Magazine to suppress and conceal Cameron's admission of their willful infringement of "Soldier" and "Demon with a Glass Hand" in December of 1984 in the presence of Thomas M. Cleaver.

265.  Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. willfully engaged in racketeering in the making of the "Terminator" within the meaning of 18 U.S.C. 1961.

266.  James Cameron, while under oath to federal Judge Margaret M. Morrow on April 29, 2005, did not disclose that he had intentionally used the copyrighted works of other people as he admitted it to Tracy Torme, Thomas M. Cleaver, Harlan Ellison, and Starlog Magazine, which conduct violated 18 U.S.C. 1621 (a).

267.  James Cameron, while under oath in the United States District Court for the Central District of California in CV 03-2873, swore that he pitched the idea to Hurd [for the first time] in March or April of 1982, just about 1 year after Pacific Western Productions, Inc. was formed, which statement was false.

268.  Cameron admitted that he wrote the original treatment solo by July of 1982 and submitted it to the Writer's Guild of America, and claimed to the Writers Guild of

America that he wrote it for Pacific Western Productions Inc. while he was being paid by New World Pictures, Inc. between March of 1982 and June of 1982.

269.   Nevertheless, the first minute and 45 seconds of the "Terminator" film found at PA 241-495 shows an introduction that reads exactly on the story language and concept of Plaintiff Sophia Stewart, and no consent was given by the defendants by Harlan Ellison or Plaintiff Sophia Stewart. (Exhibits T145, Terminator 1 minute 45 seconds "Theft,"); (the UCC Liens 22173560002 filed against James Cameron and Gale Anne Hurd)

270.   On information and belief, Cameron admitted that he gave information to the federal court that indicated that he did not in any way consult, review, read, or have any knowledge of Plaintiff's "Third Eye" prior to February of 1982.

271.   On information and belief, Cameron admitted by his own work product described in the first eight minutes of the "Terminator" movie found in registration PA 241-495 that his script described the person that did the act on May 12th was the "Terminator", which dramatic assertion identified Gale Anne Hurd as the person that willfully orchestrated the destruction of intellectual property rights of Sophia Stewart on that very day that Pacific Western Productions, Inc. in California was formed under C1043898.

272.   Based upon the aforementioned illegal practices in defiance of the public laws of the United States, particularly 17 U.S.C. 506 (e), 18 U.S.C. 1621 (a), 18 U.S.C. 1962 (c), and 18 U.S.C. 4, all contracts that omitted Harlan Ellison and Plaintiff Stewart's co-ownership interest were void against public policy including those with Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, and Pacificor LLC. The Defendants at the encroached upon the Plaintiff's exclusive rights granted to a copyright owner at 17 U.S.C. § 106, which Infringement is implicitly defined in 17 U.S.C. § 501(a): Anyone who violates any of the exclusive rights of the

copyright owner as provided by [17 U.S.C. §§ 106-122] or of the author as provided by [17 U.S.C. § 106A], or who imports copies in and/or outside of United States in violation of [17 U.S.C. § 602], is an infringer of the copyright. Section 106 of Title 17 sets out the copyright owner's exclusive rights. These rights consist of the rights "to do and to authorize" the following: (I) to reproduce a work in copies § 106(1), (II) to prepare derivative works, § 106(2), (III) to distribute copies of the work to the public, § 106(3); (IV) to perform the work publicly (for certain types of works), (V) § 106(4), (6) to display a work publicly (for certain types of works), § 106(5).

273. Based upon the aforementioned violations of public policy, plaintiff requests that the court declare void each and every contract that was negotiated without involving her as required by 17 U.S.C. 201, 17 U.S.C. 106, and 17 U.S.C. 506 (e), declare each copyright registration regarding the "Terminator" void for having failed to disclose Plaintiff Stewart as a co-author including those that arose from "Terminator 1" (PAu 584-564 – PA 241-495), "Terminator 2" (TX 3-134-386), "Terminator 3" (PA 1-210-058), and "Terminator Salvation" (PA 1-628-221) under the Declaratory Judgment Act under 28 U.S.C. 2201 and 2202.

## FOURTH CAUSE OF ACTION

### (Unfair Competition Prevention Law Article 2, Paragraph 1,

### Business and Professional Code §17200, 15 U.S.C. § 1125(a))

274. Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, as though they were fully set forth herein in full:

275. Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Hemdale Film Corporation, Cinema '84, Lightstorm Entertainment, Intermedia/IMF Production, C2 Pictures, Mostow/Lieberman Productions, Halcyon Holding Group,

LLC, Halcyon Consumer Products, LLC, Dominion Group, LLC, T-Salvation Productions, LLC, T-Salvation Distribution, LLC, T Asset Acquisition Company, LLC, and T-Salvation Distribution (BVI), LTD. and John Does I through XII copied verbatim Plaintiff's work entitled "The Third Eye," in violation of the Unfair Competition Prevention Act.

276.   Defendants Warner Brothers and Fox operated in consort controlling 99.99% of the tradition press as the "racketeering enterprises" retaliated against Sophia Stewart by blocking her from obtaining mainstream press after Warner Brothers received constructive notice as early as 2000 from the F.B.I. that the "Terminator" and the "Matrix" introductions were copied verbatim from Stewart's story "The Third Eye" in violation of 18 U.S.C. 1962 (c) and (d) and 18 U.S.C. 1964 (a) and (c).   Defendants Warner Brothers and Fox combined to block the female protégé Stewart from U.S.C. film school by "restraining her in her trade and talents," and blocking her in movie contracting for a 5 picture deal, while Warner Brothers and Fox "aided and abetted" Derek Anderson and Victor Kubicek and provided them with the financing  of $200 million dollars as Anderson and Kubicek according to Moritz Borman misrepresented there industry qualifications, as well as, "had previously been sued for swindling hundreds of thousands of dollars from motion picture investors." In addition, Warner Brothers funded Andy Wachowski and Larry Wachowski, while they misrepresented their industry qualifications.

277.   The plaintiff reasonably expected to receive certain royalties and credit after Defendants copied verbatim "The Third Eye." Second, the Defendants engaged in unfair competition that injured the plaintiff's right to receive some or all of those benefits for enjoying the exclusive right to own a copyright, to reproduce, distribute, and, in the case of certain works, publicly perform or display the work; to prepare derivative works; in the case of sound recordings, to perform the work publicly by means of a digital audio transmission; or to license others to engage in the same acts under specific terms and

conditions with more favorable terms because of race. Third, when the Defendants committed the unfair competition act to file false copyrights with the U.S. Register of Copyrights the defendants injured the plaintiff's right to receive benefits as an owner, as said parties willfully acted in bad faith.

278. The Plaintiff asserts and alleges Defendants James Cameron and Gale Anne Hurd for financial gain or for the purpose of inflicting injury, made numerous false oaths of complete ownership in the California District Court for the "Terminator" while concealing Harlan Ellison and Sophia Stewart's name on line six of the copyright registration in violation of the Unfair Competition Prevention Act availed by Business and Professional Code §17200 without prior consent of Stewart. The Defendants false oaths of ownership were designed to steal, or without authorization appropriates, takes, carries away, conceals, or by fraud, artifice, or deception covert ownership of the "Third Eye" into "The Terminator" franchise.

279. Defendants stole the "Third Eye," characters, plots, and the statement "I'll be back" as used in substantially the same place in substantially the same way that it was done in the prior submission; in order to promote, market, or sell "The Terminator" movie in direct competition with Stewart's treatment and constitutes unfair competition pursuant to 15 U.S.C. § 1125(a). James Cameron and Gale Anne Hurd's use of the "Third Eye" caused confusion, mistake, and deception among consumers. Cameron and Hurd's unfair competition has caused and will continue to cause irreparable harm to Stewart and has "restrained" her in his trade and talents by pilfering her work which there is no adequate remedy at law. Ultimately, said Defendants subjected Stewart to unfair competition based on gender discrimination in contravention to Business and Professional Code §17200.

280. Defendants knew or should have known that their willful "unfair business practices" constituted "felony copyright infringement" pursuant to 17 U.S.C. 506 (e) to

file with the Copyright Office false statements" while failing to disclose the true name of co-authors Harlan Ellison and Sophia Stewart from which they fraudulently pilfered the work of others, of which, was utilized to influence the "economic decisions" of "users, banks, bonds  and insurance companies" taken on the basis of the "financial statements" to not extend any form of financing and/or credit to Stewart.

279.   Defendants' have failed to ameliorate the problem of unfair competition and also evince their deliberate and reckless indifference toward Stewart and her rights.

280.   Defendants' unfair competition has imposed a disparate impact and are beyond outrageous and warrants – among other sanctions – an award of punitive damages.

281.   The Petitioner asserts and alleges discriminatory misconduct based on gender against all parties in violation of the California's Unfair Competition Law And Unfair Practices Act. It is the responsibility of the United States not to knowingly participate in combination to restrain trade by leaving in place a knowingly false submission of authorship.

## FIFTH CAUSE OF ACTION
## ACCOUNTING
### (Against All Defendants)

281.   Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, as though they were fully set forth herein in full:

282.   Based on the actions and deceit of the Defendants and John Does  I through XII the Plaintiff is entitled to recovery by virtue of claims for relief set forth above, the value of the Copyrights, as well as, the proceeds and dividends derived from the exploitation of the Copyrights for the "The Terminator," "Terminator 2": Judgment Day," "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," and the "Sarah Conner

Chronicles", of which, clearly violated 17 U.S.C. §409 (1) and (11) and 17 U.S.C. §408 (d).

283.   The Plaintiff asserts and alleges her registration with the Copyright Office preceded all filing by the Defendants in violation of 17 U.S.C. §506 (a) (1) as an act of criminal willful infringement associated with 18 U.S.C. §2319 as an act of racketeering under 18 U.S.C. §1961 (1). The current value of the Copyrights, the amount of the proceeds, to whom the proceeds where paid, or where they where reinvested, is so complicated that it can not be determined without accounting. The amount of the proceeds and dividends from the exploitation of Copyrights cited above and the distribution of said proceeds, dividends and profits are so complicated that it can not be determined without accounting. Moreover this information concerning the Copyrights for "The Terminator " franchise is uniquely within the knowledge of the Defendants. The amount due to the true and lawful owner of the Copyrights would be shown through an accounting.

