SOPHIA STEWART
P.O. BOX 31725
Las Vegas, NV 89173
702-501-5900

*IN PROPRIA PERSONA*

_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
              COUNSEL/PARTIES OF RECORD

**DEC 11 2018**

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

SOPHIA STEWART,
　　　Plaintiff,
　　　　　　v.
JAMES CAMERON, an individual;
LIGHTSTORM ENTERTAINMENT, a
Corporation; SKYDANCE MEDIA, a
Corporation; GALE ANNE HURD, an
individual ; PARAMOUNT PICTURES, a
Corporation; WARNER BROS, a
Corporation; TWENTIETH CENTURY
FOX PRODUCTION , a Corporation ;
DAVID ELLISON, an individual,
TENCENT PICTURES, a Corporation;
ANDY WACHOWSKI, an individual;
LARRY WACHOWSKI an individual;

# 2:18-cv-02351-JAD-GWF

**COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF FOR:**
　**(1) FELONY COPYRIGHT
　　　INFRINGEMENT-17 U.S.C.
　　　506(e)**
　**(2) ANTI-COUNTERFEITING
　　　CONSUMER PROTECTION
　　　ACT OF 1996 -FRAUDULENT
　　　OATHS OF OWNERSHIP OF
　　　CHARACTERS SARAH
　　　CONNER AND TERMINATORS**
　**(3) CIVIL RICO**
　**(4) UNFAIR COMPETION**
　**(5) ACCOUNTING**
　**(6) MONEY LAUNDERING ACT OF
　　　1986**
　**(7) MONOPOLY**
　**(8) CONCEALMENT OF CO-
AUTHORS ON COPYRIGHT
REGISTRATION**
　**(9) The intellectual Property
protection and Courts Amendments Act
of 2004**
　**(10) GENDER DISCRIMINATION
42 U.S.C 1981, 42 U.S.C. 1982**
　**(11) Declaratory Judgment that Pau
584-564 and PA 241-495 are invalid due
to a Fraudulent Registration and
contracts without true owner void
against public policy**

**JURY TRIAL DEMANDED**

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 2 of 207

|  |  |
|--|--|
|  |  |
|  |  |

## PRELIMNARY STATEMENT

This is a RICO, Civil Rights, and Declaratory Judgment complaint for damages and equitable relief brought forth on behalf of the Plaintiff Sophia Stewart " Sole Legal Copyright Owner " Terminator " and " Matrix " Movie Franchises ( adjudicated facts in the Utah Federal Courts in Utah 9/25/2014 case #: 2:07-cv-00552-DB-EJF ) against Defendants James Cameron, Gale Anne Hurd, Paramount Pictures, Skydance Media, Twentieth Century Fox Production, Warner Bros., Lightstorm Entertainment, David Ellison, Tencent Pictures, Andy Wachowski, Larry Wachowski, and John Does 1 through X11 pursuant to 17 U.S.C. 106, 17 U.S.C. §201, Criminal Copyright Infringement 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e), 18 U.S.C. 1962 (b), and 28 U.S.C. 2201-2202 essentially alleging that defendants established a "pattern of racketeering" through a fraudulent scheme of "sham and shell" companies that were conceived to avoid individual tax liability, and were so inadequately funded without "legitimate ownership" to "Terminator" or " Matrix " asset copyrights for the purpose to defraud and "money launder" proceeds from individuals, financial institutions, and creditors by utilizing the investors to illegally transfer said assets and deceive the consuming public into believing that certain Defendants created the story concepts and characters in the "Terminator" and " Matrix " films. The Plaintiff asserts and alleges the Defendants James Cameron and Gale Anne Hurd through a premeditated "pattern of brazen theft," "counterfeiting," and deceit upon the U.S. Copyright Office, the Defendant Cameron publically admitted to Tracy Torme, Reporter of Starlog magazine for the December 1984 edition (#89), and Thomas McKelvey Cleaver that he

2

had willfully "ripped off" Harlan Ellison stories entitled "Soldier" which aired first on September 19, 1964, and "Demon with a Glass Hand" which aired on October 17, 1964 and were released as Outer Limits segments, thus making the "Terminator" copyright PAu 584-564 "inoperative/invalid," including but not limited to any and all derivative and/or counterfeiting "Terminator" works. Shortly thereafter, producer Gale Anne Hurd contacted Starlog with a demand to see the interview. Gale Anne Hurd then modified Starlog's article on The Terminator. She omitted a quote from Cameron in the article that read, "'Oh, I took a couple of Outer Limits segments.'" The Plaintiff asserts facts and alleges, Harlan Ellison did not send James Cameron, Gale Anne Hurd, Hemdale Films or Pacific Western Productions his work to establish "access." On information and belief James Cameron, Gale Anne Hurd, Hemdale Films and Pacific Western Productions did not register with the Writers Guild of America, or U.S. Copyright Office the "Terminator" script bearing the stolen work therein from Harlan Ellison and Sophia Stewart, because their work was already registered with the Register of Copyrights. On information and belief Defendants Gale Anne Hurd, Hemdale Film, and James Cameron pilfered Ellison and Stewart's work, and placed their work in plain sight in the actual "Terminator" movies, of which, proves "substantial similarity," and infringements of "protective expression." The Plaintiff asserts and alleges that Defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, and Hemdale Films breached the settlement agreement between Harlan Ellison in 1984; whereby, Ellison name appears in the credits of the "Terminator" products/films as a "substantial contributing co-author;" however, to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright registration reflecting "indictable acts" as required by law pursuant to 18 U.S.C. 4, and 17 U.S.C. 106, 17 U.S.C. §201, Felony Copyright Infringement 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e). The first item produced by Pacific Western Productions not only willfully infringed Harlan Ellison and Sophia Stewart's copyrights, but the defendant's registration to the United States Copyright Office for the film wrongfully failed to disclose the fact that both Ellison and Stewart are co-authors. On information and belief, Defendants James

Cameron, Gale Anne Hurd, and Hemdale Films knew or should have known without Harlan Ellison and Sophia Stewart's name on line 6 of the "Terminator" copyright PAu 584-564 that they could not sell an "inoperative copyright" and attempt to walk away while simultaneously failing to ameliorate the problem of the copyright not bearing Ellison and Stewart's names as co-authors, of which, is an issue that the Defendants designed to vicariously explode a "money launder scheme" for proceeds from future creditors, institutional investors, and deceive the consuming public by counterfeiting derivative works such as "Terminator 2": Judgment day, "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," " Terminator: Genisys", and now "Terminator 6" and the "Sarah Conner Chronicles" in violation of Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Money Laundering Act of 1986, Unfair Business Practices Act, Unfair Competition, Monopoly, Civil RICO, Accounting, (15 U.S.C. §1, 17 U.S.C. §106 Article 1, Section 8, Clause 7 of the U.S. Constitution, 17 U.S.C. §201, 17 U.S.C. §408d, 17 U.S.C. §501, 17 U.S.C. §506, 17 U.S.C. §506(e), 18 U.S.C. §1001, 18 U.S.C. §1001(a)(1), 18 U.S.C. §1341, 18 U.S.C. §1641, 18 U.S.C. §1967, 18 U.S.C. §2319), *Buchwald v. Paramount Pictures*, 1990 WL 357611 (Cal. Superior); (*Dezendorf vs. Twentieth Century Fox*, *SD.Cal., 1940, 32 F.Supp. 359, Aff'd 9Cir,.118F.2d 561; Lockheed Information Management Systems Co. v. Maximus, Inc.*, *259 Va. 92 (2000); Bridgeport Music Inc. v. Bad Boy 507 F.3d 470 (6th Cir. 2007)*, and The Intellectual Property Protection and Courts Amendments Act of 2004, Pinkerton v. United States, 328 U.S. 640 (1946), commonly known as the Pinkerton doctrine. (Exhibits T145, Terminator 1 minute 45 seconds "Theft"), (the UCC Liens 22173560002 filed against James Cameron and Gale Anne Hurd), (Exh 1, Sophia Stewart's, The Third Eye Copyright, TXU 117-610 dated 1981), (Exhs. 2-96 Utah Federal Courts ), Sophia Stewart's The Third Eye Movie Treatment),

## **INTRODUCTION**

1. In fact, the placement of the sequence in a post nuclear war between man verses machines came directly from the story concept written by Plaintiff Sophia Stewart, an American film student at USC film school. In addition, the concept of a machine coming forth out of a burning meteorite "naked and without shame," was stolen from Sophia Stewart by defendant Gale Anne Hurd, and James Cameron in concert with certain John Does I through XII affiliated with Twentieth Century Fox, Paramount, and New World Productions, Inc. between and including May 1, 1981 and May 12, 1981 while Sophia Stewart's screen treatment entitled the "Third Eye" was in the possession of Susan Merzbach, then the Creative Director of Twentieth Century Fox, for review. Merzbach spoke to Sophia Stewart by telephone between May 1, 1981 and May 12, 1981 and expressed her view that the movie treatment was good.

2. Kay Harrison, the administrative assistant to Merzbach for Twentieth Century Fox, sent the document back to Sophia Stewart in a letter dated June 1, 1981, but it failed to provide reasonable security for Stewart's story while it was in the possession of Twentieth Century Fox. On information and belief, the Plaintiff asserts and alleges the Defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, and Hemdale Film's infringer liability arises out of misappropriation of her federally protected intangible property entitled "The Third Eye" registered with the U.S. Copyright Office dated May 1, 1981(83'84'). As a proximate result of being the legal and beneficial copyright claimant, Stewart advances RICO and Criminal copyright infringement claims against Defendants Twentieth Century Fox Film Corp., Warner Bros. Entertainment Inc., James Cameron, Gale Anne Hurd, Andy and Larry Wachowski, David Ellison, Skydance Media, Paramount Pictures, Tencent Pictures. The Plaintiff asserts facts and alleges the "Terminator" and "Matrix" series infringed on her copyrights. The Plaintiff asserts and alleges the Anti-Counterfeiting Consumer Protection Act of 1996 includes copyright counterfeiting as predicate offense under RICO against the Defendants. Similarly, the Plaintiff asserts and alleges the Copyright Felony Act of 1992 expanded 18 USC §2319 embrace and protect all copyrighted works

stolen by the Defendants. The Plaintiff asserts and alleges Congress amended the Money Laundering Control Act of 1986 to identify "criminal copyright infringement" as "specified unlawful activity" of which is perpetrated against Stewart by the Defendants. Section §2319(a) specifically proscribes criminal copyright infringement activity contravening 17 USC §506(a), and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law."

3.     Gale Anne Hurd, while a public relations specialist and production assistant for Roger Corman of New World Productions, Inc. and later a co-producer, quickly went to attorney James Miller for the purpose of filing Articles of Incorporation for Pacific Western Productions, Inc. in Los Angeles County on May 12, 1981. Amazingly, this is the same day that the script admits that a "Terminator" came to destroy the fictional character that might conceive the child that would lead the revolution against the rebellion by the machines. The script admission for May 12, 1981 states that Gale Anne Hurd started the destruction of Plaintiff Stewart's rights.

4.     By James Cameron's confession to Tracy Torme and Thomas Cleaver, it could not be denied that Gale Anne Hurd had willfully used parts of "Soldier" and "Demon with a Glass Hand" in the shot sequence that occurred within the first 9 minutes of "Terminator 1". It also could not be denied that the written screenplay sought to use the "cat" that was discussed in the last 5 minutes of soldier in the written screenplay to create the same phenomenon of communication in PAu 584-564. These acts are evidence of the careful study and use of three copyrighted stories by Gale Anne Hurd, James Cameron, and Pacific Western Productions Inc. to make false copyright applications that were designed to suppress the names of the true authors – Sophia Stewart and Harlan Ellison. The teleplay and the final film reveals that Gale Anne Hurd and James Cameron were not really authors, rather, they were copying the protected work product of other people and then gave false oaths to the United States Copyright Office in violation of 17 U.S.C. 506 (e) of which voids all contractual agreements that were based upon these illegal acts.

6

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 9 of 143

5. Gale Anne Hurd was then an employee of New World Productions, Inc. in May of 1981 and she was transitioning to working as a co-producer on "Smokey Bites the Dust" on the creative end of the company for her boss, Roger Corman. That film was released in April of 1981. Corman was the president of New World Pictures, Inc. in May of 1981 and he was also a former story analyst of Twentieth Century Fox. Corman, based upon his relationships with Fox, sometimes received scripts and screen treatments from Twentieth Century Fox that the studio decided not to buy. [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 196]

6. Between May 1, 1981 and May 12, 1981, Gale Anne Hurd did not receive a story idea from James Cameron or learn of a "dream" from him. Instead, through a John Doe affiliated with Twentieth Century Fox and a John Doe of New World Pictures, Inc., Gale Anne Hurd got a copy of the "Third Eye" book and script with the same name by Plaintiff Stewart and started Pacific Western Productions, Inc. on May 12, 1981 in California through a Los Angeles attorney named James Miller under C1043898:

> "The "liability" ("emphasis added") of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California Law." (Exh. 14.4, Freudian Slip - Smoking Gun, Articles of Incorporation, dated May 12, 1981); (Exhs. 13, 14, 14.1, 14.2, 14.3, 14.4 James R. Miller, Esq. Embezzlement Construct Trust, Articles of Incorporation)

7. The admission by conduct that Hurd, James Cameron, and Pacific Western Productions obtained a copy of Plaintiff's "Third Eye" came when the film was released on October 26, 1984 and the first minute and 45 seconds read exactly on Plaintiff's copyrighted May 1, 1981 movie treatment under TXu 117-610, the same one that was given to Susan Merzbach in early May 1, 1981. The Defendants Cameron and Hurd's use of that subject matter in the film was not a part of the screenplay filed with the Writer's Guild of America and the Copyright Office is evidence of consciousness of guilt of misappropriation of the story, access, substantial similarity, protective expression, and unauthorized use. (Exhibits T145, Terminator 1 minute 45 seconds

"Theft") entered in as evidence to the Utah Federal Courts on September 25, 2014 Rulings by Federal Judges Dee Benson and Evelyn J. Furse. Exhibit Doc 282 & 283

8. The admission by conduct was assisted by the skillful effort to omit that language from the written screenplay submitted to the United States on February 3, 1984 by Hemdale Film Corporation, Pacific Western Productions, Inc., James Cameron, and Gale Anne Hurd under PAu 584-564. The admission by conduct was assisted again by the skillful omission of that discussion in the written screenplay submitted solely in the name of James Cameron to the Writer's Guild in July 1982 that hid any contention of authorship in Gale Anne Hurd that may have suggested to Sophia Stewart that her book and script had been misappropriated while in the hands Twentieth Century Fox through Susan Merzbach. (Exhs. 11, 12, "Terminator" Fraudulent Copyright, Pau 584-564), (Exhs. Doc 282 , James Cameron's handwritten notes "Terminator" 2) (Exh. 1-96, Letter of Access by Kay Harrison reference Susan Merzbach), (Exhs. 1-96, Letter of Access Lora Lee Story Editor)

9. However, the skillful manipulation was uncovered when it became necessary to release the film with an introduction that made sense as to why there was a post nuclear war fight going on between man and machines. It was at that time that Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation admitted that its movie also "ripped off" the May 1, 1981 movie treatment formerly submitted to Twentieth Century Fox for review by Sophia Stewart when the first minute and 45 seconds of the film did not match the written screen play that was copyrighted under PAu 584-564; rather, it reads exactly on the May 1, 1981 movie treatment of Sophia Stewart registered as TXu 117-610 as confirmed in the film registration by Gale Anne Hurd and Pacific Western Productions, Inc. with James Cameron and Hemdale Film Corporation under PA 241-495 in the United States Copyright office.

8

10. This activity required careful planning including the use of film school archives to study the teleplay and plot lines, which conduct cannot be denied by a person who was weak in training in shot selection for dramatic effect. James Cameron had just been chastised by the producer of "Piranha II: The Spawning" by Ovidio Assonitis for poor shot selection.

11. Cameron admitted this use and his confession is by conduct in that the shots and characters used in the first 5 minutes were patterned after those used by Harlan Ellison in the "Soldier," which conduct was done apparently due to the inexperience of Cameron in choosing shots to establish the setting for a new story. By this admission by shot selection and content, Cameron admitted by conduct that he and Gale Hurd worked together to pilfer the work product of others to design the "Terminator". Cameron admitted that he used the "Soldier" and "Demon with a Glass Hand" for two reasons. One reason was because he got advice from an industry insider that if he wanted it to be believed that he did not steal from Plaintiff Stewart, he should borrow from a true professional from something that is vintage. They were advised to settle quickly so that it would appear that it was unlikely that the first victim was the source. The second advice that he got was to get the money from the film first and then he could use his earnings to fight off any contentions by the primary copyright victim.

12. The scheme was put into play and Thomas M. Cleaver of Starlog Magazine and Tracy Torme heard his admission to willful copyright infringement, but they also heard him admit to giving aid and support to two false copyright registrations in violation of 17 U.S.C. 506 (e) with Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation. The laws of the United States are paramount, not the private rules of the Writers Guild of American. Their scheme was to violate federal law with false registrations and then be the first to file a story with the Writers Guild of America in July of 1982. Every screenplay made since July of 1982 by Cameron does not include any

9

written language concerning the first minute and 45 seconds including the one filed with the Register of Copyrights in February of 1984.

13.     At the same time that the script was received, a series of events went into play that caused the "Terminator" to constantly remain outside of a major studio where the misconduct would have been more obvious. The employer of Cameron and Hurd, Roger Corman of New World Pictures, Inc., received an immediate offer to sell the stock of New World Pictures, an independent film company, from three attorneys, Harry Sloan, Larry Kippur, and Larry Thompson. By February of 1983 when the offer was made by Hemdale Film Corporation to finance the movie with Orion Pictures, Inc. serving as the distributor, Corman received $16.5 million for his stock, but he got to keep his movie portfolio and therefore he did not have to disclose any development work that had been done on new projects. Between February of 1983 and February of 1984, Gale Anne Hurd sought to develop a relationship with James Cameron that was intimate to assure his loyalty to her. They were married so each could not testify against the other.

14.     The confession that Hurd, Cameron, and Pacific Western Productions, Inc. used illegal registrations as a modus operandi to take parts of stories of a third person without their consent of the owner is confirmed against Harlan Ellison. These willful false registrations were criminal acts that support the classification of these acts as racketeering under the RICO statute.

15.     Hemdale Film Corporation, Tencent Pictures, Skydance Media, Paramount Pictures, Warner Bros, Twentieth Centruy Fox, Lightstorm Entertainment, David Ellision, Larry Wachowski, Andy Wachowski and Orion Pictures, Inc. took these illegal acts and classified it as business conduct for which they could own by acts of rebellion against the Copyright Act. Yet, unlike a movie, no agreement is lawful that is based upon a criminal act. An arrangement to trade in illegal copyright registrations that omit the names of co-authors as a matter of design that is supported by false oaths of

ownership of the illegal registrations is a "pattern of racketeering" that cannot be willfully endorsed by Courts of the United States when this misconduct is disclosed in accordance with 18 U.S.C. 2. 3.4.

16.     The willful concealment of these illegal registrations by industry personnel that set up this operation to defy the duty to disclose the true authors is evidence of a strategy to do business by intentionally defying the public policy of the United States and then using false testimony in courts and false oaths in bankruptcy proceedings to contend ownership of that which was never legally purchased.  [See 18 U.S.C. 152 (2) and 18 U.S.C. 1621 (a)]

17.     As such, there is evidence that Gale Anne Hurd willfully used three distinct elements from three different copyrighted works willfully in the release of the October 26, 1984 film called the "Terminator" through Pacific Western Productions, Inc., Hemdale Film Corporation, and Orion Pictures, Inc., which conduct was an aspect of the modus operandi of the producer and director to do business by illegal activity in violation of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 152 (2), and 18 U.S.C. 157 (2).

18.     Once the creative participants decide to do business by illegal acts that suppress the names of the true authors, every agreement becomes evidence of a material breach of public policy that no court can knowingly endorse.  It is not viable or feasible that persons can choose to commit crimes to do business and then claim that they made agreements that are enforceable.  A plan by Gale Anne Hurd, James Cameron, and Pacific Western Productions to implement an illegal business operation that predictably included the use of bankruptcy procedures to "money launder" based upon false oaths in violation of 18 U.S.C. 152 (2) to legitimize illegal contracts, agreements by investors and bankruptcy registrations made so that sales could appear to be done with Court sanction and is an offense so offensive that the FBI had to be brought in the case in the year 2000

to make the statement to Warner Brothers that the introduction of the "Terminator" read on the "Third Eye." Thereafter, Warner Brothers "deleted" the introduction, and this indictable conduct based upon the illegal registrations associated with PAu 584-564 and PA 241-495 was designed to deceive and defraud Plaintiff Stewart, but later offered $5 Million for the copyrights as a settlement. In 2006, Arnold Schwarzenegger also wanted to buy the copyrights for the "Terminator".

19.    The FBI in 2000 through the agent John Barrio found that the original introduction of the "Matrix" used Stewart's previously submitted "Third Eye" submission in the making of the "Matrix." That film was released in 1999. In the same pattern, Plaintiff Stewart had submitted the May 1, 1981 "Third Eye" screen treatment  and book to Twentieth Century Fox, through Producer David Madden, Valarie Redd (Paramount Pictures) and Susan Merzbach, the Vice President of Creative Affairs. When that information was disclosed, Andy and Larry Wachowski were about to do the same thing with the "Third Eye" that had been done by Gale Anne Hurd and James Cameron through Pacific Western Productions, Inc.. When Plaintiff Stewart exposed the pattern of activity to the FBI, and the FBI confirmed the wrongful use of plaintiff's copyright on the "Third Eye" under TXu 117-610, Warner Brothers, through the Wachowski Brothers, they re-edited the "Matrix" and removed the introduction. This information is described in the New York City FBI reports under 295E Theft Case number: 295-NY-U275271. (Exh. MA, Declaration of Andy Wachowski); (Exh. ML, Declaration of Larry Wachowski); (Exh. MJ, Declaration of John Schulman); (Exh. MT, Declaration of Teresa Wayne)

20.    However, after the FBI disclosed the infringement in the introduction of the "Matrix," Warner Brothers had that aspect of the film removed that looked just like the introduction of the "Terminator" and read on the "Third Eye" following the complaint of Sophia Stewart.  However, when Victor Kubicek and Derek Anderson borrowed $30 million from Pacificor LLC to pretend to buy the rights of the "Terminator" franchise

based upon the same illegal copyright registrations through sham and shell companies T Asset Acquisitions LLC, a subsidiary of Halcyon Holding Group LLC, Warner Brothers then provided that entity $200 million when it knew from the FBI that the "Terminator" introduction read on the "Third Eye" without the consent of Plaintiff Stewart. (Exhs. 15, 16, 17, 18, Andy Wachowski and Larry Wachowski Fraudulent Copyright); (Exh. 20, "The Matrix" cover-page by Larry and Andy Wachowski dated August 23, 1994); (Exh. MJ, Declaration of John Schulman); (Exh. MT, Declaration of Teresa Wayne)

21. In the background of this sorted situation, Twentieth Century Fox was reported to have offered $50 million for the rights during the Chapter 11 of Carolco Pictures, Inc. for what it refused to make an offer to Plaintiff Stewart at its inception between May 1, 1981 and June 1, 1981.

22. Yet, it backed off of its offer when questions arose about its relationship to the story line and the history of the "Terminator" franchise. The rights ended up in the hands of Victor Kubicek and Derek Anderson for far less. (Exh. MB, Declaration of Bruce Isaacs); (Exhs. 14.6, 14.7, 14.8, Bruce Isaac Declaration Power of Attorney); (Exhs. 130, 131, Bruce Isaac $7 million dollar settlement offer)

23. Each of these separate and distinct acts constituted three distinct violations of 17 U.S.C. 506 (e) at the time that the copyright registration was submitted on February 3, 1984. The racketeering enterprise willfully violated numerous federal laws in an effort to conceal this "pattern of racketeering" in violation of public policy, and therefore all contracts made regarding these matters should be declared void as against public policy. Each sale has been premised upon a false oath of intellectual property ownership in violation of 17 U.S.C. 506 (e) that was not openly disclosed to the court.

24. Plaintiff Stewart maintains that her story was taken by illegal means, commercially exploited by sham and shell companies with illusory agreements without

her permission in violation of public policy, and then willfully concealed by industry insiders that learned about the malfeasance at its inception. Susan Merzbach and Michael Medavoy were aware of the misconduct at its inception, but they concealed their knowledge of the unlawful copyright registrations from the United States in violation of 18 U.S.C. 2. 3. 4.

25. Merzbach then knew that Hemdale Film Corporation, Pacific Western Productions, Inc., Gale Anne Hurd, and James Cameron had given materially false information to the copyright office regarding authorship in violation of 17 U.S.C. 201 and 17 U.S.C. 506 (e). Merzbach had a duty from October 26, 1984 not to conceal her knowledge, but was put on a payroll not to report it. Similarly, Kay Harrison of Twentieth Century Fox had the same duty. (Exh. 12.3, Letter of Access by Kay Harrison reference Susan Merzbach), (Exhs. 12.4, Letter of Access Lora Lee Story Editor)

26. Harlan Ellison in an interview spoke up to protect the public policy of the nation when he disclosed that Pacific Western Productions, Hemdale Film Corporation, and Orion Pictures, Inc. that Hurd and Cameron had willfully given false statements of authorship to the Copyright Office regarding the "Terminator" in violation of 17 U.S.C. 506 (e). Ellison proved that the concealment of true authors was the modus operandi of Gale Anne Hurd and James Cameron through Pacific Western Productions, Inc. on the "Terminator" as a modus operandi of their production technique. (Exhibits T145, Terminator 1 minute 45 seconds "Theft,")

27. While Gale Anne Hurd was the primary known instigator of this malfeasance, she could not and did not act alone in getting access to the "Third Eye" or in making plans to get into a separate sham and shell corporation to theorize a means by which it could be commercially exploited. [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 100, 114, and196]; [FBI report in case number 295-NY-U275271]

14

28. By virtue of the organized "pattern of racketeering" acts that violated public policy and illegally concealed the authorship of Plaintiff Sophia Stewart, she now requests this court to address the question of the offenders of the public policy of the United States under the contentions that agreements could not be reached regarding the "Terminator" without her authorization or consent. Plaintiff Stewart maintains that all deals made without a recognition of her rights was done to willfully suppress her rights and restrain her in her trade and talents,  and to show that some industry leaders concealed the malfeasance by illegal means in violation of 18 U.S.C. 2. 3. 4 so that the perpetrators could benefit from their illegal malfeasance and to make certain that Plaintiff Stewart did not collect her just compensation as a gifted writer who in 1981 did not have membership in the Writers Guild of America.

29. Plaintiff Stewart maintains that the willful understanding of the two offenses against Harlan Ellison was notice to every business entity from October of 1984 that it had a duty to determine who the real authors were before making responsible contracts with these admitted public policy violators.

30. The organized efforts to conceal the stories "ripped off" from Harlan Ellison and Sophia Stewart cannot be claimed to be a basis for Hemdale Film Corporation to contend that it owned the rights to the "Terminator" or " Matrix "  by a criminal act in a "pattern of racketeering".  That same pattern cannot be said to be a lawful basis for shell and sham companies such as Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, and Pacificor LLC to maintain that they could be bona fide purchasers through false oaths of ownership when the seller did not have the lawful title to sell that part of the work product that is owned by Harlan Ellison and Sophia Stewart in light of 17 U.S.C. 201 and 17 U.S.C. 506 (e). [Jamescamerononline.com]

31. Plaintiff has brought this action to stop the Defendants from "money laundering," making and selling more than 10 copies of counterfeit derivatives of her work across state lines, and continuing to abuse her rights by the use of "invalid/inoperative copyrights" obtained by concealing material contributions to authorship, false declarations of ownership to the "Terminator" and " Matrix " franchises by corporations that have made deals with knowledge of the malfeasance with companies and in the Bankruptcy Courts without disclosing that false oaths were made in violation of 18 U.S.C. 152 (2), and further decisions made in another United States Court achieved by false declarations of ownership in violation of 18 U.S.C. 1621 (a). Plaintiff maintains that a legal outcome achieved by a criminal act is void as a matter of law.

32. Plaintiff will show how the "Terminator" and " Matrix " being one Epic story was made, reproduced and more than 10 counterfeit derivatives of Stewart work was sold across state lines by illegal means such as mail and wire fraud in violation of the RICO Act and strategically done to use the Bankruptcy Courts as the vehicle for "money laundering;" in order to make it look like illegal transfers of criminal fruit could be done and made to seem legitimate. It is a violation of the law of the United States to establish a business plan based upon illegal copyright registrations that were to be enforced through the use of false oaths through the United States Bankruptcy Courts of the United States.

33. Plaintiff Stewart has brought this case because she has been restrained in her trade and talents because of gender and race in violation of her civil rights, as well as, her copyrights were taken illegally and she has been consistently been treated differently by Fox and Warner Bros. in "contract opportunities" with the same subject matter as an gifted writer and woman than White males and women who pretended to have ownership to her story entitled the "Third Eye." Thus, in an effort to vindicate her rights and the superiority of the laws of the United States regarding story rights, Plaintiff decided to initiate this action.

34.    The on-going and continuous victim of the RICO crimes against the United States has been Plaintiff Sophia Stewart. Each and every Chapter 11 reorganization was made to "money lauder" where each owner made a false oath of full ownership of the "Terminator" intellectual property rights in violation of 18 U.S.C. 152 (2) and is an aspect of the "pattern of racketeering," in contravention to the Counterfeiting Consumer Protection Act of 1996, and Anti-Counterfeiting Amendments Act of 2004.

35.    On informational facts and belief, Gale Anne Hurd started Pacific Western Production on May 12, 1981 while still employed under Roger Corman for "Smokey Bites the Dust." Another employee of New World Pictures, Inc., James Cameron, turned in a screenplay to the Writers Guild of America West in July 1982 while he was then employed by New World Pictures, Inc. entitled the "Terminator." James Cameron was employed by New World Pictures, Inc. between January 1, 1981 and at least December 31, 1982 in that he worked on the October 1982 release called "Android" with Roger Corman, the executive producer. This confirms that three registrations were made illegally on the "Terminator" (PAu 584-564 and PA 241-495) by Gale Anne Hurd through Pacific Western Productions, Inc. Then, in February of 1983, when it was reported that Roger Corman of New World Pictures, Inc. sold the stock of the company without the films and stories in the amount of $16.5 million to three attorneys. These admissions by James Cameron proved three acts in violation of 17 U.S.C. 506 (e) between and including February 3, 1984 and December 31, 1984. The clients of these entertainment attorneys and the subject of their representation are not known and cannot be legally ascertained.

36.    Soon thereafter, Hemdale Film Corporation agreed to finance the "Terminator" for $6.5 million with Gale Anne Hurd, an untested producer, and James Cameron, an untested Director, which conducts all together, was essentially unheard of in movie making even at that level of budget. This was particularly difficult because Cameron

had been described as ineffective as a director by Ovidio Assonitis on "Piranha II: the Spawning" in Italy.

45.    The finished product revealed a work product that was much better than expected from a film making point of view because it appeared that an experienced filmmaker had participated in the design of the project between January of 1982 and July of 1982 when Cameron continued to be employed by New World Pictures.   By these facts, it is clear that executives in Twentieth Century Fox concealed their knowledge of the misappropriated "Third Eye" story by Sophia Stewart that was liked by film companies all over Hollywood in 1982 and 1983.   The film companies did not want to do the project with an untested producer and director.   These combinations of acts led to a story being made that was based upon the "Third Eye" that made $78 million on a $6.5 million investment.   After this success, Hemdale Film Corporation filed for bankruptcy in order to "money lauder" when lesser stories turned out to be commercial flops in violation of the Money Laundering Act of 1986.   Hemdale falsely represented to the Bankruptcy Court that it had the ownership rights to the "Terminator" intellectual property in violation of 18 U.S.C. 152 (2) when it was known around the industry that Gale Anne Hurd and James Cameron had falsified the copyright registrations and did not reveal all co-authors, including Harlan Ellison and Sophia Stewart.   In spite of the knowledge and access of Twentieth Century Fox, it did not reveal to law enforcement officials that the introduction of the "Terminator" came from Hurd's misappropriation of the "Third Eye" that Susan Merzbach read and liked.   Thus, the sale of the rights through that bankruptcy case was based upon crimes under 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2) that was made possible by the concealment by Twentieth Century Fox after Harlan Ellison proved the pattern of racketeering as to "Soldier" and "Demon with a Glass Hand" in 1984. The concealment of this malfeasance by Twentieth Century Fox, through Susan Merzbach, was an offense against the United States under 18 U.S.C. 2. 3. 4. (Exhs. 1-96, Terminator Fraudulent Copyright, Pau 584-564), (Exhs. 1-96, James Cameron's handwritten notes

Terminator 2), (Exh. 12.3, Letter of Access Susan Merzbach), (Exhs. 12.4, Letter of Access Lora Lee Story Editor); (Exhs. 13, 14, 14.1, 14.3, 14.4, 14.5, Articles of Incorporation Pacific Western)

46.    The later sales were void as against public policy through other shell and sham companies such as Carolco Pictures Inc. that were undercapitalized and associated with "Terminator 2: Judgment Day" in violation of Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Money Laundering Act of 1986. Again, a false statement of authorship contributed to the intellectual property in violation of 17 U.S.C. 506 (e) that then led to a false oath of intellectual property ownership of the "Terminator" franchise to the Bankruptcy Court in the Central District of California in violation of 18 U.S.C. 152 (2).

47.    In 2004, Stewart initiated a court lawsuit before Judge Margret Morrow. Sophia Stewart filed a lawsuit pro-se having entered her "Certified Copyrights" into court record as evidence. Most notably, Stewart's copy written book the "Third Eye" was admitted as "Physical Evidence" of creative authenticity at the beginning of the TRIAL. ("Emphasis Added") "Stewart's manuscript of "The Third Eye" was registered with the United States Copyright Office on May 1, 1981, which was a 6 page movie treatment that came before Cameron's 1982 treatment. "Stewart's manuscript of "The Third Eye" was registered with the United States Copyright Office (TXu 117-610) on February 2, 1983.[1] Additional work was registered on February 6, 1984 (TXu-154-281) consisting of a narrative, preface, characters, special effects, Sarah Conner character, creation of the Terminators, introductions, the making of The Third Eye, 8 brief chapters, and illustrations.