284.   The Defendants knew or should have known that Felony penalties apply to the Perpetrators in lieu of the infringement of the reproduction or distribution rights. See 17 U.S.C. § 506(a). Specifically, Defendants knew or should have known that felony penalties apply as a proximate result of the infringement involved either for "reproduction and distribution" of a minimum number and value of works, see 17 U.S.C. § 506(a)(1)(A) (numbered § 506(a)(1) before the Apr. 27, 2005 amendments) and 18 U.S.C. § 2319(b)(1); 17 U.S.C. § 506(a)(1)(B) (numbered § 506(a)(2) before the Apr. 27, 2005 amendments) and 18 U.S.C. § 2319(c)(1), or if the infringement involved "distribution of a work being prepared for commercial distribution," by making it available on a publicly-accessible computer network. See 17 U.S.C. § 506(a)(1)(C) (enacted Apr. 27, 2005), 17 U.S.C. § 506(a)(3). 18 U.S.C. § 2319(d)(1), Section II.B.4.c. of this Chapter, Cf. 4 Nimmer on Copyright § 15.01[A][2]

## (10) GENDER DISCRIMINATION
### [42 U.S.C. 1981, 42 U.S.C. 1982, AND 42 U.S.C. 1983]

285.   Plaintiff re-alleges the allegations contained in paragraphs 1 through 337 as if fully set forth herein.

286.   Plaintiff Stewart is an female of color.

287.   All persons identified in paragraphs above are White citizens.

288.   Upon information and belief, the primary reason why the persons listed in the aforementioned paragraphs did not contract with Plaintiff was because she is an female gifted writer of color who desired to write in the genre of science fiction.

289.   Industry and business executives had an unwritten agreement that females would not write, produce, or direct in the genre of science fiction, one of the most revenue genres in movie making.

290.   Plaintiff Stewart was damaged by this gender discrimination in "movie contracting" regarding the "Third Eye," which disparate treatment was observed by the FBI in New York.

291.   From 1962 through February of 2010, there has been a consistent pattern of discriminating against females writers of color in science fiction filmmaking.

292.   Gale Anne Hurd got the access to the "Third Eye" after it was determined by Susan Merzbach of Twentieth Century Fox that Plaintiff Sophia Stewart is gifted writer of color.

293.   Gale Anne Hurd, when she got access to the "Third Eye," made the decision that Plaintiff Stewart could not contract regarding the science fiction story described in the May 1, 1981 movie treatment because she is a female that would not be accepted by any studio as a science fiction film writer.  [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990),  pp. ix, 82, 97, 104, and 181]

294.   James Cameron, when he learned of Hurd's accepting of the custom of gender and racial discrimination in contracting against gifted screenwriters of color, did not oppose her or other companies that followed this practice under color of state accepted custom.

295.   Gale Hurd and James Cameron followed the discriminatory practice in contracting and conducted themselves as if Plaintiff Stewart had no right to contract that any White movie maker or producer in science fiction film making was bound to respect.

296.   As a result of the industry practice under color of state accepted customs, Hurd complied with the custom and took Plaintiff Stewart's property and ignored her interest on the belief that most public officials in positions of authority in the movie business and legal system would operate to endorse the suppression of her rights by deceptive acts and practices.

297.   By this discrimination in movie contracting implemented by Gale Anne Hurd and Pacific Western Productions, Inc. against plaintiff Stewart with the tacit approval of James Cameron, Plaintiff Stewart was denied the same contractual treatment that was accorded to Harlan Ellison in the same circumstance involving the same copyright registration malfeasance.

298.    By those actions, Hurd, Cameron, and Pacific Western Productions Inc. willfully violated Stewart's right to contract regarding science fiction screen plays in violation of 42 U.S.C. 1981 (a), (b), and (c), 42 U.S.C. 1982, and 42 U.S.C. 1983.  [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press), pp. 98-100, 102-103; Donald Bogle, Toms, Coons, Mulattoes, Mammies, and Bucks (Continuum Information Publishing Group Ltd. 1973, 1989), p. 111]

299.    Plaintiff's story was confirmed to be valuable in the hands of Larry and Andy Wachowski for the Matrix by the FBI, but when the same story was found to be in the hands of its true owner, Plaintiff Stewart, it was not valuable for commercial use and negotiations with Warner Brothers in or about the year 2000 as it had been earlier for Harlan Ellison, a White citizen, when he pointed out uses of his copyrighted material.

300.    Plaintiff's story was confirmed to be valuable to Twentieth Century Fox when it began negotiations for the "Terminator" franchise rights in an amount of $50 million in the Chapter 11 of Carolco Pictures, Inc., until it was remembered that the Studio had previously refused to buy the work product from its original and true owner, Plaintiff Sophia Stewart.

301.    On information and belief, when that history was discovered, Twentieth Century Fox ceased its interest so as not to confirm the ability of an gifted female writer of color in the field of science fiction writing in or about 1997.

302.    When Mario Kassar and Andrew Vajna, both White men, obtained the illusory rights without Plaintiff Stewart's consent, they were able to get financing and make "Terminator 3: The Rise of the Machines" with a budget of $102 million and received revenue of $500 million.

303.  All producers and writers from the "Rise of the Machines" through "Terminator Salvation" through T Asset Acquisitions LLC were White and able to raise funds and receive access to the channel of distribution to make a profit on the sequel.

304.  However, each and every participant totally and completely ignored Plaintiff Stewart in May of 2009 as if she had no rights under 42 U.S.C. 1981 in contract that they were bound to respect as the true author under 17 U.S.C. 201 and 106 under TXu 117-610.

305.  As to each illusory contract that was made regarding the "Terminator" rights from February 1983 through February 2010, only White citizens have been able to successfully make deals even when the manner of their possession was achieved by criminal acts in violation of 17 U.S.C. 506 (e).

306.  These acts and practices and the industry practice of concealment of the offenses is an admission by conduct that the defendants including Gale Anne Hurd, James Cameron, Pacific Western Productions, Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, and Pacificor LLC all gave aid and custom to the discrimination against the rights of Plaintiff Stewart to contract in violation of 42 U.S.C. 1981, 42 U.S.C. 1982, and 42 U.S.C. 1983 that culminated into damage to Plaintiff between and including May 2009 and February 2010.

307.  Plaintiff has been damaged by the aforementioned acts of discrimination in an amount in excess of $10 million.

308.  Gale Anne Hurd, Pacific Western Productions, Inc., and James Cameron laid the foundation so that these acts of discrimination could be successfully practiced by the use of illegal and fraudulent statements to the United States Copyright Office, the United

States Bankruptcy Court of the Central District of California, and the United States District Court for the Central District of California.

309.   Plaintiff Stewart has demonstrated that Gale Anne Hurd used symbolism in the "Terminator" film by showing the Black sanitation worker ran and hid in the presence of a strong and powerfully built White man which was not written into the July 1982 screen treatment filed with the Writers Guild of America West or the U.S. Copyright Office under PAu 584-564.

310.   By the success that Gale Ann Hurd has achieved by the intentional use of illegal and discriminatory acts against Plaintiff Stewart, Hurd, Cameron, and Pacific Western Productions, Inc. have proved that her efforts to establish discrimination and economic deprivation on the defendants has been difficult to achieve even when the FBI is the witness to the malfeasance.

311.   Plaintiff Stewart therefore requests that a permanent injunction be issued against these defendants for restraining her in her trade and talents; in order to prevent further patterns of discrimination against Plaintiff Stewart in using her copyright work as a co-author without disgorging profit and paying damages.

312.   Plaintiff Stewart has been damaged by defendants including RICO Enterprises Halcyon Holding Group LLC between May 10, 2009 and February 15, 2018 in an amount in excess of $300,000,000.00.

**WHEREFORE, PLAINTIFF PRAYS AS FOLLOWS AGAINST THE DEFENDANTS JOINTLY AND SEVERALLY:**

1)   For compensatory damages in an amount of $300, 000, 000.00 {300 hundred million}, under 18 U.S.C. 1962 (c) and (d);

2)   For treble damages and attorney's fees under 18 U.S.C. 1964 (c);

3)   For prejudgment interest arising under 18 U.S.C. 1962;

4)   For compensatory damages under 42 U.S.C. 1981, 42 U.S.C. 1982, and 42 U.S.C. 1983; Punitive damages in an amount to be determined at the time of trial.

5)   For judicial and declaratory relief under Sections 28 U.S.C. 2201 and 2202 under the Declaratory Judgment Act:

6)   For such other relief as the Court deems just and proper in the premises.


Dated: __December 11, 2018

By: _____

SOPHIA STEWART     12/11/2018

## DECLARATION OF JAMES CAMERON

I, JAMES CAMERON, hereby declare as follows:

1.     I am a Defendant in the pending lawsuit entitled Sophia Stewart v. Andy Wachowski, et al., Case No. CV 03-2873 MMM (VBKx).  I submit this Declaration in support of the motion for summary judgment filed by Defendants Twentieth Century Fox Film Corporation ("Fox"), Gale Anne Hurd ("Hurd") and me (collectively, the "Terminator Defendants").  I was the writer and director of the feature motion picture "The Terminator" and the writer, director and producer of "Terminator 2:  Judgment Day".

2.     I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

## I.    No Access to the Third Eye Literary Materials.

3.     As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye"; (2) a forty-five page manuscript entitled the "Third Eye"; and (3) an additional document which she calls the "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

4.     I have never met or spoken with Stewart.  I had not heard of Stewart prior to the time that she filed her lawsuit against me.

5.     I have never seen the Third Eye Literary Materials.

6.     I have never read the Third Eye Literary Materials.

7.     I have never received the Third Eye Literary Materials.

8.     I have never had access to the Third Eye Literary Materials.

26

9.     To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Terminator" or "Terminator 2: Judgment Day" had any access to the Third Eye Literary Materials.

## II.    My Relationship with Fox

10.     I never had any business, working or other relationship with Fox prior to October of 1984.  In fact, it was not until after October of 1984, when "The Terminator" had its initial theatrical release, that I had my first meeting with Fox. Based on the success of "The Terminator", Fox offered me the opportunity to be the director of "Aliens" which was released in 1986.

11.     I had no business, working or other relationship with Fox at the time I, wrote and directed "The Terminator".

12.     I had no business, working or other relationship with Fox during the process of creating, writing, developing, finding financing for or directing "The Terminator".

13.     No one from Fox ever provided me with any of the Third Eye Literary Materials.  For that matter, no person or entity ever provided me with any of the Third Eye Literary Materials.  I never received the Third Eye Literary Materials from Fox or any other person or entity prior to the initiation of this lawsuit.

## III.    My Relationship with Hemdale

14.     As I understand it, Stewart alleges that Hurd and I, acting in concert with others, formed Hemdale Film Corporation ("Hemdale") and that we did so for improper purposes.  This is a false statement.

15.     I had no involvement in the formation of Hemdale.  I have been advised that Hemdale was formed in approximately 1971.  In 1971, I was 17 years old.

27

16.     Hemdale was a company that co-financed the production of "The Terminator".  Orion also co-financed "The Terminator".  I never had, and do not now have, any ownership, financial or other interest in Hemdale or in Orion.