48.    The Plaintiff asserts and alleges the pleadings and affidavits submitted to Federal Judge Morrow by Defendants James Cameron and Gale Hurd denied having access or making use of Stewart's treatment and book. (Exh. JC, Affidavit of James Cameron);(Exh. GH, Affidavit of Gale Anne Hurd) The Plaintiff asserts and alleges that

Defendants Bruce Isaac on behalf of Cameron and Hurd Defendants infiltrated the Plaintiff legal camp and entered in an incestuous agreement with Stewart's former lawyers to not disclose the first minute and 45 seconds of the Terminator to Judge Morrow, because it proved access, substantial similarity, protective expression, and unauthorized use. The Plaintiff asserts and alleges Defendant Bruce Isaac told Judge Morrow he was afraid of the "transmissions" that are "indictable acts" of his clients and the conduct of all the "counterfeiting" of the Sole Owner's copyrights constituted "indictable acts under **The Anti-Counterfeiting Consumer Protection Act of 1996,** Copyright Felony Act of 1992 expanded 18 USC §2319 to embrace and protect all copyrighted works. (***Smith v. Jackson***, *84 F.3d 1213 (9th Cir. 1996),* ***Pinkerton v. United States***, *328 U.S. 640 (1946),* ***Pinkerton Doctrine, Money Laundering Control Act of 1986*** to identify criminal copyright infringement as "specified unlawful activity." Section §2319(a) specifically proscribes criminal copyright infringement activity contravening 17 USC §506(a) and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law."

49.     The Plaintiff asserts and alleges that the Defendants Cameron and Hurd did not disclose their unauthorized use of the first minute and 45 seconds from "The Third Eye" to Federal Judge Morrow of which was a strategy an act of deception on a federal official in violation of 18 U.S.C. 152 (2). Then, to make the matter worse, after the FBI had made their view known to Warner Brothers in a dispute regarding the "Matrix," James Cameron, Gale Anne Hurd, Andy Wachowski, and Larry Wachowski gave false affidavits to the United States District Court regarding authorship on April 29, 2005, which false affidavits were further acts in the pattern of racketeering in violation of 18 U.S.C. 1621 (a).  By these acts, Plaintiff Stewart has been and continues to be the repeated victim of a RICO enterprise that floats between sham and shell companies that do not own "Terminator" nor " Matrix " intellectual property rights and changes from independent corporation to independent corporation all of which carry and use the "same illegal DVDS and other merchandise for sale" and fraudulent Trademarks – the illegally

obtained intellectual property rights of the "Terminator" that were misappropriated from the "Third Eye" by a willful design. (Exhibits T145, Terminator 1 minute 45 seconds "Theft")

50.    The same pattern of "money laundering" and "counterfeiting" more than 10 copies of Stewart's work across state lines continued through Halcyon Holding Group LLC where "Terminator Salvation" was released in May of 2009, made $172 million over budget, and was in Chapter 11 reorganization by August 17, 2009 before Plaintiff Stewart could assert violations of 17 U.S.C. 506 (e), Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Money Laundering Act of 1986. Again, a false oath of full ownership was made and Halcyon auctioned rights that it did not fully own to Pacificor on or about February 8, 2010 for $29.5 million. This pattern of racketeering activity continued with economic support of Warner Brothers of $200 million when it had learned from the FBI in 2000 that "Terminator 1" had an introduction that read on the introduction of the "Third Eye" dated May 1, 1981 that was registered as a copyright under TXu 117-610 before any "Terminator" movie was written or released.

51.    Everybody that has been affiliated in any way with this misappropriated intellectual property has had great success, except the gifted writer and female USC Film Student that created it – Sophia Stewart.

52.    As it was for Harlan Ellison who was victimized by the same RICO enterprise, plaintiff Sophia Stewart seeks damages, Oscars and a screen credit for her protected intellectual property that was willfully "ripped off" and used by the same pattern of racketeering that was visited upon Harlan Ellison on the same production.

**JURISDICTION**

53.    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §1331, 1332 (a) (2), 1367 (a), 1338, 1334, 1343 (a) (1) and (3) in reference to claims raised under 17

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 22 of 143

U.S.C. 501, 18 U.S.C. 1962, 42 U.S.C. 1981, 42 U.S.C. 1982, 42 U.S.C. 1983, 28 U.S.C. 2201 and 2202.

54.    Venue is proper under 28 U.S.C. §1391(b) (2), 28 U.S.C. 1400 (a), 28 U.S.C. 1408, 28 U.S.C. 1409 (a), 18 U.S.C. 1965 (a) in that the alleged acts and practices that involve acts of Civil Rights violations involving discrimination, Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1964 and 1965. violations, and void contracts under state law involve defendants that reside and do business in Los Angeles County of the State of California but cross state lines for business. Venue is proper in this district for any claims based upon void contracts against public policy in that those acts and occurrences depend from the dominant RICO allegations. Crimes "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). United States v. Tucker, 495 F. Supp. 607, 618 (E.D.N.Y. 1980) The matter in controversy exceeds, exclusive of interest and costs, the sum of $300,000,000 dollars, with jurisdiction founded on the existence of the state and federal question, civil rights violations, and amount in controversy.

**PARTIES**

55.    Plaintiff Sophia Stewart is a citizen and resident of Las Vegas, Nevada.

56.    Defendant James Cameron is a citizen and resident of the County of Los Angeles, California and is doing business in this state and in interstate commerce having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

57. Defendant Gale Anne Hurd is a citizen and resident of the County of Los Angeles, California and is doing business in this state and in interstate commerce having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

58. Defendant Twentieth Century Fox, Inc. had access and is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce in the motion picture business having distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

59. Defendant Larry Wachoski, Andy Wachoski d.b.a. as Eons, David Ellison d.b.a. as Skydance Media, are citizens and residents of the County of Los Angeles, California and is doing business in this state and in interstate commerce in the motion picture business are part of the R.I.C.O Enterprises. Tencent Pictures d.b.a. as Tencent Holdings Limited, a Chinese Corporation who will co-finance as a global partner with Skydance Media Terminator 6 Movie produced by James Cameron and David Ellision. Tencent will also handle distribution, marketing and merchandising of the film in China. Paramount Pictures and 20th Century Fox are also co-financing the film. The movie will be distributed domestically by Paramount Pictures and internationally (excluding China )by 20th century Fox ( adjudicated facts in Utah Federal Court Case both defendants had access and knowledge but continues felony acts ).

60. Pacific Western Productions, Inc, is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, Pacific Western Productions has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

61. Hemdale Film Corporation, is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, Pacific Western Productions has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

62. Halcyon Holding Group, LLC is a California Corporation doing business in the County of Los Angeles, California and in interstate commerce through the distribution of some fraudulently obtained copyright material where the true co-authors of that material was not disclosed to the United States Copyright Office associated with the motion picture business. Furthermore, Halcyon Holding Group, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

63. T Salvation Productions, LLC is a California Limited Liability Company doing business in the County of Los Angeles and in interstate commerce in the motion picture business. Furthermore, T Salvation Productions, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

64. T Salvation Distributions, LLC is a California Limited Liability Company doing business in the County of Los Angeles and in interstate commerce in the motion picture business. Furthermore, T Salvation Distribution, LLC has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

65. T Asset Acquisition Company, LLC is a Delaware Limited Liability Company doing business in the County of Los Angeles of the State of California and in interstate

commerce in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

66. Dominion Group, LLC is a California Limited Liability Company that is doing business in the County of Los Angeles in the State of California and in interstate commerce through its primary members Derek Anderson and Victor Kubiceck in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

67. Salvation Distribution, LLC is a California Limited Liability Company that is doing business in the County of Los Angeles in the State of California and in interstate commerce through its primary members Derek Anderson and Victor Kubiceck in the motion picture business. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

68. Victor Kubicek is a citizen and resident of the County of Los Angeles, California doing business in the movies through at least one under capitalized California Corporation that was found to have defrauded investors. Furthermore, Victor Kubicek has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

69. Derek Anderson is a citizen and resident of the County of Los Angeles, California doing business in the movies through at least one under capitalized California Corporation that was found to have defrauded investors. Furthermore, Derek Anderson has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 26 of 143

70. Defendant Warner Brothers Entertainment Inc. ("Warner Brothers"), upon informational facts and belief, was organized under the laws of the State of Delaware, maintaining its principal office and place of business within the City of Los Angeles, California and provided approximately $200 million to T Asset Acquisitions LLC for Victor Kubicek and Derek Anderson to promote the production of "Terminator Salvation" between 2007 and 2009 which permitted T Asset Acquisitions LLC and Warner Brothers to release the film on May 21, 2009. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

71. Defendant Lightstorm Entertainment is a California Corporation doing business in the County of Los Angeles, California which was founded from the proceeds of fraudulently obtained copyright material entitled "The Third Eye" where the true co-authors of that material was not disclosed to the United States Copyright Office. Furthermore, said company, has distributed and "counterfeited" more than 10 copies of Stewart's federally protected copyright across the state lines of California.

72. Valhalla Motion Pictures is a California Corporation doing business in the County of Los Angeles, California which was founded from the proceeds of fraudulently obtained copyright material entitled "The Third Eye" where the true co-authors of that material was not disclosed to the United States Copyright Office.

73. Andrew George Vajna | Andrew Vajna | Andy Vajna | Andy Vajnac is an Executive for THE HALCYON COMPANY, and located at 9853 Lime Orchard Rd, Beverly Hills, CA 90210 and engages in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of Utah and Nevada.

74. Mario F. Kassar, are Executive 10281 CHaring Cross, L.A., CA 90024 and engages in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of Utah and Nevada.

75. Defendant s John Does I through XII are employed at all of the above Defendants companies existing and doing business under the laws of the State of California, and located at and engaging in business in said state, including having distributed more than 10 copies of fraudulently procured copyright material in the state of California.

<div align="center">

**FIRST CAUSE OF ACTION**

**Anti-Counterfeiting Consumer Protection Act Of 1996,**

**Money Laundering Control Act of 1986,**

**Willful Concealment of Co-Author**

**From All Copyright Registrations**

**On "Terminator" and " Matrix "Movie Copyrights**

**Should Render them**

**Void Against Public Policy**

</div>

76. Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

77. The Plaintiff states a claim against Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Warner Bros, David Ellison, Skydance Media, Tencent Pictures, Larry Wachoski, Andy wachoski, Paramount Pictures, Lightstorm Entertainment, and RICO Enterprises: Susan Merzbach, Pacific Western Productions, Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna, Mario

F. Kassar and John Does I through XII for establishing a "pattern of racketeering" through a fraudulent scheme of "sham and shell" companies that were conceived to avoid individual tax liability, and were so inadequately funded without "legitimate ownership" to "Terminator" asset copyrights for the purpose to defraud and "money launder" proceeds from individuals, financial institutions, and creditors by utilizing the Bankruptcy Court to illegally transfer said assets and deceive the consuming public into believing that certain Defendants created the story concept in the "Terminator" film.

78.     The Plaintiff asserts and alleges said Defendants and RICO Enterprises James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Pacific Western Productions, Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna, Mario F. Kassar and John Does I through XII carried out "transmissions" and "sold" Stewart's work via "wire" and "mail fraud" of which are "indictable acts" for distributing and "counterfeiting" more than 10 copies of her federally protected copyright work worth more than $2,500 dollars, within a 180-day period, across the state lines of California for "commercial distribution" and in different formats including over a publicly-accessible computer network in violation, and movie theater screens, CDs' and DVD in violation of 17 U.S.C. § 506(a)(1), **The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Copyright Felony Act of 1992 expanded 18 USC §2319** to embrace and protect all copyrighted works. (Smith v. Jackson, 84 F.3d 1213 (9th Cir. 1996), Pinkerton v. United States, 328 U.S. 640 (1946), Pinkerton Doctrine, **Money Laundering Control Act of 1986** to identify criminal copyright infringement as "specified unlawful activity," pursuant to Section §2319(a) which specifically proscribes "criminal copyright infringement" activity contravening 17 USC §506(a) and provides that punishment under this provision "and such penalties shall be in addition to any other provisions of title 17 or any other law, 18 U.S.C. § 1341 (1994) – Mail Fraud, 18 U.S.C. § 1343 (1994) – Wire Fraud, 18 U.S.C. § 1344 (1994) -

Bank fraud statute, 18 U.S.C. § 1030 (1994 & Supp. 1997) - Computer Fraud, 18 U.S.C. § 1031 (1994) - Major fraud, "Conspiracy to Defraud by Interference with Government Functions," prosecuted pursuant to 18 U.S.C. § 371 falls under guideline 2C1.7. See id. App. a, § 2C1.7, Tax evasion, 26 Ul.S.C. § 7201 (1994), 18 U.S.C. § 157 (1994), Marriage fraud, 8 U.S.C. § 1325(c) (1994 & Supp. 1997), 18 U.S.C. § 371 (1994), and Insurance Fraud.

79.     Plaintiff Stewart is a victim of this "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "**The Terminator** " in violation of The Anti-Counterfeiting Consumer Protection Act of 1996: USA  26 October 1984,  Australia  20 December 1984, South Korea  22 December 1984, UK  11 January 1985 Spain,  18 January 1985, Italy  25 January 1985, Sweden  8 February 1985, Philippines  9 February 1985 (Davao), Finland 15 February 1985,  Netherlands  21 February 1985,  Switzerland  27 February 1985, Switzerland  27 February 1985, West Germany  15 March 1985, Hong Kong  22 March 1985, Norway  28 March 1985, Colombia  10 April 1985, Argentina  18 April 1985, France  24 April 1985, Japan  4 May 1985, Uruguay  4 July 1985, Turkey  January 1988, Hungary  26 May 1988, Czechoslovakia  1 September 1990, Germany  29 August 1991,UK  16 March 2001. [http://www.imdb.com/title/tt0088247/releaseinfo]

80.     Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "**Terminator 2": Judgment Day**," in violation of The Anti-Counterfeiting Consumer Protection Act of 1996:  USA  1 July 1991 (Century City, California), Canada  3 July 1991, USA  3 July 1991, Hungary  4 July 1991, South Korea 6 July 1991, Brazil  August 1991, Hong Kong  1 August 1991  , Argentina  8 August 1991, Colombia  16 August 1991, UK  16 August 1991, Japan  24 August 1991, Turkey September 1991, Philippines  3 September 1991 (Davao), Australia  5 September 1991, Uruguay  5 September 1991, Sweden  13 September 1991, Netherlands  27 September

1991, Finland 4 October 1991, France 16 October 1991 , Germany 24 October 1991, Austria 25 October 1991, Denmark 8 November 1991, Spain 5 December 1991, Czechoslovakia 6 March 1992, Poland 5 May 1992, China 18 May 2000 (Beijing), Finland 1 August 2003, Finland 14 June 2006 (Midnight Sun Film Festival) (70mm version), Canada 7 February 2010 [http://www.imdb.com/title/tt0103064/releaseinfo].

81.    Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of **"Terminator 3: Rise of the Machines,"** USA 30 June 2003 (Westwood, California) (premiere), Canada 2 July 2003, USA 2 July 2003, Puerto Rico 3 July 2003, Russia 3 July 2003, Colombia 4 July 2003, Kazakhstan 4 July 2003, Japan 5 July 2003 (premiere), Argentina 8 July 2003, Philippines 9 July 2003, Hong Kong 10 July 2003, Malaysia 10 July 2003 , Singapore 10 July 2003, Estonia 11 July 2003, Thailand 11 July 2003, Japan 12 July 2003, Kuwait 15 July 2003, Bahrain 16 July 2003, Qatar 16 July 2003, Republic of Macedonia 16 July 2003, United Arab Emirates 16 July 2003, Australia 17 July 2003, Netherlands 17 July 2003 (limited), New Zealand 17 July 2003, Taiwan 17 July 2003, Iceland 18 July 2003, Denmark 23 July 2003, Switzerland 23 July 2003 (French speaking region) Lebanon 24 July 2003, Netherlands 24 July 2003, Peru 24 July 2003, Switzerland 24 July 2003, Bulgaria 25 July 2003, India 25 July 2003, Mexico 25 July 2003, Panama 25 July 2003, Portugal 25 July 2003, South Korea 25 July 2003, Turkey 25 July 2003, Spain 30 July 2003, Sweden 30 July 2003, Germany 31 July 2003, Israel 31 July 2003, Slovenia 31 July 2003, Austria 1 August 2003, Brazil 1 August 2003, Finland 1 August 2003, South Africa 1 August 2003, UK 1 August 2003, Belgium 6 August 2003, France 6 August 2003, Czech Republic 7 August 2003, Slovakia 7 August 2003, Norway 8 August 2003 (premiere), Poland 8 August 2003, Oman 12 August 2003, Malta 13 August 2003, Norway 15 August 2003, Jordan 20 August 2003, Hungary 21 August 2003, Greece 22 August 2003, Lithuania 22 August 2003, Egypt 27 August 2003,

Venezuela 27 August 2003, Italy 19 September 2003, Switzerland 19 September 2003 (Italian). [http://www.imdb.com/title/tt0181852/releaseinfo]

82. Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the release dates of "Terminator 4: Salvation": USA 14 May 2009 (Hollywood, California) (premiere), Bahrain 21 May 2009, Canada 21 May 2009, Kuwait 21 May 2009, Lebanon 21 May 2009, USA 21 May 2009, South Korea 22 May 2009, Egypt 27 May 2009, Indonesia 27 May 2009, Philippines 27 May 2009, Taiwan 27 May 2009, Hong Kong 28 May 2009, Malaysia 28 May 2009, Singapore 28 May 2009, Thailand 28 May 2009, Netherlands 31 May 2009, Argentina 3 June 2009, Belgium 3 June 2009, Finland 3 June 2009, France 3 June 2009, Greece 3 June 2009 (Athens), Iceland 3 June 2009, Ireland 3 June 2009, Sweden 3 June 2009, Switzerland 3 June 2009, UK 3 June 2009, Australia 4 June 2009, Chile 4 June 2009, Croatia 4 June 2009, Czech Republic 4 June 2009, Denmark 4 June 2009, Georgia 4 June 2009, Germany 4 June 2009, Greece 4 June 2009, Hungary 4 June 2009, Israel 4 June 2009, Kazakhstan 4 June 2009, New Zealand 4 June 2009, Panama 4 June 2009, Peru 4 June 2009, Portugal 4 June 2009, Russia 4 June 2009, Slovakia 4 June 2009, Slovenia 4 June 2009, Switzerland 4 June 2009, Ukraine 4 June 2009, Austria 5 June 2009, Brazil 5 June 2009, Bulgaria 5 June 2009, Colombia 5 June 2009, Ecuador 5 June 2009, Estonia 5 June 2009, Italy 5 June 2009, Japan 5 June 2009, Latvia 5 June 2009, Lithuania 5 June 2009, Norway 5 June 2009, Poland 5 June 2009, Romania 5 June 2009, South Africa 5 June 2009, Spain 5 June 2009, Turkey 5 June 2009, Uruguay 5 June 2009, Venezuela 5 June 2009, China 9 June 2009, Japan 13 June 2009, India 26 June 2009, Mexico 31 July 2009. [http://www.imdb.com/title/tt0438488/releaseinfo]

83. Plaintiff Stewart is a victim of this willful "pattern of racketeering" and seeks compensation for the "indictable conduct" by the above named Defendants for the

31

release dates of "Sarah Conner Chronicles": 31 episodes, January 13, 2008 – April 10, 2009.[http://www.imdb.com/title/tt0851851/];

[http://en.wikipedia.org/wiki/Terminator:_The_Sarah_Connor_Chronicles]

84.     At various times the Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Susan Merzbach, Pacific Western Productions,  Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc.,  Andrew Vajna, Mario F. Kassar and John Does I through XII through the "racketeering enterprise" of "shell and sham" companies made false oaths of ownership in order to "money launder" within the California District Bankruptcy Court for the "The Terminator," "Terminator 2": Judgment day," "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," and "Terminator Genisys" , "Terminator 6", characters Sarah Conner, Terminators, the "Sarah Conner Chronicles" intellectual property copyrights in violation of **Money Laundering Control Act of 1986,** 17 U.S.C. 506 (e), 18 U.S.C. § 371 of which falls under guideline 2C1.7. See id. App. a, § 2C1.7.  Furthermore, the Defendants willfully violated numerous federal laws in an effort to conceal this "pattern of racketeering" in violation of public policy, and therefore all contracts made regarding these matters should be declared void as against public policy.  Each sale by the Defendants within the Bankruptcy has been premised upon a false oath of intellectual property ownership in violation of 17 U.S.C. 506 (e) that was not openly disclosed to the court.

85.     The Plaintiff asserts and alleges all of the above named Defendants amd RICO Enterprises  including Derek Anderson and Victor Kubicek knew or should have known that they did not legitimately own "The Terminator" intellectual property copyrights as a proximate result of  Harlan Ellison's name appearing in the "credits" of the "Terminator" products/films as a "substantial contributing co-author," and to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright

registration as required by law pursuant to 18 U.S.C. 4, and 17 U.S.C. 106, 17 U.S.C. §201, **Felony Copyright Infringement** 17 U.S.C. §501, 17 U.S.C. §506 (a)(1)(A), 17 U.S.C. §506(e). The Plaintiff asserts and alleges the Defendants Anderson and Kubicek "aided and abetted" the commission of a Felony Copyright Infringement by "money laundering" and "Pump and Dump Fraud," and committed an affirmative act by selling the fraudulent procured copyrights via an auction on or about February 8, 2010 for $29.5 million to Pacificor intended to further the commission of indictable conduct. The Plaintiff asserts Defendant Pacificor's affiliative liability is deemed to have committed a substantive offense even though that entity was not present at the commission of Cameron and Hurd filing a fraudulent copyright with the U.S. Copyright Office for the Terminator (PAu 584-564 and PA 241-495) and did not physically consummate it. The Plaintiff asserts all of the above Defendants carry "contributory and vicarious infringer" liability, and it is reasonably foreseeable that the primary infringers Gale Anne Hurd and James Cameron did consummate a conspiratorial agreement with others whose active commission necessarily invokes the Pinkerton Doctrine. In violation of Pinkerton, the Plaintiff asserts said Defendants affinitive acts were agreeing that violations of **The Anti-Counterfeiting Consumer Protection Act of 1996, and Money Laundering Control Act of 1986** would be committed; for complicity, the affinitive act can take various forms as long as it reliably evinces a desire to support the commission of indictable conduct."

86. The Defendants "restrained" Stewart in her "trade and talents," and encroached upon her exclusive rights of ownership amounting to violations of Felony Copyright Infringement 17 USC §506, **The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, Copyright Felony Act of 1992 expanded 18 USC §2319** for: (1) reproduction, (2) preparation and distribution of derivative works based upon the original copyrighted work through federal mail and /or wire at the Register of Copyrights, (3) public distribution, (4) public performance of said types of works, (5) public display of said types of works, and (6) performance of sound

recordings by means of digital audio transmission. (See 17 U.S.C. § 106(1)-(6); 17 U.S.C. § 101). The Plaintiff asserts and alleges the Defendants were given "Constructive Notice" to cease and desist from committing Felony Copyright Infringement either for (7) commercial advantage or private financial gain, (8) by reproducing, counterfeiting or distributing infringing copies of works with a total retail value of over $1,000 over a 180-day period, or (9) by distributing a "work being prepared for commercial distribution" by making it available on a publicly-accessible computer network, and movie theater screens, CDs' and DVD in violation of 17 U.S.C. § 506(a)(1), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319.

87. Defendants Gale Anne Hurd, James Cameron, and RICO Enterprises Pacific Western Productions, Inc., and Hemdale Film Corporation knew between May 1, 1981 and February 2, 1984 that Harlan Ellison was the copyright owner of the stories entitled the "Soldier" that was first aired on the Outer Limits on September 19, 1964 and "Demon with a Glass Hand" that was first aired on October 17, 1964 on The Outer Limits.

88. Nevertheless, Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation, now defunct, did not reveal their knowledge of the co-authorship of Harlan Ellison nor Sophia Stewart to the United States Copyright Office when the "Terminator" screenplay was submitted under numbers (PAu 584-564 and PA 241-495) on February 3, 1984 as it was their duty to do under 17 U.S.C. 506 (e).

89. Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., and Hemdale Film Corporation knew between May 1, 1981 and February 2, 1984 that Sophia Stewart was the copyright owner of the May 1, 1981 story entitled the "Third Eye" registered under TXu 117-610 regarding a post nuclear war battle between man and

machines associated with the end of time with subjects from outer space acting while "naked without shame." On May 1, 1981, Sophia Stewart completed the screen treatment entitled the "Third Eye" which concept was placed in 2019 after horrible nuclear wars and a spiritual evolution was underway due to conflicts between those who were spiritually based and those that were technologically based, and this conflict led to a war between highly sophisticated machines brought about by highly skilled weapon systems scientists and humans. The war involved the use of interplanetary space travel through an advanced machine that functioned from the planet commanded by Queen Johnny called Spacestar that functions totally through cybernetic ally made machines that functioned through highly sophisticated micro chips. Each is programmed to achieve a particular function connected to warfare. Some are programmed to kill. One planet that engages in warfare with the main character who has been touched by a spiritual happening is Ikahn, a warrior. It is through this conflict that he is forced to take up arms against those on earth that are in pursuit of a spiritual life when he is forced into conflict with the machines that operate without emotion or conscious. The engagement takes place and those with spirit prevail leaving those with the seed of life to go on unencumbered by the highly programmed machines that are almost able to reason so as to conflict with the leadership of man that is grounded in spiritual thought.

90.     In May of 1981, the Plaintiff asserts and alleges subject matter of fact above was in the hands of Susan Merzbach of Fox who spoke with Sophia Stewart about the content in May of 1981.

91.     The Plaintiff asserts and alleges Susan Merzbach had physical possession of the Third Eye in May of 1981 with the consent of Sophia Stewart, but Fox did not have ownership of the story. [A constructive trust is imposed when a defendant has possession of property that in good conscience belongs to another. Knieniem v. Group Health Plan Inc., 434 F.3d 1058, 1064 (8th Cir. 2006).]

92.    James Cameron confessed between October 1, 1984 and December 31, 1984 that he "ripped off a couple of Harlan Ellison stories" to Tracy Torme and Thomas M. Cleaver, a reporter of Starlog Magazine to make the "Terminator," which admission was admitted to permit the parties to confess to willfully concealing the authorship of someone that had a story that could help them cover-up the more significant crime for concealing the story taken from Plaintiff Sophia Stewart.

93.    When Gale Anne Hurd learned that James Cameron had confessed to the unlawful misconduct to reporters at Starlog magazine, she frantically called the magazine, requested to see Cameron's confession, and begged to "cover up" Cameron's truthful statement so that it was not published in the December 1984 edition of the magazine (#89) to officials of the United States and investors.

94.    On information and belief, Roger Corman, the president of New World Productions, Inc., Gale Anne Hurd's former employer at New World Pictures, Inc. and a former story analyst of Twentieth Century Fox, knew that Hurd had obtained possession of a copy of the "Third Eye" by Sophia Stewart from Twentieth Century Fox between and including May 1, 1981 and May 10, 1981. [Roger Corman, How I made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196]

95.    On information and belief, Roger Corman, the president of New World Productions, Inc., recommended and mentored Gale Anne Hurd to commence a separate company to develop what he thought was a commercially viable story into a separate company as soon as possible between May 1, 1981 and May 10, 1981.

96.    On information and belief, Gale Anne Hurd, with the assistance of John Does 1 and 2 from Twentieth Century Fox and assistance from John Does 7 and 8 from New World Productions, Inc., Gale Anne Hurd retained attorney James Miller to file articles of incorporation for Pacific Western Productions, Inc. on May 12, 1981 in the Office of

the Secretary of State of California under C1043898. (Exhs. 13, 14, 14.1, 14.3, 14.4, 14.5, Articles of Incorporation Pacific Western)

97.    On information and belief, the sole story concept that Gale Anne Hurd had between May 1, 1981 and May 10, 1981 involving a post nuclear war fight between man and machines from another planet in a darkened earth that used naked people without shame through a large mechanized spacecraft to engage the machines was written by Sophia Stewart on May 1, 1981 which was then submitted to Twentieth Century Fox to the Vice President of Creative Affairs for consideration.

98.    On information and belief, Gale Anne Hurd did a search of the Copyright Office before February 3, 1984, knew that Plaintiff Sophia Stewart had a Copyrights registration on the "Third Eye" under TXu 117-610, and knew that Hemdale Film Corporation and Pacific Western Productions, Inc. planned to use the "Third Eye" in the introduction of the "Terminator" Film thereafter in violation of 17 U.S.C. 506 (e), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319.

99.    With this knowledge, Susan Merzbach, Kay Harrison, Gale Anne Hurd, James Cameron, and Roger Corman, still chose to conceal the contribution of Plaintiff Stewart and Harlan Ellison in the registration of the "Terminator" as depicted in PA 241-495 after the movie was released on October 26, 1984. [17 U.S.C. 506 (e) and 18 U.S.C. 4]

100.   It was the modus operandi of Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation to conceal the names of important co-authors because Hurd had decided to take credit for the writing and directing of others to create a successful first solo film using the ability of James Cameron as the apparent creator, which assertion Hurd knew to be false.

101. The choice by these defendants to conceal the names of Harlan Ellison and Plaintiff Sophia Stewart from the United States Copyright Office proved that Hurd did not have confidence in her creative ability, Cameron's creative ability, and Cameron's directing ability from July 1982 through October of 1984.

103. Plaintiff Stewart therefore requests that the registrations by defendants concerning the "Terminator" described as PAu 584-564, PA 241-495, TX 3-134-386, PA 1-210-058, and PA 1-628-221, all of which are derivative of Plaintiff Stewart's May 1, 1981 "Third Eye" previously registered under TXu 117-610 be declared void against public policy under 28 U.S.C. 2201 and 2202 to prevent these defendants from making the Government of the United States from continuing to be an unwitting agent to these deceptive and willful violations of 17 U.S.C. 506 (e), The Anti-Counterfeiting Consumer Protection Act of 1996, Anti-Counterfeiting Amendments Act of 2004, and Copyright Felony Act of 1992 expanded 18 USC §2319. The United States Customs Service may impose civil fines on any entities such as Warner Brothers and all other Defendants who directs, assists financially or otherwise aids or abets the importation of counterfeit goods. In this case where the court finds that the use of the counterfeit of goods is willful, as a proximate result of Harlan Ellison's name appearing in the credits of the "Terminator" products/films as a "substantial contributing co-author;" and to the present date Cameron and Hurd failed to disclose Ellison and Stewart's name on line 6 of the copyright registration reflecting "indictable acts" as required by law a court can award up to $1,000,000 "per counterfeit per type of goods sold."

## SECOND CAUSE OF ACTION
### MONOPOLY AND RICO
### (18 U.S.C. 1961, 18 U.S.C. §1962 (b), and 18 U.S.C. 1962 (c))
### A PATTERN OF RACKETEERING

**IN THE MAKING OF THE "TERMINATOR"**

104.   Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

105.   The Plaintiff asserts and alleges the Defendants James Cameron, Gale Anne Hurd, Twentieth Century Fox, Inc., Susan Merzbach, Pacific Western Productions, Hemdale Film Corporation, Halcyon Holding Group, T Salvation Productions, T Salvation Distributions, T Asset Acquisition Company, Dominion Group, Salvation Distribution, Victor Kubicek, Derek Anderson, Warner Brothers Entertainment Inc., Lightstorm Entertainment Corporation, Valhalla Motion Pictures, Andrew Vajna,  Mario F. Kassar and John Does I through XII, have committed "Willful **"Infringements"** upon Stewart's copyright, thus constituting **"Felony Copyright Infringement,"** of which, constitutes **"Racketeering Activity"** that either bullies, retaliates, infringes, steals, embezzles, or harms through an association by a pattern of unlawful actions.  The Plaintiff asserts and alleges the Defendants conduct was both the "but for" and proximate cause of concrete financial injury.

106.   Pacific Western Productions, Inc. was initiated by Gale Anne Hurd and certain unidentified Media Moguls with Media Companies to create a racketeering vehicle for the enterprise that was established to conceal the authorship of Plaintiff Sophia Stewart and Harlan Ellison and to move the intellectual property rights of this entity without obvious detection for this malfeasance with false copyright registrations and false bankruptcy representations of intellectual property ownership with respect to the "Soldier," "Demon with a Glass Hand," and the "Third Eye" through another trade name – "The Terminator."

107.   The pattern of racketeering activity by defendants Gale Anne Hurd, Pacific Western Productions, Inc., James Cameron, and Hemdale Film Corporation included

three acts of concealment regarding the authorship of Harlan Ellison and Plaintiff Stewart between and including May 1, 1981 and October 26, 1984 that violated 17 U.S.C. 506 (e) as to PA 241-495.

108. The first act designed to create the racketeering enterprise occurred when Gale Anne Hurd obtained Plaintiff Stewart's script by illegal means between May 1, 1981 and May 10, 1981 and used it to commence Pacific Western Productions, Inc. on May 12, 1981 while she was still an employee of New World Pictures, Inc. under Roger Corman's supervision. [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196.

109. After October 26, 1984 through November 26, 1984, the defendants described herein willfully violated three copyrights -- "Soldier," "Demon with a Glass Hand," and the "Third Eye."

110. Between May 1, 1981 and February 10, 1984, the defendants described concealed the true co-authors of the "Terminator" from the copyright registrations dated February 3, 1984 identified as PAu-584-564 (screenplay) and February 22, 1985 identified as PA-241-495 (motion picture) in violation of 17 U.S.C. 506 (e) as to three separate prior valid copyright registrations concerning the "Soldier," "Demon with a Glass Hand," and the "Third Eye."

111. On information and belief, Susan Merzbach of Twentieth Century Fox, and Kay Harrison of Twentieth Century Fox, Roger Corman and John Does VII through XII of New World Productions, Inc., were aware of the registration that related to PA 241-295 and did not disclose to United States Copyright Office or other U.S. government officials that Pacific Western Productions, Inc. had designed itself to commercialize the story concepts of Harlan Ellison and Plaintiff Stewart without first obtaining their

authorization in the "Terminator" film on October 26, 1984 in violation of 17 U.S.C. 506 (e), and 18 U.S.C. 4.

112. Based upon the above-mentioned pattern of racketeering by defendants orchestrated by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc., false oaths were made to the United States Copyright Office of authorship by persons that willfully omitted the creators Harlan Ellison, and Plaintiff Stewart, in violation of 17 U.S.C. 506 (e) as to PA 241-495, TX 3-134-386, PA 1-210-058, and PA 1-628-221.

113. James Cameron admitted that this conduct was the modus operandi of the listed producer, Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation when he said, "I ripped off a couple of Harlan Ellison stories" to help make the "Terminator" movie and those acts constituted predicate acts through the pattern of racketeering designed to usurp Plaintiff Stewart of her fair share of the remuneration from the "Terminator" film in violation of 17 U.S.C. 506 (a) (1) (A), 17 U.S.C. 506 (e), and 18 U.S.C. 1962 (c).