## IV.    The Creation, Financing and Production of "The Terminator"

17.     In either January or February of 1982, I created the story idea for "The Terminator".  I was living at my friend Randall Frakes' ("Frakes") house in Pomona, California at the time.  I had just finished shooting as director of the film "Piranha 2: The Spawning" ("Piranha 2").  Frakes and I used to discuss story ideas with each other and "The Terminator" was one of the story ideas I discussed with him.  At that time, my goal was to come up with a marketable script concept so that I could attach myself to it as the director.

18.     I pitched my idea for "The Terminator" to Frakes, but he did not see any potential in it.  He told me that he did not want to co-write the script with me.  I also pitched the story concept to Frakes' agent, but he also did not respond favorably to the pitch.

19.     The story was about a non-human cyborg, known as a Terminator.  In my story, there was a conflict in the future, and in order to resolve that conflict, the totalitarian state decided to send a Terminator through time to the past to kill the mother of their future rival, so that he would never be born.  In my story, the heroine is an ordinary woman, living in present day, whose life seems inconsequential to everyone around her.  She is just a waitress, but the future regime needs to eliminate her.  The method they use to kill her is to send a hit man, the cyborg terminator, back through time.  To help protect her, the rebels send a human back in time as well.  Ultimately, there is a confrontation between the cyborg hit man and the human sent to protect her.  The waitress and her protector also fall in love.  Although I'd originally conceived of the Terminator being a shape-shifting sort of "biological machine", by March of 1982 the difficulties inherent in realizing that vision given the limitations of

28

visual effects technology at the time led me to put that idea on hold (for later use in "Terminator 2: Judgment Day", as it turned out) and opt instead for a cyborg Terminator antagonist. Attached hereto as Exhibit "1" is a true and correct copy of my initial two-page description of "The Terminator" story. I wrote Exhibit "1" in early 1982.

20.    In March or April of 1982, I went to Rome at the request of the American co-producer of "Piranha 2" to see if I could help complete the film. One day while in Rome, I got sick and could not go to work. I spent the day stuck in a small pensione, drawing pictures of the Terminator. During my stay in Rome, I called Gale Anne Hurd ("Hurd") and pitched her the story of "The Terminator" over the telephone. I asked her if she would be interested in producing the film. Hurd told me that she was excited about my story concept and stated that she wanted to hear more about it.

21.    In the late spring or early summer of 1982, after I returned to Los Angeles, I started to work on a detailed treatment of "The Terminator". Bill Wisher ("Wisher") helped me brainstorm the story beats in an all-day session at his parent's home in Brea.

22.    After that brainstorming session, I returned to my apartment in Tarzana and finished writing the treatment for "The Terminator" in about two weeks. The treatment was registered with the WGA in July of 1982. After I completed the treatment, I showed it to Hurd. She then agreed to produce the film.

23.    Thereafter, I wrote the screenplay of "The Terminator" (a few memorable lines of dialogue were contributed by Wisher). By October of 1982, I had completed the screenplay of "The Terminator". For strategic reasons, Hurd and I decided to add her name as writer to the screenplay in order to solidify her attachment to the film. Hurd participated in the second draft of the script by acting as an editor, making suggestions for small cuts.

24. In the fourth quarter of 1982, Hurd and I submitted "The Terminator" to many potential producers and distributors. Many people were not interested in the project and passed. However, Orion was interested in our project "The Terminator" if we could secure co-financing.

25. In the fourth quarter of 1982, Hurd had meetings with Hemdale. Ultimately, towards the end of 1982, Hemdale agreed to co-finance "The Terminator" with Orion.

26. In 1982, as I understood it, Fox had no ownership interest in, or control over, either Hemdale or Orion.

27. By November of 1982, we had finished preparing the budget for "The Terminator". Both Hurd and I were comfortable with the budget as of that time.

28. In early December of 1982, we registered the title "The Terminator" with the Motion Picture Association of America (the "MPAA").

29. As of December of 1982, we were already scouting locations, attempting to secure a cast and having meetings regarding the financing, the distribution and the completion bond for the picture.

30. In February of 1984, we commenced principal photography of "The Terminator" in Los Angeles.

31. In October of 1984, "The Terminator" was first released in theaters in the United States.

32. At no time between mid 1982 and October of 1984, or any time before or after (prior to the initiation of this lawsuit), did I ever receive or have access to the Third Eye Literary Materials.

**T-2 and T-3**

33. I directed, produced and co-wrote "Terminator 2: Judgment Day".

34. I had no involvement in "Terminator 3: Rise of the Machines".

30

05/13/2005  13:05   8182264044          MICHAEL STOLLER               PAGE  08/82

04/25/2005  12:25   310655              LEI/CAMERON                   PAGE  87

1    I declare under penalty of perjury under the laws of the State of California and

2    the United States that the foregoing is true and correct.

3        Executed this __25__ day of April, 2005, at Los Angeles, California.

4

5                                    JAMES CAMERON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

31

04/26/05  TUE 17:30  FAX

@002

# DECLARATION OF GALE ANNE HURD

1   

2   

3      I, GALE ANNE HURD, hereby declare as follows:

4      1.    I am a Defendant in the pending lawsuit entitled Sophia Stewart v. Andy

5  Wachowski, et al., Case No. CV 03-2873 MMM (VBKx).  I submit this Declaration

6  in support of the motion for summary judgment filed by Defendants Twentieth

7  Century Fox Film Corporation ("Fox"), James Cameron ("Cameron") and me

8  ("Hurd") (collectively, the "Terminator Defendants").  I was the producer of the

9  feature motion picture "The Terminator".  I also received co-writing credit, with

10  Cameron, for the screenplay "The Terminator", which was based on Cameron's

11  original story idea.

12      2.    I have personal knowledge of the facts set forth in this Declaration and,

13  if called as a witness, I would and could competently testify to these facts under

14  oath.

15   

16  **I.**    **No Access to the Third Eye Literary Materials.**

17      3.    As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her

18  lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third

19  Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the

20  "Third Eye Manuscript"); and (3) an additional document which she calls the

21  "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

22      4.    I have never met or spoken with Stewart.  I had not heard of Stewart

23  prior to the time that she filed her lawsuit against me.

24      5.    I have never seen the Third Eye Literary Materials.

25      6.    I have never read the Third Eye Literary Materials.

26      7.    I have never received the Third Eye Literary Materials.

27      8.    I have never had access to the Third Eye Literary Materials.

28   

32

05/13/2005  13:05     8182264044                    MICHAEL STOLLER                          PAGE 11/82

Apr-27-05   03:10pm   From-                                                     T-194   P.003/008   F-369

9.     To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Terminator" had any access to the Third Eye Literary Materials.

## II.    My Relationship with Fox

10.    I never had any business, working or other relationship with Fox prior to October of 1984.  In fact, I never had a meeting with any one employed by Fox until after October of 1984, when "The Terminator" had its initial theatrical release.  I did not meet with anyone at Fox until after the theatrical release of "The Terminator".

11.    I had no business, working or other relationship with Fox at the time I produced "The Terminator".

12.    I had no business, working or other relationship with Fox during the process of creating, writing, developing, finding financing for and producing "The Terminator".

13.    No one from Fox ever provided me with any of the Third Eye Literary Materials.  For that matter, no person or entity ever provided me with any of the Third Eye Literary Materials.  I never received the Third Eye Literary Materials from Fox or any other person or entity.

## III.    My Relationship with Hemdale

14.    As I understand it, Stewart alleges that Cameron and I, acting in concert with others, formed Hemdale Film Corporation ("Hemdale") and that we did so for improper purposes. This is a false statement.

15.    I had no involvement in the formation of Hemdale.  I have been advised that Hemdale was formed in approximately 1971.  In 1971, I was in high school.

16.    Hemdale was a company that co-financed the production of "The Terminator".  Orion also co-financed "The Terminator".  I never had, and do not now have, any ownership, financial or other interest in Hemdale, or in Orion.

2

33

**IV.   The Creation, Financing and Production of "The Terminator"**

17.   In the spring of 1982, Cameron was working in Italy on the post-production of "Piranha 2: The Spawning". Cameron called me from Italy and told me that he had created a story idea for a new movie. He gave me the pitch over the telephone. He told me that the story was about a cyborg who was sent back in time by a totalitarian state from the future. The cyborg, known as a Terminator, was sent from the future to kill an ordinary woman who would soon give birth to the future leader of the revolution. The rebel leaders from the future also sent back in time someone to protect the woman. They sent back a man, not a cyborg. The woman and her protector end up falling in love.

18.   In this respect, Cameron's story idea was both a time travel story and a love story. In that conversation, I told Cameron that I was excited about the story idea and that I wanted to produce the movie.

19.   In the spring or summer of 1982, Cameron returned from Italy. At that time, he wrote a detailed treatment. After Cameron wrote a detailed treatment, he gave it to me to read. I thought it had great potential and told him that I would be willing to produce the movie. Shortly thereafter, Cameron wrote the screenplay of the "Terminator." He gave me pages to read as he finished them and I gave him my comments.

20.   By October of 1982, the screenplay of "The Terminator" had been completed.

21.   In the fourth quarter of 1982, Cameron and I submitted "The Terminator" to many potential financiers and distributors. Many people were not interested in the project and passed. However, Orion was interested in our project "The Terminator" if we could secure co-financing.

22.   In the fourth quarter of 1982, I had a meeting with Barry Plumley ("Plumley"). At the time, Plumley was an executive who worked for John Daly

05/13/2005  13:05   8182264044                    MICHAEL STOLLER                              PAGE  13/82

Apr-27-05   03:10pm   From-                                                         T-194  P.005/006  F-389

("Daly") at Hemdale.  Plumley liked the pitch and agreed to give the treatment to Daly.  Daly liked the treatment and the screenplay and ultimately, towards the end of 1982, Hemdale agreed to co-finance "The Terminator" with Orion.

23.    In 1982, as I understood it, Fox had no ownership interest or control over Hemdale or Orion.

24.    By November of 1982, we had finished preparing the budget for "The Terminator".  Both Cameron and I had approved the budget.

25.    In early December of 1982, I registered the title "The Terminator" with the Motion Picture Association of America ("MPAA").

26.    As of December of 1982, we were already scouting locations, attempting to secure a cast (we were having discussions with Kurt Russell at the time) and having meetings regarding the financing, the distribution and the completion bond for the picture.

27.    As of December of 1982, my loan-out company had entered into an agreement with Hemdale with respect to "The Terminator".

28.    In March of 1984, we commenced principal photography of "The Terminator" in Los Angeles.

29.    In October of 1984, "The Terminator" was first released in theaters in the United States.

30.    At no time between mid 1982 and October of 1984, or any time before or after, did I ever receive or have access to the Third Eye Literary Materials.