114. As an aspect of the pattern of racketeering, Cameron admitted by that statement that the copyright registration dated February 3, 1984 under PAu 584-564 for the screenplay and the registration for the "Terminator" movie under PA 241-495 willfully violated 17 U.S.C. 506 (e) in that they deceptively concealed the co-authorship of Harlan Ellison and Plaintiff Stewart from the U.S. Copyright Office.

115. The pattern of racketeering has existed from May 12, 1981 through February of 2010.

116. The conduct described in paragraphs above by the defendants constitutes racketeering within the meaning of 18 U.S.C. 1961 and 18 U.S.C. 1962 (c).

41

117. On information and belief, John Does 1 and 2 of Twentieth Century Fox transferred it to John Does 7 and 8 of New World Pictures, Inc. between May 1, 1981 and May 12, 1981 and then it came into the possession of Gale Anne Hurd without the knowledge or consent of Sophia Stewart, the author of the May 1, 1981 screen treatment entitled the "Third Eye." [Roger Corman, How I made a Hundred Movies in Hollywood and never Lost a Dime (Da Capa Press 1990), p. 196.]

118. On information and belief, having discussed the value of the story concept in May of 1981 with Roger Corman, Gale Anne Hurd decided to make the movie using the skills of other people while she was in a position to ask Corman questions to help achieve the goal.

119. On information and belief, Hurd and Cameron had the "Third Eye" before they were recommended to check old "Outer Limits" episodes from the film library at the USC film school.

120. In May of 1981, Gale Anne Hurd was not aware that Roger Corman of New World Pictures, Inc. would entertain an offer from attorneys Harry Sloan, Lawrence Kippur, and Larry Thompson to sell his stock in New World Pictures in mid-1982.

121. On information and belief, Gale Anne Hurd realized that Harry Sloan, Larry Kuppin, and Larry Thompson were entertainment lawyers that sought to make a deal with Corman almost at the same time that the "Terminator" was registered with the Writers Guild of America.

122. On information and belief, Gale Anne Hurd and Roger Corman discussed the risk that would exist to the "Terminator" story if he sold his film library with the company, which discussion led Corman to decide not to sell his film library.

123. On information and belief, Roger Corman agreed with Sloan, Thompson, and Kippur not to compete with New World Pictures, Inc. for a period of 1 year, further agreed to be a consultant for 2 years, refused to sell his film portfolio, and closed in February of 1983.

124. On information and belief, the strategy by Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation to conceal their possession and willful unauthorized use of the "Third Eye" was racketeering under 17 U.S.C. 506 and 18 U.S.C. 1962 (c).

125. On information and belief, the effort to conceal the development of the "Third Eye" Story at New World Pictures was helped by Roger Corman's decision not to sell his film library with the stock, which permitted the sale to take place without the necessity of an accurate disclosure of the intellectual property that was then in progress.

126. In July of 1982, James Cameron gave no credit to Gale Anne Hurd for writing any aspect of the "Terminator" that could have connected her to the misappropriation for Plaintiff Sophia Stewart.

127. On information and belief, Roger Corman contributed to the modification of the May 1, 1981 "Third Eye" story possessed by Gale Anne Hurd either knowingly or unwittingly through budgetary controls, style of presentation, and screenplay dynamics from May 31, 1981 to May 31, 1982.

128. On information and belief, Gale Anne Hurd and Pacific Western Productions, Inc. concealed the fact that they had willfully used the "Third Eye" in the first minute and 45 seconds of the "Terminator" film in violation of Plaintiff Stewart's exclusive rights described in 17 U.S.C. 201, 17 U.S.C. 106, and 17 U.S.C. 506 (a) (1) (A) in reference to her TXu 117-610 copyright on and after October 26, 1984.

129.  Gale Anne Hurd, as the primary managerial force of Pacific Western Productions, Inc. set out to terminate the property rights of Plaintiff Stewart, Harlan Ellison, and the marital relationship of James Cameron with Sharon Cameron, all with the objective of taking profits that should have been assigned to others without feeling, regret, or remorse through a pattern of racketeering within the meaning of 18 U.S.C. 1961 that violated 18 U.S.C. 1962 (c).

130.  Based upon the above-mentioned "pattern of racketeering" constituting "counterfeiting" by defendants and orchestrated by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc., false oaths were made regarding the ownership of the intellectual property of the "Terminator" movie to the United States Bankruptcy Court by Hemdale Film Corporation in or about 1992 in violation of 18 U.S.C. 152 (2) and/or 18 U.S.C. 157 (2) and Carolco Pictures, Inc. in 1997 in violation of 18 U.S.C. 152 (2) and/or 18 U.S.C. 157 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319,  Money Laundering Control Act of 1986.

131.  C2 Partners, Mario Kassar and Andrew Vajna, received false representations through Hurd that Hemdale Film Corporation had purchased 50 percent of the "Terminator" rights from Gale Anne Hurd through Pacific Western Productions, Inc. and that James Cameron had sold his percent of Pacific Western Productions to Gale Anne Hurd for $1.00 in exchange for the right to direct "Terminator 1," when in fact they could not together have 100 percent of a property that Hurd acquired by confessed illegal means from Plaintiff Stewart through a failed bailment by Twentieth Century Fox. [Roger Corman, "How I Made a Hundred Movies in Hollywood and Never Lost a Dime" (Da Capa Press 1990), p. 196]

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 45 of 143

132. On information and belief, because Gale Anne Hurd "ripped off" the "Third Eye," started Pacific and Western Productions, Inc. on May 12, 1981 with it, got James Cameron to re-write it under supervision without the creator's consent, claimed that she had contributed something to the venture worth 50 percent of the intellectual property rights, and then illegally compensated Cameron under the minimum wage law, the deal between Pacific Western Productions, Inc and Hemdale Film Corporation was illegal and void.

133. Gale Anne Hurd then appeared to sell 50 percent of the stock in Pacific Western Productions Inc. to Hemdale Film Corporation without revealing to the company that she had first illegally "ripped off" Plaintiff Stewart and then used that offense to submit a false registration of authorship to the United States Copyright Office as if she worked for hire, when in fact she was essentially taking credit for the work product of James Cameron, Plaintiff Sophia Stewart, and Harlan Ellison.

134. As these events occurred in defiance of public law, Gale Anne Hurd illegally sold 50 percent of the "Terminator" rights to Mario Kassar and Andrew Vajna as C2 Partners for $8 million in or about 1997 through the bankruptcy court when she did not truly have 50 percent to sell in the bankruptcy case of Carolco Pictures, Inc. in violation of The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319, Money Laundering Control Act of 1986.

135. Illusory contracts through "sham and shell" companies by Hurd, Cameron, and Pacific Western Productions, Inc. made in violation of the public laws of 17 U.S.C. 506 (e) should have been declared void for being against federal public policy.

136. C2 Partners, Mario Kassar and Andrew G. Vajna, created illusory contracts through "sham and shell" companies that were under-capitalized and without legitimate

"Terminator" assets and pretended to sell what it did not buy from Hurd to Halcyon Holding Group LLC in 2007 for $25 million.

137. On August 17, 2009, after Halcyon Holding Group LLC profited from the fictitious use of the "Terminator" rights, made poor business decisions which led it to file for Chapter 11 reorganization which followed the same "pattern of bankruptcy" filings based upon false oaths of ownership of the "Terminator" franchise rights in violation of 18 U.S.C. 152 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319, Money Laundering Control Act of 1986 in the same manner as Hemdale Film Corporation and Carolco Pictures, Inc.

138. Again, Halcyon Holding Group LLC made the deceptive representation to the Bankruptcy Court that it owned the rights that it could not legally acquire by the aforementioned indictable acts that violated 17 U.S.C. 506 (e), and therefore the assertions of ownership by Halcyon Holding Group LLC to the Bankruptcy Court violated 18 U.S.C. 152 (2) and 18 U.S.C. 157 (2), The Anti-Counterfeiting Consumer Protection Act of 1996, Copyright Felony Act of 1992 expanded 18 USC §2319, Money Laundering Control Act of 1986.

152. The same false oaths regarding authorship were used by Carolco Pictures, Inc. in its Chapter 11 bankruptcy case that commenced in 1995 in violation of 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 17 U.S.C. 506 (e) to a U.S. Bankruptcy Court in the Central District of California for the "Terminator" story that is estimated to be valued at $100,000,000 million dollars.

153. By these false oaths Hemdale Film Corporation, Pacific Western Productions, Inc., Carolco Pictures, Inc., C2 Pictures, Orion Pictures, T Asset Acquisitions, LLC have achieved revenue in excess of $1.4 billion on the story treatment first written by Sophia

155. The subject matter described in paragraph 154 is not in the introduction of the "Terminator" film as it is depicted in PA 241-495.

156. The "Terminator" film released on October 26, 1984 is depicted in PA 241-495 ("Terminator" movie) reads on the May 1, 1981 treatment of the "Third Eye" written by Sofia Stewart as described here:

> One of the major research and weapon systems development organizations on Earth was headed by a philosopher-scientist, Ikahan. His organization was instrumental in building the Spacestar, a huge vehicle . . . designed for inter-planetary warfare and space travel. . . . [I]t contained the most secret and highly advanced devices known at that time. The [leaders] commanded Ikahan to use the Spacestar as a vehicle for war against any people who resisted their tyranny. . . . When all of the preparations were completed, the vessel left the orbiting dock where it had been constructed. . . . These orders clearly stated [that the] rebels on board the Spacestar [engage in interplanetary travel] and destroy . . . the consciousness of God from the population on Earth. . . . The Spacestar fights many battles with Earth's fleet, pirates, and experiences space storms. Many are wounded, and others die. . . . Eventually, they are forced to land on the planet Sorr, ruled by Queen Johnny, that is completely operated by Machines powered by energy from the "Black Moons". The light from planet Sorr is such that it encompasses everything in darkness . . . As they stand in the open, the surrounding heavens blaze with fire, lightning, thunderous roars, and other phenomenon. [The director] moves in for a medium close shot of Ikahn who is now standing . . . They are all naked and without shame. Ikahn retired to his quarters for meditation, and received notification from the [leaders] to open his secret orders. These orders clearly specified . . . that the parties [engage in an] expedition of destruction . . . on Earth [for

48

systematic termination of its future leaders]. [They] descend to Earth . . . [to engage].

157. Based upon the false oath statements by Gale Anne Hurd, James Cameron, Lightstorm Entertainment, Skydance media, Paramounts pictures, Warner Bros., 20th Century Fox, David Ellison, Andy Wachowski, Larry wachowski Tencent Pictures, Pacific Western Productions, Inc., Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, Dominion Group LLC, Mario Kassar, Andrew Vajna, Derek Anderson, Victor Kubicek, and Pacificor LLC to the United States Copyright Office, numerous Bankruptcy Court proceedings, and the United States District Court for the Central District of California in CV 03-2873 by the defendants James Cameron, Gale Anne Hurd, Pacific Western Productions, Inc., and Hemdale Film Corporation, all agreements and submissions should be declared void as against public policy under 17 U.S.C. 506 (e), and 18 U.S.C. 152 (2) from 1984 through and including February of 2018.

158. The first minute and 45 seconds of "Terminator 1" willfully infringed Plaintiff Stewart's TXu 117-610 copyright from October 26, 1984 and every subsequent time that it was commercially produced through February 2018.

159. The aforementioned bankruptcy cases from 1995 through August of 2009 have been used to create an air of propriety regarding the next transfer of the "Terminator" franchise, but each bankruptcy case including Hemdale Film Corporation in 1992, Carolco Pictures, Inc. in 1997, and T Asset Acquisitions in August of 2009 were based upon false oaths of sole ownership of the intellectual property rights of the "Terminator" that arose from PAu 584-564 and PA 241-495 through illegal representations of authorship to the U.S Copyright Office, all of which was known by Twentieth Century Fox, through its vice president of Creative Affairs, Susan Merzbach and Kay Harrison, from October 26, 1984 to the present.

160. Based upon the allegations contained herein, the illusory agreements made by Gale Anne Hurd, Pacific Western Productions, Inc., Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, Dominion Group LLC, Mario Kassar, Andrew Vajna, Derek Anderson, Victor Kubicek, and Pacificor LLC are void to the extent that they purport to transfer intellectual property rights that were made by the illegal copyright registrations by Hurd, Cameron, Pacific Western Productions, Inc. and Hemdale Film Corporation against the copyright rights of Plaintiff Sophia Stewart and Harlan Ellison at their inception.

161. The assertions of sole ownership to the "Terminator" and " Matrix " publishing, merchandising, and other exploitative rights asserted by the corporations described in paragraph 159 through 160 was a public offense under 18 U.S.C. 152 (2) and were acts in the pattern of racketeering within the meaning of 18 U.S.C. 1961 that violated 18 U.S.C. 1962 (c).

162. Gale Anne Hurd and James Cameron made the "Terminator" and production decisions based upon the fraudulent conversion of intellectual property owned by Plaintiff Stewart and Harlan Ellison as a means of business planning.

163. On information and belief, Gale Anne Hurd went to Starlog Magazine to omit Cameron's admissions that they had "ripped off" Harlan Ellison stories to assist in the directing and placing of the setting of the story described in the "Third Eye" by Harlan Ellison, which admissions Gale Anne Hurd sought to conceal by making threats to Starlog Magazine to remove those confessions recorded by Thomas M. Cleaver and confirmed by Tracey Torme.

164. By virtue of Cameron's admission that he went to a film library and searched for the September 19, 1964 edition of the Outer Limits entitled "Soldier" and the October

17, 1964 edition of the Outer Limits entitled "Demon with a Glass Hand" to help him set up the teleplay for the willful unauthorized use of the story described in Plaintiff Stewart's "Third Eye" as confirmed by the FBI in case number 295-NY-U275271 is an admission by conduct that Cameron, Hurd, and Pacific Western Productions, Inc. established a RICO enterprise to function by unlawful means to commercially exploit Plaintiff's copyright described as TXu 117-610.

165.    Warner Brothers stood by two men, Victor Kubicek and Derek Anderson, known to undercapitalize business ventures in the entertainment industry who borrowed $30 million from Pacificor LLC to unlawfully acquire the illusory "Terminator" franchise from C2 Partners, Mario Kassar and Andrew Vajna. Then plan was for Halcyon Holding Group LLC to be operated by Victor Kubicek and Derek Anderson in concert with Moritz Borman. This outcome was achieved when Warner Brothers provided $200 million in financing to T Asset Acquisitions LLC, a subsidiary of Halcyon Holding Group LLC in or about 2007 to make "Terminator Salvation" that was released on May 21, 2009 even though Warner Brothers was aware of the fact that the intellectual property rights were illegally acquired from Plaintiff Sophia Stewart at least as early as October 26, 1984.

166.    Notwithstanding the knowledge held by Twentieth Century Fox through Susan Merzbach and Kay Harrison from May 1, 1981 and June 1, 1981 that the "Third Eye" belonged to Sophia Stewart, the original plan of reorganization under Chapter 11 for Carolco Pictures, Inc. in 1995 in the United States Bankruptcy Court for the Central District of California stated that Twentieth Century Fox would provide $50 million for the rights to the illusory "Terminator" franchise rights, which contention was evidence of complicity between Mario Kassar of Carolco Pictures, Inc. and high level executives of Twentieth Century Fox.

167. Yet, in spite of these admissions by the Twentieth Century Fox and Warner Brothers that they recognized the highly valuable branch of the story line that led to $1.4 billion in revenue, no person affiliated with Twentieth Century Fox or Warner Brothers ever elected to recognize the tremendous value of Sophia Stewart's copyright on the subject matter of her May 1, 1981 screen treatment that was written and registered before anything was done by James Cameron, Gale Anne Hurd, and Pacific Western Productions Inc., which facts are subject to verification by Susan Merzbach of Twentieth Century Fox.

168. Due to the collective "pattern of racketeering" through multiple "sham and shell" under-capitalized corporations described by Moritz Borman about Dominion Group, LLC, the parent company to Halcyon Holding Group LLC, the parent company to T Asset Acquisition Company LLC, all of which were essentially owned, controlled, and undercapitalized by Derek Anderson and Victor Kubicek as described in the Superior Court of the County of Los Angeles in case number SC102043, Plaintiff Sophia Stewart was again victimized of "counterfeiting" by the illusory transfers by entities that sought to sell what they did not own in that Gale Anne Hurd and James Cameron intentionally used Pacific Western Productions Inc. to violate 17 U.S.C. 506 (e) to get control over the "Third Eye" by illegal means from February 3, 1984 and then illegally transferred rights that they did not own by false pretenses including through false assertions of ownership in the U.S. Bankruptcy Court in the Central District of California.

169. Because Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. did these acts of misconduct as described above in violation of 17 U.S.C. 506 (a)(1)(A) and 17 U.S.C. 506 (e) in 1984 on at least two occasions, and then deceived Hemdale Film Corporation to continue to make false oaths in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 157 to the U.S. Bankruptcy Court regarding its illusory ownership interest, then persuaded Mario Kassar and Andrew Vajna to transfer the illusory properties to Halcyon Holding Group LLC by the same false pretense that Hurd, James Cameron, and

Stewart without her remuneration or consent, which conduct were acts of racketeering. http://en.wikipedia.org/wiki/The_Terminator; http://en.wikipedia.org/wiki/Terminator_2:_Judgment_Day, http://en.wikipedia.org/wiki/Terminator_3:_Rise_of_the_Machines, http://en.wikipedia.org/wiki/Terminator_Salvation

154. The screen play that was supposedly written for the U.S. Copyright Office by Cameron and Hurd for Pacific Western Productions, Inc. stated in pertinent part:

> Spray can hieroglyphics. A Los Angeles public school in a blue-collar neighborhood. Angle between school buildings, where a trash dumpster Looms in a low angle. A cat crosses frame. Close on CAT, which freezes, alert, sensing something. Just beyond perception. [Harlan Ellison's "Soldier] A source less wind rises, and with it a keening WHINE. Papers blow across the pavement The cat YOWLS and hides under the dumpster. Windows rattle in their frames. The WHINE intensifies, accompanied now by a wash of Frigid purple light. A concussion like a thunderclap Right overhead blows in all the windows facing the yard. C.U. – CAT, its eyes are wide as the glare dies. 1A/FX Angle – Dumpster – 1A/FX Electrical discharges are from the dumpster to a water Faucet and climb a drainpipe like a Jacob's ladder. 2 EXT. School yard – Night – Slow Pan as the sound of stray electrical crackling subsides. Frame comes to rest on the figure of a naked man kneeling, faced away, in the previously empty yard. He stands slowly. This man is in his late thirties, tall and powerfully built moving with grace and precision. He is the "TERMINATOR".

47

Pacific Western Productions, Inc. could legally transfer illegal outcomes that defied 17 U.S.C. 506 (e) notwithstanding their admissions to Harlan Ellison, each and every transfer of the fictitious and illusory assertion of ownership were through similar acts of deception and fraud on investors including Pacificor LLC to obtain $30 million to acquire the "Terminator" franchise rights by Kubicek and Anderson were further acts of fraud in the RICO enterprise in the pattern of racketeering by mail and wire fraud in violation of 18 U.S.C. 1341 and 18 U.S.C. 1343 in and about 2007.

170.    The $30 million that was obtained by Victor Kubicek and Derek Anderson from Pacificor LLC to finance "Terminator Salvation" was achieved by false representations of ownership by Mario Kassar and Andrew Vajna through C2 Partners to Halcyon Holding Group LLC in violation of 18 U.S.C. 1341 and 18 U.S.C. 1343, which false representations through means of interstate commerce were the result of prior illegal copyright registrations by Hurd, Cameron, and Pacific Western Productions, Inc. that willfully violated 17 U.S.C. 506 (e) as to both PA 241-495 and PAu 584-564 in 1984 as was admitted by Cameron to Thomas M. Cleaver, Tracy Torme, Starlog Magazine, and Harlan Ellison.

171.    The RICO enterprise that first formed as Pacific Western Productions, Inc. was replaced by numerous undercapitalized corporations, all of which including Halcyon Holding Group LLC have used fictitious intellectual property rights that were owned in part by Plaintiff Sophia Stewart, and this pattern of racketeering has continued through repeated offenses of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 18 U.S.C. 1621 (a), all of which violated 18 U.S.C. 1962 (c) by the fictitious sale of the "Terminator" franchise rights through at least three acts of wire and mail fraud in interstate commerce between and including 2007 and February 8, 2018.

172. By the aforementioned acts, Plaintiff Stewart was the subject of strategic and repeated under-capitalized corporate trickery through multiple violations of 17 U.S.C. 506 (e), 17 U.S.C. 506 (a)(1)(A), 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), and 18 U.S.C. 1621 (a), all of which racketeering was designed to block Plaintiff Stewart as a women from receiving her fair share of the $1.4 billion in revenue that has been made on her May 1, 1981 screen treatment entitled the "Third Eye" that is protected by TXu 117-610.

173. The corporate participants in this pattern of racketeering that were aware of the malfeasance of Hurd, Cameron, and Pacific Western Productions included Twentieth Century Fox, but it never reported its knowledge of the illegal copyright registrations through Susan Merzbach and Kay Harrison since October 26, 1984 in accordance with its duty to do so under 18 U.S.C. 4.

174. Every entity that got close to the "Third Eye" had amazing outcomes:
a)      Roger Corman - $16.5 Million;
b)      Gale Anne Hurd – in excess of $8 million;
c)      Pacific Western Productions – (unknown);
d)      Hemdale Film Corporation - - $72 million;
e)      Carolco Pictures, Inc. -- $400 million;
f)      C2 Partners (Intermedia) - $233 million;
g)      Halcyon Holding Group LLC - $172 million;
h)      James Cameron – unknown; and

175. James Cameron was employed by New World Pictures, Inc. between January 1, 1981 and at least December 31, 1982 in that he worked on the October 1982 release called "Android" with Roger Corman, the executive producer.

176. At all times while James Cameron worked on the first draft of the "Terminator" that was filed with the Writer's Guild of America, he was the employee of New World Pictures, Inc. through July of 1982.

177. The only entity therefore that should have been able to claim that James Cameron did an act as an employee for hire based upon that story was New World Pictures, Inc. since Cameron was its employee through the close of December of 1982.

178. Yet, Cameron labeled the July 1982 First Draft of the "Terminator" that was registered with the Writers Guild of America as a writing done totally by him for Pacific Western Productions, Inc. without any credit to Roger Corman even though he was then admittedly employed by New World Pictures, Inc. and employed as design consultant on the "Android."

179. On information and belief, James Cameron, by that indictable action, admitted part of the pattern of racketeering by the script language about the "cat" from "Soldier," but withheld and concealed that part of the misconduct that involved his abuse of the rights of Plaintiff Sophia Stewart that were identified in the first minute and 45 seconds of "Terminator 1" as depicted in the film filed under PA 241-495.

180. Gale Anne Hurd and Pacific Western Productions, Inc. deceived numerous businesses and entities into investing into the "Terminator" franchise by falsifying the original copyright application regarding authorship with Hemdale Film Corporation.

181. Defendant Hurd, Pacific Western Productions, Inc., and her fellow defendants in the motion picture industry RICO enterprise defiantly breached and rebelled against the following laws to carry out the on going pattern of racketeering: 17 U.S.C. 506 (a) (1) (A), 17 U.S.C. 506 (e), 18 U.S.C. 152 (2), 18 U.S.C. 157 (2), 18 U.S.C. 1621 (a), and 18 U.S.C. 1962 (c).

182. Gale Anne Hurd, by paying Cameron only $1.00 for a script that he claimed that he wrote for Pacific Western Productions after February of 1982 for 50 percent of the story rights that she claimed were then worth $1.00 to permit Cameron to Direct was a farce designed to subvert the minimum wage and scale for the writers in the Writers Guild of America. [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 196]

183. At the same time that Gale Anne Hurd made this legally inoperative arrangement with Cameron, she involved herself in an intimate relationship with James Cameron to the detriment of his then existing marriage with Sharon Cameron in 1982, which conduct is an admission by conduct that she did not respect required boundaries of business and social society in order to gain an unfair advantage in the business value of the "Third Eye" that she knowingly used to create the "Terminator" through Pacific Western Productions Inc. to usurp the commercial advantage that should have been assigned to Plaintiff Stewart under the laws of the United States.

184. On information and belief, James Cameron filed a false affidavit under oath on the Motion for Summary Judgment to the United States District Court for the Central District of North Carolina on or about April 29, 2005 and declared that he: (1) conceived the story idea alone in February of 1982; (2) pitched the idea to Hurd in March or April of 1982; (3) obtained Hurd's interest in producing the idea; (4) completed a treatment in July of 1982 and registered it with the Writers Guild of America; which assertions of authorship were false within the meaning of 18 U.S.C. 1621.

185. These same statements were presented to a federal judge in the United States District Court for the Central District of California in case number CV 03-2873 MMM on or about April 29, 2005.

186. By Cameron's admissions in the dispute against Hemdale Film Corporation and Orion Pictures Inc. for the "ripped off" work of Harlan Ellison reflects a modus operandi to pilfer the work product of other writers with copyrights and was "willfully" omitted from his April 29, 2005 Affidavit to the United States District Court of the Central District of California in violation of 18 U.S.C. 1621, which material omission illegally deceived the assigned United States District Court Judge and earlier deceived the United States Copyright Office on February 3, 1984 in violation of 17 U.S.C. 506 (e), which conduct was another "indictable act" in the pattern of racketeering by Hurd, Cameron, and Pacific Western Productions, Inc. within the meaning of 18 U.S.C. 1961, 18 U.S.C. 1621 (a), and 18 U.S.C. 1962 (c) that began in May of 1981.

187. Cameron's affidavit to the United States District Court for the Central District of California in case number CV 03-2873 MMM dated April 29, 2005 was a materially false statement of authorship via an affidavit in violation of 18 U.S.C. 1621 (a) that was based upon a prior materially false copyright registration that did not disclose that Harlan Ellison and Sophia Stewart were co-authors of the "Terminator" in violation of 17 U.S.C. 506 (e); in order to cover up the complete strategy of making the "Terminator" film with the copyrighted work of others as the primary elements of its production.

188. Before Starlog Magazine could publish the truthful statement made by James Cameron, Gale Anne Hurd sent a legal demand to the magazine to review the article before it was published; and by that action, she took steps to "conceal" Cameron's admission of the misconduct in accordance with the public policy of the United States described in 18 U.S.C. 4.

189. Gale Anne Hurd, on information and belief, consulted Roger Corman regarding the "Third Eye" and was advised that the writer was not a member of the Writers Guild of America West and therefore New World Pictures, Inc., a signatory, would not consider her submission.

190. On information and belief, Gale Anne Hurd then took the copy of the "Third Eye" while James Cameron was still in Italy working on "Piranha II: the Spawning" and then registered articles of incorporation for Pacific Western Productions, Inc. on May 12, 1981 under C1043898 through Carmelle M. Gray and M. Forg Eu of the Office of the Secretary of State through attorney James R. Miller, then of 2029 Century Park East, Suite 2500, Los Angeles, California.

191. On information and belief, Cameron, by his admission, tried to stop the conspiracy to conceal the unlawful misconduct that he was engaged in with Gale Anne Hurd and Pacific Western Productions, Inc. in 1984 after he noticed that Hurd had duped him out of his interest in the work product for playing the role of the writer of the "Terminator."

192. On information and belief, Cameron intentionally used aspects of "Soldier" and "Demon with a Glass Hand" in an effort to protect himself from being accused of a far greater wrong, an allegation of theft from an unknown student writer, then Plaintiff Sophia Stewart of the USC Film School.

193. On information and belief, the best protection from an allegation from Plaintiff Stewart was to actively construct part of the teleplay from a well-respected writer, Harlan Ellison, who would elevate the perspective of a quality screenplay and provide the appearance of a defense of the real malfeasance, the willful unauthorized use of a story created by a student writer that did not then have the units to become a member of the Writers Guild of America West.

194. On information and belief, this malfeasance was done on purpose to deter Plaintiff Sophia Stewart from believing that the malfeasance came from the "Third Eye," but from Harlan Ellison and the Outer Limits.

195. On information and belief, while James Cameron was fully employed by Roger Corman of New World Pictures Inc. in early to mid-1982, he then submitted the first draft of the "Terminator" to the Writers Guild of America West surprisingly in the name of Pacific Western Productions, Inc.

196. On information and belief, Roger Corman of New World Pictures Inc. mentored James Cameron regarding his efforts between February of 1982 and July of 1982.

197. Between February of 1982 and July of 1982, Cameron went to the USC Film School and reviewed and copied Harlan Ellison's "Soldier" and "Demon with a Glass Hand" as to the teleplay in an effort to create an alibi as to how he did not use the "Third Eye" by intentionally using portions of Harlan Ellison's work product.

198. The idea of using Harlan Ellison's 1964 episodes from the Outer Limits did not come first from Cameron or Hurd, it came from another New World Pictures, Inc. employee described here as John Doe number 7.

199. Before "Terminator 1" was made, the following executives knew that the introduction that was filed with the Writers Guild of America and that disclosed in the copyright registration for the film was not used, including Susan Merzbach of Twentieth Century Fox, Gale Anne Hurd of Pacific Western Productions, Inc., Barry Plumley of Hemdale Film Corporation, Barbara Boyle, Senior Vice President of Orion Pictures, Inc., Mike Medavoy, Vice President of Productions, and John Daly, a co-founder of Hemdale Film Corporation.

200. Derek Anderson, Victor Kubicek, Warner Brothers, Halcyon Holding Group LLC, T Asset Acquisitions LLC, T Salvation Productions, LLC, T Salvation Distribution LLC, T Salvation Distribution (BVI), LTD, Halcyon Company, Halcyon Consumer Products, LLC, and Dominion Group, LLC knew from the FBI, Harlan Ellison, Plaintiff Sophia

Stewart, and James Cameron that C2 Partners through Mario Kassar and Andrew G. Vajna could not lawfully sell 100 percent of the "Terminator" production, merchandising, interactive, software, and other exploitative media rights because of the prior and superior story rights of Plaintiff Stewart disclosed in TXu 117-610.

201. According to Barbara Boyle, Vice President of Orion Pictures, Inc., John Daly, the co-founder of Hemdale Film Corporation, Susan Merzbach of Twentieth Century Fox, Mike Medavoy, vice president of productions of Orion Pictures, Inc., and Barry Plumley of Hemdale Film Corporation, the story depicted in the "Terminator" film that was based upon the "Third Eye" was commercially feasible in 1984.

202. According to Moritz Borman, Derek Anderson, Victor Kubicek, Warner Brothers, Twentieth Century Fox, T-Salvation Productions, LLC, T Salvation Distribution LLC, T Asset Acquisition Company, LLC, T Salvation Distribution (BVI), LTD., Halcyon Holding Group LLC, and Dominion Group LLC, the story concept that formed the basis on "Terminator 1" was highly valuable and therefore they collectively made a significant effort to obtain the so-called "Terminator" franchise, but they ignored their responsibility to ascertain how it was that the FBI had informed Warner Brothers in 2000 that the so-called franchise was based upon the prior registration of the "Third Eye" by Sophia Stewart in 2000 before they collectively invested about $200 million, mostly from Warner Brothers, in 2007 to bring forth "Terminator Salvation" in May of 2009. [New York City FBI -- 295-NY-U275271]

203. After Plaintiff Stewart notified James Cameron and Gale Anne Hurd that they had violated her rights under 17 U.S.C. 201 through the deceptive assertion of full authorship to the "Terminator" franchise, they along with Bruce Isaac and David Boren took steps to wrongfully retaliate against her for reporting their misconduct to them as to the first minute and 45 seconds of the film, which the indictable conduct was illegal under 18 U.S.C. 1513 (e) (2), 18 U.S.C. 241, 18 U.S.C. 1621, 18 USC §242 – Deprivation of civil

rights under the color of law, 18 USC §1505 – Obstruction of proceedings before a judiciary, U.S. v. Cross, 128 F.3rd 145 (3rd Cir. 1997), and Dennis v. Sparks, 449 U.S. 24 (1980), and a further extortion act in accordance with the "pattern of racketeering" in or about 2007:

**BRUCE ISAAC:**
"I would like to set a judgment debtor examination regarding your financial condition so that we can collect the $305,000 YOU OWN MY CLIENTS." (Exhs. 14.11, Bruce Isaac Extortion Request...); (Exh. 21, 22 Bruce Isaac Extortion Liens for $305,235.62); (Exh. 22.11, Katherine Chilton Extortion Letter dated July 25, 2007)

204. In spite of the fact that there was a "genuine issue of material fact" as to James Cameron, Gale Anne Hurd, and Pacific Western Productions, Inc. "ripping off" the "Third Eye" through disclosed and undisclosed John Does 1 through 6 of Twentieth Century Fox and disclosed and undisclosed John Does 7 through 12 of New World Pictures, Inc. from Plaintiff Stewart using the same modus operandi as they had used against Harlan Ellison, Plaintiff Stewart was entitled to a decision that denied defendant's Motion for Summary Judgment in that the disputed facts of substantial similarity," and infringements of "protective expression were generally known through public reports in the media about the making of the "Terminator".

205. The federal court did not permit Plaintiff Stewart to have a trial on the genuine disputed facts described hereinabove because defendants James Cameron and Gale Anne Hurd gave intentionally false statement about their creative authorship, but omitted how they willfully studied and copied "Soldier" and "Demon with a Glass Hand" in making he "Terminator" as they admitted it to Harlan Ellison, Tracy Torme, Thomas M. Cleaver, and Starlog Magazine in violation of 18 U.S.C. 1621.

206. On information and belief, other industry executives that opined that the "Terminator" Story alone, which was based upon the "Third Eye" by Sophia Stewart, was commercially feasible were Barry Plumley, an executive of Hemdale Film Corporation, Mike Medavoy, an executive with Orion Pictures Inc., John Daley, a co-founder of Hemdale Film Corporation, Roger Corman, CEO of New World Pictures, Inc., and Susan Merzbach, the vice president of Creative Affairs of Twentieth Century Fox between and including May 1, 1981 and February 3, 1984.

207. "The Terminator" story, based upon a number 1 box office rating three weeks in a row, produced $78 million in revenue world wide on a cost basis of $6.5 million, making "Terminator 1" the film that had the highest rate of return on investment of all of the film series.