35

**V.   T-2 and T-3**

31.   I received an executive producer credit on "Terminator 2: Judgment Day" ("T-2").

32.   I also received an executive producer credit on "Terminator 3:  Rise of the Machine" ("T-3").  However, I was not involved in the creative process for T-3.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this ___29th___ day of April, 2005, at Los Angeles, California.

GALE ANNE HURD

5

36

05/13/2005  14:13    8182264044              MICHAEL STOLLER                    PAGE  08/91

APR-27-2005  13:37       ·   ENTERTAINMENT               3103063910    P.02

# DECLARATION OF LAURENCE WACHOWSKI

1
2
3    I, LAURENCE WACHOWSKI, hereby declare as follows:

4    1.    I am a Defendant in the lawsuit entitled Sophia Stewart v. Andy
5 Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration
6 in support of the motion for summary judgment filed by Defendants Warner Bros.
7 Entertainment, Inc., Andy Wachowski ("Andy"), Thea Bloom, Joel Silver and me
8 (the "Matrix Defendants"). Together with my brother Andy, I was the co-writer, co-
9 director and co-executive producer of "The Matrix", "The Matrix Reloaded" and
10 "The Matrix Revolutions" (the "Matrix Trilogy").

11    2.    I have personal knowledge of the facts set forth in this Declaration and,
12 if called as a witness, I would and could competently testify to these facts under
13 oath.

14    3.    In the summer of 1986, I was 21 years old and I was attending Bard
15 College in New York.

16
17 **I.**    **No Access to the Third Eye Literary Materials.**

18    4.    As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her
19 lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third
20 Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the
21 "Third Eye Manuscript"); and (3) an additional document which she calls the
22 "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

23    5.    I have never met or spoken with Stewart. I had not heard of Stewart
24 prior to the time that she filed her lawsuit against me.

25    6.    I have never seen the Third Eye Literary Materials.

26    7.    I have never read the Third Eye Literary Materials.

27    8.    I have never received the Third Eye Literary Materials.

28    9.    I have never had access to the Third Eye Literary Materials.

DECL. DECLARATION OF L. WACHOWSKI

1

*30*

10.    To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Matrix" had any access to the Third Eye Literary Materials.

## II.    The Purported Advertisement

11.    As I understand it, Stewart also alleges in her lawsuit that during the summer of 1986, my brother Andy and I ran an advertisement in a national magazine by which we supposedly solicited writers to send us science fiction treatments and scripts (the "Purported Advertisement"). This is not true.

12.    I never ran the Purported Advertisement. I never asked anyone to run the Purported Advertisement for me. The Purported Advertisement does not now exist and never existed. I never solicited science fiction or other scripts in a national magazine or in any other publication in 1986 or at any other time. To my knowledge, my brother Andy, who had just graduated from high school in 1986, never ran, and never asked anyone to run, the Purported Advertisement either.

13.    As I understand it, Stewart also alleges in her lawsuit that, in response to the Purported Advertisement, she sent the Third Eye Literary Materials to my brother and me. This is not true. I never received the Third Eye Literary Materials in 1986 and I certainly did not receive them in response to the Purported Advertisement.

14.    I never received the Third Eye Literary Materials from Stewart, or any other person or entity, at any time either before or after 1986.

## III.    The Creation of The Matrix Trilogy

15.    My brother Andy and I independently created the Matrix Trilogy.

16.    We first started working on the Matrix Trilogy in 1992 and continued to work on it in 1993. Initially, the Matrix Trilogy was an idea for a comic book. Andy and I created the concept for the Matrix Trilogy (all three films) in 1993.

2

17.   In 1993, Andy and I wrote the script for the Matrix Trilogy in long hand. Attached hereto as Exhibit "1" is a true and correct copy of the first page of the first draft of the script for the Matrix Trilogy.  This first draft is dated 8/13/93 and is entitled First Draft, Second Notebook.  Attached hereto as Exhibit "2" is a true and correct copy of the first page of the next draft of the script for the Matrix Trilogy. This next draft is dated 10/7/93 and is entitled First Draft, Third Notebook.  There is also a First Draft, First Notebook which is dated prior to 8/13/93, but I have not been able to locate it at this time.

## IV.   Joel Silver and Warner Bros.

18.   In 1993, Andy and I did re-writes for a movie entitled "Assassins".  Joel Silver ("Joel") was the producer of "Assassins".  While working on that project with Joel, Andy and I showed him our script for "The Matrix".  Joel liked it.  He optioned the rights to it from us and together we pitched it to Warner Bros.  Warner Bros. liked the pitch and liked our script.  In 1993, Andy and I entered into a deal with Warner Bros.  As part of that deal, Warner Bros. had us re-write the script for them.

19.   Andy and I then re-wrote "The Matrix" for Warner Bros.  We delivered a first version and a revised version in February of 1994.  Attached hereto as Exhibit "3" is a true and correct copy of the first page of the February 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros.  We then revised it again for Warner Bros.  Attached hereto as Exhibit "4" is a true and correct copy of the first page of the August 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros.

## V.   Warner Bros. Needs More Convincing

20.   Warner Bros. liked the revised script.  However, Warner Bros. still needed more convincing before it would agree to finance and distribute "The Matrix."

32

05/13/2005  14:13    8182264044         MICHAEL STOLLER                    PAGE  11/91

APR-27-2005  13:37      E   ENTERTAINMENT                    31830853910       P.05

21.   Joel, Andy and I asked Warner Bros. to hire two comic book artists to draw detailed shot-by-shot storyboards.  Warner Bros. agreed.

22.   At the same time, Joel, Andy and I got the script to Keanu Reeves ("Keanu").  Keanu liked the script and stated that he would be willing to play the role of Neo.

23.   After Warner Bros. saw the 500 plus pages of the shot-by-shot storyboards and after Keanu agreed to be in the movie, Warner Bros. agreed to finance and distribute "The Matrix" and, ultimately, the Matrix Trilogy.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this  27  day of April, 2005, at _____.


LAURENCE WACHOWSKI

4

*33*

05/13/2005  14:13    8182264044                 MICHAEL STOLLER              PAGE  03/91

APR-27-2005  13:38      EON ENTERTAINMENT                    3183263910    P.06

# DECLARATION OF ANDY WACHOWSKI

1   I, ANDY WACHOWSKI, hereby declare as follows:

2

3       1.     I am a Defendant in the lawsuit entitled Sophia Stewart v. Andy

4   Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration

5   in support of the motion for summary judgment filed by Defendants Warner Bros.

6   Entertainment, Inc., Laurence Wachowski ("Larry"), Thea Bloom, Joel Silver and me

7   (the "Matrix Defendants"). Together with my brother Larry, I was the co-writer, co-

8   director and co-executive producer of "The Matrix", "The Matrix Reloaded" and

9   "The Matrix Revolutions" (the "Matrix Trilogy").

10

11      2.     I have personal knowledge of the facts set forth in this Declaration and,

12  if called as a witness, I would and could competently testify to these facts under

13  oath.

14      3.     In the summer of 1986, I was 18 years old and I had just graduated from

15  High School.

16

## I.   No Access to the Third Eye Literary Materials.

17      4.     As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her

18  lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third

19  Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the

20  "Third Eye Manuscript"); and (3) an additional document which she calls the

21  "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

22

23      5.     I have never met or spoken with Stewart. I had not heard of Stewart

24  prior to the time that she filed her lawsuit against me.

25      6.     I have never seen the Third Eye Literary Materials.

26      7.     I have never read the Third Eye Literary Materials.

27      8.     I have never received the Third Eye Literary Materials.

28      9.     I have never had access to the Third Eye Literary Materials.

1

26

10.   To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Matrix" had any access to the Third Eye Literary Materials.

## II.   The Purported Advertisement

11.   As I understand it, Stewart also alleges in her lawsuit that during the summer of 1986, my brother Larry and I ran an advertisement in a national magazine by which we supposedly solicited writers to send us science fiction treatments and scripts (the "Purported Advertisement"). This is not true.

12.   I never ran the Purported Advertisement. I never asked anyone to run the Purported Advertisement for me. The Purported Advertisement does not now exist and never existed. I never solicited science fiction or other scripts in a national magazine or in any other publication in 1986 or at any other time. To my knowledge, my brother Larry, who was in college in 1986, never ran, and never asked anyone to run, the Purported Advertisement either.

13.   As I understand it, Stewart also alleges in her lawsuit that, in response to the Purported Advertisement, she sent the Third Eye Literary Materials to my brother and me. This is not true. I never received the Third Eye Literary Materials in 1986 and I certainly did not receive them in response to the Purported Advertisement.

14.   I never received the Third Eye Literary Materials from Stewart, or any other person or entity, at any time either before or after 1986.

## III.   The Creation of The Matrix Trilogy

15.   My brother Larry and I independently created the Matrix Trilogy.

16.   We first started working on the Matrix Trilogy in 1992 and continued to work on it in 1993. Initially, the Matrix Trilogy was an idea for a comic book. Larry and I created the concept for the Matrix Trilogy (all three films) in 1993.

2

27

05/13/2005  14:13    8182264044                 MICHAEL STOLLER                         PAGE  05/91

APR-27-2005  13:39        EON ENTERTAINMENT                       3103063910      P.08

17.   In 1993, Larry and I wrote the script for the Matrix Trilogy in long hand. Attached hereto as Exhibit " _1_ " is a true and correct copy of the first page of the first draft of the script for the Matrix Trilogy. This first draft is dated 8/13/93 and is entitled First Draft, Second Notebook. Attached hereto as Exhibit " _2_ " is a true and correct copy of the first page of the next draft of the script for the Matrix Trilogy. This next draft is dated 10/7/93 and is entitled First Draft, Third Notebook. There is also a First Draft, First Notebook which is dated prior to 8/13/93, but I have not been able to locate it at this time.

## IV.   Joel Silver and Warner Bros.

18.   In 1993, Larry and I did re-writes for a movie entitled "Assassins". Joel Silver ("Joel") was the producer of "Assassins". While working on that project with Joel, Larry and I showed him our script for "The Matrix". Joel liked it. He optioned the rights to it from us and together we pitched it to Warner Bros. Warner Bros. liked the pitch and liked our script. In 1993, Larry and I entered into a deal with Warner Bros. As part of that deal, Warner Bros. had us re-write the script for them.

19.   Larry and I then re-wrote "The Matrix" for Warner Bros. We delivered a first version and a revised version in February of 1994. Attached hereto as Exhibit " _3_ " is a true and correct copy of the first page of the February 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros. We then revised it again for Warner Bros. Attached hereto as Exhibit " _4_ " is a true and correct copy of the first page of the August 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros.