208. After Twentieth Century Fox did not make the required report of this malfeasance that its executive recognized in violation of 18 U.S.C. 4 in light of the obvious false copyright registration in violation of 17 U.S.C. 506 (e), Twentieth Century Fox participated in negotiations to buy the rights of what it knew were unlawful intellectual property rights during the Carolco Pictures, Inc. Chapter 11 for $50 million.

209. After Harlan Ellison disclosed the modus operandi to Hemdale Film Corporation, all industry executives were aware that James Cameron, Gale Anne Hurd, and Pacific Western Productions, Inc. had used illegal means to craft and author the "Terminator" in 1985.

210. The RICO enterprise offenses have included 17 U.S.C. 506 (e) (false registrations), 17 U.S.C. 506 (a) (1) (A) (willful infringement), 18 U.S.C. 152 (2) (false oaths to the Bankruptcy Court), 18 U.S.C. 1621 (a) (false affidavits to the U.S. District Court regarding sole authorship), 18 U.S.C. 1341 (mail fraud by false submissions to the U.S. Bankruptcy Court), 18 U.S.C. 1343 (false representations regarding ownership to

62

solicit offers to buy intellectual property that the sellers did not wholly own in reference to the U.S. Bankruptcy Court), all of which offenses were used to deprive one true co-author of her screen credit and remuneration on $1.4 billion in sales in violation of 18 U.S.C. 1962 (c) and (d) and 18 U.S.C. 1964 (a) and (c), which damages to plaintiff when trebled are in excess of $30 million.

**THIRD CAUSE OF ACTION**
**DEFENDANTS' EFFORTS TO MAKE**
**CONTRACTS REGARDING COPYRIGHTED**
**INFORMATION THAT THEY DID NOT**
**OWN UNDER 17 U.S.C. 201 AND 106**
**ARE VOID AND AGAINST PUBLIC POLICY**
**UNDER 17 U.S.C. 506 (e)**

211. Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, "as though they were fully set forth herein in full":

212. Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Hemdale Film Corporation, Cinema '84, Lightstorm Entertainment, Intermedia/IMF Production, C2 Pictures, Mostow/Lieberman Productions, Halcyon Holding Group, LLC, Halcyon Consumer Products, LLC, Dominion Group, LLC, T-Salvation Productions, LLC, T-Salvation Distribution, LLC, T Asset Acquisition Company, LLC, and T-Salvation Distribution (BVI), LTD. made agreements regarding the "Terminator" story without first getting authorization from co-author Plaintiff Stewart to use her copyrighted "Third Eye" story that had been incorporated into "The Terminator," "Terminator 2: Judgment Day," "Terminator 3: Rise of the Machines," "Terminator Salvation," and the "Sarah Conner Chronicles".

213.    The failure of the above defendants to get the authorization from Harlan Ellison to use "Soldier" (1964), and "Demon with a Glass Hand" (1964), and to use the first minute and 45 seconds of Sophia Stewart's the "Third Eye" (May 1, 1981) registered under [Txu117-610], is a confession by the defendants that they had a modus operandi to willfully conceal the names of the true authors and creative designers of the concept and thereby wrongfully and illegally took all credit in violation of 17 U.S.C. 506 (e) for authorship and profit to the derivates "The Terminator" [PAu 584-564 and PA 241-495] (October 26, 1984), "The Terminator 2: Judgment Day" [PA 527-728] (July 3, 1991), "Terminator 3: Rise of the Machines" [PA 1-210-058] (July 2, 2003), "Terminator Salvation" [PA 1-628-221] (May 21, 2009), and the "Sarah Conner Chronicles" (January 13, 2008 – April 10, 2009).

214.    Based upon Gale Anne Hurd's willful misconduct to combine to illegally conceal Harlan Ellison and Plaintiff Stewart's names as co-authors from the U.S. Copyright Office through Hemdale Film, and Pacific Western Productions, Inc., every business arrangement involving the rights of every "Terminator" movie were void at their inception against public policy because Harlan Ellison and Plaintiff Stewart, co-owners, were not consulted for authorization under 17 U.S.C. 106, which willful omission was an offense under 17 U.S.C. 506 (e).

215.    The public policy of the United States from October 26, 1984 through May 21, 2009 is that every co-author must be listed on the copyright registration that deals with their creative input under 17 U.S.C. 201, and the willful omission/concealment of that disclosure from the United States Copyright Office by Gale Anne Hurd through Pacific Western Productions, Inc. and the deception of all buyers, beginning with Hemdale Film Corporation through Pacificor LLC in February of 2010 by that offense under 17 U.S.C. 506 (e) has been an intentional violation of federal public policy pursuant to 17 U.S.C. 106 for commercial purposes.

64

216. Plaintiff Stewart was a co-author/co-owner of the "Terminator" motion picture copyrights pursuant to 17 U.S.C. 201 as demonstrated in the first minute and 45 seconds of the film identified as PA 241-495 in the same way that Harlan Ellison was later determined to be a co-author after that same crime under 17 U.S.C. 506 (e) on the same movie by the same actors, Hurd, Cameron, and Pacific Western Productions, Inc The first minute and 45 seconds of "The Terminator" was based upon Plaintiff's May 1, 1981 "Third Eye" screen treatment as described in paragraphs 156 and 160 as registered under TXu 117-610.

217. Hemdale Film Corporation provided $6.5 million to do the "Terminator" near the same time that Roger Corman received $16.5 million from attorneys Sloan, Kippur, and Thompson for New World Pictures, Inc. minus the film library near February of 1983.

218. Upon information and belief, the investors in Hemdale Film Corporation had assistance in evaluating the "Terminator" screenplay from Roger Corman of New World Pictures, Inc., Mike Medavoy of Orion Pictures, Arthur Krim of Orion Pictures, and Eric Pleskow of Orion Pictures.

219. Every business deal that was made by the companies described in paragraphs above did not disclose the fact that Harlan Ellison and Plaintiff Stewart were co-authors of the base story depicted in PA 241-495 and every derivative work described as "Terminator 2: Judgment Day," "Terminator 3: Rise of the Machines," and "Terminator Salvation."

220. The defendants described in paragraph 165 were deceived by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. regarding authorship due to the false statements of authorship submitted to the United States Copyright Office by them regarding PA 241-495 and PAu 584-564, when, in fact, those submissions were

derivative works from Plaintiff's May 1, 1981 "Third Eye" under TXu 117-610 and Harlan Ellison's "Soldier" and "Demon with a Glass Hand."

221. Each and every agreement reached by the defendants from February 3, 1984 to May 21, 2009 regarding the "Terminator" has been legally inoperative because Plaintiff Stewart was not included or compensated in accordance with 17 U.S.C. 106 and 201.

222. Plaintiff Stewart requests that the Court declare each agreement void as against public policy based upon offenses in the registrations that violated 17 U.S.C. 506 (e) as to PAu 584-564 and PA 241-495 that became the basis of every other illegal "Terminator" registration under 28 U.S.C. 2201 and 2202, and that the defendants disgorge any and all profits that resulted from the illegal concealment of Plaintiff's contribution to authorship that was done by the same unlawful modus operandi that was used to conceal the rights of Harlan Ellison in the production of the first "Terminator" film.

223. Plaintiff Stewart requests that a constructive trusts be imposed upon Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Halcyon Holding Group LLC, and T Asset Acquisitions LLC that failed to ascertain the validity of Plaintiff Stewart's public assertion of co-ownership, particularly after the FBI disclosed that its investigation confirmed Stewart's assertions to Warner Brothers before it provided $200 million in 2007 for the production of "Terminator Salvation" to Halcyon Holding Group LLC.

224. Gale Anne Hurd, Pacific Western Productions, Inc., and Halcyon Holding Group LLC should be required to disgorge the reasonable value of Plaintiff Stewart's interest in the "Terminator" franchise for the recent $29.5 million paid by Pacificor LLC to Halcyon Holding Group LLC due to the illegal pattern of racketeering that has been used to deprive Stewart of her interest including but not limited to false oaths of ownership to

the U.S. Bankruptcy Court in the Halcyon Holding Corporation LLC case commenced on August 17, 2009 in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 1621 (a).

225. James Cameron admitted by conduct in the movie and screenplay that Gale Anne Hurd "ripped off" Plaintiff's "The Third Eye" when he used the date May 12th to describe the day that the "Terminator" arrived in Los Angeles.

226. Gale Anne Hurd started Pacific Western Productions, Inc. on May 12, 1981 through attorney James R. Miller in California under C1043898, just days after Twentieth Century Fox in Los Angeles had possession of the script and its former story analyst, Roger Corman of New World Pictures, Inc. had his employee start a new production company while still employed by him at New World Pictures, Inc.

227. James Cameron, by those words in the dialogue, admitted that Gale Anne Hurd was the person that illegally terminated Plaintiff Stewart's rights in the "Third Eye" in the same way that she acted toward Harlan Ellison's story entitled "Soldier" in the fall of 1964 in violation of 17 U.S.C. 506 (e).

228. By the concerted concealment of the evidence of the foundation work for each "Terminator" story by Gale Hurd, James Cameron, and Pacific Western Productions, Inc. beginning in May of 1981, these defendants deceived every subsequent purchaser into believing that they could buy intellectual property rights that were illegally acquired by them in violation of 17 U.S.C. 506 (e), but this law was established to protect rights accorded under Article 1, Section 8, and Clause 6 of the Constitution of the United States and cannot be contravened by a private agreement based upon an illegal act.

229. On information and belief, Hemdale Film Corporation was defrauded by Pacific Western Productions, Inc. in that neither James Cameron nor Gale Anne Hurd authored the "Terminator"; rather, they misappropriated the May 1, 1981 screen treatment of the

"Third Eye" by Plaintiff Stewart to create a derivative work that was called the "Terminator" without disclosing their additional illegal use of the "Soldier" and "Demon with a Glass Hand" by Harlan Ellison in violation of 17 U.S.C. 506 (e) and 17 U.S.C. 201.

230. On information and belief, Hemdale Film Corporation after the successful release of the "Terminator" that made more than $70 million in revenue world-wide, later filed for bankruptcy protection and alleged to the United States Bankruptcy Court falsely that it owned all rights to the "Terminator" story with Pacific Western Productions Inc. and its related merchandising, publishing, and other commercial rights, based upon the false registrations by Gale Anne Hurd, James Cameron, and Pacific Western Productions regarding the "Terminator" film under PA 241-495 and PAu 584-564 which statement was in violation of 18 U.S.C. 152 (2) and 18 U.S.C. 157 (2).

231. Carolco Pictures, Inc. paid $10 million to Hemdale Film Corporation for the rights to the "Terminator" franchise without first giving Plaintiff Stewart her credit and remuneration for the use of her May 1, 1981 screen treatment called the "Third Eye" registered as TXu 117-610 in "Terminator" as revealed in PA 241-495 and "Terminator 2: Judgment Day" that reads on PAu 1-513-625.

232. Carolco Pictures, Inc. made "Terminator 2: Judgment Day" on a budget of $102 million and achieved gross sales of $519.8 million from a movie released on July 3, 1991 that is represented by registration PAu 1-513-625 that did not acknowledge the use of Plaintiff's "The Third Eye" screen treatment dated May 1, 1981 as it is described above and identified as TXu 117-610.

233. Nevertheless, Carolco Pictures, Inc. had to file for bankruptcy protection on November 10, 1995 where a plan was proposed by Mario Kassar and Andrew G. Vajna to sell the stock to Twentieth Century Fox for $50 million, but this plan failed to

materialize apparently due to this history, which resulted in Mario Kassar and Andrew Vajna purchasing the right to the "Terminator" merchandising, publishing, and franchise rights without first resolving Plaintiff Sophia Stewart's interest in the amount of $15 million through a new entity called C2 Pictures that constitutes a partnership between Kassar and Vajna.

234. Carolco Pictures made false oaths of ownership to the Bankruptcy Court. As a result, the purchase through the bankruptcy court was void as a matter of public policy under 17 U.S.C. 201 and 106 in light of 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2) due to the fact that Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. had willfully concealed the contribution of Plaintiff Stewart to PA 241-495 in violation of 17 U.S.C. 506 (e) and 18 U.S.C. 152 (2).

235. The purchase by C2 Pictures through Mario Kassar and Andrew G. Vajna for $15 million was void against public policy in 1997 because Twentieth Century Fox then knew that it had reviewed the "Third Eye" between and including May 1, 1981 and June 1, 1981 through a letter by Kay Harrison and that this story was clearly derived from that submission without the consent of Plaintiff Stewart. (Exh. 12.3, Letter of Access by Kay Harrison reference Susan Merzbach)

236. C2 Pictures made "Terminator 3: Rise of the Machines" that was released on June 30, 2003 that was registered with the Copyright Office under PA 1-210-058 and they continued to conceal the fact that Plaintiff Stewart was a co-author on the underling copyright in violation 17 U.S.C. 506 (e) even though the film was made with a budget of $102 million and generated revenue of $519.8 million with the use of Plaintiff Stewart's story incorporated within the introduction of the film.

237. In 2007, C2 Pictures with the assistance of businessman Moritz Borman sold the "Terminator" merchandising, publishing, and other exploitation rights that arose from

the original film copyright PAu 584-564 and PA 241-495 and related copyrights to Halcyon Holding Group, LLC for the sum of $25 million, but this deal was also void because Plaintiff Stewart's rights were not resolved and the agreement was based upon the public offense by Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. in violation of 17 U.S.C. 506 (e) as to PA 241-495 and PAu 584-564.

238.   Halcyon Holding Group LLC then made "Terminator Salvation" that was released on May 21, 2009 on a budget of $200 million with a gross revenue of $372 million with a copyright registration of PA 1-628-221 registered to T Asset Acquisition Company LLC without disclosing the contribution of Plaintiff Stewart to the story through the "Third Eye" as disclosed in TXu 117-610 that predated all "Terminator" film registrations as of February 3, 1984.

239.   The copyright of "Terminator Salvation" was registered as PA 1-628-221 without any reference to the co-authorship of Plaintiff Stewart.

240.   Again, after another successful "Terminator" movie, Halcyon Holding Group, LLC continued its pattern of "money laundering" and "counterfeiting" by filing bankruptcy with the false claim that it was the true owner of the copyright rights in violation of 17 U.S.C. 506 (e) as of the August 2009 submission for protection under Chapter 11 of the Bankruptcy Code.

241.   Plaintiff Stewart is the only party in the history of "Terminator" bankruptcy filings to simultaneously enter the actual copyrights of the "Terminator" with Harlan Ellison and Sophia Stewart's names being absent thereon, and a copy of the "Terminator" movie bearing Harlan Ellison's name in the credits, thus Stewart requests that the Court follow the procedure to contact the executive branch of the government and "The Register of Copyrights" to investigate the circumstances to make sure that the government is not providing an "Unlawful Monopoly" under 15 U.S.C. 1 because the facts to support

exclusive use under 17 U.S.C. 106 are factually inaccurate. Since, it is obvious that the registration is based upon materially false facts that are called into question, the Court can request that the investigatory arm of the United States to confirm the facts to eliminate the possibility of an offense under 18 U.S.C. 1001 (a). If it is known to the Court that the Terminator copyrights PAu 584-564 and PA 241-495 are materially false/inoperative, it would be participating in a "Wrongful Restraint of Trade" ("Emphasis Added"), because the writers would not then be "Entitled to a Lawful Monopoly" of the subject matter under 17 U.S.C. 106 based upon Article 1, Section 8, Clause 7 of the Constitution."

242. The auction sale on or about February 8, 2010 by T Asset Acquisition LLC, the subsidiary to Halcyon Holding Group LLC to Pacificor LLC for $29.5 million with an additional $5 million was void in that it constitutes a violation of Money Laundering Act of 1986 against Pacificor creditors and was also based upon offenses under 18 U.S.C. 152 (2) and 17 U.S.C. 506 (e) through a "pattern of racketeering" that violated 18 U.S.C. 1962 (c) and (d), and was therefore void against public policy.

243. The consistent "pattern of racketeering" by poorly capitalized sham and shell companies without legitimate "Terminator" assets constitutes a "Ponzi Scheme," then converting the "Terminator" franchise copyrights it into millions of dollars, and repeatedly returning back to the bankruptcy court for a cheap sale is a pattern that is too consistent to be ignored as a modus operandi to thwart Plaintiff Stewart's ability to recover for the willful infringement of her copyright on May 21, 2009 as described above and then filing for bankruptcy on August 17, 2009 after having quickly made $172 million.

244. The effort by Twentieth Century Fox to acquire the "Terminator" franchise by a purchase from Carolco Pictures, Inc. and C2 Partners, Mario Kassar and Adrew Vajna, for $50 million as a part of a plan of reorganization is further evidence that Twentieth

Century Fox knew that the story written by Plaintiff Stewart was valuable and commercially viable between May 1, 1981 and May 12, 1981.

245. The discussions that Twentieth Century Fox had in the Carolco Pictures, Inc. bankruptcy in 2007 to acquire the "Terminator" franchise is evidence that Plaintiff Stewart was truthful when she said that Susan Merzbach of Twentieth Century Fox advised her between May 1, 1981 and May 12, 1981 that the story was commercially useful.

246. On information and belief, the election of Twentieth Century Fox to conceal its knowledge that all of the persons involved in these transfers did so illegally is confirmed by the decision of Twentieth Century Fox not to buy it after it confirmed within the corporation that the title was bad because the sellers had not resolved the interest of Plaintiff Stewart.

247. Due to this pattern of malfeasance, all agreements discussed hereinabove were void against public policy for failing to identify the contribution of the first author, Plaintiff Sophia Stewart, in violation of 17 U.S.C. 506 (e) and 17 U.S.C. 506 (a) (1) (A) as of May 12, 1981 when Gale Anne Hurd "ripped off" Stewart and used it to start Pacific Western Productions, Inc. with a story that revealed the "naked" without shame interplanetary travel in a post nuclear setting between man and machines as it was clearly depicted in the "Third Eye."

248. The entity that first had a lawful right to review the May 1, 1981 "Third Eye" screen treatment by Plaintiff Stewart was Twentieth Century Fox between May 1, 1981 and May 31, 1981.

249. On information and belief, John Does 1 through 6 of Twentieth Century Fox got together with John Does 7 through 12 of New World Pictures, Inc., one of whom was a former story analyst of Twentieth Century Fox between May 1, 1981 and May 12, 1981 transferred the "Third Eye" to a representative of New World Pictures, Inc. who could develop the story through a writer that would first register the work with the Writer's Guild of America on the recommendation of a manager of New World Pictures, then Roger Corman.

250. Upon information and belief, Twentieth Century Fox had an internal policy not to act on submissions that were submitted by writers that were not members of the Writer's Guild of American, but that policy did not permit industry heads to aid and abet in a "rip off" of the subjects creative work product through illegal copyright submissions in violation of 17 U.S.C. 506 (e) and the willful infringement of the subject's story rights in violation of 17 U.S.C. 506 (a) (1) (A).

251. Upon information and belief, the perpetuation of such a "pattern of racketeering" through the use of illegal copyright registrations in violation of 17 U.S.C. 506 (e), illegal statements of ownership to the bankruptcy courts in violation of 18 U.S.C. 152 (2), and illegal affidavits to the United States District Court for the Central District of California cannot be endorsed by the Courts after the FBI in the year 2000 found that the "Third Eye" was infringed in the "Terminator" in a New York City FBI report described as case number 295-NY-U275271.

252. When false information was submitted to the United States District for the Central District of California in case number CV 03-2873 MMM through the false affidavits of April 29, 2005 by Cameron and Hurd, the Court was encouraged to make a decision on a Motion for Summary Judgment where the actual film at issue described in PA 241-495 was not even presented to the federal Judge or the expert witness as a matter of deception to compare the language in TXu 117-610, and that indictable act of deception

is further proof that the "pattern of racketeering" by the use of materially false statements was in violation of 18 U.S.C. 1621 in the federal court in Los Angeles.

253. James Cameron, Gale Anne Hurd, Pacific Western Productions, Inc., Hemdale Film Corporation, and Orion Pictures, Inc. already admitted in writing that they "ripped off" other stories in the making of the "Terminator" in or about December of 1984 to Harlan Ellison, Thomas M. Cleaver, Tracy Torme, and Starlog Magazine.

254. Pacific Western Productions, Inc. was started by Gale Anne Hurd when James Cameron was not in the Country and when he was in the midst of working on "Piranha II: The Spawning" in Italy.

255. On information and belief, Roger Corman of New World Pictures, Inc. was not looking for a buyer for New World Pictures, Inc, in May of 1981, but as soon as James Cameron finished the first draft of the script as his employee supposedly while working as a design consultant on "Android" for New World Pictures, Inc. between February of 1982 and June of 1982, three attorneys came to make an offer to buy the stock of New World Pictures, Inc. [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), p. 221]

256. Thus, Gale Anne Hurd's position has been that she started Pacific Western Productions, Inc. without a story of her own and also without strategic and economic support from Roger Corman of New World Pictures, Inc.

257. Still, Susan Merzbach and Kay Harrison of Twentieth Century Fox have affirmed that Twentieth Century Fox had a copy of Plaintiff Stewart's "Third Eye" between May 1, 1981 and May 12, 1981, and thereafter a story that resembled it was filed with the Writers Guild of America by another New World Pictures employee who was then working on the movie "Android" in July 1982.

74

258. The language in the screenplay that infringed the copyrights of Harlan Ellison was in the July 1982 submission to the Writers Guild of America by James Cameron that was written while he was employed by New World Pictures, Inc. apparently on the film entitled "Android" as a design consultant.

259. Plaintiff Stewart later submitted the "Third Eye" to the Wachowski Brothers before the "Matrix" was written near the late 1990s.

260. The Federal Bureau of Investigation investigated her complaint in case number: 295-0-25/195-SU-0 that the introduction of the "Matrix" read on the "Third Eye," but when those facts were brought to the attention of Warner Brothers before the movie was released, some aspects of the infringing portions were removed immediately in 2000.

261. The Federal Bureau of Investigation also opined in 2001 at the Salt Lake City Branch that the segments of the "Matrix" were the same as segments of the introduction to "The Terminator" that was released on October 26, 1984.

262. In both instances, Plaintiff Stewart had submitted her screen treatment to a major studio before this malfeasance surfaced; however, no studio that used the "Third Eye" would accept this story when submitted by Sophia Stewart, an person of color, but each studio accepted the story under all kinds of adverse circumstances when it came from Gale Anne Hurd, James Cameron, Andy Wachowski, Larry Wachowski, Victor Kubicek, Derek Anderson, Mario Kassar, Andrew Vajna, and Moritz Borman, all of whom are White citizens with varying levels of experience in movie making.

263. Gale Anne Hurd, from May 12, 1981 surrounded herself with the one young married writer, Cameron, who had a background that had an interest in a concept that at least had some involvement with robots in 1978 called "Xenogenesis."

264. Gale Anne Hurd, started Pacific Western Productions, Inc. on May 12, 1981, created a romance with James Cameron while he was then married, promised to let him direct for co-writing the script, and violated the minimum wage law when she paid him $1 dollar for the "Terminator" script. At the same time Hurd accepted help from New World Pictures, Inc. by permitting it to pay Cameron while the first draft was worked on, covered up Cameron's admissions that he had used two copyrighted works from Harlan Ellison in writing the "Terminator", and threatened editors of Starlog Magazine to suppress and conceal Cameron's admission of their willful infringement of "Soldier" and "Demon with a Glass Hand" in December of 1984 in the presence of Thomas M. Cleaver.

265. Gale Anne Hurd, James Cameron, and Pacific Western Productions, Inc. willfully engaged in racketeering in the making of the "Terminator" within the meaning of 18 U.S.C. 1961.

266. James Cameron, while under oath to federal Judge Margaret M. Morrow on April 29, 2005, did not disclose that he had intentionally used the copyrighted works of other people as he admitted it to Tracy Torme, Thomas M. Cleaver, Harlan Ellison, and Starlog Magazine, which conduct violated 18 U.S.C. 1621 (a).

267. James Cameron, while under oath in the United States District Court for the Central District of California in CV 03-2873, swore that he pitched the idea to Hurd [for the first time] in March or April of 1982, just about 1 year after Pacific Western Productions, Inc. was formed, which statement was false.

268. Cameron admitted that he wrote the original treatment solo by July of 1982 and submitted it to the Writer's Guild of America, and claimed to the Writers Guild of

America that he wrote it for Pacific Western Productions Inc. while he was being paid by New World Pictures, Inc. between March of 1982 and June of 1982.

269. Nevertheless, the first minute and 45 seconds of the "Terminator" film found at PA 241-495 shows an introduction that reads exactly on the story language and concept of Plaintiff Sophia Stewart, and no consent was given by the defendants by Harlan Ellison or Plaintiff Sophia Stewart. (Exhibits T145, Terminator 1 minute 45 seconds "Theft,"); (the UCC Liens 22173560002 filed against James Cameron and Gale Anne Hurd)

270. On information and belief, Cameron admitted that he gave information to the federal court that indicated that he did not in any way consult, review, read, or have any knowledge of Plaintiff's "Third Eye" prior to February of 1982.

271. On information and belief, Cameron admitted by his own work product described in the first eight minutes of the "Terminator" movie found in registration PA 241-495 that his script described the person that did the act on May 12th was the "Terminator", which dramatic assertion identified Gale Anne Hurd as the person that willfully orchestrated the destruction of intellectual property rights of Sophia Stewart on that very day that Pacific Western Productions, Inc. in California was formed under C1043898.

272. Based upon the aforementioned illegal practices in defiance of the public laws of the United States, particularly 17 U.S.C. 506 (e), 18 U.S.C. 1621 (a), 18 U.S.C. 1962 (c), and 18 U.S.C. 4, all contracts that omitted Harlan Ellison and Plaintiff Stewart's co-ownership interest were void against public policy including those with Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, and Pacificor LLC. The Defendants at the encroached upon the Plaintiff's exclusive rights granted to a copyright owner at 17 U.S.C. § 106, which Infringement is implicitly defined in 17 U.S.C. § 501(a): Anyone who violates any of the exclusive rights of the

copyright owner as provided by [17 U.S.C. §§ 106-122] or of the author as provided by [17 U.S.C. § 106A], or who imports copies in and/or outside of United States in violation of [17 U.S.C. § 602], is an infringer of the copyright. Section 106 of Title 17 sets out the copyright owner's exclusive rights. These rights consist of the rights "to do and to authorize" the following: (I) to reproduce a work in copies § 106(1), (II) to prepare derivative works, § 106(2), (III) to distribute copies of the work to the public, § 106(3); (IV) to perform the work publicly (for certain types of works), (V) § 106(4), (6) to display a work publicly (for certain types of works), § 106(5).

273. Based upon the aforementioned violations of public policy, plaintiff requests that the court declare void each and every contract that was negotiated without involving her as required by 17 U.S.C. 201, 17 U.S.C. 106, and 17 U.S.C. 506 (e), declare each copyright registration regarding the "Terminator" void for having failed to disclose Plaintiff Stewart as a co-author including those that arose from "Terminator 1" (PAu 584-564 – PA 241-495), "Terminator 2" (TX 3-134-386), "Terminator 3" (PA 1-210-058), and "Terminator Salvation" (PA 1-628-221) under the Declaratory Judgment Act under 28 U.S.C. 2201 and 2202.

## FOURTH CAUSE OF ACTION

**(Unfair Competition Prevention Law Article 2, Paragraph 1,**

**Business and Professional Code §17200, 15 U.S.C. § 1125(a))**

274. Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, as though they were fully set forth herein in full:

275. Defendants Gale Anne Hurd, James Cameron, Pacific Western Productions, Inc., Hemdale Film Corporation, Cinema '84, Lightstorm Entertainment, Intermedia/IMF Production, C2 Pictures, Mostow/Lieberman Productions, Halcyon Holding Group,

LLC, Halcyon Consumer Products, LLC, Dominion Group, LLC, T-Salvation Productions, LLC, T-Salvation Distribution, LLC, T Asset Acquisition Company, LLC, and T-Salvation Distribution (BVI), LTD. and John Does I through XII copied verbatim Plaintiff's work entitled "The Third Eye," in violation of the Unfair Competition Prevention Act.

276. Defendants Warner Brothers and Fox operated in consort controlling 99.99% of the tradition press as the "racketeering enterprises" retaliated against Sophia Stewart by blocking her from obtaining mainstream press after Warner Brothers received constructive notice as early as 2000 from the F.B.I. that the "Terminator" and the "Matrix" introductions were copied verbatim from Stewart's story "The Third Eye" in violation of 18 U.S.C. 1962 (c) and (d) and 18 U.S.C. 1964 (a) and (c). Defendants Warner Brothers and Fox combined to block the female protégé Stewart from U.S.C. film school by "restraining her in her trade and talents," and blocking her in movie contracting for a 5 picture deal, while Warner Brothers and Fox "aided and abetted" Derek Anderson and Victor Kubicek and provided them with the financing of $200 million dollars as Anderson and Kubicek according to Moritz Borman misrepresented there industry qualifications, as well as, "had previously been sued for swindling hundreds of thousands of dollars from motion picture investors." In addition, Warner Brothers funded Andy Wachowski and Larry Wachowski, while they misrepresented their industry qualifications.

277. The plaintiff reasonably expected to receive certain royalties and credit after Defendants copied verbatim "The Third Eye." Second, the Defendants engaged in unfair competition that injured the plaintiff's right to receive some or all of those benefits for enjoying the exclusive right to own a copyright, to reproduce, distribute, and, in the case of certain works, publicly perform or display the work; to prepare derivative works; in the case of sound recordings, to perform the work publicly by means of a digital audio transmission; or to license others to engage in the same acts under specific terms and

conditions with more favorable terms because of race. Third, when the Defendants committed the unfair competition act to file false copyrights with the U.S. Register of Copyrights the defendants injured the plaintiff's right to receive benefits as an owner, as said parties willfully acted in bad faith.

278.   The Plaintiff asserts and alleges Defendants James Cameron and Gale Anne Hurd for financial gain or for the purpose of inflicting injury, made numerous false oaths of complete ownership in the California District Court for the "Terminator" while concealing Harlan Ellison and Sophia Stewart's name on line six of the copyright registration in violation of the Unfair Competition Prevention Act availed by Business and Professional Code §17200 without prior consent of Stewart. The Defendants false oaths of ownership were designed to steal, or without authorization appropriates, takes, carries away, conceals, or by fraud, artifice, or deception covert ownership of the "Third Eye" into "The Terminator" franchise.

279.   Defendants stole the "Third Eye," characters, plots, and the statement "I'll be back" as used in substantially the same place in substantially the same way that it was done in the prior submission; in order to promote, market, or sell "The Terminator" movie in direct competition with Stewart's treatment and constitutes unfair competition pursuant to 15 U.S.C. § 1125(a). James Cameron and Gale Anne Hurd's use of the "Third Eye" caused confusion, mistake, and deception among consumers. Cameron and Hurd's unfair competition has caused and will continue to cause irreparable harm to Stewart and has "restrained" her in his trade and talents by pilfering her work which there is no adequate remedy at law. Ultimately, said Defendants subjected Stewart to unfair competition based on gender discrimination in contravention to Business and Professional Code §17200.

280.   Defendants knew or should have known that their willful "unfair business practices" constituted "felony copyright infringement" pursuant to 17 U.S.C. 506 (e) to

file with the Copyright Office false statements" while failing to disclose the true name of co-authors Harlan Ellison and Sophia Stewart from which they fraudulently pilfered the work of others, of which, was utilized to influence the "economic decisions" of "users, banks, bonds and insurance companies" taken on the basis of the "financial statements" to not extend any form of financing and/or credit to Stewart.

279.   Defendants' have failed to ameliorate the problem of unfair competition and also evince their deliberate and reckless indifference toward Stewart and her rights.

280.   Defendants' unfair competition has imposed a disparate impact and are beyond outrageous and warrants – among other sanctions – an award of punitive damages.

281.   The Petitioner asserts and alleges discriminatory misconduct based on gender against all parties in violation of the California's Unfair Competition Law And Unfair Practices Act. It is the responsibility of the United States not to knowingly participate in combination to restrain trade by leaving in place a knowingly false submission of authorship.

## FIFTH CAUSE OF ACTION
## ACCOUNTING
### (Against All Defendants)

281.   Plaintiff re-alleges and incorporates each and every allegation contained in all prior paragraphs of this Complaint, as though they were fully set forth herein in full:

282.   Based on the actions and deceit of the Defendants and John Does I through XII the Plaintiff is entitled to recovery by virtue of claims for relief set forth above, the value of the Copyrights, as well as, the proceeds and dividends derived from the exploitation of the Copyrights for the "The Terminator," "Terminator 2": Judgment Day," "Terminator 3: Rise of the Machines," "Terminator 4: Salvation," and the "Sarah Conner

Chronicles", of which, clearly violated 17 U.S.C. §409 (1) and (11) and 17 U.S.C. §408 (d).

283. The Plaintiff asserts and alleges her registration with the Copyright Office preceded all filing by the Defendants in violation of 17 U.S.C. §506 (a) (1) as an act of criminal willful infringement associated with 18 U.S.C. §2319 as an act of racketeering under 18 U.S.C. §1961 (1). The current value of the Copyrights, the amount of the proceeds, to whom the proceeds where paid, or where they where reinvested, is so complicated that it can not be determined without accounting. The amount of the proceeds and dividends from the exploitation of Copyrights cited above and the distribution of said proceeds, dividends and profits are so complicated that it can not be determined without accounting. Moreover this information concerning the Copyrights for "The Terminator " franchise is uniquely within the knowledge of the Defendants. The amount due to the true and lawful owner of the Copyrights would be shown through an accounting.

284. The Defendants knew or should have known that Felony penalties apply to the Perpetrators in lieu of the infringement of the reproduction or distribution rights. See 17 U.S.C. § 506(a). Specifically, Defendants knew or should have known that felony penalties apply as a proximate result of the infringement involved either for "reproduction and distribution" of a minimum number and value of works, see 17 U.S.C. § 506(a)(1)(A) (numbered § 506(a)(1) before the Apr. 27, 2005 amendments) and 18 U.S.C. § 2319(b)(1); 17 U.S.C. § 506(a)(1)(B) (numbered § 506(a)(2) before the Apr. 27, 2005 amendments) and 18 U.S.C. § 2319(c)(1), or if the infringement involved "distribution of a work being prepared for commercial distribution," by making it available on a publicly-accessible computer network. See 17 U.S.C. § 506(a)(1)(C) (enacted Apr. 27, 2005), 17 U.S.C. § 506(a)(3). 18 U.S.C. § 2319(d)(1), Section II.B.4.c. of this Chapter, Cf. 4 Nimmer on Copyright § 15.01[A][2]

# (10) GENDER DISCRIMINATION
## [42 U.S.C. 1981, 42 U.S.C. 1982, AND 42 U.S.C. 1983]

285. Plaintiff re-alleges the allegations contained in paragraphs 1 through 337 as if fully set forth herein.

286. Plaintiff Stewart is an female of color.

287. All persons identified in paragraphs above are White citizens.

288. Upon information and belief, the primary reason why the persons listed in the aforementioned paragraphs did not contract with Plaintiff was because she is an female gifted writer of color who desired to write in the genre of science fiction.