## V.   Warner Bros. Needs More Convincing

20.   Warner Bros. liked the revised script. However, Warner Bros. still needed more convincing before it would agree to finance and distribute "The Matrix."

3

28

05/13/2005  14:13    8182264044              MICHAEL STOLLER           PAGE  05/91

APR-27-2005  13:38      EON ENTERTAINMENT              3103063910   P.09

21.    Joel, Larry and I asked Warner Bros. to hire two comic book artists to draw detailed shot-by-shot storyboards.  Warner Bros. agreed.

22.    At the same time, Joel, Larry and I got the script to Keanu Reeves ("Keanu").  Keanu liked the script and stated that he would be willing to play the role of Neo.

23.    After Warner Bros. saw the 500 plus pages of the shot-by-shot storyboards and after Keanu agreed to be in the movie, Warner Bros. agreed to finance and distribute "The Matrix" and, ultimately, the Matrix Trilogy.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this __27__ day of April, 2005, at _____, _____

ANDY WACHOWSKI

4

29

# DECLARATION OF TERESA WAYNE

I, Teresa Wayne, hereby declare as follows:

1.      I am Vice President of Story and Creative Administration of Warner Bros. Entertainment, Inc. ("Warner Bros."). My duties and responsibilities include supervising the Story Department of Warner Bros. I have been employed by Warner Bros. for 24 years and I have been in charge of the Story Department since 1993. I submit this Declaration in support of the motion for summary judgment filed by Defendants Warner Bros., Andy Wachowski, Larry Wachowski, Thea Bloom and Joel Silver (collectively, the "Matrix Defendants").

2.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

3.      Warner Bros.' policy is to accept the submission of a script, treatment or other literary material ("Literary Material") only from licensed literary agents who are signatories to the Writer's Guild of America ("WGA") or from producers, attorneys and managers with whom we have a business relationship.

4.      The Story Department documents the submission of Literary Material submitted to Warner Bros.' creative executives. The process by which Warner Bros. receives Literary Material is as follows:

        a.      Literary Material is submitted to creative executives who, in turn, send it to the Story Department for "coverage".

        b.      The Story Department maintains, in the ordinary course of our business, a computerized database. The database is updated and checked daily. Whenever a submission is received, the Story Department promptly enters certain information about the submission into the database, including the date it was received by Warner Bros.

34

c.   After the Literary Material is logged into the database, story analysts read the submitted Literary Material.

d.   After their review of the Literary Material, the story analysts prepare "coverage". Coverage is a short synopsis of the Literary Material. Coverage typically includes a recommendation from the story analyst as to whether or not the Literary Material submitted has the potential to become a viable film property. The Story Department maintains a copy of the coverage analysis.

5.   Warner Bros. policy prevents the Story Department from considering unsolicited submissions. Unsolicited submissions are returned unopened and unread.

6.   Typically, my department is notified when Literary Material is submitted to the Warner Bros. legal department as part of a claim.

7.   I was asked by our outside counsel to check the computerized database to determine the date "The Matrix" was first submitted to Warner Bros. I then checked the database and verified that Joel Silver of Silver Pictures, a producer with whom Warner Bros. had a business relationship, first submitted "The Matrix" to Warner Bros. on February 4, 1994.

8.   Warner Bros. released "The Matrix" domestically on March 31, 1999.

9.   I was also asked by our outside counsel to check the computerized database to determine whether a treatment or manuscript (or script) entitled the "Third Eye" written by Sophia Stewart ("Stewart") was ever received by Warner Bros. I then checked the database and verified that at no time prior to April 16, 1999 did Warner Bros. ever receive the "Third Eye" written by Stewart. According to the database, the first time Warner Bros. received the "Third Eye" written by Stewart was on April 16, 1999 when Stewart it to the Warner Bros. legal department along with a claim letter.

35

n:Roman Empire Inc. To:Sophia Stewart (17022423505)

THIRD EYE

by

Sofia Stewart

May 1981
Los Angeles, California

Exh, 2

n:Roman Empire Inc. To:Sophia Stewart (17022423506)

## THIRD EYE

The proposed science fiction film deals with Earth during the year 2110 A.D. By that time, planet Earth had experienced horrible nuclear wars, and a Spiritual Evolution was underway. Also, Man was finally moving from the unconscious to the conscious stages of spiritual development. Thus, it seemed apparent that spirituality would soon prevail over technocracy and Earth would have lasting "Peace".

Unfortunately, members of Earth's largest banking institutions and corporations secretly banded together in a final effort to maintain the object-worship of money as a permanent way of life. By controlling the mass media (television, newspapers and radio), the secret organization, with a code name of "Rothfellars", convinced people on Earth to rebuild their weapon systems as a means to provide money and jobs for everyone. War began again even before the new weapon systems were finished, and most of the population abandoned the pursuit of Spirituality or died in nuclear battles.

One of the major research and weapon systems development organizations on Earth was headed by a philosopher-scientist, Ikahan. His organization was instrumental in building the Spacestar, a huge vehicle shaped like a pyramid designed for inter-planetary warfare and space travel. Additionally, the

1

Exh. 3

1:Roman Empire Inc. To:Sophia Stewart (17022423508)

07/02/2004 18 27 FAX                                                    014/019

Spacestar was to be the flagship of Earth's space fleet, and
it contained the most secret and highly advanced devices
known at that time.

The Rothfellers commanded Ikahn to use the Spacestar as
a vehicle for war against people who resisted their tyranny.
Ikahn accepted the assignment with some reluctance.

Just before beginning the assigned mission, Ikahn
personally experienced a Spiritual Happening that became
manifest in the form of an "eye". After the 'Happening', he
sat it aside as simply a hallucination and continued his
organisational tasks.  These tasks included collecting the
finest, most highly trained people on earth to operate the
Spacestar.  When all of the preparations were completed, the
vessel left the orbiting dock where it had been constructed.
At that time, Ikahn experienced another Spiritual Happening,
and he envisioned the "eye" again.  After the 'Happening'
Ikahn discussed the event with one of his close associates
who informed him that some members of the Spacestar crew were
rebels against the Rothfellers, and they stole galactic maps
of the universe from top-secret stellar receiving stations.
These people were pointed out to Ikahn who confessed that
they possessed information concerning the main source of
Spiritual Power, the THIRD EYE, that exists on a planet
named Cnvn III in the distant universe.

More importantly, the rebels produced incontrovertible
evidence proving to Ikahn that the Rothfellers intended,

2

Exh.4

n:Roman Empire Inc. To:Sophia Stewart (17022423506)          16:09 12/30/09GMT-05 Pg 11/38

to control and reduce Earth's population to industrial object-worshippers, and they wanted to systematically destroy the concept of God.  They also explained to Ikahn that his Spiritual Happening had meaning, and that he was destined to stand before the THIRD EYE; also, that he was to bring that power back to Earth.

Ikahn retired to his quarters for meditation, and received notification from the Rothfellers on Earth to open his secret orders.  These orders clearly specified exactly what the rebels on board the Spacestar stated, and Ikahn became infuriated over the fact that he had been duped into leading an expedition of destruction eventuating in eliminating the consciousness of God from the population on Earth.

Ikahn called all the people of the Spacestar together and confessed this information.  They voted to join the rebels.  As a result, the Rothfellers on Earth informed Ikahn that they would hunt down the valuable Spacestar and execute all of the rebels.

The Spacestar fights many battles with Earth's fleet, pirates, and experiences space storms. Many are wounded, and others die.  Eventually they are forced to land on the planet Sorr, ruled by Queen Johnay, that is completely operated by machines powered by energy from the "Black Moons". The light from planet Sorr is such that it encompasses everything in darkness, and it does not lend itself to that

3

Exh. 5

1:Roman Empire Inc. To:Sophia Stewart (17022423506)          16:09 12/30/09GMT-05 Pg 12-96

accurate interstellar navigation unless a space vehicle is
within at least one million miles of its atmosphere.
Although Queen Johnay agrees to help Ikan with repairs and
medical attention for the many wounded people, she informs
Rothfellers on Earth about the arrival of the Spacestar.

Queen Johnay is gorgeous, and possesses the unique
capability of changing the color of her skin to reflect
her inner emotions. Unfortunately for Queen Johnay, she
comes into intimate contact with Ikahn's growing spirituality.
that penetrates her machine-conditioned consciousness;
she falls in love with Ikahn. At the last minute Johnay helps
Ikahn and his people to escape from Sorr, avoid the oncoming
war fleet from Earth. Ikahn escapes, but the Rothfellers
soldiers capture and hold Johnay as a hostage for her deceit.

Ikahn moves to the planet Cove III that contains the
THIRD EYE, and takes up orbit around it. By this time he
has been informed that his physical strength and spirituality
enables him to stand before the THIRD EYE. But, he will
die from that experience if he contains any amount of
Spiritual Impurity. Additionally, it is discovered that the
test for Spiritual Impurity is DEATH. In other words, the
people on the Spacestar are informed that they must all want
Ikahn to possess powers of the THIRD EYE, but all of them
must first die as a testament for their belief in Ikahn's
Spiritual Purity.

The people on Spacestar decide to die for Ikahn, and
they descend to the plains on planet Cove III. As they

4

PAGE 41/77                            5629896414    12:24  06/29/2004

Exh. C

1:Roman Empire Inc. To:Sophia Stewart (17022423508)

stand in the open, the surrounding heavens blaze with fire,
lightning, thunderous roars, and other phenomenon. All of
the people die and Ikahn is left standing--but he is blind.
He turns and walks among the bodies of his fallen comrades
experiencing humbling emotions. He yells out that he
doesn't want the power of the THIRD EYE at a cost so great.
Slowly the clothing on his body disintegrates and he is
naked on the plains of Cove.III. The sound of "OM" emanates
from the heavens. He yells out that he wants to die to
resurrect the people, but there is no way available for him
to kill himself. He falls to his knees, saying: "Oh God,
let thy will be done."

The CAMERA PANS the plains of Cove III showing that
Ikahn is alone on the grassy emptiness. Slowly the CAMERA
moves in for a MEDIUM CLOSE SHOT of Ikahn who is now standing
and each one of the people walks out of Ikahn's body. When
the plains of Cove III are again full of the people who are
happily facing the blind Ikahn, he is surrounded by magnificent
auras of lights that slowly form into two golden beams
emanating from his closed eyes. Ikahn slowly opens his eyes
and perceives the people who appear before him as all the
races on Earth, other planets and stars.. It is a multitude
of the universe that walked out of him. They are all naked,
and without shame.

They decide to go back to Earth in their Spiritual
Form with full knowledge that they must defeat armies

5

PAGE 42/77                    5629986414    12:24   06/29/2004

the Rothfellers in space and on land.