289. Industry and business executives had an unwritten agreement that females would not write, produce, or direct in the genre of science fiction, one of the most revenue genres in movie making.

290. Plaintiff Stewart was damaged by this gender discrimination in "movie contracting" regarding the "Third Eye," which disparate treatment was observed by the FBI in New York.

291. From 1962 through February of 2010, there has been a consistent pattern of discriminating against females writers of color in science fiction filmmaking.

292. Gale Anne Hurd got the access to the "Third Eye" after it was determined by Susan Merzbach of Twentieth Century Fox that Plaintiff Sophia Stewart is gifted writer of color.

293. Gale Anne Hurd, when she got access to the "Third Eye," made the decision that Plaintiff Stewart could not contract regarding the science fiction story described in the May 1, 1981 movie treatment because she is a female that would not be accepted by any studio as a science fiction film writer. [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press 1990), pp. ix, 82, 97, 104, and 181]

294. James Cameron, when he learned of Hurd's accepting of the custom of gender and racial discrimination in contracting against gifted screenwriters of color, did not oppose her or other companies that followed this practice under color of state accepted custom.

295. Gale Hurd and James Cameron followed the discriminatory practice in contracting and conducted themselves as if Plaintiff Stewart had no right to contract that any White movie maker or producer in science fiction film making was bound to respect.

296. As a result of the industry practice under color of state accepted customs, Hurd complied with the custom and took Plaintiff Stewart's property and ignored her interest on the belief that most public officials in positions of authority in the movie business and legal system would operate to endorse the suppression of her rights by deceptive acts and practices.

297. By this discrimination in movie contracting implemented by Gale Anne Hurd and Pacific Western Productions, Inc. against plaintiff Stewart with the tacit approval of James Cameron, Plaintiff Stewart was denied the same contractual treatment that was accorded to Harlan Ellison in the same circumstance involving the same copyright registration malfeasance.

84

298. By those actions, Hurd, Cameron, and Pacific Western Productions Inc. willfully violated Stewart's right to contract regarding science fiction screen plays in violation of 42 U.S.C. 1981 (a), (b), and (c), 42 U.S.C. 1982, and 42 U.S.C. 1983. [Roger Corman, How I Made a Hundred Movies in Hollywood and Never Lost a Dime (Da Capa Press), pp. 98-100, 102-103; Donald Bogle, Toms, Coons, Mulattoes, Mammies, and Bucks (Continuum Information Publishing Group Ltd. 1973, 1989), p. 111]

299. Plaintiff's story was confirmed to be valuable in the hands of Larry and Andy Wachowski for the Matrix by the FBI, but when the same story was found to be in the hands of its true owner, Plaintiff Stewart, it was not valuable for commercial use and negotiations with Warner Brothers in or about the year 2000 as it had been earlier for Harlan Ellison, a White citizen, when he pointed out uses of his copyrighted material.

300. Plaintiff's story was confirmed to be valuable to Twentieth Century Fox when it began negotiations for the "Terminator" franchise rights in an amount of $50 million in the Chapter 11 of Carolco Pictures, Inc., until it was remembered that the Studio had previously refused to buy the work product from its original and true owner, Plaintiff Sophia Stewart.

301. On information and belief, when that history was discovered, Twentieth Century Fox ceased its interest so as not to confirm the ability of an gifted female writer of color in the field of science fiction writing in or about 1997.

302. When Mario Kassar and Andrew Vajna, both White men, obtained the illusory rights without Plaintiff Stewart's consent, they were able to get financing and make "Terminator 3: The Rise of the Machines" with a budget of $102 million and received revenue of $500 million.

303. All producers and writers from the "Rise of the Machines" through "Terminator Salvation" through T Asset Acquisitions LLC were White and able to raise funds and receive access to the channel of distribution to make a profit on the sequel.

304. However, each and every participant totally and completely ignored Plaintiff Stewart in May of 2009 as if she had no rights under 42 U.S.C. 1981 in contract that they were bound to respect as the true author under 17 U.S.C. 201 and 106 under TXu 117-610.

305. As to each illusory contract that was made regarding the "Terminator" rights from February 1983 through February 2010, only White citizens have been able to successfully make deals even when the manner of their possession was achieved by criminal acts in violation of 17 U.S.C. 506 (e).

306. These acts and practices and the industry practice of concealment of the offenses is an admission by conduct that the defendants including Gale Anne Hurd, James Cameron, Pacific Western Productions, Hemdale Film Corporation, Carolco Pictures, Inc., C2 Partners, Halcyon Holding Group LLC, T Asset Acquisitions LLC, and Pacificor LLC all gave aid and custom to the discrimination against the rights of Plaintiff Stewart to contract in violation of 42 U.S.C. 1981, 42 U.S.C. 1982, and 42 U.S.C. 1983 that culminated into damage to Plaintiff between and including May 2009 and February 2010.

307. Plaintiff has been damaged by the aforementioned acts of discrimination in an amount in excess of $10 million.

308. Gale Anne Hurd, Pacific Western Productions, Inc., and James Cameron laid the foundation so that these acts of discrimination could be successfully practiced by the use of illegal and fraudulent statements to the United States Copyright Office, the United

States Bankruptcy Court of the Central District of California, and the United States District Court for the Central District of California.

309. Plaintiff Stewart has demonstrated that Gale Anne Hurd used symbolism in the "Terminator" film by showing the Black sanitation worker ran and hid in the presence of a strong and powerfully built White man which was not written into the July 1982 screen treatment filed with the Writers Guild of America West or the U.S. Copyright Office under PAu 584-564.

310. By the success that Gale Ann Hurd has achieved by the intentional use of illegal and discriminatory acts against Plaintiff Stewart, Hurd, Cameron, and Pacific Western Productions, Inc. have proved that her efforts to establish discrimination and economic deprivation on the defendants has been difficult to achieve even when the FBI is the witness to the malfeasance.

311. Plaintiff Stewart therefore requests that a permanent injunction be issued against these defendants for restraining her in her trade and talents; in order to prevent further patterns of discrimination against Plaintiff Stewart in using her copyright work as a co-author without disgorging profit and paying damages.

312. Plaintiff Stewart has been damaged by defendants including RICO Enterprises Halcyon Holding Group LLC between May 10, 2009 and February 15, 2018 in an amount in excess of $300,000,000.00.

**WHEREFORE, PLAINTIFF PRAYS AS FOLLOWS AGAINST THE DEFENDANTS JOINTLY AND SEVERALLY:**

1) For compensatory damages in an amount of $300, 000, 000.00 {300 hundred million}, under 18 U.S.C. 1962 (c) and (d);

2) For treble damages and attorney's fees under 18 U.S.C. 1964 (c);

87

3) For prejudgment interest arising under 18 U.S.C. 1962;

4) For compensatory damages under 42 U.S.C. 1981, 42 U.S.C. 1982, and 42 U.S.C. 1983; Punitive damages in an amount to be determined at the time of trial.

5) For judicial and declaratory relief under Sections 28 U.S.C. 2201 and 2202 under the Declaratory Judgment Act:

6) For such other relief as the Court deems just and proper in the premises.

Dated: __December 11, 2018

By: _____

SOPHIA STEWART    12/11/2018

# DECLARATION OF JAMES CAMERON

I, JAMES CAMERON, hereby declare as follows:

1.      I am a Defendant in the pending lawsuit entitled Sophia Stewart v. Andy Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration in support of the motion for summary judgment filed by Defendants Twentieth Century Fox Film Corporation ("Fox"), Gale Anne Hurd ("Hurd") and me (collectively, the "Terminator Defendants"). I was the writer and director of the feature motion picture "The Terminator" and the writer, director and producer of "Terminator 2: Judgment Day".

2.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

## I.      No Access to the Third Eye Literary Materials.

3.      As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye"; (2) a forty-five page manuscript entitled the "Third Eye"; and (3) an additional document which she calls the "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

4.      I have never met or spoken with Stewart. I had not heard of Stewart prior to the time that she filed her lawsuit against me.

5.      I have never seen the Third Eye Literary Materials.

6.      I have never read the Third Eye Literary Materials.

7.      I have never received the Third Eye Literary Materials.

8.      I have never had access to the Third Eye Literary Materials.

24

05/13/2005  13:05     8182264044              MICHAEL STOLLER                    PAGE  04/82

9.     To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Terminator" or "Terminator 2: Judgment Day" had any access to the Third Eye Literary Materials.

## II.     My Relationship with Fox

10.     I never had any business, working or other relationship with Fox prior to October of 1984.  In fact, it was not until after October of 1984, when "The Terminator" had its initial theatrical release, that I had my first meeting with Fox. Based on the success of "The Terminator", Fox offered me the opportunity to be the director of "Aliens" which was released in 1986.

11.     I had no business, working or other relationship with Fox at the time I, wrote and directed "The Terminator".

12.     I had no business, working or other relationship with Fox during the process of creating, writing, developing, finding financing for or directing "The Terminator".

13.     No one from Fox ever provided me with any of the Third Eye Literary Materials.  For that matter, no person or entity ever provided me with any of the Third Eye Literary Materials.  I never received the Third Eye Literary Materials from Fox or any other person or entity prior to the initiation of this lawsuit.

## III.     My Relationship with Hemdale

14.     As I understand it, Stewart alleges that Hurd and I, acting in concert with others, formed Hemdale Film Corporation ("Hemdale") and that we did so for improper purposes. This is a false statement.

15.     I had no involvement in the formation of Hemdale.  I have been advised that Hemdale was formed in approximately 1971. In 1971, I was 17 years old.

SV/FOX/STEWART/DECL.OF J CAMERON                          2

27

16. Herndale was a company that co-financed the production of "The Terminator". Orion also co-financed "The Terminator". I never had, and do not now have, any ownership, financial or other interest in Herndale or in Orion.

## IV. The Creation, Financing and Production of "The Terminator"

17. In either January or February of 1982, I created the story idea for "The Terminator". I was living at my friend Randall Frakes' ("Frakes") house in Pomona, California at the time. I had just finished shooting as director of the film "Piranha 2: The Spawning" ("Piranha 2"). Frakes and I used to discuss story ideas with each other and "The Terminator" was one of the story ideas I discussed with him. At that time, my goal was to come up with a marketable script concept so that I could attach myself to it as the director.

18. I pitched my idea for "The Terminator" to Frakes, but he did not see any potential in it. He told me that he did not want to co-write the script with me. I also pitched the story concept to Frakes' agent, but he also did not respond favorably to the pitch.

19. The story was about a non-human cyborg, known as a Terminator. In my story, there was a conflict in the future, and in order to resolve that conflict, the totalitarian state decided to send a Terminator through time to the past to kill the mother of their future rival, so that he would never be born. In my story, the heroine is an ordinary woman, living in present day, whose life seems inconsequential to everyone around her. She is just a waitress, but the future regime needs to eliminate her. The method they use to kill her is to send a hit man, the cyborg terminator, back through time. To help protect her, the rebels send a human back in time as well. Ultimately, there is a confrontation between the cyborg hit man and the human sent to protect her. The waitress and her protector also fall in love. Although I'd originally conceived of the Terminator being a shape-shifting sort of "biological machine", by March of 1982 the difficulties inherent in realizing that vision given the limitations of

28

visual effects technology at the time led me to put that idea on hold (for later use in "Terminator 2: Judgment Day", as it turned out) and opt instead for a cyborg Terminator antagonist. Attached hereto as Exhibit "1" is a true and correct copy of my initial two-page description of "The Terminator" story. I wrote Exhibit "1" in early 1982.

20. In March or April of 1982, I went to Rome at the request of the American co-producer of "Piranha 2" to see if I could help complete the film. One day while in Rome, I got sick and could not go to work. I spent the day stuck in a small pensione, drawing pictures of the Terminator. During my stay in Rome, I called Gale Anne Hurd ("Hurd") and pitched her the story of "The Terminator" over the telephone. I asked her if she would be interested in producing the film. Hurd told me that she was excited about my story concept and stated that she wanted to hear more about it.

21. In the late spring or early summer of 1982, after I returned to Los Angeles, I started to work on a detailed treatment of "The Terminator". Bill Wisher ("Wisher") helped me brainstorm the story beats in an all-day session at his parent's home in Brea.

22. After that brainstorming session, I returned to my apartment in Tarzana and finished writing the treatment for "The Terminator" in about two weeks. The treatment was registered with the WGA in July of 1982. After I completed the treatment, I showed it to Hurd. She then agreed to produce the film.

23. Thereafter, I wrote the screenplay of "The Terminator" (a few memorable lines of dialogue were contributed by Wisher). By October of 1982, I had completed the screenplay of "The Terminator". For strategic reasons, Hurd and I decided to add her name as writer to the screenplay in order to solidify her attachment to the film. Hurd participated in the second draft of the script by acting as an editor, making suggestions for small cuts.

24. In the fourth quarter of 1982, Hurd and I submitted "The Terminator" to many potential producers and distributors. Many people were not interested in the project and passed. However, Orion was interested in our project "The Terminator" if we could secure co-financing.

25. In the fourth quarter of 1982, Hurd had meetings with Hemdale. Ultimately, towards the end of 1982, Hemdale agreed to co-finance "The Terminator" with Orion.

26. In 1982, as I understood it, Fox had no ownership interest in, or control over, either Hemdale or Orion.

27. By November of 1982, we had finished preparing the budget for "The Terminator". Both Hurd and I were comfortable with the budget as of that time.

28. In early December of 1982, we registered the title "The Terminator" with the Motion Picture Association of America (the "MPAA").

29. As of December of 1982, we were already scouting locations, attempting to secure a cast and having meetings regarding the financing, the distribution and the completion bond for the picture.

30. In February of 1984, we commenced principal photography of "The Terminator" in Los Angeles.

31. In October of 1984, "The Terminator" was first released in theaters in the United States.

32. At no time between mid 1982 and October of 1984, or any time before or after (prior to the initiation of this lawsuit), did I ever receive or have access to the Third Eye Literary Materials.

**T-2 and T-3**

33. I directed, produced and co-wrote "Terminator 2: Judgment Day".

34. I had no involvement in "Terminator 3: Rise of the Machines".

05/13/2005 13:05 8182264044 MICHAEL STOLLER PAGE 08/82

04/25/2005 12:26 310555 LEI/CAMERON PAGE 07

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 25 day of April, 2005, at Los Angeles, California.

JAMES CAMERON

6

04/26/05 TUE 17:30 FAX

# DECLARATION OF GALE ANNE HURD

I, GALE ANNE HURD, hereby declare as follows:

1.      I am a Defendant in the pending lawsuit entitled Sophia Stewart v. Andy Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration in support of the motion for summary judgment filed by Defendants Twentieth Century Fox Film Corporation ("Fox"), James Cameron ("Cameron") and me ("Hurd") (collectively, the "Terminator Defendants"). I was the producer of the feature motion picture "The Terminator". I also received co-writing credit, with Cameron, for the screenplay "The Terminator", which was based on Cameron's original story idea.

2.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

## I.    No Access to the Third Eye Literary Materials.

3.      As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the "Third Eye Manuscript"); and (3) an additional document which she calls the "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

4.      I have never met or spoken with Stewart. I had not heard of Stewart prior to the time that she filed her lawsuit against me.

5.      I have never seen the Third Eye Literary Materials.

6.      I have never read the Third Eye Literary Materials.

7.      I have never received the Third Eye Literary Materials.

8.      I have never had access to the Third Eye Literary Materials.

BU/FOX/STEWART/DECL OF A445 HURD                      1                                   32

9.    To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Terminator" had any access to the Third Eye Literary Materials.

## II.    My Relationship with Fox

10.    I never had any business, working or other relationship with Fox prior to October of 1984. In fact, I never had a meeting with any one employed by Fox until after October of 1984, when "The Terminator" had its initial theatrical release. I did not meet with anyone at Fox until after the theatrical release of "The Terminator".

11.    I had no business, working or other relationship with Fox at the time I produced "The Terminator".

12.    I had no business, working or other relationship with Fox during the process of creating, writing, developing, finding financing for and producing "The Terminator".

13.    No one from Fox ever provided me with any of the Third Eye Literary Materials. For that matter, no person or entity ever provided me with any of the Third Eye Literary Materials. I never received the Third Eye Literary Materials from Fox or any other person or entity.

## III.    My Relationship with Hemdale

14.    As I understand it, Stewart alleges that Cameron and I, acting in concert with others, formed Hemdale Film Corporation ("Hemdale") and that we did so for improper purposes. This is a false statement.

15.    I had no involvement in the formation of Hemdale. I have been advised that Hemdale was formed in approximately 1971. In 1971, I was in high school.

16.    Hemdale was a company that co-financed the production of "The Terminator". Orion also co-financed "The Terminator". I never had, and do not now have, any ownership, financial or other interest in Hemdale, or in Orion.

NOTICE OF ASSOCIATED

2

33

## IV.    The Creation, Financing and Production of "The Terminator"

17.    In the spring of 1982, Cameron was working in Italy on the post-production of "Piranha 2: The Spawning". Cameron called me from Italy and told me that he had created a story idea for a new movie. He gave me the pitch over the telephone. He told me that the story was about a cyborg who was sent back in time by a totalitarian state from the future. The cyborg, known as a Terminator, was sent from the future to kill an ordinary woman who would soon give birth to the future leader of the revolution. The rebel leaders from the future also sent back in time someone to protect the woman. They sent back a man, not a cyborg. The woman and her protector end up falling in love.

18.    In this respect, Cameron's story idea was both a time travel story and a love story. In that conversation, I told Cameron that I was excited about the story idea and that I wanted to produce the movie.

19.    In the spring or summer of 1982, Cameron returned from Italy. At that time, he wrote a detailed treatment. After Cameron wrote a detailed treatment, he gave it to me to read. I thought it had great potential and told him that I would be willing to produce the movie. Shortly thereafter, Cameron wrote the screenplay of the "Terminator." He gave me pages to read as he finished them and I gave him my comments.

20.    By October of 1982, the screenplay of "The Terminator" had been completed.

21.    In the fourth quarter of 1982, Cameron and I submitted "The Terminator" to many potential financiers and distributors. Many people were not interested in the project and passed. However, Orion was interested in our project "The Terminator" if we could secure co-financing.

22.    In the fourth quarter of 1982, I had a meeting with Barry Plumley ("Plumley"). At the time, Plumley was an executive who worked for John Daly

("Daly") at Hemdale.  Plumley liked the pitch and agreed to give the treatment to Daly.  Daly liked the treatment and the screenplay and ultimately, towards the end of 1982, Hemdale agreed to co-finance "The Terminator" with Orion.

23.    In 1982, as I understood it, Fox had no ownership interest or control over Hemdale or Orion.

24.    By November of 1982, we had finished preparing the budget for "The Terminator".  Both Cameron and I had approved the budget.

25.    In early December of 1982, I registered the title "The Terminator" with the Motion Picture Association of America ("MPAA").

26.    As of December of 1982, we were already scouting locations, attempting to secure a cast (we were having discussions with Kurt Russell at the time) and having meetings regarding the financing, the distribution and the completion bond for the picture.

27.    As of December of 1982, my loan-out company had entered into an agreement with Hemdale with respect to "The Terminator".

28.    In March of 1984, we commenced principal photography of "The Terminator" in Los Angeles.

29.    In October of 1984, "The Terminator" was first released in theaters in the United States.

30.    At no time between mid 1982 and October of 1984, or any time before or after, did I ever receive or have access to the Third Eye Literary Materials.

4

05/13/2005 13:05    8182264044             MICHAEL STOLLER                    PAGE 14/82

Apr-27-05   03:10pm   From-                                        T-194   P.006/006   F-869

## V.    T-2 and T-3

31.    I received an executive producer credit on "Terminator 2: Judgment Day" ("T-2").

32.    I also received an executive producer credit on "Terminator 3: Rise of the Machine" ("T-3"). However, I was not involved in the creative process for T-3.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this ___27th___ day of April, 2005, at Los Angeles, California.


_____
GALE ANNE HURD

36

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 100 of 207
Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 100 of 143
05/13/2005 14:13    8182264044                    MICHAEL STOLLER                    PAGE 08/91

APR-27-2005  13:37        ,  ENTERTAINMENT                      3103063910    P.02

## DECLARATION OF LAURENCE WACHOWSKI

I, LAURENCE WACHOWSKI, hereby declare as follows:

1.    I am a Defendant in the lawsuit entitled Sophia Stewart v. Andy Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration in support of the motion for summary judgment filed by Defendants Warner Bros. Entertainment, Inc., Andy Wachowski ("Andy"), Thea Bloom, Joel Silver and me (the "Matrix Defendants"). Together with my brother Andy, I was the co-writer, co-director and co-executive producer of "The Matrix", "The Matrix Reloaded" and "The Matrix Revolutions" (the "Matrix Trilogy").

2.    I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

3.    In the summer of 1986, I was 21 years old and I was attending Bard College in New York.

I.    No Access to the Third Eye Literary Materials.

4.    As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the "Third Eye Manuscript"); and (3) an additional document which she calls the "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

5.    I have never met or spoken with Stewart. I had not heard of Stewart prior to the time that she filed her lawsuit against me.

6.    I have never seen the Third Eye Literary Materials.

7.    I have never read the Third Eye Literary Materials.

8.    I have never received the Third Eye Literary Materials.

9.    I have never had access to the Third Eye Literary Materials.

1

30

05/13/2005 14:13    8182264044           MICHAEL STOLLER                    PAGE   09/91

APR-27-2005   13:37      ⎣  ENTERTAINMENT                    3103063910    P.03

10.   To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Matrix" had any access to the Third Eye Literary Materials.

## II.   The Purported Advertisement

11.   As I understand it, Stewart also alleges in her lawsuit that during the summer of 1986, my brother Andy and I ran an advertisement in a national magazine by which we supposedly solicited writers to send us science fiction treatments and scripts (the "Purported Advertisement"). This is not true.

12.   I never ran the Purported Advertisement. I never asked anyone to run the Purported Advertisement for me. The Purported Advertisement does not now exist and never existed. I never solicited science fiction or other scripts in a national magazine or in any other publication in 1986 or at any other time. To my knowledge, my brother Andy, who had just graduated from high school in 1986, never ran, and never asked anyone to run, the Purported Advertisement either.

13.   As I understand it, Stewart also alleges in her lawsuit that, in response to the Purported Advertisement, she sent the Third Eye Literary Materials to my brother and me. This is not true. I never received the Third Eye Literary Materials in 1986 and I certainly did not receive them in response to the Purported Advertisement.

14.   I never received the Third Eye Literary Materials from Stewart, or any other person or entity, at any time either before or after 1986.

## III.   The Creation of The Matrix Trilogy

15.   My brother Andy and I independently created the Matrix Trilogy.

16.   We first started working on the Matrix Trilogy in 1992 and continued to work on it in 1993. Initially, the Matrix Trilogy was an idea for a comic book. Andy and I created the concept for the Matrix Trilogy (all three films) in 1993.

2

17.    In 1993, Andy and I wrote the script for the Matrix Trilogy in long hand. Attached hereto as Exhibit " __1__ " is a true and correct copy of the first page of the first draft of the script for the Matrix Trilogy. This first draft is dated 8/13/93 and is entitled First Draft, Second Notebook. Attached hereto as Exhibit " __2__" is a true and correct copy of the first page of the next draft of the script for the Matrix Trilogy. This next draft is dated 10/7/93 and is entitled First Draft, Third Notebook. There is also a First Draft, First Notebook which is dated prior to 8/13/93, but I have not been able to locate it at this time.

## IV.    Joel Silver and Warner Bros.

18.    In 1993, Andy and I did re-writes for a movie entitled "Assassins". Joel Silver ("Joel") was the producer of "Assassins". While working on that project with Joel, Andy and I showed him our script for "The Matrix". Joel liked it. He optioned the rights to it from us and together we pitched it to Warner Bros. Warner Bros. liked the pitch and liked our script. In 1993, Andy and I entered into a deal with Warner Bros. As part of that deal, Warner Bros. had us re-write the script for them.

19.    Andy and I then re-wrote "The Matrix" for Warner Bros. We delivered a first version and a revised version in February of 1994. Attached hereto as Exhibit " __3__ " is a true and correct copy of the first page of the February 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros. We then revised it again for Warner Bros. Attached hereto as Exhibit " __4__" is a true and correct copy of the first page of the August 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros.

## V.    Warner Bros. Needs More Convincing

20.    Warner Bros. liked the revised script. However, Warner Bros. still needed more convincing before it would agree to finance and distribute "The Matrix."

3

32

05/13/2005 14:13    8182264044                MICHAEL STOLLER                    PAGE 11/91

APR-27-2005 13:37        E  ENTERTAINMENT                        31030035910      P.05

21.    Joel, Andy and I asked Warner Bros. to hire two comic book artists to draw detailed shot-by-shot storyboards. Warner Bros. agreed.

22.    At the same time, Joel, Andy and I got the script to Keanu Reeves ("Keanu"). Keanu liked the script and stated that he would be willing to play the role of Neo.

23.    After Warner Bros. saw the 500 plus pages of the shot-by-shot storyboards and after Keanu agreed to be in the movie, Warner Bros. agreed to finance and distribute "The Matrix" and, ultimately, the Matrix Trilogy.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this _7 7_ day of April, 2005, at _____, _____.

LAURENCE WACHOWSKI

4

33

# DECLARATION OF ANDY WACHOWSKI

I, ANDY WACHOWSKI, hereby declare as follows:

1.    I am a Defendant in the lawsuit entitled Sophia Stewart v. Andy Wachowski, et al., Case No. CV 03-2873 MMM (VBKx). I submit this Declaration in support of the motion for summary judgment filed by Defendants Warner Bros. Entertainment, Inc., Laurence Wachowski ("Larry"), Thea Bloom, Joel Silver and me (the "Matrix Defendants"). Together with my brother Larry, I was the co-writer, co-director and co-executive producer of "The Matrix", "The Matrix Reloaded" and "The Matrix Revolutions" (the "Matrix Trilogy").

2.    I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

3.    In the summer of 1986, I was 18 years old and I had just graduated from High School.

I.    **No Access to the Third Eye Literary Materials.**

4.    As I understand it, Plaintiff Sophia Stewart ("Stewart") alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the "Third Eye" (the "Third Eye Treatment"); (2) a forty-five page manuscript entitled the "Third Eye" (the "Third Eye Manuscript"); and (3) an additional document which she calls the "Making of the Third Eye" (collectively, the "Third Eye Literary Materials").

5.    I have never met or spoken with Stewart. I had not heard of Stewart prior to the time that she filed her lawsuit against me.

6.    I have never seen the Third Eye Literary Materials.

7.    I have never read the Third Eye Literary Materials.

8.    I have never received the Third Eye Literary Materials.

9.    I have never had access to the Third Eye Literary Materials.

1

05/13/2005 14:13    8182264044                MICHAEL STOLLER                    PAGE 04/91

APR-27-2005  13:39        EON ENTERTAINMENT                              3103063910    P.07

10.    To my knowledge, no one connected with the process of creating, writing, developing, financing or producing "The Matrix" had any access to the Third Eye Literary Materials.

## II.    The Purported Advertisement

11.    As I understand it, Stewart also alleges in her lawsuit that during the summer of 1986, my brother Larry and I ran an advertisement in a national magazine by which we supposedly solicited writers to send us science fiction treatments and scripts (the "Purported Advertisement"). This is not true.

12.    I never ran the Purported Advertisement. I never asked anyone to run the Purported Advertisement for me. The Purported Advertisement does not now exist and never existed. I never solicited science fiction or other scripts in a national magazine or in any other publication in 1986 or at any other time. To my knowledge, my brother Larry, who was in college in 1986, never ran, and never asked anyone to run, the Purported Advertisement either.

13.    As I understand it, Stewart also alleges in her lawsuit that, in response to the Purported Advertisement, she sent the Third Eye Literary Materials to my brother and me. This is not true. I never received the Third Eye Literary Materials in 1986 and I certainly did not receive them in response to the Purported Advertisement.

14.    I never received the Third Eye Literary Materials from Stewart, or any other person or entity, at any time either before or after 1986.

## III.    The Creation of The Matrix Trilogy

15.    My brother Larry and I independently created the Matrix Trilogy.

16.    We first started working on the Matrix Trilogy in 1992 and continued to work on it in 1993. Initially, the Matrix Trilogy was an idea for a comic book. Larry and I created the concept for the Matrix Trilogy (all three films) in 1993.

2

27

05/13/2005 14:13    8182264044                    MICHAEL STOLLER                            PAGE 05/91

APR-27-2005 13:38        EON ENTERTAINMENT                              3103063910    P.08

17.    In 1993, Larry and I wrote the script for the Matrix Trilogy in long hand. Attached hereto as Exhibit "_1_" is a true and correct copy of the first page of the first draft of the script for the Matrix Trilogy. This first draft is dated 8/13/93 and is entitled First Draft, Second Notebook. Attached hereto as Exhibit "_2_" is a true and correct copy of the first page of the next draft of the script for the Matrix Trilogy. This next draft is dated 10/7/93 and is entitled First Draft, Third Notebook. There is also a First Draft, First Notebook which is dated prior to 8/13/93, but I have not been able to locate it at this time.

## IV. Joel Silver and Warner Bros.

18.    In 1993, Larry and I did re-writes for a movie entitled "Assassins". Joel Silver ("Joel") was the producer of "Assassins". While working on that project with Joel, Larry and I showed him our script for "The Matrix". Joel liked it. He optioned the rights to it from us and together we pitched it to Warner Bros. Warner Bros. liked the pitch and liked our script. In 1993, Larry and I entered into a deal with Warner Bros. As part of that deal, Warner Bros. had us re-write the script for them.

19.    Larry and I then re-wrote "The Matrix" for Warner Bros. We delivered a first version and a revised version in February of 1994. Attached hereto as Exhibit "_3_" is a true and correct copy of the first page of the February 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros. We then revised it again for Warner Bros. Attached hereto as Exhibit "_4_" is a true and correct copy of the first page of the August 23, 1994 revised version of "The Matrix" as we delivered it to Warner Bros.

## V. Warner Bros. Needs More Convincing

20.    Warner Bros. liked the revised script. However, Warner Bros. still needed more convincing before it would agree to finance and distribute "The Matrix."

3

28

21.    Joel, Larry and I asked Warner Bros. to hire two comic book artists to draw detailed shot-by-shot storyboards. Warner Bros. agreed.

22.    At the same time, Joel, Larry and I got the script to Keanu Reeves ("Keanu"). Keanu liked the script and stated that he would be willing to play the role of Neo.

23.    After Warner Bros. saw the 500 plus pages of the shot-by-shot storyboards and after Keanu agreed to be in the movie, Warner Bros. agreed to finance and distribute "The Matrix" and, ultimately, the Matrix Trilogy.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this **27** day of April, 2005, at _____.

_____
ANDY WACHOWSKI

4

05/13/2005 14:13 8182264044 MICHAEL STOLLER PAGE 13/91

## DECLARATION OF TERESA WAYNE

I, Teresa Wayne, hereby declare as follows:

1. I am Vice President of Story and Creative Administration of Warner Bros. Entertainment, Inc. ("Warner Bros."). My duties and responsibilities include supervising the Story Department of Warner Bros. I have been employed by Warner Bros. for 24 years and I have been in charge of the Story Department since 1993. I submit this Declaration in support of the motion for summary judgment filed by Defendants Warner Bros., Andy Wachowski, Larry Wachowski, Thea Bloom and Joel Silver (collectively, the "Matrix Defendants").

2. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would and could competently testify to these facts under oath.

3. Warner Bros.' policy is to accept the submission of a script, treatment or other literary material ("Literary Material") only from licensed literary agents who are signatories to the Writer's Guild of America ("WGA") or from producers, attorneys and managers with whom we have a business relationship.

4. The Story Department documents the submission of Literary Material submitted to Warner Bros.' creative executives. The process by which Warner Bros. receives Literary Material is as follows:

   a. Literary Material is submitted to creative executives who, in turn, send it to the Story Department for "coverage".

   b. The Story Department maintains, in the ordinary course of our business, a computerized database. The database is updated and checked daily. Whenever a submission is received, the Story Department promptly enters certain information about the submission into the database, including the date it was received by Warner Bros.

34

c. After the Literary Material is logged into the database, story analysts read the submitted Literary Material.

d. After their review of the Literary Material, the story analysts prepare "coverage". Coverage is a short synopsis of the Literary Material. Coverage typically includes a recommendation from the story analyst as to whether or not the Literary Material submitted has the potential to become a viable film property. The Story Department maintains a copy of the coverage analysis.

5. Warner Bros. policy prevents the Story Department from considering unsolicited submissions. Unsolicited submissions are returned unopened and unread.

6. Typically, my department is notified when Literary Material is submitted to the Warner Bros. legal department as part of a claim.

7. I was asked by our outside counsel to check the computerized database to determine the date "The Matrix" was first submitted to Warner Bros. I then checked the database and verified that Joel Silver of Silver Pictures, a producer with whom Warner Bros. had a business relationship, first submitted "The Matrix" to Warner Bros. on February 4, 1994.

8. Warner Bros. released "The Matrix" domestically on March 31, 1999.

9. I was also asked by our outside counsel to check the computerized database to determine whether a treatment or manuscript (or script) entitled the "Third Eye" written by Sophia Stewart ("Stewart") was ever received by Warner Bros. I then checked the database and verified that at no time prior to April 16, 1999 did Warner Bros. ever receive the "Third Eye" written by Stewart. According to the database, the first time Warner Bros. received the "Third Eye" written by Stewart was on April 16, 1999 when Stewart it to the Warner Bros. legal department along with a claim letter.

*35*

n:Roman Empire Inc. To:Sophia Stewart(17022423500)



THIRD EYE

by

Sofia Stewart

May 1981
Los Angeles, California

Exhi 2

n:Roman Empire Inc. To:Sophia Stewart (17022423606)

# THIRD EYE

The proposed science fiction film deals with Earth during the year 2110 A.D. By that time planet Earth had experienced horrible nuclear wars, and a Spiritual Evolution was underway. Also, Man was finally moving from the unconscious to the conscious stages of spiritual development. Thus, it seemed apparent that spirituality would soon prevail over technocracy and Earth would have lasting "Peace".