The followers of Ikahn board the Spacestar and fight their way into Earth orbit. The descend to Earth amid cheers of the multitudes now affected by powers of the THIRD EYE within Ikahn.

The Rothfellars are defeated, and "peace" is proclaimed.

Exh. 8



Third Eye

by

Sofia Stewart

"He entered Earth's atmosphere in a
flash of brilliant light."
"After the energy, he lies naked
and still.."

-The Third Eye
By
Sophia Stewart

May 1981
Los Angeles, California



THIRD EYE

by

Sofia Stewart

"The year 2110 A.D. brought many great
changes on Earth. Mankind just finished
experienced the last of the Atomic Age,
when evolution of awareness began; and man
was going from the unconscious stages of
evolutionary development in to the
conscious levels of it. There was no doubt
earth would be destroyed."

—"The Third Eye"
By
Sophia Stewart

May 1981
Los Angeles, California



Sofia Stewart

"The proposed science fiction film deals with Earth during the year 2110 A.D. By that time planet Earth had experienced horrible nuclear wars..."

"The 22nd Century will be a time in which Earth will have experienced many computerized nuclear wars; and for the first time in history, the people of earth will feel the ultimate nuclear war that will bring universal death."

-The Third Eye Movie Treatment
By Sophia Stewart

May 1981
Los Angeles, California

*Protected Literary Work*
**Sophia Stewart – "The Third Eye"**

I-Kahn (The One)

X-sers
(young, 200 Ibs., muscular, abilities)

Kev
(young, muscular, 230 Ibs.)

Old Gypsy Hag

(prophet)

Vashta
(45 yrs, 6'0", 170 Ibs. strong character,
wise, advisor, participate when called
upon)

Trifina
5'7", 120 lbs., pure heart, playing
always symbolic majority part in
the background, awareness of all
that takes places, like an angel)

Awn
(Passive in nature, goes along to
to a certain extent with what is
decided, betrayer; keeps to himself,
no abilities

Trev
(Slender, warm hearted, well loved, 20
yrs old, youthful factors, moral support
to Neo characters and the rest)

Zonia
(nondescript lady, no major part)

3 Levels of Authority that became
same men.

Dome Hidden city above Earth

(Hidden city above ground)

Spacestar Ship
(highly computerized futuristic ship)

*The Infringing Work*
**"The Matrix I-III"**

Neo, "One", an Anagram for
One.

Tank
(Same characteristics)

Apoc
(Same characteristics)

Oracle

(Same)

Morpheus
(Same – verbatim)

Trinity
(Same-verbatim)

Cyper
(Same)

Mouse
(Same)

Switch

3 Agents Levels that      the
became the same men.

Zion Hidden city below

(Hidden city above
ground)

Nebchadnzzar Ship
(highly computerized
futuristic ship)

192

*EXH 27*

| | |
|---|---|
| Advanced computers<br>(alien being different composition,<br>not human) | Advanced computers<br>(created by computers not<br>human) |
| Guardian Eyes Logos<br>Guardian human eye logos | Sentinel Eyes Logos<br>Sentinel human eye logos |
| Rebels | Rebels |
| (Rebels band knows the truth) | (Rebels band knows the truth) |
| Planet with machines<br>(planet with computers and computer<br>networks, planet ruled by them) | Planet with machines<br>(planet with computers and<br>computer networks, planet<br>ruled by them) |
| Epic – Evolution of Consciousness | Epic – Evolution of<br>Consciousness |
| (Birth and evolution of consciousness<br>is the theme of the story) | (Birth and evolution of<br>consciousness is the theme of<br>the story) |
| Narrative | Narrative |
| Ending | Ending |
| (Perpetual existence) | (Perpetual existence) |
| Begin again | Begin again |
| Good people walked out of I-Khan | Good people walked out of<br>I-Khan |
| (transnormal effect of entry and exit<br>from body) | (transnormal effect of entry<br>and exit from body) |
| I-khan is blind | Neo is blind |
| (Character ascends to power<br>after incurring blindness) | (Character ascends to power<br>after incurring blindness) |
| Golden beams emanate from his eyes;<br>ascends to power after incurring<br>blindness | Golden beams emanate from<br>his eyes; ascends to power after<br>incurring blindness |
| Girl is captured & held hostage | Morpheus is captured & held<br>hostage |

193

EXH 28

| | |
|---|---|
| (Character captured, held hostage for portrayal) | (character captured, held hostage for portrayal) |
| Rebels (ships) die as treatment (rebels on ship die in testament and belief that I-khan is the one) | Rebels (ships) dies as treatment (rebels on ship die in testament and belief that Neo is the one) |
| I-khan human side dies (reborn) | Neo human side dies (reborn) |
| (Reborn without corruption) | (reborn without corruption) |
| I-khan is foretold as the one (Prophecy foretold character as the one) | Neo is foretold as the one (prophecy foretold character as the one) |
| Plot introduction year 2110 A.D. (time frame) | Plot introduction (time frame) |
| I-khan spiritual happening (hallucinatory) | Neo spiritual happening (hallucinatory) |
| Awakening, self recognition to his purpose | Awakening, self recognition to his purpose |
| Rebels (ship) knew he was the one (rebel band recognized I-khan was the one and pointed him out to each other) | Rebels (ship) knew Neo (rebel band recognized Neo.) |
| Hunting for the ship to kill rebels (government sent sentinels to hunt down and kill rebel band) | Sentinels were doing the same (government sent sentinels to kill rebel band |
| Special effects | Special effects |
| I-khan and rebel band send forth optical projections of images of themselves to engage in battle | Neo and rebel band send forth optical projections of images of themselves to engage in battle |
| Programmed the mind-computerized warfare – to teach (programmed the mind for computerized warfare and combat) | Programmed the mind (same) programmed the mind for computerized warfare and combat) |
| In space I-khan develops his alien side and inherits special powers) | In space Neo develops his alien side and inherits special powers) |

194

ExH29

| *Protected Literary Work*<br>*Sophia Stewart – "The Third Eye"* | *The Infringing Work*<br>*"The Terminator I-III"* |
|---|---|
| Quote: "We will be back" | Quote: "I'll be back" |
| Identical plot | Identical plot |
| Identical characters | Identical characters |
| Identical settings | Identical settings |
| Spans past, present, and future | Spans past, present, and future |
| Iceus | Sara Connors |
| (Mother expecting child destined to destroy computers in the future) | (Mother expecting child destined to destroy computers in the future) |

EXH 30



# The Third EyeAnimatrix Fraudulent

# Procurement



## The Terminator FraudDerivativeAnimatrix Fraud





## Animatrix Derivative



http://www.youtube.com/watch?v=iieuwaHJ9us&wide=1

## The Third Eye pg. 19     Animatrix Fraudulent Procurement

 

## The Third Eye, pg 40     Animatrix Fraudulent Procurement

 



The

Third Eye, pg 38     Animatrix Fraudulent Procurement

 

The Third Eye, pg. 48

AnimatrixFraudulent Procurement





Animatrix Fraudulent Procurement

Animatrix Fraudulent Procurement



### III. Recommended Findings of Fact and Conclusions of Law

#### A. Facts

The Court accepts as true the following allegations in Ms. Stewart's Amended Complaint (Am. Compl., ECF No. 2):

Ms. Stewart, a science fiction screenwriter, sent screen treatments and other creative materials to film production companies and film producers and writers in the 1980s. Ms. Stewart owns the registered copyright for these works under the name "The Third Eye" or "Third Eye." In 2003, Ms. Stewart, acting pro se, sued a number of film studios and producers ("the California defendants") alleging the films in the TERMINATOR and MATRIX trilogies infringed her copyrighted works. *Stewart v. Wachowski*, No. CV 03-2873 MMM (VBKx) (C.D. Cal. 2003). That case ("the California action") asserted claims for copyright infringement and declaratory relief in addition to claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act").

Sometime around July 2004, Jonathan Lubell contacted Ms. Stewart at her home in Utah to offer his services as an attorney with respect to the California action. Mr. Lubell spoke with Ms. Stewart over the phone from her home in Utah and sent a written fee agreement to Ms. Stewart's home in Utah, where she executed the agreement and paid a retainer fee. Mr. Lubell held himself out as an expert and stated he would assemble a competent legal team to assist with the case—representations upon which Ms. Stewart relied. Gary Brown and Dean Webb thereafter joined Ms. Stewart's California-action legal team. Mr. Lubell, Gary Brown, and Dean Webb drafted Ms. Stewart's first amended complaint in that action. Dean Webb withdrew as Ms. Stewart's counsel in January 2005, and Michael Stoller joined Ms. Stewart's legal team three months later.

-4-

CLOSED,LODGE_DOC

## US District Court Electronic Case Filing System
### District of Utah (Central)
### CIVIL DOCKET FOR CASE #: 2:07-cv-00552-DB

Stewart v. Stoller et al                          Date Filed: 07/30/2007
Assigned to: Judge Dee Benson                     Date Terminated: 09/29/2014
Cause: 28:1332 Diversity-Other Contract           Jury Demand: Plaintiff
                                                  Nature of Suit: 190 Contract: Other
                                                  Jurisdiction: Diversity

**Plaintiff**

**Sophia Stewart**                 represented by   **Sophia Stewart**
                                                  PO BOX 31725
                                                  LAS VEGAS, NV 89173
                                                  (702)501-5900
                                                  Email:
                                                  PRO SE

                                                  **Edward W. McBride , Jr.**
                                                  VIAL FOTHERINGHAM LLP
                                                  602 E 300 S
                                                  SALT LAKE CITY, UT 84102
                                                  (801)355-9594
                                                  Email: ted.mcbride@vf-law.com
                                                  *TERMINATED: 12/07/2011*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Joseph G. Pia**
                                                  PIA ANDERSON DORIUS
                                                  REYNARD & MOSS
                                                  222 S MAIN ST STE 1830
                                                  SALT LAKE CITY, UT 84101
                                                  (801)961-1300
                                                  Email: joe.pia@padrm.com
                                                  *TERMINATED: 06/01/2010*
                                                  *LEAD ATTORNEY*

                                                  **Arthur T. Van Wagenen**
                                                  10442 S SILVER MTN DR
                                                  SANDY, UT 84094
                                                  (801)637-4207

Email: arthurvanwagenen@yahoo.com
*TERMINATED: 06/01/2010*
*ATTORNEY TO BE NOTICED*

**Kevin P. Moriarty**
MCBRIDE & MORIARTY PLLC
2319 S FOOTHILL DR STE 220
SALT LAKE CITY, UT 84109
(801)531-1030
Email: kpmaccount9@live.com
*TERMINATED: 02/12/2009*
*PRO HAC VICE*

V.