Unfortunately, members of Earth's largest banking institutions and corporations secretly banded together in a final effort to maintain the object-worship of money as a permanent way of life. By controlling the mass media (television, newspapers and radio), the secret organization, with a code name of "Rothfellers", convinced people on Earth to rebuild their weapon systems as a means to provide money and jobs for everyone. War began again even before the new weapon systems were finished, and most of the population abandoned the pursuit of Spirituality or died in nuclear battles.

One of the major research and weapon systems development organizations on Earth was headed by a philosopher-scientist, Ikahan. His organization was instrumental in building the Spacestar, a huge vehicle shaped like a pyramid designed for inter-planetary warfare and space travel. Additionally, the

1

Exh. 3

ı:Roman Empire Inc. To:Sophia Stewart (17022426656) Case 2:12-cv-02351-GMN-EJX Document 31 Filed 12/18/8 10-8 Page 112 of 207

07/02/2004 18 27 FAX                                                                    014/019

Spacestar was to be the flagship of Earth's space fleet, and it contained the most secret and highly advanced devices known at that time.

The Rothfellers commanded Ikahn to use the Spacestar as a vehicle for war against people who resisted their tyranny. Ikahn accepted the assignment with some reluctance.

Just before beginning the assigned mission, Ikahn personally experienced a Spiritual Happening that became manifest in the form of an "eye". After the 'Happening', he set it aside as simply a hallucination and continued his organisational tasks. These tasks included collecting the finest, most highly trained people on Earth to operate the Spacestar. When all of the preparations were completed, the vessel left the orbiting dock where it had been constructed. At that time, Ikahn experienced another Spiritual Happening, and he envisoned the "eye" again. After the 'Happening' Ikahn discussed the event with one of his close associates who informed him that some members of the Spacestar crew were rebels against the Rothfellers, and they stole galactic maps of the universe from top-secret stellar receiving stations. These people were pointed out to Ikahn who confessed that they possessed information concerning the main source of Spiritual Power, the THIRD EYE, that exists on a planet named Cava III in the distant universe.

More importantly, the rebels produced incontrovertible evidence proving to Ikahn that the Rothfellers intended,

2

Ex 4.4

to control and reduce Earth's population to industrial object-worshippers, and they wanted to systematically destroy the concept of God. They also explained to Ikahn that his Spiritual Happening had meaning, and that he was destined to stand before the THIRD EYE; also, that he was to bring that power back to Earth.

Ikahn retired to his quarters for meditation, and received notification from the Rothfellers on Earth to open his secret orders. These orders clearly specified exactly what the rebels on board the Spacestar stated, and Ikahn became infuriated over the fact that he had been duped into leading an expedition of destruction eventuating in eliminating the consciousness of God from the population on Earth.

Ikahn called all the people of the Spacestar together and confessed this information. They voted to join the rebels. As a result, the Rothfellers on Earth informed Ikahn that they would hunt down the valuable Spacestar and execute all of the rebels.

The Spacestar fights many battles with Earth's fleet, pirates, and experiences space storms. Many are wounded, and others die. Eventually they are forced to land on the planet Sorr, ruled by Queen Johnay, that is completely operated by machines powered by energy from the "black Moons". The light from planet Sorr is such that it encompasses everything in darkness, and it does not lend itself to light

Exh.5

3

5

1:Roman Empire Inc. To:Sophia Stewart (17022423506)

accurate interstellar navigation unless a space vehicle is within at least one million miles of its atmosphere. Although Queen Johnay agrees to help Ikan with repairs and medical attention for the many wounded people, she informs Rothfellers on Earth about the arrival of the Spacestar.

Queen Johnay is gorgeous, and possesses the unique capability of changing the color of her skin to reflect her inner emotions. Unfortunately for Queen Johnay, she comes into intimate contact with Ikahn's growing spirituality, that penetrates her machine-conditioned consciousness; she falls in love with Ikahn. At the last minute Johnay helps Ikahn and his people to escape from Sorr, avoid the oncoming war fleet from Earth. Ikahn escapes, but the Rothfellers soldiers capture and hold Johnay as a hostage for her deceit.

Ikahn moves to the planet Cove III that contains the THIRD EYE, and takes up orbit around it. By this time he has been informed that his physical strength and spirituality enables him to stand before the THIRD EYE. But, he will die from that experience if he contains any amount of Spiritual Impurity. Additionally, it is discovered that the test for Spiritual Impurity is DEATH. In other words, the people on the Spacestar are informed that they must all want Ikahn to possess powers of the THIRD EYE, but all of them must first die as a testament for their belief in Ikahn's Spiritual Purity.

The people on Spacestar decide to die for Ikahn, and they descend to the plains on planet Cove III. As they

Exh. C

4

6

Roman Empire Inc. To:Sophia Stewart (17022426606)

stand in the open, the surrounding heavens blaze with fire, lightning, thunderous roars, and other phenomenon. All of the people die and Ikahn is left standing--but he is blind. He turns and walks among the bodies of his fallen comrades experiencing humbling emotions. He yells out that he doesn't want the power of the THIRD EYE at a cost so great. Slowly the clothing on his body disintegrates and he is naked on the plains of Cove.III. The sound of "OM" emanates from the heavens. He yells out that he wants to die to resurrect the people, but there is no way available for him to kill himself. He falls to his knees, saying: "Oh God, let thy will be done."

The CAMERA PANS the plains of Cove III showing that Ikahn is alone on the grassy emptiness. Slowly the CAMERA moves in for a MEDIUM CLOSE SHOT of Ikahn who is now standing and each one of the people walks out of Ikahn's body. When the plains of Cove III are again full of the people who are happily facing the blind Ikahn, he is surrounded by magnificent auras of lights that slowly form into two golden beams emanating from his closed eyes. Ikahn slowly opens his eyes and perceives the people who appear before him as all the races on Earth, other planets and stars.. It is a multitude of the universe that walked out of him. They are all naked, and without shame.

They decide to go back to Earth in their Spiritual Form with full knowledge that they must defeat armies of evil!

5

Exh. 7

7

1:Roman Empire Inc. To:Sophia Stewart (17022425806)

the Rothfellers in space and on land.

The followers of Ikahn board the Spacestar and fight their way into Earth orbit. The descend to Earth amid cheers of the multitudes now affected by powers of the THIRD EYE within Ikahn.

The Rothfellers are defeated, and "peace" is proclaimed.

Exh. 8



THIRD EYE

by

Sofia Stewart

"He entered Earth's atmosphere in a
flash of brilliant light;"
"After the energy, he lies naked
and still.."

-The Third Eye
By
Sophia Stewart

May 1981
Los Angeles, California

Case 2:13-cv-04265-MMM-E Document 3-1 Filed 12/11/18 Page 117 of 207

THIRD EYE

by

Sofia Stewart

"The year 2110 A.D. brought many great
changes on Earth. Mankind just finished
experienced the last of the Atomic Age,
when evolution of awareness began; and man
was going from the unconscious stages of
evolutionary development in to the
conscious levels of it. There was no doubt
earth would be destroyed."

—"The Third Eye"
By
Sophia Stewart

May 1981
Los Angeles, California



Case 2:12-cv-02465-GMN-E DWr Document 3-1  Filed 11/1/18 Page 118 of 207



THIRD EYE

by

Sofia Stewart

"The proposed science fiction film
deals with Earth during the year 2110
A.D. By that time planet Earth had
experienced horrible nuclear wars..."
"The 22nd Century will be a time in
which Earth will have experienced many
computerized nuclear wars, and for the
first time in history, the people of
earth will feel the ultimate nuclear
war that will bring universal death."

-The Third Eye Movie Treatment
By Sophia Stewart

May 1981
Los Angeles, California

Case 2:12-cv-02663-GW-E Document 3-1 Filed 11/21/08 Page 119 of 207

| Protected Literary Work<br>Sophia Stewart – "The Third Eye" | The Infringing Work<br>"The Matrix I-III" |
|---|---|
| I-Kahn (The One) | Neo, "One", an Anagram for One. |
| X-sers<br>(young, 200 lbs., muscular, abilities) | Tank<br>(Same characteristics) |
| Kev<br>(young, muscular, 230 lbs.) | Apoc<br>(Same characteristics) |
| Old Gypsy Hag | Oracle |
| (prophet) | (Same) |
| Vashta<br>(45 yrs, 6'0", 170 lbs. strong character, wise,advisor, participate when called upon) | Morpheus<br>(Same – verbatim) |
| Trifina<br>5'7", 120 lbs., pure heart, playing always symbolic majority part in the background, awareness of all that takes places, like an angel) | Trinity<br>(Same-verbatim) |
| Awn<br>(Passive in nature, goes along to to a certain extent with what is decided, betrayer; keeps to himself, no abilities | Cyper<br>(Same) |
| Trev<br>(Slender, warm hearted, well loved, 20 yrs old, youthful factors, moral support to Neo characters and the rest) | Mouse<br>(Same) |
| Zonia<br>(nondescript lady, no major part) | Switch |
| 3 Levels of Authority that became same men. | 3 Agents Levels that the became the same men. |
| Dome Hidden city above Earth | Zion Hidden city below |
| (Hidden city above ground) | (Hidden city above ground) |
| Spacestar Ship<br>(highly computerized futuristic ship) | Nebchadnzzar Ship<br>(highly computerized futuristic ship) |

192

EXH 27

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 121 of 143

| | |
|---|---|
| Advanced computers (alien being different composition, not human) | Advanced computers (created by computers not human) |
| Guardian Eyes Logos Guardian human eye logos | Sentinel Eyes Logos Sentinel human eye logos |
| Rebels | Rebels |
| (Rebels band knows the truth) | (Rebels band knows the truth) |
| Planet with machines (planet with computers and computer networks, planet ruled by them) | Planet with machines (planet with computers and computer networks, planet ruled by them) |
| Epic – Evolution of Consciousness | Epic – Evolution of Consciousness |
| (Birth and evolution of consciousness is the theme of the story) | (Birth and evolution of consciousness is the theme of the story) |
| Narrative | Narrative |
| Ending | Ending |
| (Perpetual existence) | (Perpetual existence) |
| Begin again | Begin again |
| Good people walked out of I-Khan | Good people walked out of I-Khan |
| (transnormal effect of entry and exit from body) | (transnormal effect of entry and exit from body) |
| I-khan is blind | Neo is blind |
| (Character ascends to power after incurring blindness) | (Character ascends to power after incurring blindness) |
| Golden beams emanate from his eyes; ascends to power after incurring blindness | Golden beams emanate from his eyes; ascends to power after incurring blindness |
| Girl is captured & held hostage | Morpheus is captured & held hostage |

EXH 28

| | |
|---|---|
| (Character captured, held hostage for portrayal) | (character captured, held hostage for portrayal) |
| Rebels (ships) die as treatment (rebels on ship die in testament and belief that I-khan is the one) | Rebels (ships) dies as treatment (rebels on ship die in testament and belief that Neo is the one) |
| I-khan human side dies (reborn) | Neo human side dies (reborn) |
| (Reborn without corruption) | (reborn without corruption) |
| I-khan is foretold as the one (Prophecy foretold character as the one) | Neo is foretold as the one (prophecy foretold character as the one) |
| Plot introduction year 2110 A.D. (time frame) | Plot introduction (time frame) |
| I-khan spiritual happening (hallucinatory) | Neo spiritual happening (hallucinatory) |
| Awakening, self recognition to his purpose | Awakening, self recognition to his purpose |
| Rebels (ship) knew he was the one (rebel band recognized I-khan was the one and pointed him out to each other) | Rebels (ship) knew Neo (rebel band recognized Neo.) |
| Hunting for the ship to kill rebels (government sent sentinels to hunt down and kill rebel band) | Sentinels were doing the same (government sent sentinels to kill rebel band |
| Special effects | Special effects |
| I-khan and rebel band send forth optical projections of images of themselves to engage in battle | Neo and rebel band send forth optical projections of images of themselves to engage in battle |
| Programmed the mind-computerized warfare – to teach (programmed the mind for computerized warfare and combat) | Programmed the mind (same) programmed the mind for computerized warfare and combat) |
| In space I-khan develops his alien side and inherits special powers) | In space Neo develops his alien side and inherits special powers) |

194

EXH 29

| **Protected Literary Work** <br> **Sophia Stewart – "The Third Eye"** | **The Infringing Work** <br> **"The Terminator I-III"** |
|---|---|
| Quote: "We will be back" | Quote: "I'll be back" |
| Identical plot | Identical plot |
| Identical characters | Identical characters |
| Identical settings | Identical settings |
| Spans past, present, and future | Spans past, present, and future |
| Iceus | Sara Connors |
| (Mother expecting child destined to destroy computers in the future) | (Mother expecting child destined to destroy computers in the future) |

195

EXH 30



## The Third EyeAnimatrix Fraudulent

## Procurement



## The Terminator FraudDerivativeAnimatrix Fraud



## Animatrix Derivative



http://www.youtube.com/watch?v=iieuwaHJ9us&wide=1

**The Third Eye pg. 19**          Animatrix Fraudulent Procurement




**The Third Eye, pg 40**      Animatrix Fraudulent Procurement





The Third Eye, pg 38          Animatrix Fraudulent Procurement




The Third Eye, pg. 48

AnimatrixFraudulent Procurement




Animatrix Fraudulent Procurement



Animatrix Fraudulent Procurement



## III. Recommended Findings of Fact and Conclusions of Law

### A. Facts

The Court accepts as true the following allegations in Ms. Stewart's Amended Complaint (Am. Compl., ECF No. 2):

Ms. Stewart, a science fiction screenwriter, sent screen treatments and other creative materials to film production companies and film producers and writers in the 1980s. Ms. Stewart owns the registered copyright for these works under the name "The Third Eye" or "Third Eye." In 2003, Ms. Stewart, acting pro se, sued a number of film studios and producers ("the California defendants") alleging the films in the TERMINATOR and MATRIX trilogies infringed her copyrighted works. *Stewart v. Wachowski*, No. CV 03-2873 MMM (VBKx) (C.D. Cal. 2003). That case ("the California action") asserted claims for copyright infringement and declaratory relief in addition to claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act").

Sometime around July 2004, Jonathan Lubell contacted Ms. Stewart at her home in Utah to offer his services as an attorney with respect to the California action. Mr. Lubell spoke with Ms. Stewart over the phone from her home in Utah and sent a written fee agreement to Ms. Stewart's home in Utah, where she executed the agreement and paid a retainer fee. Mr. Lubell held himself out as an expert and stated he would assemble a competent legal team to assist with the case—representations upon which Ms. Stewart relied. Gary Brown and Dean Webb thereafter joined Ms. Stewart's California-action legal team. Mr. Lubell, Gary Brown, and Dean Webb drafted Ms. Stewart's first amended complaint in that action. Dean Webb withdrew as Ms. Stewart's counsel in January 2005, and Michael Stoller joined Ms. Stewart's legal team three months later.

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 129 of 207
Case 2:18-cv-02351-JAD-GWF Document 3-1 Filed 12/12/18 Page 129 of 207

CLOSED,LODGE_DOC

## US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:07-cv-00552-DB

Stewart v. Stoller et al
Assigned to: Judge Dee Benson
Cause: 28:1332 Diversity-Other Contract

Date Filed: 07/30/2007
Date Terminated: 09/29/2014
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Sophia Stewart**                represented by **Sophia Stewart**
PO BOX 31725
LAS VEGAS, NV 89173
(702)501-5900
Email:
PRO SE

**Edward W. McBride , Jr.**
VIAL FOTHERINGHAM LLP
602 E 300 S
SALT LAKE CITY, UT 84102
(801)355-9594
Email: ted.mcbride@vf-law.com
*TERMINATED: 12/07/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph G. Pia**
PIA ANDERSON DORIUS
REYNARD & MOSS
222 S MAIN ST STE 1830
SALT LAKE CITY, UT 84101
(801)961-1300
Email: joe.pia@padrm.com
*TERMINATED: 06/01/2010*
*LEAD ATTORNEY*

**Arthur T. Van Wagenen**
10442 S SILVER MTN DR
SANDY, UT 84094
(801)637-4207

Email: arthurvanwagenen@yahoo.com
*TERMINATED: 06/01/2010*
*ATTORNEY TO BE NOTICED*

**Kevin P. Moriarty**
MCBRIDE & MORIARTY PLLC
2319 S FOOTHILL DR STE 220
SALT LAKE CITY, UT 84109
(801)531-1030
Email: kpmaccount9@live.com
*TERMINATED: 02/12/2009*
*PRO HAC VICE*

V.

**Defendant**

**Michael T. Stoller**                          represented by **Michael T. Stoller**
*TERMINATED: 02/14/2014*                                    5747 HOBACK GLEN RD
                                                            HIDDEN HILLS, CA 91302
                                                            (818)226-4040
                                                            Email:
                                                            michael.stoller@stollerlawgroup.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Jonathan Lubell**                             represented by **Jonathan Lubell**
                                                            207 PELICAN PL
                                                            ST SIMOND ISLAND, GA 31522
                                                            (912)638-2332
                                                            Email:
                                                            PRO SE

**Defendant**

**Gary S. Brown**                               represented by **Gary S. Brown**
*TERMINATED: 06/18/2013*                                    1 S FAIR OAKS AVE STE 301
                                                            PASADENA, CA 91105-1945
                                                            (818)293-0979
                                                            Email: garysbrown@ca.rr.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Dean Webb**                                   represented by **Kathleen M. Liuzzi**
*TERMINATED: 06/30/2011*                                    DUNN & DUNN PC

                                            2455 PARLEYS WY STE 340
                                            SALT LAKE CITY, UT 84109
                                            (801)521-6677
                                            Email: kljuzzi@dunndunn.com
                                            *LEAD ATTORNEY*

**Interested Party**

**Warner Bros Entertainment**          represented by **P. Matthew Cox**
                                            SNOW CHRISTENSEN &
                                            MARTINEAU
                                            10 EXCHANGE PLACE 11TH FLOOR
                                            PO BOX 45000
                                            SALT LAKE CITY, UT 84145-5000
                                            (801)521-9000
                                            Email: pmc@scmlaw.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Andy Wachowski**                     represented by **P. Matthew Cox**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Larry Wachowski**                    represented by **P. Matthew Cox**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Thea Bloom**                         represented by **P. Matthew Cox**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Joel Silver**                        represented by **P. Matthew Cox**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Interested Party**

**Twentieth Century Fox Film**         represented by **P. Matthew Cox**
**Corporation**                             (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**James Cameron**         represented by   **P. Matthew Cox**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Interested Party**

**Gale Anne Hurd**         represented by   **P. Matthew Cox**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2007 | 1 | COMPLAINT against Michael T. Stoller, Jonathan Lubell, Gary Brown (Filing fee $ 350, receipt number 4681019135), filed by Sophia Stewart. Assigned to Judge Dale A. Kimball (jtj) (Entered: 07/30/2007) |
| 08/01/2007 | 2 | AMENDED COMPLAINT *First* against all defendants with Jury Demand., filed by Sophia Stewart.(McBride, Edward) (Entered: 08/01/2007) |
| 11/26/2007 | 3 | Ex Parte (Not Sealed) MOTION for Extension of Time Time to Serve Process filed by Plaintiff Sophia Stewart. (Attachments: # 1 Memorandum# 2 Affirmation# 3 Text of Proposed Order)(McBride, Edward) (Entered: 11/26/2007) |
| 11/26/2007 | 4 | AFFIDAVIT OF SERVICE for Summons and Complaint served on Dean Browning Webb on November 14, 2007, filed by Plaintiff Sophia Stewart. (McBride, Edward) Modified on 11/27/2007: note that summons was not properly issued by the Clerk's Office (alt) (Entered: 11/26/2007) |
| 11/28/2007 | 5 | Ex Parte (Not Sealed) MOTION for Extension of Time to Serve Process filed by Plaintiff Sophia Stewart. (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 6 | MEMORANDUM in Support re 5 Ex Parte (Not Sealed) MOTION for Extension of Time to Serve Process filed by Plaintiff Sophia Stewart. (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 7 | NOTICE of Affirmation by Sophia Stewart (McBride, Edward) (Entered: 11/28/2007) |
| 11/28/2007 | 8 | ORDER finding as moot 3 Motion for Extension of Time; granting 5 Motion for Extension of Time. Plaintiff's time to serve process on Defendants is extended by 60 days. Signed by Judge Dale A. Kimball on 11/27/2007. (rlr) (Entered: 11/29/2007) |



Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 134 of 207
Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 134 of 143

THE MAKING OF THE THIRD EYE

(the Past to the Present)

Pseudo . . . . . . . . . . . . . . . . By Zenia Kavalas

\*

FIRST PART . . . . . . . . . . . . May 1, 1981

SECOND PART  . . . . . . . . . . . August 10, 1982

THIRD PART   . . . . . . . . . . . June 28, 1983

FINAL  . . . . . . . . . . . . . . October 1, 1983

280 Pages

9 Chapters

40 Pages or less to
   each chapter

FOREWARD

PREFACE

INTRODUCTION

CONTENTS

ILLUSTRATIONS

BRIEF CHAPTERS:  I, II, III, IV, V
COMBINATION OF LAST SIX CHAPTERS WITH CONCLUSION

12/10/2018　　Case 2:18-cv-02351-GM... Yahoo Mail - Fwd: "Terminator Is Actually A Drama" / Wall Street Journal ... 135 of 207

Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 135 of 143

Fwd: "Terminator Is Actually A Drama" - Wall Street Journal

From: Sophia Stewart (sophiastewart10@yahoo.com)

To: sophiastewart10@yahoo.com

Date: Monday, December 10, 2018, 3:11 PM PST

## "Terminator Is Actually a Drama"

**Wall Street Journal, February 4th 2010**

http://blogs.wsj.com/bankruptcy/2010/02/04/terminator-is-actually-a-drama/tab/article/

**In Reference to Cameron's entertainment lawyer Burt Field's comment, "...that all of the pictures that he [Cameron] created are totally his own, original work," and that, "He [Cameron] hasn't taken anything from anybody, including her [Stewart]", we respectfully submit the following:**

1 Minute and 45 Seconds - AVATAR & ATAVISM? - Poul Anderson's (1978) "The Avatar" on Amazon.com - Does Copyright Law Care If James Cameron's Avatar Ripped Off Parts Of "Call Me Joe"? - Cameron's AVATAR & STARGATE SG-1

**California Judge Margaret M. Morrow has already been informed about the "1 Minute and 45 Seconds" and the Articles of Incorporation that were hidden from the court. According to court transcripts, Judge Morrow told Warner Brothers Attorney Bruce Isaac**

that she "could not grant him Summary Judgment" in light of "Substantial Similarity" to Stewart's protected literary work. Subsequently, no Evidence was ever entered into Discovery on behalf of Stewart and Judge Morrow ruled on fraudulent admissions entered into the court system by Bruce Isaac and David Boren. Therefore, no legal basis for summary judgment ever existed.

When you see this brief discussion, you will see an example of what can happen to a person that has a correct legal position when artful techniques are used to mislead a federal judicial official. Notwithstanding the fact that the first minute and 45 seconds of the film read exactly on the copyright of the writer, and the person that claimed ownership of the remainder did not claim to own that portion of the film, and the matter was in evidence through her copyright and her opponent claimed to have started the company when she had no story on the same day she referred to in the film, May 12th, every aspect of the representatives for the defendants failed to disclose this matter to the federal judge in a proper context. Then the defendant used that material misrepresentation to achieve summary judgment under rule 56 which should have been impossible when the true creator had the first copyright and film dialogue

that read on her work that the so-called owners did not claim in their copyright submission. This is a story that has intrigue, betrayal, misconduct, abuse of the legal system, and a curious inability to perceive the harm to the original creator, Sophia Stewart.

The matter that makes their position indefensible is that Hurd and Cameron planned and implemented a strategy to use false facts to the United States Government, and got away with it. Then the Wachowski's made the same plan and got caught. When they were caught, the connection between the Third Eye and the Terminator did not stop them. Their conspiracy counted on the fact that the United States would not stop a fraud done on their agents. That is a troubling observation. After that, both Cameron and Hurd gave a false affidavits to the Federal Court. It did not stop them.

Both "Terminator 4" and "The Sarah Conner Chronicles" TV Series are new claims being cited after the adjudication of the 2003 California Civil Case.

Best,

www.truthaboutmatrix.com

_____

Attached for your review are Liens and other Documents pursuant to this matter.

1. Sophia Stewart's 1981 & 1983 Federal Copyright Txu 117-610 can be seen in <u>attachment - "Articles of Incorporation..." exhibit 1.</u>

2. Sophia Stewart's 1981 & 1983 copywritten movie treatment can be seen in <u>attachment - "Articles of Incorporation..." exhibits 2 thru 8.</u>

3. Sophia Stewart's 1984 copywritten Manuscript Txu 154-281 can be seen in <u>attachment - "Articles of Incorporation..." exhibit 9</u>.

4. 20th Century Fox Vice President of Creative Affairs Susan Merzbach <u>06/01/1981</u> letter of access as seen in <u>attachment – "Articles of Incorporation..." exhibit 12.3.</u>

5. Sophia Stewart's affidavit to the Bankruptcy Court can be seen in <u>attachment - "Sophia Stewart Affidavit 2010 bank".</u>

6. Sophia Stewart's Adversarial Civil RICO Complaint can be seen in <u>attachment - "Sophia Stewart vs. Cameron & Hurd".</u>

7. James Cameron, Gale Anne Hurd, Pacific Western & Hemdale Film's 1984 assignment movie treatment can be seen in <u>attachment - "Articles of Incorporation..." exhibits 11 thru 12.2. Invalid copyright – theft of Harlan Ellison work</u>

8. The <u>MAY 12TH</u> Articles of Incorporation for Pacific

**Western & Hemdale Film's can be seen in <u>attachment - "Articles of Incorporation..." exhibits 13 thru 14.5.</u>**

**9. Warner Brothers & the Wachowski's 1998 assigment one-page "The Matrix" & assignments to Warner Brothers can be seen in <u>attachment - "Articles of Incorporation..." exhibits 15 thru 20.</u>**

**10. Lubell's confession to have prepared Stewart's admission "without the substantive assistance of anyone else" can be seen in <u>attachment - "UTAHCOURT CASE 2009-1 exhibit 240 & 241 Lubell Confession.pdf"</u>**

**Please review all information carefully.**

---

## §18 U.S.C. 4

WHOEVER, HAVING KNOWLEDGE OF THE ACTUAL COMMISSION OF A FELONY COGNIZABLE BY A COURT OF THE UNITED STATES, CONCEALS AND DOES NOT AS SOON AS POSSIBLE MAKE KNOWN THE SAME TO SOME JUDGE OR OTHER PERSON IN CIVIL OR MILITARY AUTHORITY UNDER THE UNITED STATES, SHALL BE FINED UNDER THIS TITLE OR IMPRISONED NOT MORE THAN THREE YEARS, OR BOTH.

## §18 U.S.C. 3

WHOEVER, KNOWING THAT AN OFFENSE AGAINST THE UNITED STATES HAS BEEN COMMITTED, RECEIVES, RELIEVES, COMFORTS OR ASSISTS THE OFFENDER IN

ORDER TO HINDER OR PREVENT
HIS APPREHENSION, TRIAL OR
PUNISHMENT, IS AN ACCESSORY
AFTER THE FACT.

# 1 MINUTE AND 45 SECONDS - HIDDEN IN PLAIN SIGHT A DOCUMENTARY ON COPYRIGHT INFRINGEMENT

**Part I:**
http://www.youtube.com/watch?v=NUY6E-ByYVs
**Part II:**
http://www.youtube.com/watch?v=RLyJuMWttE4
**Part III:**
http://www.youtube.com/watch?v=AH8viFxZLy4

-A Hovercraft of immense proportions enters the scene with the most advanced computer oriented laser guided weapons known to the post nuclear world.

-A man pops up from nowhere and begins to run as his friend hopes that he make it.
-Still, with precision, the computer generated robot focuses, aims, and disperses his atom relationships so as to mystify his very existence.

-Terminator open with a post nuclear darkened war scene canvassed by robots controlled through computer chips with laser-guided weapons in or about 2010 to 2030 A.D.

-What's critical to understand here, is that this 1 minute and 45 second description of a nuclear war in Terminator do not appear anywhere in the script written by James Cameron and Gale Anne Hurd.

-Yet, the words and the "post nuclear war" comes verbatim from Sophia Stewart's the Third Eye.

**"The proposed science fiction film deals with Earth during the year 2110 A.D. By that time planet Earth had experienced horrible nuclear wars..." "The 22nd Century will be a time in which Earth will have experienced many computerized nuclear wars, and for the first time in history, the people of earth will feel the ultimate nuclear war that will bring universal death."**
**-The Third Eye Movie Treatment by Sophia Stewart**

"This willful failure to disclose Stewart's contribution makes Cameron's and Hurd's copyright registration invalid…for willfully failing to reveal that the substantial contributing author was omitted with the intent to deny her royalties in the project."

**"The year 2110 A.D. brought many great changes on Earth. Mankind just finished experienced the last of the Atomic Age, when evolution of awareness began; and man was going from the unconscious stages of evolutionary development in to the conscious levels of it. There was no doubt earth would be destroyed."**

–Quotations from "The Third Eye"
by Sophia Stewart

"Yet, on a reading of Stewart's "Third Eye as copyrighted 81', 83' and 84', it is undeniable that the first 1 minute and 45 seconds of Terminator came from that discussion and that it is totally excluded from the copyright submission of Cameron and Hurd to the Copyright Office."

**"He entered Earth's atmosphere in a flash of brilliant light;"**
**"After the energy, he lies naked and still..."**
–The Third Eye by Sophia Stewart

"The technique of taking the script and sending it through a "chop shop" so that many of its features are changed while unpublished and then bringing it forth as a published work is described as infringement in Dezendorf v. Twentieth Century Fox. Yet, it is plainly present in the movie. This is evidence that Gale Anne Hurd had consciousness of the wrongfulness of this activity and did not want it to be said that she wrote exactly what was written in Stewart's treatment. **[TXU 117-610 COPYRIGHT]** The May 1, 1981 treatment is covered by copyright registration number Txu 117-610 in the name of Sophia Stewart. This is evidence of a theft of the script, knowing unauthorized use of it, and an intent to deny Stewart of her share of the profits associated therewith".

"Kyle Reese: "What day is it? The date!"
Cop in Alley: "12th... May..."

Sophia Stewart completed the six-page treatment of the Third Eye on May 1, 1981. It was forwarded to the Vice President of Creative Affairs of Fox before May 7, 1981. Surprisingly, Gale Anne Hurd, then the public relations and marketing director of New World Productions under Roger Corman (who had never produced a film), started Pacific Western Productions on May 12, 1981.

"Kyle Reese: "What day is it? The date!"
Cop in Alley: "12th... May…"

## - May 12, 1981-

Is it simply coincidence, that Gale Ann Hurd started Pacific Western Productions on the same day Kyle Reese began his search for Sarah Conner? Or, is this the M/O of an Embezzlement of copywritten material? Allegations of "criminal copyright infringement" must be evidenced by: "Access" "Copying" & "Substantial Similarity" to a protected literary work. In relation to Terminator; Ms. Sophia Stewart, former USC Film student, has evidenced all three.

As Recently as December 2009, Twenty-Two year old Samantha Tumpach was taping portions of her sister's surprise party at a local theater and accidentally captured some scenes of the film "New Moon" on her digital camcorder. Although Samantha insisted she was not trying to record the new release on purpose, she was arrested for "criminal use of a motion picture exhibition" - a criminal statue intended to curb piracy by deterring movie watchers from recording movies in

theaters and selling "bootlegged" copies. Initially, Samantha faced up to three years in prison. Fortunately for Tumpach, she only spent two-days in jail following her arrest.

If Law Enforcement protects the rights of Billion dollar corporations, shouldn't Law enforcement also protect the rights of citizens?

While young movie watchers are being jailed for accidentally capturing a few scenes of a film; the Stewart case is shining the light on white collar crime sweeping America. Stewart uncovered a white collar theft of her protected literary work, its embezzlement and how that was used as a means to conceal the crime and escape punishment.

What's critical to remember, is that the 1:45 description of a nuclear war in Terminator do not appear ANYWHERE in the script written by James Cameron and Gale Anne Hurd. No "post nuclear war" was revealed in any draft done by James Cameron including the draft from June of 1982. Without any "post nuclear war" revealed by Cameron's scripts, why does a Terminator travel through time to kill Sarah Conner? And what does Kyle Reese have to protect Sarah Conner from? Nevertheless, the words, "nuclear war" and the element of "time travel" come verbatim from Sophia Stewart's copywritten material - The Third Eye.

The act of trying to conceal unauthorized use of someone's

protected literary work, "hidden in plain sight" of a newly released film, is the weakest link in the chain of criminal copyright infringement. **[Terminator & Reese]** To be caught with copywritten "source material" that bears no resemblance to the film or movie it is based upon, is to catch a thief with a smoking gun. **[James Cameron T2]**

Once again, it's for good reason that thieves don't register stolen property without changing the appearance of what was stolen. These "changes" and "alterations" are premeditated measures used to escape detection and consequence. Likewise, this pattern of theft is consistent with child kidnappers who are known by law enforcement to shave the heads or otherwise "alter" the appearance of children they abduct. Nevertheless, a mother will always recognize her baby. **[Stewart Quote]**

**"If someone steals your car and puts it through a chop shop, (where the crooks add or take away from it) trying to make it their own, is it still your car? Do you go out and buy another car to prove yours was stolen?" –Sophia Stewart, Legal Owner of the Matrix & the Terminator**

# AN EMBEZZLEMENT OF COPYWRITEN MATERIAL

Fwd: Skydance Media And Tencent Pictures Co-Financing Tim Miller's New TERMINATOR Film; Arnold Schwarzenegger and Linda Hamilton To Star With James Cameron Producing - We Are Movie Geeks

From:   Sophia Stewart (sophiastewart10@yahoo.com)

To:     sophiastewart10@yahoo.com

Date:   Monday, December 10, 2018, 12:16 PM PST

# Skydance Media And Tencent Pictures Co-Financing Tim Miller's New TERMINATOR Film; Arnold Schwarzenegger and Linda Hamilton To Star With James Cameron Producing

<u>Michelle Hannett</u>    April 23, 2018



Skydance Media, LLC ("Skydance") and Tencent Pictures, the film and television arm of Chinese Internet giant Tencent Holdings Limited ("Tencent"), announced today that Tencent will co-finance as a global partner the upcoming Terminator film directed by Tim Miller and produced by James Cameron and David Ellison. Under the pact, Tencent will also handle the distribution, marketing

and merchandising of the film in China. This is the first collaboration between the two companies since they entered into a partnership, with Tencent making a strategic investment in Skydance Media.