**Defendant**

**Michael T. Stoller**                represented by   **Michael T. Stoller**
*TERMINATED: 02/14/2014*                                5747 HOBACK GLEN RD
                                                        HIDDEN HILLS, CA 91302
                                                        (818)226-4040
                                                        Email:
                                                        michael.stoller@stollerlawgroup.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Jonathan Lubell**                   represented by   **Jonathan Lubell**
                                                        207 PELICAN PL
                                                        ST SIMOND ISLAND, GA 31522
                                                        (912)638-2332
                                                        Email:
                                                        PRO SE

**Defendant**

**Gary S. Brown**                     represented by   **Gary S. Brown**
*TERMINATED: 06/18/2013*                                1 S FAIR OAKS AVE STE 301
                                                        PASADENA, CA 91105-1945
                                                        (818)293-0979
                                                        Email: garysbrown@ca.rr.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Dean Webb**                         represented by   **Kathleen M. Liuzzi**
*TERMINATED: 06/30/2011*                                DUNN & DUNN PC

2455 PARLEYS WY STE 340
SALT LAKE CITY, UT 84109
(801)521-6677
Email: kliuzzi@dunndunn.com
*LEAD ATTORNEY*

**Interested Party**

**Warner Bros Entertainment**          represented by   **P. Matthew Cox**
                                                        SNOW CHRISTENSEN &
                                                        MARTINEAU
                                                        10 EXCHANGE PLACE 11TH FLOOR
                                                        PO BOX 45000
                                                        SALT LAKE CITY, UT 84145-5000
                                                        (801)521-9000
                                                        Email: pmc@scmlaw.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Interested Party**

**Andy Wachowski**          represented by   **P. Matthew Cox**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Larry Wachowski**          represented by   **P. Matthew Cox**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Interested Party**

**Thea Bloom**          represented by   **P. Matthew Cox**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Interested Party**

**Joel Silver**          represented by   **P. Matthew Cox**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

**Interested Party**

**Twentieth Century Fox Film**          represented by   **P. Matthew Cox**
**Corporation**                                         (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**James Cameron**        represented by   **P. Matthew Cox**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

**Interested Party**

**Gale Anne Hurd**        represented by   **P. Matthew Cox**
                                           (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2007 | 1 | COMPLAINT against Michael T. Stoller, Jonathan Lubell, Gary Brown (Filing fee $ 350, receipt number 4681019135), filed by Sophia Stewart. Assigned to Judge Dale A. Kimball (jtj) (Entered: 07/30/2007) |
| 08/01/2007 | 2 | AMENDED COMPLAINT *First* against all defendants with Jury Demand., filed by Sophia Stewart.(McBride, Edward) (Entered: 08/01/2007) |
| 11/26/2007 | 3 | Ex Parte (Not Sealed) MOTION for Extension of Time Time to Serve Process filed by Plaintiff Sophia Stewart. (Attachments: # 1 Memorandum# 2 Affirmation# 3 Text of Proposed Order)(McBride, Edward) (Entered: 11/26/2007) |
| 11/26/2007 | 4 | AFFIDAVIT OF SERVICE for Summons and Complaint served on Dean Browning Webb on November 14, 2007, filed by Plaintiff Sophia Stewart. (McBride, Edward) Modified on 11/27/2007: note that summons was not properly issued by the Clerk's Office (alt) (Entered: 11/26/2007) |
| 11/28/2007 | 5 | Ex Parte (Not Sealed) MOTION for Extension of Time to Serve Process filed by Plaintiff Sophia Stewart. (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 6 | MEMORANDUM in Support re 5 Ex Parte (Not Sealed) MOTION for Extension of Time to Serve Process filed by Plaintiff Sophia Stewart. (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 7 | NOTICE of Affirmation by Sophia Stewart (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 8 | ORDER finding as moot 3 Motion for Extension of Time; granting 5 Motion for Extension of Time. Plaintiff's time to serve process on Defendants is extended by 60 days. Signed by Judge Dale A. Kimball on 11/27/2007. (rlr) (Entered: 11/29/2007) |



THE MAKING OF THE THIRD EYE

(the Past to the Present)

Pseudo . . . . . . . . . . . . . . By Zenia Kavalas

\*

FIRST PART . . . . . . . . . May 1, 1981

SECOND PART . . . . . . . . . August 10, 1982

THIRD PART . . . . . . . . . June 28, 1983

FINAL . . . . . . . . . . . October 1, 1983

280 Pages

9 Chapters

40 Pages or less to
each chapter

FOREWARD

PREFACE

INTRODUCTION

CONTENTS

ILLUSTRATIONS

BRIEF CHAPTERS:  I, II, III, IV, V
COMBINATION OF LAST SIX CHAPTERS WITH CONCLUSION

# Fwd: "Terminator Is Actually A Drama" - Wall Street Journal

**From:** Sophia Stewart (sophiastewart10@yahoo.com)

**To:** sophiastewart10@yahoo.com

**Date:** Monday, December 10, 2018, 3:11 PM PST

## "Terminator Is Actually a Drama"

**Wall Street Journal, February 4th 2010**

http://blogs.wsj.com/bankruptcy/2010/02/04/terminator-is-actually-a-drama/tab/article/

**In Reference to Cameron's entertainment lawyer Burt Field's comment, "...that all of the pictures that he [Cameron] created are totally his own, original work," and that, "He [Cameron] hasn't taken anything from anybody, including her [Stewart]", we respectfully submit the following:**

1 Minute and 45 Seconds - AVATAR & ATAVISM? - Poul Anderson's (1978) "The Avatar" on Amazon.com - Does Copyright Law Care If James Cameron's Avatar Ripped Off Parts Of "Call Me Joe"? - Cameron's AVATAR & STARGATE SG-1

**California Judge Margaret M. Morrow has already been informed about the "1 Minute and 45 Seconds" and the Articles of Incorporation that were hidden from the court. According to court transcripts, Judge Morrow told Warner Brothers Attorney Bruce Isaac**

that she "could not grant him Summary Judgment" in light of "Substantial Similarity" to Stewart's protected literary work. Subsequently, no Evidence was ever entered into Discovery on behalf of Stewart and Judge Morrow ruled on fraudulent admissions entered into the court system by Bruce Isaac and David Boren. Therefore, no legal basis for summary judgment ever existed.

When you see this brief discussion, you will see an example of what can happen to a person that has a correct legal position when artful techniques are used to mislead a federal judicial official. Notwithstanding the fact that the first minute and 45 seconds of the film read exactly on the copyright of the writer, and the person that claimed ownership of the remainder did not claim to own that portion of the film, and the matter was in evidence through her copyright and her opponent claimed to have started the company when she had no story on the same day she referred to in the film, May 12th, every aspect of the representatives for the defendants failed to disclose this matter to the federal judge in a proper context. Then the defendant used that material misrepresentation to achieve summary judgment under rule 56 which should have been impossible when the true creator had the first copyright and film dialogue

that read on her work that the so-called owners did not claim in their copyright submission. This is a story that has intrigue, betrayal, misconduct, abuse of the legal system, and a curious inability to perceive the harm to the original creator, Sophia Stewart.

The matter that makes their position indefensible is that Hurd and Cameron planned and implemented a strategy to use false facts to the United States Government, and got away with it. Then the Wachowski's made the same plan and got caught. When they were caught, the connection between the Third Eye and the Terminator did not stop them. Their conspiracy counted on the fact that the United States would not stop a fraud done on their agents. That is a troubling observation. After that, both Cameron and Hurd gave a false affidavits to the Federal Court. It did not stop them.

Both "Terminator 4" and "The Sarah Conner Chronicles" TV Series are new claims being cited after the adjudication of the 2003 California Civil Case.

Best,

www.truthaboutmatrix.com

_____

Attached for your review are Liens and other Documents pursuant to this matter.

Case 2:18-cv-02351-GMN-EJY　Document 1　Filed 12/11/18　Page 138 of 149

1. Sophia Stewart's 1981 & 1983 Federal Copyright Txu 117-610 can be seen in <u>attachment - "Articles of Incorporation..." exhibit 1.</u>

2. Sophia Stewart's 1981 & 1983 copywritten movie treatment can be seen in <u>attachment - "Articles of Incorporation..." exhibits 2 thru 8.</u>

3. Sophia Stewart's 1984 copywritten Manuscript Txu 154-281 can be seen in <u>attachment - "Articles of Incorporation..." exhibit 9.</u>

4. 20th Century Fox Vice President of Creative Affairs Susan Merzbach <u>06/01/1981</u> letter of access as seen in <u>attachment – "Articles of Incorporation..." exhibit 12.3.</u>

5. Sophia Stewart's affidavit to the Bankruptcy Court can be seen in <u>attachment - "Sophia Stewart Affidavit 2010 bank".</u>

6. Sophia Stewart's Adversarial Civil RICO Complaint can be seen in <u>attachment - "Sophia Stewart vs. Cameron & Hurd".</u>

7. James Cameron, Gale Anne Hurd, Pacific Western & Hemdale Film's 1984 assignment movie treatment can be seen in <u>attachment - "Articles of Incorporation..." exhibits 11 thru 12.2.  Invalid copyright - theft of Harlan Ellison work</u>

8. The <u>MAY 12TH</u> Articles of Incorporation for Pacific

**Western & Hemdale Film's can be seen in <u>attachment - "Articles of Incorporation..." exhibits 13 thru 14.5.</u>**

**9. Warner Brothers & the Wachowski's 1998 assigment one-page "The Matrix" & assignments to Warner Brothers can be seen in <u>attachment - "Articles of Incorporation..." exhibits 15 thru 20.</u>**

**10. Lubell's confession to have prepared Stewart's admission "without the substantive assistance of anyone else" can be seen in <u>attachment - "UTAHCOURT CASE 2009-1 exhibit 240 & 241 Lubell Confession.pdf"</u>**

**Please review all information carefully.**

---

## §18 U.S.C. 4

WHOEVER, HAVING KNOWLEDGE OF THE ACTUAL COMMISSION OF A FELONY COGNIZABLE BY A COURT OF THE UNITED STATES, CONCEALS AND DOES NOT AS SOON AS POSSIBLE MAKE KNOWN THE SAME TO SOME JUDGE OR OTHER PERSON IN CIVIL OR MILITARY AUTHORITY UNDER THE UNITED STATES, SHALL BE FINED UNDER THIS TITLE OR IMPRISONED NOT MORE THAN THREE YEARS, OR BOTH.

## §18 U.S.C. 3

WHOEVER, KNOWING THAT AN OFFENSE AGAINST THE UNITED STATES HAS BEEN COMMITTED, RECEIVES, RELIEVES, COMFORTS OR ASSISTS THE OFFENDER IN

ORDER TO HINDER OR PREVENT
HIS APPREHENSION, TRIAL OR
PUNISHMENT, IS AN ACCESSORY
AFTER THE FACT.