"We are thrilled Terminator will be our first collaboration with Tencent, and we believe that partnering this early in the process, prior to production, will allow both companies to fully maximize the opportunity," said Jesse Sisgold, Skydance Media President & COO. "This franchise is hugely popular with Chinese audiences and will greatly benefit from the massive reach and valuable know-how Tencent has in marketing, distribution, games, and more."

"We are truly excited to be partnering with Skydance on the newest chapter of this iconic franchise. With Skydance's savvy production expertise and impeccable taste in talent, along with Tencent's tremendous marketing and distribution capabilities in China, we believe the success of Terminator will serve as a benchmark for future collaborations," said Edward Cheng, Vice President of Tencent and CEO of Tencent Pictures.

**The upcoming Terminator movie will be a direct sequel to Cameron's Terminator 2: Judgment Day starring Arnold Schwarzenegger and Linda Hamilton, both reprising their iconic roles as "The Terminator" and "Sarah Connor" from the first two Terminator films. The new story will introduce the next generation of characters played by rising stars Mackenzie Davis (Blade Runner 2049, "Halt and Catch Fire"), Natalia Reyes ("Lady, La Vendedora de Rosas"), Diego Boneta ("Scream Queens," Rock of Ages), and Gabriel Luna ("Marvel's Agents of S.H.I.E.L.D.") Specific details on the characters are being kept under wraps.**

Paramount Pictures and 20th Century Fox are also co-financing the film, which is scheduled for U.S. release the Friday before Thanksgiving on November 22, 2019. The movie will be distributed domestically by Paramount Pictures and internationally (excluding China) by 20th Century Fox.



Case 2:18-cv-02351-JAD-GWF Document 1 Filed 12/11/18 Page 149 of 149

# Fwd: The Terminator 2019 Unveiled by Skydance and Tencent | TheTerminatorFans.com

From: Sophia Stewart (sophiastewart10@yahoo.com)

To: sophiastewart10@yahoo.com

Date: Monday, December 10, 2018, 3:33 PM PST

# The Terminator 2019 Unveiled by Skydance and Tencent



By: TheTerminatorFans.com On April 23rd, 2018

It was pretty obvious when Skydance sold shares to Tencent that the China internet/tech giant would be buying into "Terminator (2019)". The business move seems like a "play-safe" move after the success of Terminator Genisys. As Hollywood backs away from China investment; Skydance strengthens their relationship.

Tencent officially announces:

Case 2:18-cv-02391-JAD-GWF Document 1-1 Filed 12/11/18 Page 150 of 207

Achieved strategic cooperation with Skydance Media. The first part of the new movie "Terminator"

Tencent Pictures will conduct extensive and in-depth cooperation with Skydance Media in the areas of film, IP adaptation, and VR. The first collaborative film is the first of the new "Terminator" trilogy, produced by James Cameron and David Ellison, directed by Tim Miller, starring Arnold Schwarzenegger and Linda Hamilton. . Tencent will participate in the investment and production of this film, and will be responsible for the declaration and derivative products in mainland China. The movie is expected to be turned on this summer and will be released in North America in November 2019.

Skydance Media CEO David Ellison attended the conference and started strategic cooperation with Cheng Wu.



External reports continue talk about the co-operation between Tencent and Skydance…

Arnold Schwarzenegger will make a return to the big screen next year in the first instalment of a new *Terminator* trilogy backed by Tencent Pictures.

The entertainment arm of the Shenzhen-based internet giant will work with US production firm Skydance Media to revive the *Terminator* movie franchise, according to Tencent Pictures CEO Cheng Wu.

Tencent invested in Skydance earlier this year for an undisclosed sum, and as part of the arrangement will co-finance movies, TV shows and video game projects while lending their expertise to each other in their respective countries.

Case 2:18-cv-02391-JAD-GWF   Document 1-1   Filed 12/11/18   Page 2 of 98

An event shows a title unveiling of **The Terminator 2019** but in published (yet translated) wording,- calls it Terminator (2019). Is it possible China, who has never has a theatrical release of the first movie, will get The Terminator (2019) and the rest of us will get Terminator (2019) OR is the world getting a semi-remake of the first movie titled The Terminator 2019 which will be a sequel to the second Terminator movie; Terminator 2: Judgment Day… ?

> **Tencent Pictures announced that it had initiated strategic cooperation with Skydance Media and reactivated Terminator with Skydance Media.**
>
> **The first of the new "Terminator" trilogy is "Terminator 2019". James Cameron is the producer. The starring Schwarzenegger and Linda Hamilton will return.**
>
> **The film will be filmed in May of this year and will be released in 2019.**



The event announces the keyplayers…



Case 2:18-cv-02391-JAD-GWF Document 1-1 Filed 12/11/18 Page 3 of 98

Tim Miller will be directing Terminator (2019) but what is pretty funny is his previous R Rated movie Deadpool was BANNED in China and Deadpool was hardly serious and brutal as an R Rated movie might be (if you exclude the strap on and unnecessary OTT sex scenes that obviously boosted the R Rating).
We know that China investment includes certain demands like cultural references (even if scenes are just filmed for China), casting or even toning down violence.

> **China's tech giants are engaged in intense competition to acquire and create content, whether movies, TV dramas or games, to attract and retain users across their various platforms.**
>
> **At stake is the world's largest internet market with almost 800 million users, with the growing number of younger digital-native consumers more willing to spend on content.**

Is a PG-13 rating for the new Terminator movie already set in stone? Is Skydance playing things so safe that potentially it could be dooming the Terminator movie to fail in every market other than China? Could Chinese audiences reveal that the tremendous turnout for Genisys was nothing more than a anomaly that won't be repeated in succession, were they just curious- did they actually enjoy the movie or did they just turn out for Arnold Schwarzenegger?



Case 2:18-cv-02391-JAD-GWF   Document 1-1   Filed 12/11/18   Page 4 of 98

Is Tencent and China going to embrace a real Terminator movie that is R Rated, or will investor demands destroy the movie (like they have destroyed Terminator movies before)?

We want to know the age rating now Skydance- until then we are presuming this is PG-13, as Age Rating holdbacks (which you have already participated in with Genisys once already) definitely point to and suggest it.

When James Cameron described Terminator Genisys as a renaissance, was he talking about the movie, or pushing the Terminator franchise around the China market like his Avatar movies?



How much of a reboot is this?

> **Tencent Pictures announced a strategic cooperation with Skydance Media to restart the "The Ultimate" movie trilogy.**

This claims to be a sequel to Terminator 2 but has the title of the first movie? Confused? Affirmative.

Thanks to Infiltrator for the tip off!

Source:  Gamersky donews and South China Morning Post

**Update – Introduction to a new Generation of Terminator Characters…**

# Official Terminator 2019 Press Release:

> **SANTA MONICA, Calif. & BEIJING–(BUSINESS WIRE)–Skydance Media, LLC ("Skydance"), a diversified media company that creates event-**

Case 2:18-cv-02391-JAD-GWF Document 1-1 Filed 12/11/18 Page 5 of 8

level entertainment for global audiences across multiple platforms, and Tencent Pictures, the film and television arm of Chinese Internet giant Tencent Holdings Limited ("Tencent"), announced today that Tencent will co-finance as a global partner the upcoming *Terminator* film directed by Tim Miller and produced by James Cameron and David Ellison. Under the pact, Tencent will also handle the distribution, marketing and merchandising of the film in China. This is the first collaboration between the two companies since they entered into a partnership, with Tencent making a strategic investment in Skydance Media.

"We are thrilled *Terminator* will be our first collaboration with Tencent, and we believe that partnering this early in the process, prior to production, will allow both companies to fully maximize the opportunity," said Jesse Sisgold, Skydance Media President & COO. "This franchise is hugely popular with Chinese audiences and will greatly benefit from the massive reach and valuable know-how Tencent has in marketing, distribution, games, and more."

"We are truly excited to be partnering with Skydance on the newest chapter of this iconic franchise. With Skydance's savvy production expertise and impeccable taste in talent, along with Tencent's tremendous marketing and distribution capabilities in China, we believe the success of Terminator will serve as a benchmark for future collaborations," said Edward Cheng, Vice President of Tencent and CEO of Tencent Pictures.

The upcoming *Terminator* movie will be a direct sequel to Cameron's *Terminator 2:Judgment Day* starring Arnold Schwarzenegger and Linda Hamilton, both reprising their iconic roles as "The Terminator" and "Sarah Connor" from the first two *Terminator* films. The new story will introduce the next generation of characters played by rising stars Mackenzie Davis (*Blade Runner 2049,* "Halt and Catch Fire"), Natalia Reyes ("Lady, La Vendedora de Rosas"), Diego Boneta ("Scream Queens," *Rock of Ages*), and Gabriel Luna ("Marvel's Agents of S.H.I.E.L.D.") Specific details on the characters are being kept under wraps.

Paramount Pictures and 20th Century Fox are also co-financing the film, which is scheduled for U.S. release the Friday before Thanksgiving on November 22, 2019. The movie will be distributed domestically by Paramount Pictures and internationally (excluding China) by 20th Century Fox.

## About Skydance Media, LLC

Skydance is a diversified media company founded by David Ellison in 2010 to create high quality, event-level entertainment for global audiences across platforms, including feature films, animation, television, gaming and digital. To date, Skydance has produced and financed 15 feature films, which have cumulatively grossed nearly $5 billion in worldwide box office. Skydance TV launched in 2013, creating 8 premium series to date, with current distribution partners that include Apple, Amazon, AMC, DirecTV, Hulu, Netflix, and The Paramount Network. Skydance Interactive is a multifaceted game studio with premier brand games, including *Archangel VR*. In the last four years, the Company has grown from 15 employees in Santa Monica to over 150, with facilities in Santa Monica, Marina Del Rey, Hollywood and Vancouver.

## About Tencent Holdings Limited and Tencent Pictures

Tencent uses technology to enrich the lives of Internet users. Tencent's social products WeChat and QQ link its users to a rich digital content catalogue including games, video, music and books. Its proprietary targeting technology helps advertisers reach out to hundreds of millions of consumers in China. Tencent's infrastructure services including payment, security, cloud and artificial intelligence create differentiated offerings and support its partners' business growth. Tencent invests heavily in people and innovation, enabling the company to evolve with the Internet.

Tencent Pictures, the film and television arm of Chinese Internet giant Tencent Holdings Limited ("Tencent"), has been a key strategic partner on a number of high profile global films such as Universal's *Warcraft*, Warner Bros' *Kong: Skull Island*, and most recently Warner Bros' *Wonder Woman*.



https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=16&ti=1,16&Search_Arg=Terminator%3A%20The%20Sarah%20Connor%20Chronicles&Search_Code=TAL...

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Terminator: The Sarah Connor Chronicles
Search Results: Displaying 16 of 33 entries

◀ previous    next ▶


Labeled View

### TERMINATOR: THE SARAH CONNOR CHRONICLES :

**Type of Work:** Motion Picture
**Registration Number / Date:** PA0001886795 / 2013-06-28
**Application Title:** TERMINATOR: THE SARAH CONNOR CHRONICLES (SERIES) THE TOWER IS TALL BUT THE FALL IS SHORT.
**Title:** TERMINATOR: THE SARAH CONNOR CHRONICLES : 3T7308, THE TOWER IS TALL BUT THE FALL IS SHORT.
**Description:** Videocassette (Betacam SP) ; 1/2 in.
**Copyright Claimant:** Warner Bros. Entertainment Inc., Transfer: By Assignment. Address: 4000 Warner Boulevard, Burbank, California 91522.
**Date of Creation:** 2008
**Date of Publication:** 2008-10-17
**Nation of First Publication:** United States
**Authorship on Application:** Warner Bros. Television, a division of WB Studio Enterprises Inc., employer for hire; Citizenship: United States. Authorship: ENTIRE WORK.
**Pre-existing Material:** Based on characters created by James Cameron and Gale Anne Hurd.
**Basis of Claim:** Motion picture, including audio, visual and other cinematographic material.
**Names:** WB Studio Enterprises Inc.
Warner Bros. Television
Warner Bros. Entertainment Inc.

Case 2:19-cv-02382-JGB-MAD Document 1-1 Filed 12/21/18 Page 156 of 207

# Tencent Buys Stake in Skydance, Production Company Behind 'Terminator'

Tencent takes less than 10% of Skydance, on terms that value production company at about $1.5 billion

*By*
*Ben Fritz*
Jan. 25, 2018 8:14 p.m. ET

Chinese internet giant Tencent Holdings is buying a piece of Skydance Media, the Hollywood company behind "Terminator."

Tencent has sealed a deal giving it a little less than 10% of Skydance, on terms that value the production company at approximately $1.5 billion, said a person with knowledge of the agreement. This person didn't disclose the exact dollar amount of the investment.

# Terminator Genisys

| | |
|---|---|
| Word Mark | TERMINATOR GENISYS |
| Goods and Services | IC 009. US 021 023 026 036 038. G & S: Downloadable files in the field of entertainment, namely, electronic game software, via a global computer network and wireless devices; covers for mobile phones; fitted plastic films known as skins for covering and protecting electronic apparatus, namely, mobile phones, portable music players; cases for mobile phones; laptop carrying cases; mouse pads; video games; downloadable computer game programs; downloadable computer game software via a global computer network and wireless devices; downloadable interactive video game programs and video game software that can be played on handheld electronic game units and/or mobile telephones. downloadable audio and video recordings featuring fictional drama; decorative magnets; downloadable software in the nature of mobile applications for mobile communication devices for use in distribution of digital video, video files, video games, and multimedia content; decorative refrigerator magnets; downloadable mobile applications for electronic games; downloadable mobile applications featuring a digital watch in the field of motion picture films. FIRST USE: 20140600. FIRST USE IN COMMERCE: 20140600 |
| Standard Characters Claimed | |
| Mark Drawing Code | (4) STANDARD CHARACTER MARK |
| Serial Number | 86451417 |
| Filing Date | November 11, 2014 |
| Current Basis | 1A |
| Original Filing Basis | 1B |
| Published for Opposition | August 4, 2015 |
| Registration Number | 5276740 |
| Registration Date | August 29, 2017 |
| Owner | (REGISTRANT) StudioCanal S.A. CORPORATION FRANCE 1 Place du Spectacle, Cedex 9 Issy-Les-Moulineaux FRANCE 92863 |
| Attorney of Record | Robert H. Steinberg, Esq. |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

Trademark Electronic Application System (TEAS) filing receipt

We have received your Response to Office Action Form form below.

To the Commissioner for Trademarks:
Application serial no. **85266836** (THE TERMINATOR) has been amended as follows:

**ARGUMENT(S)**
**In response to the substantive refusal(s), please note the following:**

The registrant's specimens are unacceptable as evidence of actual service mark use because it does not show the mark used in the sale or adverting for any of the services identified in the notice of allowance. All 16 Terminator Marks are fraudulent derivatives of the original mark in commerce. The original mark The Terminator was in use in commerce prior to the dissolutional usage. The registrant must submit a specimen showing the mark as it is used in commerce. Example of acceptable specimens are signs, photographs, brochures or advertisements. The registrant must verify with an affidavit or a declaration under 37 C.F.R. 2.20 , otherwise the offending marks should be cancelled.

**EVIDENCE**
Evidence in the nature of Specimen-2 The Terminator .jpg First use in Commerence : 10/26/1984 37 C.F.R. 2.56 and 2.88(b)(2). A photograph TMEP 1301.04 Verified affidavit under 37 C.F.R. 2.20 37 C.F.R. 2.59(b); TMEP 904.09 . March 14, 2011. has been attached.

**Response Signature**
Signature: / Sophia Stewart/    Date: 11/15/2011
Signatory's Name: Sophia Stewart
Signatory's Position: Owner

The signatory has confirmed that he/she is not represented by either an authorized attorney or Canadian attorney/agent, and that he/she is either (1) the applicant or (2) a person(s) with legal authority to bind the applicant; and if an authorized U.S. attorney or Canadian attorney/agent previously represented him/her in this matter, either he/she has filed a signed revocation of power of attorney with the USPTO or the USPTO has granted the request of his/her prior representative to withdraw.

Thank you,

The TEAS support team
Tue Nov 15 16:15:18 EST 2011

Terminator, The (1984)                                                   Page 1 of 5

Case 2:03-cv-02873-MMM-VBK   Document 1   Filed 04/24/03   Page 62 of 64   Page ID #:62

NextCard Internet Visa - Apply Now

IMDb    › Personalize

Top Movies | Photo Galleries | IMDb Recommends | Browse IMDb | Independent Film

PAGEFLICKER

Search us database for

[All ▼]

[    ] (Go!)

Search Tips

# Company credits for
# Terminator, The (1984)

Page 4 of 34

Overview
- combined details
- full cast and crew
- company credits

Awards & Reviews
- user comments
- external reviews
- newsgroup reviews
- awards & nominations
- user ratings
- recommendations

Plot & Quotes
- plot summary
- plot keywords
- plot summary
- memorable quotes

Fun Stuff
- trivia
- goofs
- soundtrack listing
- alternate versions
- movie connections

Other Info
- merchandising links
- box office & business
- release dates
- filming locations
- technical specs
- laserdisc details
- DVD details
- literature listings
- news reports

Miscellaneous
- languages

## Production Companies

- Cinema 84
- Euro Film Funding
- Hemdale Film Corporation
- Pacific Western

## Distributors

- Artisan Entertainment [us] (Video)
- Home Box Office (HBO) Home Video [us] (video)
- Orion Pictures Corporation [us]
- Thorne EMI (video)
- VCL Communications GmbH [de] (Germany, video)

## Special Effects

- Fantasy II Film Effects
- Stan Winston Studio

## Opticals

- Ray Mercer & Company

## Extras casting

- Christal Blue Casting

## Robots supplied and operated by



AT&T    5:23 PM    60%

Touch to return to call 51:19

wearemoviegeeks.com

## We Are Movie Geeks

"We are thrilled Terminator will be our first collaboration with Tencent, and we believe that partnering this early in the process, prior to production, will allow both companies to fully maximize the opportunity," said Jesse Sisgold, Skydance Media President & COO. "This franchise is hugely popular with Chinese audiences and will greatly benefit from the massive reach and valuable know-how Tencent has in marketing, distribution, games, and more."

"We are truly excited to be partnering with Skydance on the newest chapter of this iconic franchise. With Skydance's savvy production expertise and impeccable taste in talent, along with Tencent's tremendous marketing and distribution capabilities in China, we believe the success of Terminator will serve as a benchmark for future collaborations," said Edward Cheng, Vice President of Tencent and CEO of Tencent Pictures.

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 162 of 207
Case 2:18-cv-02351-JAD-GWF Document 1-1 Filed 12/11/18 Page 15 of 58

Yahoo! Mail - sophiastewart003@yahoo.com                                    Page 1 of 1

# YAHOO! Mail ✉

**From:**    FHFBrown@aol.com

**Date:**    Tue, 26 Oct 2004 00:20:14 EDT

**Subject:**  harlan ellision

**To:**      sophiastewart003@yahoo.com

Another Lawsuit they settled with her,,well well what do we have here.....

Science fiction author Harlan Ellison sued Cameron, claiming that the film was plagiarized from the two "Outer Limits, The" (1963) episodes that Ellison wrote, namely "Soldier" and "Demon With a Glass Hand". The concept of "Skynet" could also have been borrowed from an Ellison short story called "I Have No Mouth and I Must Scream". The suit was settled out of court and newer prints of the film acknowledge Ellison.

Case 2:18-cv-02351-GMN-EJY    Document 3-1    Filed 12/12/18    Page 163 of 207

 **MAIL**                                          Print - Close Window

**From:**    Brownfhf@aol.com

**Date:**    Wed, 22 Dec 2004 19:09:28 EST

**Subject:**    terminator

**To:**    sophiastewart003@yahoo.com

When The Terminator was in the theaters, another blow came from an unexpected quarter: Science fiction writer Harlan Ellison threatened to sue, claiming The Terminator had ripped off two episodes of The Outer Limits that he'd written, "Soldier" and "Demon With a Glass Hand," as well as "I Have No Mouth, and I Must Scream," an award-winning short story. Their plots concerned robots, time travel, altering the past to save humanity from a holocaust, and a future world where "machines are born to kill." Gagged for many years by a secrecy clause, Ellison is now speaking about it for the first time: "He got all my best stuff, but the wonderful thing is, he combined it in a new, fresh, and interesting way.

Sophia]s way this is very important in a court of law especailly if they try to site that htis material was sued for prior and? So that Refreshing way  could it have come from you.

  **MAIL**                                             Print - Close Window

**From:**      FHFBrown@aol.com

**Date:**      Tue, 26 Oct 2004 03:12:25 EDT

**Subject:**   what ever happen to these folks

**To:**        sophiastewart10@yahoo.com

### CAMERON SUED OVER TERMINATOR 2 SCRIPT!
### "T2" scenes stolen from "The Minotaur"?
Reported By: René de Jong
Saturday, April 13, 2002

## Reported by IMDB.com:

*Over 10 years after the movie was released, someone still wants a piece of the Terminator pie. Director James Cameron is being sued for allegedly stealing ideas for his hit sci-fi sequel Terminator 2. An Australian couple claim the Oscar-winning director owes them damages and credits on the 1991 movie, alleging he stole from a script for a proposed movie sent to Hollywood producers in 1987.*

*Filia and Constantinos Kourtis have filed a suit in America's federal court which alleges the Arnold Schwarzenegger flick borrows heavily from a script for a proposed movie called **The Minotaur** which was touted around Hollywood. Mr. Kourtis says Cameron called him while he was in Los Angeles in 1989 and told him he "loved the project" and said his agent would be calling him "soon." The pair were then shocked to see echoes of the script in Terminator 2 as well as earlier Cameron flick The Abyss.*

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 165 of 207
Case 2:18-cv-02351-JAD-GWF Document 1-1 Filed 12/12/18 Page 16 of 58

Case 2:03-cv-02873-MMM-VBK Document 1 Filed 04/24/03 Page 52 of 64 Page ID #:52

The Matrix                                                              Page 3 of 4

 see it for yourself. - (281 kb)



THE CAST OF THE MATRIX

| | | |
|---|---|---|
| NEO<br>Keanu Reeves | MORPHEUS<br>Laurence Fishburne | TRINITY<br>Carrie-Anne Moss |
| AGENT SMITH<br>Hugo Weaving | TANK<br>Marcus Chong | CYPHER<br>Joe Pantoliano |
| SWITCH<br>Belinda Mcclory | APOC<br>Julian Arahanga | MOUSE<br>Matt Doran |



Prior film    Movie Index    Next film



http://www.ozcraft.com/scifidu/matrix.html                              5/20/99



Case 2:18-cv-02351-JAD-GWF Document 1-1 Filed 12/12/18 Page 18 of 58

POSTAL SERVICE
BUSINESS

TRUCTIONS
ZIP Code in the space below.
, and 4 on the reverse.
if space permits,
of article.
Receipt Requested".

U.S. MAIL

PENALTY FOR PRIVATE USE, $300

URN
O

Ms Sofia Stewart #145
(Name of Sender)
3353 Fod Independence St
(Street or P.O. Box)
Bronx, NY 10463
(City, State, and ZIP Code)

UNITED STATES POSTAL SERVICE
OFFICIAL BUSINESS

SENDER INSTRUCTIONS
Print your name, address, and ZIP Code in the space below.
- Complete items 1, 2, 3, and 4 on the reverse.
- Attach to front of article if space permits, otherwise affix to back of article.
- Endorse article "Return Receipt Requested" adjacent to number.

U.S. MAIL

PENALTY FOR PRIVATE USE, $300

RETURN TO

Ester Duffie, Agent
(Name of Sender)
200 g Kenzy St.
(No. and Street, Apt., Suite, P.O. Box or R.D. No.)
San Angelo, Texas 76901
(City, State, and ZIP Code)
Suite 96

PURCHASER'S AGREEMENT:
You, the purchaser, agree to immediately complete this Money Order by filling in the front of the Money Order, signing, and addressing it at the bottom. The terms of this Money Order bind you, your heirs, or others who receive this Money Order from you.

SERVICE CHARGE:
If this Money Order is not used or cashed (presented for payment) within three (3) years of the purchase date, there will be a non-refundable service charge where permitted by law. The service charge will be deducted from the amount of payment shown on the Money Order. The service charge is twenty-five (25) cents per month from the date of purchase, but not more than twenty-one (21) dollars.

RESTRICTIONS ON USE:
The business or person selling this Money Order cannot use it to pay personal or business obligations.

LIMITED RECOURSE:
This Money Order will not be paid if it has been forged, altered, or stolen, and recourse is only against the endorser. This means that persons receiving this money order should accept it only from those known to them and against whom they have effective recourse.

Save This Receipt For Registered Mail Claims & Inquiries

DECLARATION OF VALUE—Mailers are required to declare the FULL value at the time of mailing on all registered mail articles, whether insurance is desired or not. Failure to declare full value may invalidate any claim.

INSURANCE—Domestic Postal insurance may be purchased by paying the appropriate fee. Domestic insurance on registered mail is limited to the lesser of (1) the value of the article at the time of mailing or the cost or replacement if lost or totally damaged, or (2) the cost of repairs. An article may also be sent by registered mail without postal insurance by paying the appropriate fee. No indemnity will be paid for articles mailed without Postal insurance coverage. Consult your postmaster for additional details of insurance limits and coverage for domestic and international registered mail.

FILING CLAIMS—Claim must be filed within 1 year from the date of mailing. Present this receipt and submit evidence of value, cost of repairs, or cost of duplication. The contents and packing must be presented when filing a claim for damage or loss of contents.

INTERNATIONAL REGISTERED MAIL—Indemnity coverage for International Registered Mail is limited. Consult postmaster for maximum indemnity limits.

PS Form 3806, July 1983 (Reverse Part 1)

Stick postage stamps to article to cover First-Class postage, certified mail fee, and charges for any selected optional services (See front).

1. If you want this receipt postmarked, stick the gummed stub to the right of the return address leaving the receipt attached, and present the article at a post office service window or hand it to your rural carrier (no extra charge).
2. If you do not want this receipt postmarked, stick the gummed stub to the right of the return address of the article, date, detach, and retain the receipt, and mail the article.
3. If you want a return receipt, write the certified mail number and your name and address on a return receipt card, Form 3811, and attach it to the front of the article by means of the gummed ends if space permits. Otherwise, affix to back of article. Endorse front of article RETURN RECEIPT REQUESTED adjacent to the number.
4. If you want delivery restricted to the addressee, or to an authorized agent of the addressee, endorse RESTRICTED DELIVERY on the front of the article.
5. Enter fees for the services requested in the appropriate spaces on the front of this receipt. If return receipt is requested, check the applicable blocks in item 1 of Form 3811.
6. Save this receipt and present it if you make an inquiry.

PS Form 3800, April 1995 (Reverse)

# Warner bros. Legal dept.

P.O.Box  165153 Salt Lake City, Ut.  84116
801  575-8387

April 9, 1999

4000  Warner Blvd.

Dear Sir or Madam:

I recently spoke with your office about the movie " *Matrix* " April 1, 1999. This movie is a unauthorized derivative work based on my book called *"Third Eye"*. I wrote this book in May 1981TXU 117-610 and added to it November 1983TXU154-231. Many producers, production companies, editors, lawyers comic-book illustrators had access to this material. I have a list of all people involved. I was attending USC ( University Of Southern California ) at the time. I own all rights to this book. Since  I never authorized you to do any work , it follows that you infringed upon my copyright by doing so.

This letter is to demand that you immediately cease and desist from selling or showing of this movie. In addition , I demand to be reasonably compensated for the use  of my book and all work that have been copied and sold. Please respond to this letter by May 13, 1999 .

Sincerely,

Sofia Stewart
Author/Writer

June 28, 1999

Andy & Larry Wachowski
Warner Brothers
4000 Warner Blvd.
Burbank, CA 91522

Re: ""The Third Eye"/"The Matrix"

Dear Sirs:

This letter is to inform you that I have given key evidence and the name of a witness to the
Federal Bureau of Investigations, on June 10, 1999, for criminal prosecution.

I have submitted my <u>original draft</u>, <u>illustrations</u> and <u>character analysis</u> pertaining to "The Third
Eye" to you to make into a comic book. I discovered years later that not only have you used my
<u>epic material</u> for the comic book "The Matrix," but you have also adapted from chapters,
illustrations, and characters of my published book (published November 23, 1983) into a
screenplay called "The Matrix."

I have contacted you numerous times asking you to pay for the stolen material and have not
received a reply from you. However, I have received several letters from Warner Brothers
asking for evidence to use against me as a cover-up. I have since discovered why. You leave me
with no choice in the matter. Since you have been living off of me, so to speak, for a number of
years now, I see no course other than to take this matter to the Federal authorities.

You have committed a white collar crime, (willful copyright infringement is a federal crime and
perjury a felony), a crime I feel would not have been discovered if you did not continue this
unauthorized activity.

Gentlemen, I will not let this matter go unresolved...you <u>will</u> pay me a <u>settlement</u> or <u>restitution</u>
for the stolen material. Either way, I will be paid for the work I have done. I have given you
every fair chance to comply and I am prepared to have you prosecuted to the fullest extent of the
law. This is a very serious matter; a federal investigation will uncover other activities. The FBI
took my information due to copyright thefts. Washington needs a "high profile case" to be made
an example of! I suggest you get some criminal lawyers if you do not intend to pay...Timing is
Everything!

Sincerely,

Sofia Stewart

P.O. Box 165153
Salt Lake City, UT 84116
(801) 575-8387



**TWENTIETH
CENTURY-FOX
PRODUCTIONS**

SUSAN MERZBACH
VICE PRESIDENT
CREATIVE AFFAIRS

June 1, 1981

Ms. Sofia Stewart
SOFIA STEWART PRODUCTIONS
256 South Robertson Blvd., Ste. 8180
Beverly Hills, CA.   90211

Re:   THIRD EYE by Sofia Stewart - TRE (6pp)

Dear Sofia,

Pursuant to your telephone conversation of this morning with
Susan Merzbach, I am enclosing the above-referenced material.

Many thanks.

Sincerely,

Kay Harrison

/kh
Enclosure

$Exh. 12.3$

BOX 900 BEVERLY HILLS CALIFORNIA 90213 | PHONE (213) 277-2211 | CABLE ADDRESS CENTFOX LOS ANGELES | TELEX 6-74875

A DIVISION OF TWENTIETH CENTURY-FOX FILM CORPORATION

Case 2:03-cv-02873-MMM-VBK Document 1 Filed 04/24/03 Page 39 of 64 Page ID #:39



**Columbia Pictures Industries, Inc.**

Richard Berres
Vice President
Director of Music

June 8, 1981

Sofia Stewart Productions
256 South Robertson Blvd.
Suite 8180
Beverly Hills, CA 90211

Dear Sofia,

Sorry for the delayed response -- have been in New York.
In looking closely at your outline, let me first say that
I'm not an expert whatsoever in determining what's commercially
viable for the networks. However, I will give you a personal
viewpoint and say that while your outline is interesting to
read, I believe that it is not "commercially viable".

In any event -- best wishes and good luck!

Cordially,

Dick Berres

DB:ds

Columbia Plaza, Burbank, California 91505 · 213-954-4045

June 10, 2001

James Cameron
Lightstorm Entertainment
919 Santa Monica Blvd.
Santa Monica, CA 90401-2704
( 310 ) 656-6100

Re: " Terminator "/ " The Matrix " / " The Third Eye "

Dear Mr. Cameron:

Just a few lines to inform you that your past have caught up with you! I have paper trail ( finance ) evidence and witness to this theft & fraud involving you and Fox Studios and a host of others ( knowing & not knowing in the 80's ) .

  I am now waiting for one last piece of key evidence and which I will receive shortly and then I shall go public with this scandal against Fox, you, Joel Silver, Washsoskis Brothers, and finally Warner Brothers! You are a big celebrity now and this scandal will surely hurt your name & reputation, because the media will eat this up. The FBI have been investigating my case since June of 1999 and have evidence and names in their files. I am sending you paper work to show you I am serious.

  Did Greg Gelfan inform you about any of this? As you can see by the letters I've enclosed . . . he has known about this for a while and has written me several letters. I have advised him that his silence is not going to make this go away. The only thing that will make this go away is to pay me for the use of my work. I do not want to hurt anyone's career, but I will if I have to! Arnold Schwarzenegger's career was made off of a lot of these stolen movies involving my Epic material!

Sofia Stewart

June 21, 2001

David Madden/producer
Paramount Studios
5451 Marathon St.
Los Angeles, CA. 90018

Re: " Terminator "/ " The Matrix "/ " The Third Eye "

Dear Mr. Madden:

My work was sent to you via Valarie Redd ( see the evidence enclosed )in the 80's when you were at Fox! Years later I discover my work is stolen and used to make a number of multi-million dollars hit movies in which I was never paid a dime for! I kept all the evidence over the many years , and I soon discovered other evidence , because I took my case to the FBI in June 10th, 1999, for an investigation. I was shocked and hurt to learn my work was used , and handsomely profited by so many Hollywood insiders!
Did you also get monies for your part in this? I would think so, because you had my work from 81'-85' , and no offer to pay me for my work came . . . instead I got a phone call from Fox telling me that the administration that was interested in doing my work was no longer with Fox, and now Fox wish me to send my work to them again , but this time through an agent that is with the Guild! I must admit then I was very young and naive . . . I knew very little about the ways of theft in the movie industry, but I've learnt a lot since. I want you to pay me for my work or suffers with the rest. I have enclosed certain documents to let you know that I am serious. You could also be a witness for the FBI's investigation and turn in the rest of the people involved. I am certain that some people is going to choose that in favor of other consequences. Your past have caught up with you and this matter is not going to go away until I am fully compensated for the use of my work. I like you to think it over and decide what part you want to play,

because soon you will be contacted by the FBI! I would like for you to be a witness against the other parties involved, and I want you to know I have evidence against all . . . I am waiting for one key piece of evidence, and then I shall bring my case forward to the media . . . that is if the FBI does not file charges first . . . they may not need you as a witness!

Sofia Stewart

P.O. Box 165153
Salt Lake City, Utah 84116
( 801 ) 220-0588

Ester Duffie, Agent
(915) 949-9208
2009 Raney
San Angelo, Texas    76901
Suite 96



3353 Ft. Independence Street
Riverdale, New York    10463
Suite 14S



August 18, 1984


Valrie Redd
David Madden Office
Twentieth Century-Fox Productions
Box 900
Beverly Hill, CA    90213


Re: Third Eye by Sofia Stewart-Manuscript


Dear Valrie,

Pursuant to your telephone conversation several months ago with Sofia Stewart,
I am enclosing the above-referenced material for your consideration.


Sincerely,


Ester Duffie

ED/jb

Enclosure



Verona Russell-Scales, Agent
(718) 287-8347
3353 Ft. Independence Street
Riverdale, New York   10463
Suite 14S


July 1, 1985


Lora Lee, Story Editor
Twentieth Century-Fox Productions
Box 900
Beverly Hill, CA   90213 .


Re: Third Eye by Sofia Stewart-Manuscript

Dear Ms. Lee:

In June 1981 Susan Merzbach read these six pages of a science fiction treatment
entitle "Third Eye" and liked what she had read ... so much in fact, that she
personally called up my client to see if there were anything more written about
the subject.  Unfortunately at the time my client was busy working on the
manuscript of her book which wasn't completed until the winter of 83.

After it's completion, she received a second phone call from Twentieth Century-
Fox but this time from a David Madden's Office via Valrie Redd etc. requesting
the finished product.

I submitted the manuscript on the behalf of my client August 23, 1984
(Register; Return Receipt), but never received a formal acknowledgment of
receipt!

As per conservation on June 17, 1985, between my client and the secretary
(Vivian) in your office I am re-submitting this manuscript for your
consideration.


Sincerely,


Verona Russell-Scales
      Agent


VR-S/jb


Enclosure

David G. Turcotte
Page 2



Regarding your question about the source of The Matrix, the answer is simple. There is no "source work" in the sense of some underlying work published in another medium. The film is based on an original screenplay, and the screenplay contains an original story created by its authors.

One other point is worth emphasizing here. In your letter, you state that a "simple denial" of liability "without supporting documentation" will not satisfy you or your client. That statement implies that we have the burden of proving that we did not copy your client's work. That is a legal theory that neither we nor any court will accept. On the contrary, your client must prove copying, and, as noted, we have seen no evidence that even suggests it.

As I hope Ms. Stewart will confirm, we have treated her claim seriously and respectfully. But based on everything we have seen to date, there is no merit in this claim. That leaves us no choice but to defend against it, and if necessary we are prepared to do so. We hope, however, that upon objective review of the evidence, you and Ms. Stewart may come to the conclusion that there is no basis here for legal action.

Sincerely,

Jeremy N. Williams

Enclosure

cc: Pamela Kirsh, John Schulman

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 178 of 207
Case 2:18-cv-02351-JAD-CWF Document 1-1 Filed 12/12/18 Page 29 of 58
Case 2:03-cv-02873-MMM-VBK Document 1 Filed 04/24/03 Page 42 of 64 Page ID #:42

# TWENTIETH CENTURY FOX FILM CORPORATION



July 10, 1985


Verona Russell-Scales
3353 Ft. Independence Street, Suite 14S
Riverdale, NY 10463


Dear Ms. Russell-Scales,

Thank you for your submission entitled, Third Eye, which I am returning.

While I understand that there was interest from Fox during a previous administration, I regret to inform you that Fox now is only allowed to accept submissions from agents who are signatory with the Writer's Guild of America. Unfortunately, we cannot make exceptions.

Thank you, however, for thinking of Fox. Much luck to you in the future.

Sincerely yours,

Lora Lee
Story Editor


encl.
LL/vcm

Twentieth Century Fox Film Corporation   P.O. Box 900   Beverly Hills, CA 90213   (213) 27
Cable Address  CENTFOX. LosAngeles   TELEX 6-74875

Yahoo! Mail - sophiastewart003@yahoo.com
Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 179 of 207
Document 1-1 Filed 12/12/18 Page 30 of 33

**YAHOO!** MAIL

**From:** Brownfhf@aol.com

**Date:** Wed, 22 Dec 2004 15:30:55 EST

**Subject:** terminator

**To:** sophiastewart003@yahoo.com

# Business Data for
# The Terminator (1984)

**FREE TRIAL!**
*IMDbPro.com offers representation listings for over 50,000 individuals, including actors, writers, and directors, as well as contact details for over 9,000 companies in the entertainment industry.*
*Click here for a free trial!*
**Budget** $6,400,000 (estimated)

**Opening Weekend** $4,020,663 (USA) (28 October 1984) (1,005 Screens)

**Gross** $9,780,393 (USA) (4 November 1984)
$4,020,663 (USA) (28 October 1984)
$36,900,000 (USA)
â,¬1,928,803 (Spain) (20 December 2002)
SEK 2,690,178 (Sweden)

**Weekend Gross** $4,219,463 (USA) (4 November 1984) (1,112 Screens)
$4,020,663 (USA) (28 October 1984) (1,005 Screens)

**Admissions** 3,005,355 (France)
1,212,966 (Spain) (20 December 2002)
80,259 (Sweden)

**Filming Dates** March 1984Â -Â June 1984

**Copyright Holder** Cinema '84, A Greenberg Brothers Partnership

**Print: May 16, 2011**                          **74063780**

**TYPED DRAWING**

**Serial Number**
74063780

**Status**
REGISTERED AND RENEWED

**Word Mark**
TERMINATOR

**Standard Character Mark**
No

**Registration Number**
1783506

**Date Registered**
1993/07/20

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
STUDIOCANAL, S.A. CORPORATION FRANCE 1 PLACE DU SPECTACLE ISSY
MOULINEAUX FRANCE 92130

**Name Change**
BY ASSIGNMENT, BY MERGER

**Original Owner**
CAROLCO PICTURES INC. CORPORATION Los Angeles CALIFORNIA 90069

**Goods/Services**
Class Status -- ACTIVE. IC 028. US 022 023 038 050. G & S:
] and playthings; namely, [ target games, kites ], toy action f
[ board games, card games, disc-type toss toys, toys, bows and
plush toys ], toy vehicles, [ toy cars, toy trucks, roller skat
toy model hobbycraft kits, [ toy rockets, toy guns, jigsaw puzz
toy figurines, [ puppets ], video and computer [ output ] games
First Use: 1991/07/04. First Use In Commerce: 1991/11/15.

**Filing Date**

**Sent:** Saturday, August 8, 2009 6:41 PM
**Subject:** ANDY DOC


Alan U. Schwartz
Tel. 310.586.6517
Fax 310.586.7800
schwartza@gtlaw.com
November 20, 2006
**VIA E-MAIL**


Andy Vajna
Mario Kassar
AGV Productions Inc.
2308 Broadway
Santa Monica, California 90404
Re:        The Terminator Franchise

Dear Andy:
On behalf of a financially responsible client we are authorized to advise you that they are prepared to make the following firm and final proposal to you and your relevant affiliates (collectively "AV/MK controlled entities") Kassar for the purchase of all rights in and to "The Terminator Franchise" owned and controlled by the AV/MK controlled entities.

1.        The rights in and to "The Terminator Franchise" which are owned and controlled by AV/MK controlled entities include without limitation the following rights:

        (a)        Remake rights in the first three Terminator films, namely "The Terminator," "Terminator II: Judgment Day" and "Terminator 3: Rise of the Machines";

        (b)        All rights to revenue streams from "Terminator 3: Rise of the Machines" including:
                i.        Producer's and other fees
                ii.       Ongoing revenues from video games
                iii.      Merchandising, publishing and other licensing revenues.

# Exh. 8

(c)     All ongoing revenues from new video and other interactive games including multi-player online games to be developed.

(d)     All derivative rights in and to the "Terminator" films including, without limitation, sequel, prequel, remake and television production rights to the "Terminator" films, including the screenplay for "Terminator 4"; Salvation written by John Brancato, Michael Ferris and Jonathan Mostow. We understand that you have developed "Terminator 4" to be the first picture of the next trilogy although there are no scripts for subsequent theatrical sequels.

(e)     Animated series for DVD (OVA) revenues. We understand that you have executed a memorandum of agreement (long form still to be negotiated with certain issues still outstanding) with Itochu Corp for the development and subsequent production of a approx $8M budget Original Video Animation (OVA) for release on DVD to exploit stand-alone stories within the "Terminator" mythology and that the initial 60 to 72 -minute OVA consisting of 5 to 7 individual stories is currently entitled "Termination."

(f)     Television series revenues. We understand that you have entered into an Option-Purchase Agreement and Executive Producer Agreement with **Warner Bros. Television** to develop a television series currently entitled "Terminator: The Sarah Connor Chronicles" for 20[th]Century Fox to broadcast. The pilot, which has a high seven-figure budget and goes into production on or about January 18, 2007 in New Mexico, has been written by Josh Friedman and directed by David Nutter. We understand that you have begun to internally develop two potential animated television series and intend to develop a live action television series after the final theatrical motion picture (e.g. similar to "Stargate: SG1").

(g)     All ongoing merchandising, licensing, brand integration and sponsorship revenues from the Terminator Franchise excluding only "The Terminator" and "Terminator II: Judgment Day" OVA and television productions.

2.     We understand that MGM, Warner Bros., Columbia/Tri-Star/Sony and Toho Towa have the following rights in connection with "Terminator 4", which our client will honor:

(a)     MGM has a first negotiation right for each of domestic and worldwide distribution rights to "Terminator 4."

Exh. 9

(b)      Warner Bros. and Sony Picture have a first negotiation right in second position to MGM for domestic distribution rights and international distribution rights, respectively, to "Terminator 4."

(c)      Behind MGM, Toho Towa has a first refusal right for Japanese distribution rights to "Terminator 4" (minimum guarantee of 10% of the final cost of the picture, 12.5% distribution fee, 75%/25% backend split in favor of producer after carve outs for residuals and gross participants up to 20% (inclusive of 5% to Owners) and TV series rights.

(d)      There is a book publishing option agreement with Tor Forge and other related merchandising 1st rights that are not material.

3. Video Games:  We understand that there are no current arrangements with respect to video games as the Atari option agreement was extinguished although preliminary conversations have taken place concerning both console and multi-player online games and there is a next generation platform game development proposal prepared by Stormfront.

4. We have been further advised that approximately $17M is U.S. dollars of income is forecasted to be due to be received by you for "Terminator 3" on an "ultimate" basis.  This revenue stream would be part of the rights purchase, as of course would be all additional ongoing revenue and we acknowledge that you are not guaranteeing or assuring us that such ultimate forecast will be achieved and accordingly, you shall not be required to make any guarantee, rep or warranty as to the realization of such ultimate forecast but such ultimate forecast shall be subject to our due diligence.

5. We have been advised that the script of "Terminator 4" has been written with a PG-13 rating in mind rather than the R-rating for "Terminator 3."

6. The full and complete purchase price for "The Terminator Franchise" will be $25M in U.S. dollars, which sum will be paid by wire transfer within one week after the satisfactory conclusion of the conditions set forth in Paragraph 7 below. You have notified us that you are requesting to be paid 10% of the MAGR from the "Terminator: The Sarah Connor Chronicles" spin offs, etc. We will consider your request in good faith and negotiations therefor will be part of the long form agreement.

# Exh. 10

7. This proposal is made to you subject to the following conditions:

(a) That you notify me in writing by 6 p.m. on Wednesday, November 22nd that you are in a position to proceed in the manner described in this letter;

(b) That I notify you in writing no later than 6 p.m. Tuesday, November 28th that our client has certified to **Greenberg Traurig, LLP** in writing that ready funds of $25M are in place to conclude this deal;

(c) That I provide you with a draft long form agreement no later than 6 p.m. Friday, December 1, 2006 that provides for an effective closing (and payment) date of January 10, 2007 subject only to our completion of the due diligence;

(d)

# Exh. 11

# FORM PA
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PAU    584-564

| PA | PAU |

EFFECTIVE DATE OF REGISTRATION

**FEB 03 1984**

Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**TITLE OF THIS WORK ▼**

TERMINATOR

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼** See instructions

Screenplay

---

**NAME OF AUTHOR ▼**    James Cameron

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____ USA _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☒ No
Pseudonymous?    ☐ Yes ☒ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
screenplay

**NAME OF AUTHOR ▼** Gale Anne Hurd as employee for hire of Pacific Western Productions

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of country
OR { Citizen of ▶ _____
Domiciled in ▶ _____ USA _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☒ No
Pseudonymous?    ☐ Yes ☒ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
screenplay

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

---

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1983    ◀ Year

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
▶ _____    ▶ _____    ▶ _____    ◀ Nation

---

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼

Hemdale Film Corp.
9255 Sunset Blvd.
Los Angeles, CA

APPLICATION RECEIVED
**03 FEB 1984**
ONE DEPOSIT RECEIVED
**03 FEB 1984**
TWO DEPOSITS RECEIVED

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼
J.Cameron assigned to Pacific Western Productions
and Pacific Western Productions assigned to Hemdale Film

REMITTANCE NUMBER AND DATE
**114898 FEB 384**

---

**MORE ON BACK ▶**
• Complete all applicable spaces (numbers 5-11) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of ____ pages

Exh 11

PAu 584-564

☐ DEPOSIT ACCOUNT
FUNDS USED

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

PREVIOUS REGISTRATION  Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

DERIVATIVE WORK OR COMPILATION  Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

DEPOSIT ACCOUNT  If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Account Number ▼

CORRESPONDENCE  Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼

Melaine Cook, Esq.
Cooper, Epstein & Hurewitz
9465 Wilshire Blvd. #800
Beverly Hills, CA 90212
Area Code & Telephone Number ▶  213-278-1111

Be sure to give your daytime phone number

CERTIFICATION*  I, the undersigned, hereby certify that I am the
☐ only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  **Hemdale Film Corp.**
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼  If this is a published work, this date must be the same as or later than the date of publication given in space 3.

Melaine Cook                                     date▶  _____ 3  1984

Handwritten signature (X) ▼
Melanie Cook

Exh.12

MAIL
TO

Name ▼
Hemdale Film Corp.
c/o Cooper, Epstein & Hurewitz
Number/Street/Apartment Number ▼
9465 Wilshire Blvd. #800
City/State/ZIP ▼
Beverly Hills, CA  90212

Have you:
• Completed all necessary spaces?
• Signed your application in space 8?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?

MAIL TO: Register of Copyrights
Library of Congress, Washington
DC 20559

Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

n:Roman Empire Inc. To:Sophia Stewart (17022423506)    15:37 12/30/09GMT-05 Pg 30-88    of 38 of 58

# Copyright Office of the United States

## THE LIBRARY OF CONGRESS

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-MENT WAS RECORDED IN THE COPYRIGHT OFFICE ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE

20Jun94

| | |
|---|---|
| 2998 | 506 |
| 2998 | 507 |

*Barbara Ringer*

Acting
Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**DOCUMENT COVER SHEET**
For Recordation of Documents
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION
(Assigned by Copyright Office)

|  | Month | Day | Year |
|---|---|---|---|

063341979

Volume 2998   Page 506

Volume 2998   Page 507

DO NOT WRITE ABOVE THIS LINE

REMITTANCE _____

## To the Register of Copyrights:
*Please record the accompanying original document or copy thereof.*

FUNDS RECEIVED _____

**1** NAME OF THE PARTY OR PARTIES TO THE DOCUMENT, AS THEY APPEAR IN THE DOCUMENT.

Party 1: Andy Wachowski
c/o Circle of Confusion   Title:
131 Country Village Lane
New Hyde Park, New York 11040   (Cont'd...)

Party 2: Warner Bros., a division of Time
Warner Entertainment Company, L.P.
4000 Warner Blvd.
Burbank,
CA 91522

**2** DESCRIPTION OF THE DOCUMENT:
- Transfer of Copyright
- Security Interest
- Change of Name of Owner
- Termination of Transfer(s) [Section 304]
- Shareware
- Life, Identity, Death Statement [Section 302]
- Transfer of Mask Works
- ☒ Other Assignment

**3** TITLE(S) OF WORK(S), REGISTRATION NUMBER(S), AUTHOR(S), AND OTHER INFORMATION TO IDENTIFY WORK.

Title: MATRIX

Registration Number

Author: Andy Wachowski and Larry Wachowski

Additional sheet(s) attached?
- yes
- no
If so, how many? _____

**4** ☐ Document is complete by its own terms
☐ Document is not complete. Record "as is"

**5** Number of titles in Document _____ 1

**6** Amount of fee enclosed or authorized to be charged to a Deposit Account _____ $20

**7** Account number ____ DA013544
Account name ____ Warner Bros.

**8** Date of execution and/or effective date of accompanying document ____ as of February 15, 1994

**9** AFFIRMATION:* I hereby affirm to the Copyright Office that the information given on this form is a true and correct representation of the accompanying document. This affirmation will not suffice as a certification of a photocopy signature on the document.

_____ (Irene Slade)
Signature
6/10/94
Date

**10** CERTIFICATION:* Complete this certification if a photocopy of the original signed document is submitted in lieu of a document bearing the actual signature.
I certify under penalty of perjury under the laws of the United States of America that the accompanying document is a true copy of the original document.

_____
Signature

_____
Duly Authorized Agent of

_____
Date

MAIL RECORDATION TO:
Name: Irene Slade
Warner Bros.
Number/Street/Apartment number: 4000 Warner Blvd., Rm. 253, Bldg. 3
City/State/ZIP: Burbank, CA 91522

Exh 16

05/13/2005  14:13   8182264044              MICHAEL STOLLER              PAGE  33/91

# THE MATRIX

Written by

Larry and Andy Wachowski

(

No portion of this script may be performed, reproduced,
or used by any means, or quoted or published in any
medium without the prior written consent of Warner Bros.

WARNER BROS.                          February 23, 1994
4000 Warner Boulevard                 © 1994
Burbank. California 91522             WARNER BROS.
                                      All Rights Reserved

48

Exh. 19

n:Roman Empire Inc. To:Sophia Stewart (17022423506)    15:37 12/30/09GMT-06 Pg 35-88
Nov 05 2008 12:43PM   HP LASERJET FAX

05/13/2015  14:13   6182254844          MICHAEL STOLLER              PAGE  36/91

THE MATRIX

Written by

Larry and Andy Wachowski

No portion of this script may be performed, reproduced,
or used by any means, or quoted or published in any
medium without the prior written consent of Warner Bros.

WARNER BROS.                          August 23, 1994
4000 Warner Boulevard                 © 1994
Burbank, California 91522             WARNER BROS.
                                      All Rights Reserved

47

Exh. 20

:Roman Empire Inc. To:Sophia Stewart (17022423506)

**ASSIGNMENT**

For valuable consideration, receipt of which is hereby acknowledged, the undersigned ANDY WACHOWSKI and LARRY WACHOWSKI (herein referred to jointly and severally as "Assignor"), whose address is c/o Circle of Confusion Limited, 131 Country Village Lane, New Hyde Park, New York 11040, Attention: Rajeev Agarwal, hereby sells, grants, and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P., (hereinafter referred to as "Assignee"), whose address is 4000 Warner Blvd., Burbank, California 91522, exclusively, in perpetuity and throughout the universe, all right, title and interest, including without limitation the entire copyright and all extensions and renewals thereof (but excluding comic book publishing rights and those rights reserved to a "professional writer" in connection with the sale of a screenplay to a signatory company under the 1992 Writers Guild of America Theatrical and Television Basic Agreement), in and to that certain work of authorship described as follows:

Title:   "MATRIX"

Written By:  ANDY WACHOWSKI and LARRY WACHOWSKI

Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters therein, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired.

Assignor and Assignee have entered into a formal agreement dated February 15, 1994, relating to the assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

The undersigned has executed this assignment effective as of February 15, 1994.

_____
ANDY WACHOWSKI

_____
LARRY WACHOWSKI

Exh. 17

Space 1 continued:


Party 1 continued:


Larry Wachowski
c/o Circle of Confusion Limited
131 Country Village Lane
New Hyde Park, New York 11040


Exh. 18


("MATRIX")



# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___1___ page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of

DEC 1 7 2008

DEBRA BOWEN
Secretary of State

Exh. 13

**1043898**

FILED
In the office of the Secretary of State
of the State of California

MAY 12 1981

MARCH FONG EU, Secretary of State

By _Carmelle M. Guy_
Deputy

ARTICLES OF INCORPORATION

OF

PACIFIC WESTERN PRODUCTIONS, INC.

I

The name of this corporation is PACIFIC WESTERN PRODUCTIONS, INC.

II

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business, or the practices of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in the State of California of this corporation's initial agent for service of process is:

James R. Miller, Esq.
2029 Century Park East
Suite 2500
Los Angeles, California 90067

IV

This corporation is authorized to issue one class of shares of stock; the total number of said shares is five hundred thousand (500,000).

Dated: 5/12/81



_____
(Signature of Incorporator)

_____
JAMES R. MILLER
(Typed Name of Incorporator)

I hereby declare that I am the person who executed the foregoing Articles of Incorporation, which execution is my act and deed.

_____
JAMES R. MILLER

EXL. 14

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 495 of 207

:Roman Empire Inc. To:Sophia Stewart (17022423506)                16:09 12/30/09GMT-06 Pg 23-88                Page 46 of 58

Fw: Corporate Misconduct – 'AT&T Yahoo! Mail'                                           Page 2 of 2

Similarly, as to Hemdale Film Corporation, the name and addresses of the officers and their addresses that apply to the period between the aforementioned period of time.

| Corporation | | |
|---|---|---|
| PACIFIC WESTERN PRODUCTIONS, INC. | | |
| Number: C1043898 | Date Filed: 5/12/1981 | Status: active |
| Jurisdiction: California | | |
| Address | | |
| 70 N RAYMOND AVE STE 201. | | |
| PASADENA, CA 91103 | | |
| Agent for Service of Process | | |
| JULIE A THOMSON | | |
| 70 N RAYMOND AVE STE 201 | | |
| PASADENA, CA 91103 | | |

Don't pick lemons.
See all the new 2007 cars at Yahoo! Autos.

Exh. 14.1

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 196 of 207

n:Roman Empire Inc. To:Sophia Stewart (17022423506)          16:09 12/30/09 GMT-05 Pg 24-58          Page 3 of 6

Fw: Historical Notes – PWP – 'AT&T Yahoo! Mail'

The name of this corporation is PACIFIC WESTERN PRODUCTIONS, INC.

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may

The name and address in the State of California of this corporation's initial agent for service of proces

    James R. Miller, Esq.
    2029 Century Park East
    Suite 2500
    Los Angeles , California  90067

This corporation is authorized to issue one class of shares of stock; the total number of said shares is fi

Dated: 5/12/81

                    ___James R. Miller_____
                    Signature of Incorporator

I hereby declare that I am the person who executed the foregoing Articles of Incorporation, which exe

                /s/  James R. Miller

Exh. 14.3

n:Roman Empire Inc. To:Sophia Stewart (17022423566) GWF Document 3-1-1 Filed 12/12/18 16:09 12/30/09 GMT-05 Pg 25-66 Page 48 of 58

Fw: Historical Notes – PWP – 'AT&T Yahoo! Mail'

Page 4 of 6

DAVID GALE AND JULIE THOMSON certify that:

1. They are the President and Secretary, respectively, of Pacific Western Productions, Inc., a Calif
2. The articles of incorporation of this corporation are hereby amended to add a new Article V rea

"The *liability of the directors* of the corporation for monetary damages shall be *eliminated to*

3. The foregoing amendment of the articles of incorporation has been duly approved by the board
4. The foregoing amendment of articles of incorporation has been duly approved by the required v amendment equaled or exceeded the vote required. The percentage vote required was more than

We further declare under penalty of perjury under the laws of the State of California that the matte

Date: **March 25, 1992.**

David Gale  -  President

Julie Thomson – Secretary

**James R Miller - #69920**

**Current Status: Not eligible to practice law (Not Entitled)**

See below for more details.
**Profile Information**

| Bar Number | 69920 |
|---|---|
| Address | 9460 Wilshire Blvd #600 Beverly Hills, CA 90212-2719 |

Exh. 14.4

Case 2:18-cv-02351-GMN-EJY Document 3-1 Filed 12/12/18 Page 198 of 207

ı:Roman Empire Inc. To:Sophia Stewart (17022428556)
Fw: Historical Notes – PWP – 'AT&T Yahoo! Mail'

Page 5 of 6

| District | District 7 |
|---|---|
| County | Los Angeles |
| Sections | None . |

**Status History**

| Effective Date |  |
|---|---|
| *Present* | |
| 9/16/2003 | |
| 1/4/2001 | |
| 1/1/1996 | |
| 12/9/1976 | |

Miller had been in practice from 1976 through 1981 when he got the request to form Pacific Weste

The current lawyer affiliated with the management of PWP is Gale. He is listed as inactive. It is interesting t

"The *liability of the directors* of the corporation for monetary damages shall be *eliminated*

## David Marc Gale - #155713

**Current Status: Inactive**

This member is inactive, but is eligible to become active.
See below for more details.

**Profile Information**

| Bar Number | 155713 | | |
|---|---|---|---|
| Address | MTV Films 5555 Melrose Ave MOD213 Los Angeles , CA 90038-3149 | Phone Number | (323) 956-4390 |
| | | Fax Number | (323) 862-1386 |
| | | e-mail | dpjul@bjnpoep.comfytn@lqscl.cometlqrtge@frr.comfsrrcgl@osuuem‹ |
| District | District 7 | Undergraduate School | Stanford Univ; Stanford CA |
| County | Los Angeles | Law School | New York Univ SOL; New York NY |
| Sections | None | | |

**Status History**

| Effective Date |  |
|---|---|
| *Present* | |
| 1/1/1992 | |
| 12/16/1991 | |

Exh. 14.5



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

February 12, 2014

Ms. Sophia Stewart
Post Office Box 31725
Las Vegas, NV 89173

Dear Ms. Stewart:

This letter is in response to the correspondence
you mailed to the FBI in which you allege your rights were violated
by the courts in Utah.

I have forwarded your correspondence to our Salt Lake City
Division for review and appropriate action. Please direct any
further concerns to that division, located at 5425 West Amelia
Earhart Drive, Salt Lake City, UT 84116.

Sincerely yours,

Matthew W. Drake
Chief, Civil Rights Unit
Criminal Investigative Division

EXH 1

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

767 Headquarters
Pacific Force
935 Pennsylvania Ave. NW
Washington, D.C. 20535-0001

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent ☐ Addressee
B. Received by ( Printed Name )    C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7012 0470 0001 9274 0239

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540



From the Desk Of:

# ASAC WILLIAM H. DUFF
*WHITE COLLAR CRIME BRANCH*
*DIVISION 2 - BRANCH "2"*
*X2802*

DATE __7/6/01__

\_\_ CSSA

\_\_ ADIC MAWN

\_\_ SAC \_\_\_\_

\_\_ SAC CORDIER

\_\_ A/SAC\_\_\_\_

\_\_ ASAC\_\_\_\_

\_\_ CDC\_\_\_\_

\_\_ \_\_\_\_\_

\_\_ SSA (C-1)
\_\_ SSA (C-2)
\_\_ SSA (C-3)
\_\_ SSA (C-4)
\_\_ SSA (C-8)
\_\_ SSA (C-12)
\_\_ SSA (C-14)
\_\_ SSRA (C-21)
\_\_ SSA (C-28)
\_\_ SSA (C-33)
\_\_ SSA (C-35)
\_\_ SSA (C-37)

b6
b7C

b6
b7C

RE:_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\_\_ Please Expedite          \_\_ For Info.                \_\_ Please Handle
\_\_ For Approval             \_\_ Please See Me            \_\_ See Attached

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Looks like a 295 E case.

EXH 13

# CERTIFICATE OF COPYRIGHT REGISTRATION

**FORM TX**
UNITED STATES COPYRIGHT OFFICE

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

REGISTRATION NUMBER

TXu 154-281

TX    TXU

EFFECTIVE DATE OF REGISTRATION

2    6    84
Month    Day    Year

*Nina Ladd*

**REGISTER OF COPYRIGHTS**
United States of America

OFFICIAL SEAL

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** TITLE OF THIS WORK ▼

*THIRD EYE (Add-on Manuscript)*

PREVIOUS OR ALTERNATIVE TITLES ▼  *THIRD EYE (Treatment) 6 Pgs.*

PUBLICATION AS A CONTRIBUTION  If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

---

**2** NAME OF AUTHOR ▼

**a**  *Sofia M. Stewart (Jerra Kayala Pseudonym)*

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

AUTHOR'S NATIONALITY OR DOMICILE  Name of Country
OR { Citizen of ▶ *United States*
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☑ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼
*ENTIRE TEXT*

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE  Name of country
OR { Citizen of ▶
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE  Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

---

**3** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED  This information must be given in all cases.
*1983* ◄ Year

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK  Complete this information ONLY if this work has been published.
Month ▶    Day ▶    Year ▶    ◄ Nation

---

**4** COPYRIGHT CLAIMANT(S)  Name and address must be given even if the claimant is the same as the author given in space 2.▼
*Sofia Stewart*
*3353 40 ? Independence ch*
*Riverdale, N.Y. 10463*

APPLICATION RECEIVED
*06 FEB 1984*
ONE DEPOSIT RECEIVED
*11/28/83*
TWO DEPOSITS RECEIVED

TRANSFER If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.▼

REMITTANCE NUMBER AND DATE
*117024 FEB 6R4*

*Ex# 4*

117

EXAMINED BY  IHG

CHECKED BY

☐ CORRESPONDENCE
☐ Yes

☐ DEPOSIT ACCOUNT
☐ FUNDS USED

FOR COPYRIGHT OFFICE USE ONLY

FORM TX

TXu    154-281

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5** **PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☑ Yes ☐ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

☐ This is the first published edition of a work previously registered in unpublished form.

☐ This is the first application submitted by this author as copyright claimant.

☑ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼     Year of Registration ▼
# TXu 117-610     1983

**6** **DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼
Third Eye (Treatment)

b. Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼
a.) the narrative plus 8 brief Chapters
b.) the Preface and also illustrations . Introductions

See instructions before completing this space.

**7** **MANUFACTURERS AND LOCATIONS** If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.
Names of Manufacturers ▼     Places of Manufacture ▼

**8** **REPRODUCTION FOR USE OF BLIND OR PHYSICALLY HANDICAPPED INDIVIDUALS** A signature on this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.
a ☐ Copies and Phonorecords     b ☐ Copies Only     c ☐ Phonorecords Only

See instructions.

**9** **DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼     Account Number ▼

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
Ms. Sofia Stewart
3353 Fort Independence St.
Riverdale, N.Y. 10463
Area Code & Telephone Number ▶ (212) 287-8347 N (915) 653-2731

Be sure to give your daytime phone ◀ number

**10** **CERTIFICATION** I, the undersigned, hereby certify that I am the
Check one ▶
☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.
Mo. Sofia M. Metall se Stewart     date ▶ Jan. 30, 1984

Handwritten signature (X) ▼

**11** MAIL CERTIFICATE TO
Name ▼
Ms. Sofia M. Metall Stewart
Number/Street/Apartment Number ▼
3353 Fort Independence St. Apt. 145
City/State/ZIP ▼
Riverdale, N.Y. 10463

Certificate will be mailed in window envelope

Have you:
• Completed all necessary spaces?
• Signed your application in space 10?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?

MAIL TO: Register of Copyrights, Library of Congress, Washington, D.C. 20559.

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Sept. 1982—500,000

EXH 4

118

CERTIFICATE OF COPYRIGHT REGISTRATION

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*Dnia Ladd*

REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

**FORM TX**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TXu    117-610

| TX | TXU |

EFFECTIVE DATE OF REGISTRATION

Feb    2    1983

Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1** TITLE OF THIS WORK ▼

*Third Eye*

PREVIOUS OR ALTERNATIVE TITLES ▼

*NONE*

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

*NONE*

If published in a periodical or serial give: Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

*NONE*

**2** NAME OF AUTHOR ▼

**a** *Sofia Stewart*

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ *United States*
Domiciled in ▶ *United States*

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☒ No
Pseudonymous?    ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼

*Original Treatment for Motion Pictures ( Entire Text- (Story)*

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**3** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
*May 1, 1981* ◀ Year

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶    Day ▶    Year ▶
◀ Nation

**4** COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

*Sofia Stewart*
*3353 Fort Independence St. Apt 145*
*Bronx, N.Y.- 10463*

APPLICATION RECEIVED
02 FEB 1983
ONE DEPOSIT RECEIVED
02 FEB 1983
TWO DEPOSITS RECEIVED

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 are different from the author(s)

*EXH 3*

EXAMINED BY

CHECKED BY

FORM TX

TXu    117-610

☐ CORRESPONDENCE
Yes

☐ DEPOSIT ACCOUNT
FUNDS USED

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☒ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material. Identify any preexisting work or works that this work is based on or incorporates. ▼

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions before completing this space.

**MANUFACTURERS AND LOCATIONS** If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.
Names of Manufacturers ▼          Places of Manufacture ▼

**7**

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY HANDICAPPED INDIVIDUALS** A signature on this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.
a ☒ Copies and Phonorecords          b ☐ Copies Only          c ☐ Phonorecords Only

**8**

See instructions.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼          Account Number ▼

**9**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Sofia Stewart
3353 Fort Independence St. Apt 145
Bronx N.Y. 10463
Area Code & Telephone Number ▶ (212) 543-4505

Be sure to give your daytime phone number

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check one ▶
☐ author
☐ other copyright claimant
☒ owner of exclusive right(s)
☐ authorized agent of _____
name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

**10**

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.

Third Eye          date ▶ May 1, 1981

Handwritten signature (X) ▼
Mo. Sofia Stewart

**MAIL CERTIFICATE TO**
Name ▼
Ms. Sofia Stewart
Number/Street/Apartment Number ▼          Apt 145
3353 Fort Independence St.
City/State/ZIP ▼
Bronx, N.Y. 10463

Certificate will be mailed in window envelope

Have you:
• Completed all necessary spaces?
• Signed your application in space 10?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?
MAIL TO: Register of Copyrights, Library of Congress, Washington, D.C. 20559.

**11**

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in

*EX H3*

116

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number**

## PAu 3-478-780

**Effective date of
registration:**

July 20, 2010

## Title

**Title of Work:** Matrix 4: The Evolution Cracking The Genetic Codes

**Nature of Work:** Movie Treatment, Synopsis, 4D Movie Attraction and Hologram Clones -
New Machines

## Completion/Publication

**Year of Completion:** 2000

## Author

**Author:** Sophia Stewart

**Author Created:** Treatment, Synopsis, 4D Hologram Clones - New Machine

**Work made for hire:** No

**Citizen of:** United States

**Anonymous:** No                          **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** Sophia Stewart

P.O. Box 31725, Las Vegas, NV, 89173

## Limitation of copyright claim

**Previously registered:** No

**Basis of current registration:** This is the first application submitted by this author as claimant.

## Certification

**Name:** Sophia Stewart

**Date:** July 15, 2010

*EXH 5*

Page 1 of 1