# 1 MINUTE AND 45
# SECONDS - HIDDEN IN
# PLAIN SIGHT
# A DOCUMENTARY ON
# COPYRIGHT
# INFRINGEMENT

**Part I**:
http://www.youtube.com/watch?
v=NUY6E-ByYVs
**Part II**:
http://www.youtube.com/watch?
v=RLyJuMWttE4
**Part III**:
http://www.youtube.com/watch?
v=AH8viFxZLy4

-A Hovercraft of immense proportions
enters the scene with the most advanced
computer oriented laser guided
weapons known to the post nuclear
world.

-A man pops up from nowhere and
begins to run as his friend hopes that he
make it.
-Still, with precision, the computer
generated robot focuses, aims, and
disperses his atom relationships so as to
mystify his very existence.

-Terminator open with a post nuclear
darkened war scene canvassed by
robots controlled through computer
chips with laser-guided weapons in or
about 2010 to 2030 A.D.

-What's critical to understand here, is that this 1 minute and 45 second description of a nuclear war in Terminator do not appear anywhere in the script written by James Cameron and Gale Anne Hurd.

-Yet, the words and the "post nuclear war" comes verbatim from Sophia Stewart's the Third Eye.

**"The proposed science fiction film deals with Earth during the year 2110 A.D. By that time planet Earth had experienced horrible nuclear wars…" "The 22nd Century will be a time in which Earth will have experienced many computerized nuclear wars, and for the first time in history, the people of earth will feel the ultimate nuclear war that will bring universal death."**
**-The Third Eye Movie Treatment by Sophia Stewart**

"This willful failure to disclose Stewart's contribution makes Cameron's and Hurd's copyright registration invalid…for willfully failing to reveal that the substantial contributing author was omitted with the intent to deny her royalties in the project."

**"The year 2110 A.D. brought many great changes on Earth. Mankind just finished experienced the last of the Atomic Age, when evolution of awareness began; and man was going from the unconscious stages of evolutionary development in to the conscious levels of it. There was no doubt earth would be destroyed."**

**—Quotations from "The Third Eye"
by Sophia Stewart**

"Yet, on a reading of Stewart's "Third Eye as copyrighted 81', 83' and 84', it is undeniable that the first 1 minute and 45 seconds of Terminator came from that discussion and that it is totally excluded from the copyright submission of Cameron and Hurd to the Copyright Office."

**"He entered Earth's atmosphere in a flash of brilliant light;"
"After the energy, he lies naked and still..."
—The Third Eye by Sophia Stewart**

"The technique of taking the script and sending it through a "chop shop" so that many of its features are changed while unpublished and then bringing it forth as a published work is described as infringement in Dezendorf v. Twentieth Century Fox. Yet, it is plainly present in the movie. This is evidence that Gale Anne Hurd had consciousness of the wrongfulness of this activity and did not want it to be said that she wrote exactly what was written in Stewart's treatment. **[TXU 117-610 COPYRIGHT]** The May 1, 1981 treatment is covered by copyright registration number Txu 117-610 in the name of Sophia Stewart. This is evidence of a theft of the script, knowing unauthorized use of it, and an intent to deny Stewart of her share of the profits associated therewith".

"Kyle Reese: "What day is it? The date!"
Cop in Alley: "12th... May..."

Sophia Stewart completed the six-page treatment of the Third Eye on May 1, 1981. It was forwarded to the Vice President of Creative Affairs of Fox before May 7, 1981.  Surprisingly, Gale Anne Hurd, then the public relations and marketing director of New World Productions under Roger Corman (who had never produced a film), started Pacific Western Productions on May 12, 1981.

"<u>Kyle Reese</u>: "What day is it? The date!"
<u>Cop in Alley</u>: "12th... May…"

## - **May 12, 1981**-

Is it simply coincidence, that Gale Ann Hurd started Pacific Western Productions on the same day Kyle Reese began his search for Sarah Conner? Or, is this the M/O of an Embezzlement of copywritten material? Allegations of "criminal copyright infringement" must be evidenced by: "Access" "Copying" & "Substantial Similarity" to a protected literary work.In relation to Terminator; Ms. Sophia Stewart, former USC Film student, has evidenced all three.

As Recently as December 2009, Twenty-Two year old Samantha Tumpach was taping portions of her sister's surprise party at a local theater and accidentally captured some scenes of the film "New Moon" on her digital camcorder. Although Samantha insisted she was not trying to record the new release on purpose, she was arrested for "criminal use of a motion picture exhibition" - a criminal statue intended to curb piracy by deterring movie watchers from recording movies in

Case 2:18-cv-02351-GMN-EJY Document 1 Filed 12/11/18 Page 144 of 149

theaters and selling "bootlegged"
copies. Initially, Samantha faced up to
three years in prison. Fortunately for
Tumpach, she only spent two-days in
jail following her arrest.

If Law Enforcement protects the rights
of Billion dollar corporations, shouldn't
Law enforcement also protect the rights
of citizens?

While young movie watchers are being
jailed for accidentally capturing a few
scenes of a film; the Stewart case is
shining the light on white collar crime
sweeping America. Stewart uncovered
a white collar theft of her protected
literary work, its embezzlement and
how that was used as a means to
conceal the crime and escape
punishment.

What's critical to remember, is that the
1:45 description of a nuclear war in
Terminator do not appear ANYWHERE
in the script written by James Cameron
and Gale Anne Hurd. No "post nuclear
war" was revealed in any draft done by
James Cameron including the draft
from June of 1982. Without any "post
nuclear war" revealed by Cameron's
scripts, why does a Terminator travel
through time to kill Sarah Conner? And
what does Kyle Reese have to protect
Sarah Conner from? Nevertheless, the
words, "nuclear war" and the element
of "time travel" come verbatim from
Sophia Stewart's copywritten material -
The Third Eye.

The act of trying to conceal
unauthorized use of someone's

protected literary work, "hidden in plain sight" of a newly released film, is the weakest link in the chain of criminal copyright infringement. **[Terminator & Reese]** To be caught with copywritten "source material" that bears no resemblance to the film or movie it is based upon, is to catch a thief with a smoking gun. **[James Cameron T2]**

Once again, it's for good reason that thieves don't register stolen property without changing the appearance of what was stolen. These "changes" and "alterations" are premeditated measures used to escape detection and consequence. Likewise, this pattern of theft is consistent with child kidnappers who are known by law enforcement to shave the heads or otherwise "alter" the appearance of children they abduct. Nevertheless, a mother will always recognize her baby. **[Stewart Quote]**

**"If someone steals your car and puts it through a chop shop, (where the crooks add or take away from it) trying to make it their own, is it still your car? Do you go out and buy another car to prove yours was stolen?" –Sophia Stewart, Legal Owner of the Matrix & the Terminator**

# AN EMBEZZLEMENT OF COPYWRITEN MATERIAL

12/10/2018    Yahoo Mail - Fwd: Skydance Media And Tencent Pictures Co-Financing Tim Miller's New TERMINATOR Film; Arnold Schwarzenegger ...

Case 2:18-cv-02616-MWF-E    Document 1   Filed 12/11/18   Page 146 of 149

Fwd: Skydance Media And Tencent Pictures Co-Financing Tim Miller's New TERMINATOR Film; Arnold Schwarzenegger and Linda Hamilton To Star With James Cameron Producing - We Are Movie Geeks

From:  Sophia Stewart (sophiastewart10@yahoo.com)

To:     sophiastewart10@yahoo.com

Date:  Monday, December 10, 2018, 12:16 PM PST

# Skydance Media And Tencent Pictures Co-Financing Tim Miller's New TERMINATOR Film; Arnold Schwarzenegger and Linda Hamilton To Star With James Cameron Producing

<u>Michelle Hannett</u>    April 23, 2018



Skydance Media, LLC ("Skydance") and Tencent Pictures, the film and television arm of Chinese Internet giant Tencent Holdings Limited ("Tencent"), announced today that Tencent will co-finance as a global partner the upcoming Terminator film directed by Tim Miller and produced by James Cameron and David Ellison. Under the pact, Tencent will also handle the distribution, marketing

and merchandising of the film in China. This is the first collaboration between the two companies since they entered into a partnership, with Tencent making a strategic investment in Skydance Media.

"We are thrilled Terminator will be our first collaboration with Tencent, and we believe that partnering this early in the process, prior to production, will allow both companies to fully maximize the opportunity," said Jesse Sisgold, Skydance Media President & COO. "This franchise is hugely popular with Chinese audiences and will greatly benefit from the massive reach and valuable know-how Tencent has in marketing, distribution, games, and more."

"We are truly excited to be partnering with Skydance on the newest chapter of this iconic franchise. With Skydance's savvy production expertise and impeccable taste in talent, along with Tencent's tremendous marketing and distribution capabilities in China, we believe the success of Terminator will serve as a benchmark for future collaborations," said Edward Cheng, Vice President of Tencent and CEO of Tencent Pictures.

**The upcoming Terminator movie will be a direct sequel to Cameron's Terminator 2: Judgment Day starring Arnold Schwarzenegger and Linda Hamilton, both reprising their iconic roles as "The Terminator" and "Sarah Connor" from the first two Terminator films. The new story will introduce the next generation of characters played by rising stars Mackenzie Davis (Blade Runner 2049, "Halt and Catch Fire"), Natalia Reyes ("Lady, La Vendedora de Rosas"), Diego Boneta ("Scream Queens," Rock of Ages), and Gabriel Luna ("Marvel's Agents of S.H.I.E.L.D.") Specific details on the characters are being kept under wraps.**

Paramount Pictures and 20th Century Fox are also co-financing the film, which is scheduled for U.S. release the Friday before Thanksgiving on November 22, 2019. The movie will be distributed domestically by Paramount Pictures and internationally (excluding China) by 20th Century Fox.

Case 2:18-cv-02551-GMN-EJY   Document 1   Filed 12/11/18   Page 148 of 149



Case 2:18-cv-02351-GMN-EJY Document 1 Filed 12/11/18 Page 149 of 149

## Fwd: The Terminator 2019 Unveiled by Skydance and Tencent | TheTerminatorFans.com

From: Sophia Stewart (sophiastewart10@yahoo.com)

To: sophiastewart10@yahoo.com

Date: Monday, December 10, 2018, 3:33 PM PST

# The Terminator 2019 Unveiled by Skydance and Tencent



By: TheTerminatorFans.com On April 23rd, 2018

It was pretty obvious when Skydance sold shares to Tencent that the China internet/tech giant would be buying into "Terminator (2019)". The business move seems like a "play-safe" move after the success of Terminator Genisys. As Hollywood backs away from China investment; Skydance strengthens their relationship.

Tencent officially announces: